No. 23-13914
*(consolidated with Nos. 23-13916 & 23-13921)*

# In the
# United States Court of Appeals
# for the Eleventh Circuit

Alpha Phi Alpha Fraternity, Inc., et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05337 — Steve C. Jones, *Judge*

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

No. 23-13916
*(consolidated with Nos. 23-13914 & 23-13921)*

# In the
# United States Court of Appeals
## for the Eleventh Circuit

Coakley Pendergrass, et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05339 — Steve C. Jones, *Judge*

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

No. 23-13921
*(consolidated with Nos. 23-13914 & 23-13916)*

# In the
# United States Court of Appeals
# for the Eleventh Circuit

Annie Lois Grant, et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:22-cv-00122 — Steve C. Jones, *Judge*

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
 *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
 *Attorney General of Georgia*
Stephen J. Petrany
 *Solicitor General*
Paul R. Draper
 *Deputy Solicitor General*

Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Albert M. Pearson LLC, Counsel for Amicus;

Allensworth, Robert M., Attempted Amicus;

Alpha Phi Alpha Fraternity, Inc., *APA* Plaintiff;

Adegbile, Debo, Counsel for *APA* Plaintiffs;

Allen, De'Ericka, Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation, Inc., Counsel for Plaintiffs;

Arbuthnot, Jacqueline Faye, *Grant* Plaintiff;

Bokat-Lindell, Noah B., Counsel for Intervenor U.S. Department of Justice;

Boone, Robert, Counsel for *APA* Plaintiffs;

Bowles, Jasmine, Amicus;

Boyle, Jr., Donald P., Counsel for Defendant;

Brown, Phil, *APA* Plaintiff;

Brown, Theron, *Grant* Plaintiff;

Bush, Jacquelyn, *Grant* Plaintiff;

Calvo-Friedman, Jennessa, Former Counsel for *APA* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Carr, Christopher M., Counsel for Defendant;

Cheung, Ming, Counsel for *APA* Plaintiffs;

Common Cause, Amicus;

Conner, Mary Nell, *Grant* Plaintiff;

Crowell & Moring LLP, Counsel for Amicus;

Data, Sonika, Counsel for *APA* Plaintiffs;

Draper, Paul, Counsel for Defendant;

Georgia Department of Law, Counsel for Defendant;

Davis, Alexander S., Counsel for Amicus;

Dechert LLP, Counsel for Amicus;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Dixit, Anuj, Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Duffey, Jr., William S., Former Defendant in *Grant* and
    *Pendergrass*;

Election Law Clinic at Harvard Law School, Amicus;

Elias Law Group LLP, Counsel for *Grant* and *Pendergrass*
    Plaintiffs;

Fair Districts GA, Amicus;

Flynn, Erin H., Counsel for Intervenor;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Ford, Christina Ashley, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Freeman, Daniel J., Counsel for Intervenor;

GALEO Latino Community Development Fund, Inc., Amicus;

Garabadu, Rahul, Former Counsel for *APA* Plaintiffs;

Geaghan-Breiner, Charlotte, Counsel for *APA* Plaintiffs;

Genberg, Jack, Counsel for Amicus;

Georgia Coalition for the People's Agenda, Amicus;

Georgia State Conference of the NAACP, Amicus;

Ghazal, Sara Tindall, Former Defendant in *Grant* and *Pendergrass*;

Glaze, Ojuan, *Pendergrass* Plaintiff;

Glenn, Katie Bailey, *APA* Plaintiff;

Grant, Annie Lois, *Grant* Plaintiff;

Graves, Cheryl, Amicus;

Greenbaum, Jon, Counsel for Amicus;

Greenwood, Ruth M., Counsel for Amicus;

Hamilton, Kevin J., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Harrison, Keith, Counsel for Amicus;

Hawley, Jonathan Patrick, Counsel for *Grant* and *Pendergrass* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Heard, Bradley E., Counsel for Amicus;

Heaven, Astor H.L., Counsel for Amicus;

Hennington, Elliott, *Pendergrass* Plaintiff;

Hessel, Daniel J., Counsel for Amicus;

Houk, Julie M., Counsel for Amicus;

Howell, Quentin T., *Grant* Plaintiff;

Isaacson, Cory, Counsel for *APA* Plaintiffs;

Ivey, Marvis McDaniel, Amicus;

Jacoutot, Bryan F., Counsel for Defendant;

Jackson, Toni Michelle, Counsel for Amicus;

James, Triana Arnold, *Grant* and *Pendergrass* Plaintiff;

Jamieson, Nathan, Counsel for Amicus;

Johnston, Janice W., Former Defendant in *Grant* and
    *Pendergrass*;

Jones, Michael Brandon, Counsel for *Grant* and *Pendergrass*
    Plaintiffs;

Jones, Steve C., Judge, U.S. District Court, Northern District of
    Georgia;

Kastorf Law LLP, Counsel for Amicus;

Kastorf, Kurt, Counsel for Amicus;

Khanna, Abha, Counsel for *Grant* and *Pendergrass* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Kim, Eliot, Former Counsel for *APA* Plaintiffs;

Kim, Taeyoung, Counsel for *APA* Plaintiffs;

Krevolin & Horst LLC, Counsel for *Grant* and *Pendergrass*
Plaintiffs;

Lakin, Sophia Lin, Counsel for *APA* Plaintiffs;

LaRoss, Diane F., Counsel for Defendant;

Lawyers' Committee for Civil Rights Under Law, Counsel for
Amicus;

Le, Anh, Former Defendant in *Grant* and *Pendergrass*;

League of Women Voters of Georgia, Amicus;

Lee, Theresa J., Counsel for Amicus;

Lewis, Joyce Gist, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lindsey, Edward, Former Defendant in *Grant* and *Pendergrass*;

Love-Olivo, Cassandra Nicole, Counsel for Amicus;

Mashburn, Matthew, Former Defendant in *Grant* and
*Pendergrass*;

May, Caitlyn Felt, Counsel for *APA* Plaintiffs;

McGowan, Charlene, Former Counsel for Defendant;

Miller, Alex W., Counsel for *APA* Plaintiffs;

Miller, Kelsey A., Counsel for *APA* Plaintiffs;

Mitchell, Cassandra, Counsel for *APA* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

O'Donnell, Courtney, Counsel for Amicus;

Osher, Daniel C., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Paradise, Loree Anne, Former Counsel for Defendant;

Pearson, III, Albert Matthews, Counsel for Amicus;

Pendergrass, Coakley, *Pendergrass* Plaintiff;

Perkins Coie LLP, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Perkins, Brianne, Amicus;

Petrany, Stephen J., Solicitor General, Counsel for Defendant;

Raffensperger, Brad, Defendant in his official capacity as Secretary of State of Georgia;

Reynolds, Garrett, *Grant* Plaintiff;

Richards, Roberts, *Pendergrass* Plaintiff;

Rollins-Boyd, David, Counsel for Amicus;

Rosenberg, Ezra D., Counsel for Amicus;

Rueckert, Jens, *Pendergrass* Plaintiff;

Ruiz Toro, Juan M., Counsel for *APA* Plaintiffs;

Rutahindurwa, Makeba, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Savitsky, Ari J., Counsel for *APA* Plaintiffs;

Shaw, Abigail, Former Counsel for *APA* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Sivaram, Anuradha, Former Counsel for *APA* Plaintiffs;

Sixth District of the African Methodist Episcopal Church, *APA* Plaintiff;

Solomon, Elbert, *Grant* Plaintiff;

Southern Poverty Law Center, Counsel for Amicus;

Sparks, Adam M., Counsel for *Grant* and *Pendergrass* Plaintiffs;

Smith, Casey Katherine, Counsel for *APA* Plaintiffs;

Steiner, Neil, Counsel for Amicus;

Stewart, Janice, *APA* Plaintiff;

Stewart, Michael Elliot, Counsel for Intervenor;

Strickland, Frank B., Counsel for Defendant;

Sullivan, Rebecca N., Former Defendant in *Grant* and *Pendergrass*;

Sykes, Eunice, *Grant* Plaintiff;

Taylor English Duma LLP, Counsel for Defendant;

Thomas, Ursula, Amicus;

Tolbert, Elroy, *Grant* Plaintiff;

Tsai, Denise, Counsel for *APA* Plaintiffs;

Tyson, Bryan P., Counsel for Defendant;

United States Department of Justice, Intervenor;

Varghese, George P., Counsel for *APA* Plaintiffs;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Vaughan, Elizabeth Marie Wilson, Former Counsel for Defendant;

Webb, Bryan K., Counsel for Defendant;

Weigel, Daniel H., Counsel for Defendant;

Weitzman, Samuel, Former Counsel for *APA* Plaintiffs;

White, Graham, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Willard, Russell D., Counsel for Defendant;

Williams, Ayana, Former Counsel for *APA* Plaintiffs;

Williams, H. Benjamin, Amicus;

Williams, Edward Henderson, Counsel for *APA* Plaintiffs;

Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for *APA* Plaintiffs;

Wimbish, Dexter, *Grant* Plaintiff;

Woods, Eric T., *APA* Plaintiff;

Young, Sean Jengwei, Former Counsel for *APA* Plaintiffs;

Zabel, Joseph D., Former Counsel for *APA* Plaintiffs.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary requests oral argument. The record and legal issues are extensive and oral argument could help the Court in resolving the appeals.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ................................................................. iv

Jurisdiction............................................................................. x

Statement of Issues................................................................. 1

Introduction........................................................................... 2

Statement of the Case.............................................................. 5

    A. Factual Background ......................................................... 5

        1. Georgia electoral information. ........................................ 5

        2. The 2021 redistricting process........................................ 7

    B. Proceedings Below.......................................................... 8

    C. Standard of Review ........................................................ 14

Summary of Argument ............................................................ 14

Argument............................................................................... 18

    I. Plaintiffs failed to prove a § 2 violation. ............................ 18

        A. Plaintiffs did not prove that they have lesser
            opportunity "on account of race."................................... 19

            1. To prove vote dilution "on account of race," Plaintiffs
               must show racial, not partisan, bloc voting............. 21

            2. The evidence here shows ordinary partisanship, not
               racial bloc voting. ..................................................... 29

        B. Black voters enjoy equal opportunity and broad success
            in Georgia elections. ...................................................... 35

II. The district court's race-based remedy is not justified by
present-day circumstances. .................................................. 43

   A. Prophylactic legislation must reflect current conditions,
but Congress has not updated § 2 in half a century. .... 44

   B. In any event, political conditions today no longer justify
§ 2's racialized remedy. .................................................. 52

III. There is no private cause of action to enforce § 2. ............. 57

   A. The Act's text and structure show that Congress did not
create a private cause of action. .................................... 58

   B. The district court's arguments to the contrary are
unavailing. ...................................................................... 61

Conclusion ..................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S. Ct. 2485 (2021) .................................................. 61

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................... 58, 60

*Allen v. Cooper*,
140 S. Ct. 994 (2020) ............................................. 46, 51

*Allen v. Milligan*,
599 U.S. 1 (2023) .............................. 17, 43, 45, 47, 50

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
86 F.4th 1204 (8th Cir. 2023).......................... 57, 61-63

*Baird v. Consol. City of Indianapolis*,
976 F.2d 357 (7th Cir. 1992) ........................................ 3

*Board of Trustees v. Garrett*,
531 U.S. 356 (2001) ..................................................... 51

*Bolden v. City of Mobile*,
423 F. Supp. 384 (S.D. Ala. 1976)............................ 24-25, 34, 38

*Bolden v. City of Mobile*,
571 F.2d 238 (5th Cir. 1978) ..................................... 25

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) .................................. 2, 40-41, 53, 57, 62

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ..................................................... 59

iv

*City of Boerne v. Flores,*
521 U.S. 507 (1997) .............................................. 16, 43, 45-46, 48

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ........................................ 19, 22, 24-25, 36, 44

*City of Rome v. United States,*
446 U.S. 156 (1980) ...................................................... 4, 16, 44

*Clarke v. City of Cincinnati,*
40 F.3d 807 (6th Cir. 1994) ...................................................... 27

*Cooper v. Harris,*
137 S. Ct. 1455 (2017) ............................................................. 35

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008) ................................................................. 36

*Egbert v. Boule,*
596 U.S. 482 (2022) ................................................................. 59

*Gonzalez v. City of Aurora,*
535 F.3d 594 (7th Cir. 2008) .............................................. 15, 34

*Goosby v. Town Bd. of Hempstead,*
180 F.3d 476 (2d Cir. 1999)................................................ 27, 33

*Greater Birmingham Ministries v. Sec'y of Ala.,*
992 F.3d 1299 (11th Cir. 2021) .................................... 21, 44, 50

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ................................................................. 27

*Grutter v. Bollinger,*
539 U.S. 306 (2003) ................................................................. 56

*Holder v. Hall,*
512 U.S. 874 (1994) ................................................................. 20

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ..................................................... 58

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ....................................... 3, 22, 43

*Krahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*,
    489 U.S. 527 (1989) ..................................................... 59

*League of United Latin Am. Citizens, Council No. 4434*
    *v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ................................... 4, 27, 31, 33

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ................................... 14, 21, 39, 44

*Marks v. United States*,
    430 U.S. 188 (1977) ..................................................... 28

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) ..................................................... 60

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) ....................................... 58, 62-63

*Nat'l Ass'n of the Deaf v. Florida*,
    980 F.3d 763 (11th Cir. 2020) ............................... 46, 57

*Nev. Dep't of Hum. Res. v. Hibbs*,
    538 U.S. 721 (2003) ............................... 19-20, 46, 51

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) ................................... 27

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ............................... 16-17, 47, 52

*Rapanos v. United States*,
    547 U.S. 715 (2006) ..................................................... 61

*Roberts v. City of Shreveport,*
397 F.3d 287 (5th Cir. 2005) ..................................................... 37

*Rucho v. Common Cause,*
139 S. Ct. 2484 (2019) ............................................................. 20

*Shaw v. Reno,*
509 U.S. 630 (1993) .................................................................. 56

*Shelby County v. Holder,*
570 U.S. 529 (2013) ..................... 17, 43, 47-49, 51-52, 54, 56, 60

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) .................................................................. 48

*Students for Fair Admissions, Inc. v. President &
Fellows of Harvard Coll.,*
600 U.S. 181 (2023) ............................................................. 55-57

*Thornburg v. Gingles,*
478 U.S. 30 (1986) .. 3, 10, 14-15, 18, 20, 22-24, 28, 31, 33, 35, 41

*United States v. Marengo Cnty. Comm'n,*
731 F.2d 1546 (11th Cir. 1984) ................................................. 36

*Uno v. City of Holyoke,*
72 F.3d 973 (1st Cir. 1995)...................................... 15, 26-27, 31

*Veasey v. Abbott,*
830 F.3d 216 (5th Cir. 2016) ............................................. 38, 50

*Whitcomb v. Chavis,*
403 U.S. 124 (1971) ............................................................. 3, 24

*White v. Regester,*
412 U.S. 755 (1973) ............................................................. 3, 18

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) .................................................................. 64

*In re Wild*,
994 F.3d 1244 (11th Cir. 2021) ........................................... 59, 63

*Wis. Legislature v. Wis. Elections Comm'n*,
595 U.S. 398 (2022) ................................................................. 47

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
979 F.3d 1282 (11th Cir. 2020) ................................................ 26

**Statutes, Legislation, and Constitutional Provisions**

52 U.S.C. § 10301 ............... 4, 15, 18-19, 21-22, 26, 34-35, 42, 44, 58

52 U.S.C. § 10302 ................................................................. 60, 63

52 U.S.C. § 10308 ................................................................. 60, 63

52 U.S.C. § 10310 ....................................................................... 60

Ga. Congressional Redistricting Act of 2023, § 2, S.B.
3EX, Gen. Assemb. Spec. Sess. (Ga. 2023) ............................... 13

Ga. House of Representatives Redistricting Act of 2023,
§ 2, H.B. 1EX, Gen. Assemb. Spec. Sess. (Ga. 2023) ................ 13

Ga. Senate Redistricting Act of 2023, § 2, S.B. 1EX,
Gen. Assemb. Spec. Sess. (Ga. 2023) ....................................... 13

Pub. L. 89-110, § 2, 79 Stat. 437 (1965) ...................................... 50

Pub. L. 97-205, § 3, 96 Stat. 131 (1982) ...................................... 50

U.S. Const. amend. XV ................................................................ 44

**Other Authorities**

Dep't of Commerce, Census Bureau, *Reported Voting
and Registration of the Total Voting-Age Population,
by Sex, Race and Hispanic Origin, for States:
November 2022* (Table 4b)........................................................ 52

Ga. Sec'y of State, *Data Hub – November 8, 2022*
  *General Election* .......................................................... 39

H.R. Rep. No. 109-478 (2006) .................................... 52-53

Model Penal Code § 2.02 ................................................. 28

Model Penal Code § 2.03 ................................................. 28

Restatement (Second) of Torts § 8A ............................. 28

Restatement (Second) of Torts § 9 ................................. 28

S.Rep. No. 97-417 (1982) ......................................... 19, 23

# JURISDICTION

Plaintiff-Appellees, in three separate actions, sued the Georgia Secretary of State under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court considered all three cases in one "coordinated" trial and entered a single final decision on October 26, 2023. *See* Docs. 224 & 333, No. 1:21-cv-05337; Docs. 169 & 286, No. 1:21-cv-05339; Docs. 185 & 294, No. 1:22-cv-00122.

The Secretary filed timely notices of appeal on November 22, 2023. *See* Doc. 341, No. 1:21-cv-05337; Doc. 302, No. 1:21-cv-05339; Doc. 302, No. 1:22-cv-00122. This Court has appellate jurisdiction under 28 U.S.C. § 1291. On January 16, 2024, the Clerk of Court consolidated the appeals. *See* ECF 20, No. 23-13914; ECF 25, No. 23-13916; ECF 21, No. 23-13921.[1]

---

[1] The Secretary has filed an identical opening brief in all three cases.

# STATEMENT OF ISSUES

1. Whether Georgia's electoral districts violate § 2 of the Voting Rights Act, even though black and black-preferred candidates are remarkably successful in Georgia and are limited only by the same partisan politics as all candidates.

2. Whether § 2 of the Voting Rights Act, as interpreted by the district court to require racial gerrymandering, is unconstitutional because it is no longer congruent or proportional to the illegality (intentional racial discrimination) it purports to address.

3. Whether § 2 of the Voting Rights Act provides a private cause of action.

# INTRODUCTION

Black candidates in Georgia enjoy remarkable success. Black voters make up 31.7% of the voting-age population, yet black candidates have won 50% of Georgia's U.S. Senate seats, 35.7% of Georgia's congressional seats, and approximately 25% of the seats in the state General Assembly. Expanding to candidates *preferred* by black voters reveals even more success, including *both* U.S. Senate seats, the State's electoral votes for the presidency in 2020, and roughly 41% of the seats in the General Assembly.

Nevertheless, the district court here held that Georgia must redraw its districts for Congress and the state General Assembly because Georgia's maps supposedly dilute black votes in violation of § 2 of the Voting Rights Act. Section 2 guarantees voters "equal opportunity" to participate in elections and elect candidates of their choice. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). Yet despite the obvious fact that black voters have no problem electing candidates in Georgia, the district court, in the guise of ensuring "equal opportunity," ordered Georgia to racially gerrymander its maps.

That outcome is beyond the pale, for numerous independent reasons. To start, a vote dilution claim is based on the theory that a racial minority has been "submerg[ed]" into a large electoral

district, *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986), to "invidiously … cancel out or minimize the voting strength of racial groups," *White v. Regester*, 412 U.S. 755, 765 (1973) (citations omitted). But no one can pretend that is what happened here. At most, Georgia enacted maps that were intended to serve various *partisan* goals. But if black voters suffer electoral losses because their preferred candidates are *Democrats*, they are in the exact same position as white voters, Asian-American voters, Latino voters, and anyone else who prefers Democrats. Section 2 is "meant to hasten the waning of racism in American politics," *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994); it "does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates," *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992).

In *Whitcomb v. Chavis*, 403 U.S. 124, 154 (1971)—a foundational case that § 2, as amended, is intended to codify—the Supreme Court rejected a vote dilution claim where partisanship explained electoral outcomes. "[A]re poor [blacks] … any more underrepresented than poor … whites who also voted Democratic and lost … ? We think not." *Id.* at 154. The district court's ruling here depends on the idea that black voters in Georgia in 2024 are

worse off than *black voters in Indiana in the 1960s*. That is nonsense. Where "divergent voting patterns among white and minority voters are best explained by partisan affiliation," a plaintiff has not established the necessary "racial bloc voting," and so there is no vote dilution. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993) (en banc).

Even setting aside that fundamental legal error, the district court's analysis of the "totality of the circumstances" does not withstand scrutiny. 52 U.S.C. § 10301(b). The question under § 2 is whether a minority has less "opportunity" than members of the majority to "participate in the political process" and "elect representatives of their choice." *Id.* Georgia—where black candidates are broadly successful, and black-preferred candidates more successful still—cannot possibly fit that bill.

If, somehow, § 2 really did provide for liability in this case, it would be unconstitutional. Section 2 is a "prophylactic" statute meant to promote the Fifteenth Amendment's prohibition of intentional discrimination in voting. *City of Rome v. United States*, 446 U.S. 156, 173 (1980). But Congress has not established evidence tending to show that § 2, as interpreted by the district court, is a congruent and proportional response to any intentional

4

worse off than *black voters in Indiana in the 1960s*. That is nonsense. Where "divergent voting patterns among white and minority voters are best explained by partisan affiliation," a plaintiff has not established the necessary "racial bloc voting," and so there is no vote dilution. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993) (en banc).

Even setting aside that fundamental legal error, the district court's analysis of the "totality of the circumstances" does not withstand scrutiny. 52 U.S.C. § 10301(b). The question under § 2 is whether a minority has less "opportunity" than members of the majority to "participate in the political process" and "elect representatives of their choice." *Id.* Georgia—where black candidates are broadly successful, and black-preferred candidates more successful still—cannot possibly fit that bill.

If, somehow, § 2 really did provide for liability in this case, it would be unconstitutional. Section 2 is a "prophylactic" statute meant to promote the Fifteenth Amendment's prohibition of intentional discrimination in voting. *City of Rome v. United States*, 446 U.S. 156, 173 (1980). But Congress has not established evidence tending to show that § 2, as interpreted by the district court, is a congruent and proportional response to any intentional

discrimination by the States in more than forty years. Prophylactic legislation that demands the use of racial gerrymandering cannot go on indefinitely without any Congressional update to account for changed conditions. And if this case demonstrates anything, it is that conditions have changed. Georgia of 2024 is not Georgia of 1965 or even 1982. The Court should reverse the judgment below.

## STATEMENT OF THE CASE

Plaintiff-Appellees filed three separate suits challenging Georgia's enacted 2021 electoral maps under § 2 of the Voting Rights Act. The district court ruled in their favor, and Defendant Secretary of State of Georgia appealed. This Court consolidated the cases for appeal.

### A. Factual Background

#### 1. Georgia electoral information.

Georgia regularly nominates and elects racial and ethnic minorities to political office. Roughly 53% of Georgia voters are white, 31.7% are black, and the remainder include other racial and ethnic minorities of various backgrounds. Doc. 333 at 265.[2]

---

[2] Unless otherwise indicated, record citations refer to the docket in *Alpha Phi Alpha Fraternity, Inc. et al. v. Raffensperger*, No. 1:21-cv-05337.

Black Georgians occupy many state offices. Georgia's Congressional delegation is comprised of 35.7% black members, and its state houses include roughly 25% black members. Doc. 333 at 255, 266.

Georgia's most recent federal Senate election saw two black men face off: Herschel Walker won the 2022 Republican primary over then-incumbent Agriculture Commissioner, Gary Black, who is white and who had been successfully elected in past statewide elections. Doc. 276 at 5. Herschel Walker received the highest number of primary votes in every county in Georgia. *Id.* Senator Raphael Warnock, a Democrat, defeated Herschel Walker in the general election after having also won in 2021. *Id.*; Doc. 270-5 at 55.

Georgia's other statewide offices are also peopled with black and other minority officials. On the five-member Public Service Commission is Fitz Johnson, a black Republican who won the 2022 Republican nomination with 1,007,354 votes in an uncontested primary election. Doc. 276 at 5. The state Insurance Commissioner is a Latino Republican. *Id.* The state Supreme Court, whose justices are elected in non-partisan elections, includes a black woman and an Asian-American woman, both of whom have won statewide elections. *Id.*; Doc. 270-5 at 56; Doc. 333

at 254 n.65. The recent past includes other examples, including former Chief Justice Melton (who served on the Supreme Court from 2005 to 2021) and former Attorney General Thurbert Baker (who served from 1997 to 2011), both black men. Doc. 270-5 at 56; Doc. 333 at 253-254 & n.65.

When looking at black-*preferred* candidates, regardless of race, the numbers go even higher. Forty-one percent of the General Assembly is black-preferred (all Democrats), both U.S. Senators are black-preferred (again, Democrats), and Georgia voted for Joe Biden as President (again, a Democrat). Doc. 333 at 491.

### 2.    The 2021 redistricting process.

On August 21, 2021, the Census Bureau released the population counts that Georgia and other states use to redraw their legislative districts. Doc. 270-5 at 20. The Georgia General Assembly and its relevant committees engaged in extensive public processes to prepare for redistricting. Doc. 333 at 44, 46-47 (detailing, *inter alia*, nine in-person and two virtual joint committee meetings, with online portals for comments). The committees adopted guidelines for redistricting, including minimal population deviation, compliance with state and federal

law, contiguous geography, avoiding the pairing of incumbents, and so forth. *Id.* at 42-43.

Georgia enacted plans for federal and state legislative districts, although not a single member of the Democratic party voted for them. *Id.* at 47. That was not surprising, since the districts were adjusted to achieve some partisan goals for the Republican majority. *See id.* at 260-62, 475-76, 489-91. The plans were used in the 2022 elections. *Id.* at 47.

The 2021 Congressional plan includes 14 districts. *Id.* at 50. Two are majority-black districts and two have greater than 49% black-voting-age population. *Id.* at 51. Under the plan, Georgians elected 5 black Democratic members of Congress in the 2022 general election out of the 14 districts. *Id.* at 468-69.

The 2021 state Senate plan includes 56 districts. *Id.* at 52-53. The plan includes 14 majority-black districts, *id.* at 54, and elected 14 black state senators, *id.* at 469. The 2021 state House plan includes 180 districts. *Id.* at 56. It includes 49 majority-black districts, *id.* at 57, and elected 41 black representatives. *Id.* at 469.

### B. Proceedings Below

Plaintiff-Appellees—various organizations and some individuals—filed three cases in late 2021 and early 2022, alleging

that the enacted plans dilute black voters' political power in violation of § 2 of the Voting Rights Act. *See id.* at 13. They sought to force Georgia to redraw its maps to include an additional majority-black congressional district, three additional majority-black state Senate districts, and five additional majority-black state House districts. *See id.* at 98, 107, 132, 175.

Defendant-Appellant Secretary of State moved to dismiss the complaints on a number of grounds, including that § 2 does not provide a private right of action. Doc. 333 at 14. The district court denied those motions, holding in cursory fashion that, although the Supreme Court has not actually resolved the issue, lower courts "have never denied a private plaintiff the ability to bring a [§] 2 claim." Doc. 65 at 34; Doc. 50 at 20, No. 1:21-cv-05339; Doc. 43 at 33, No. 1:22-cv-00122.

After discovery, the Secretary moved for summary judgment, arguing that Plaintiffs could not establish a fundamental prerequisite for a § 2 claim: "racial bloc voting." Doc. 230-1 at 18-32; Doc. 175-1 at 17-30, No. 1:21-cv-05339; Doc. 190-1 at 21-34, No. 1:22-cv-00122. Although the evidence showed that majority and black voters voted differently, there was no evidence this had anything to do with race; the patterns were caused by partisan preference. *Id.* But the district court held that even if different

voters simply prefer different political parties, there is still racial bloc voting if the majority votes differently than the minority. Doc. 268 at 38-46; Doc. 215 at 48-56, No. 1:21-cv-05339; Doc. 229 at 49-57, No. 1:22-cv-00122.

On October 26, 2023, after trial, the district court issued an order holding that Georgia must redraw its maps to include an additional majority-black congressional district, two additional majority-black state Senate districts, and five additional majority-black state House districts. Doc. 333 at 509. The district court held that, with respect to the required districts, Plaintiffs had established the three *Gingles* preconditions. *Gingles*, 478 U.S. at 50-51 (requiring a large and compact minority group, cohesive minority voting, and racial bloc voting by the majority that defeats the minority). First, they had established that Georgia *could* draw relatively compact, additional, black-majority districts. Doc. 333 at 200-01, 275. Second, Plaintiffs had established that black voters voted cohesively, because large majorities of black voters always prefer Democrats. *Id.* at 203-04, 408-17. Third, because the court had already held that Plaintiffs have no burden to show "bloc voting" that is actually based on race—as opposed to partisanship or some other reason—the court held that Plaintiffs had satisfied the third *Gingles* prerequisite. *Id.* at 205-08, 417-26.

Turning to the "totality of the circumstances," the district court proceeded to find that some factors (drawn from the Senate Committee Report on § 2's amendment in 1982) favored the State but most favored Plaintiffs. *Id.* at 209-74, 426-93.

- With respect to Factor 1, whether the jurisdiction has a history of "intentional discrimination," the court held that Georgia does, even while acknowledging that Georgia's official discrimination ended many decades ago. *Id.* at 216-19, 232-33; 431-36, 449-50.

- With respect to Factor 2, racially polarized voting, the district court held that, although the evidence showed that the minority always prefers the Democratic candidate (regardless of race) and the majority always prefers the Republican candidate (again, regardless of race), race and party are too difficult to "disentangle," so Factor 2 favors Plaintiffs. *Id.* at 233-42, 451-58, 486-89.

- On Factor 3, whether the jurisdiction has used "practices or procedures that tend to enhance the opportunity for discrimination," the district court pointed to a few laws that supposedly demonstrate "disparate impact"—like

voter ID laws—and held that this factor favors Plaintiffs. *Id.* at 219-33, 431, 437-50, 484-86.

- On Factor 4, the exclusion of minorities from candidate slating processes, the district court found there were no such processes. *Id.* at 242 n.57, 458 n.105.

- On Factor 5, socioeconomic differences that hinder the ability to participate, the district court noted that black Georgians suffer from some socioeconomic deficits. *Id.* at 248-49, 462-64. It also held that black Georgians are hindered in their ability to participate, even though black voters are registered at similar rates to majority voters and are close in terms of actual turnout, with many elections being virtually identical. *Id.* at 242-50, 459-62, 464-65.

- On Factor 6, the district court acknowledged that campaigns are not characterized by racial appeals. *Id.* at 250-52, 465-67.

- On Factor 7, the extent of minority success, the district court acknowledged that black candidates have achieved enormous success in Georgia. *Id.* at 253-56, 468-69. But the district court saw this success as "isolated" and "underrepresent[ative]" and held that this factor "strong[ly]" favors Plaintiffs. *Id.* at 257, 471-72.

- On Factor 8, the district court found no lack of responsiveness to the particularized needs of the black community. *Id.* at 258-60, 472-75.
- On Factor 9, the district court explicitly found that the maps were *not* racially discriminatory but instead designed to further partisan goals. *Id.* at 260-62, 475-77, 489-91.

The district court mixed these factors together and determined that, despite the across-the-board success of black and black-preferred candidates in Georgia, political participation and opportunity in Georgia is not "equally open" to black voters. *Id.* at 273-74, 480-83, 492-93. The court permanently enjoined use of the enacted maps. *Id.* at 514-15.[3]

---

[3] The General Assembly enacted remedial redistricting plans, subsequently approved by the district court, in November 2023. Those plans revert to the 2021 versions if the Secretary succeeds in this appeal. *See* Ga. House of Representatives Redistricting Act of 2023, § 2, H.B. 1EX, Gen. Assemb. Spec. Sess. (Ga. 2023), https://bit.ly/3SeGUGF; Ga. Senate Redistricting Act of 2023, § 2, S.B. 1EX, Gen. Assemb. Spec. Sess. (Ga. 2023), https://bit.ly/48YptBq; Ga. Congressional Redistricting Act of 2023, § 2, S.B. 3EX, Gen. Assemb. Spec. Sess. (Ga. 2023), https://bit.ly/3vUTUcT.

## C. Standard of Review

In a § 2 case, the Court reviews legal questions *de novo* and factual questions for clear error. *Gingles*, 478 U.S. at 78-79.

## SUMMARY OF ARGUMENT

The district court held that § 2 does not require evidence of *race*-based bloc voting and that black voters do not have equal opportunity under the totality of the circumstances. It held that its interpretation of § 2 was constitutional. And it held that Plaintiffs have a private right of action under § 2. Each of these errors require reversal.

**I.A.** To prevail on their § 2 vote dilution claims, Plaintiffs must prove that minority voters in Georgia fail to elect their preferred candidates because the majority votes as a "racial bloc" to defeat them. *Gingles*, 478 U.S. at 51. That means exactly what it says: the majority must vote as a *racial* bloc, not a *partisan* bloc. If black voters prefer Democrats who lose because the majority simply prefers Republicans (regardless of race), then black voters have the same "opportunity" as anyone else "to elect representatives of their choice." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425, 428 (2006) (quotation omitted).

Simply put, voting is not racially polarized merely because "the majority of white voters vote for different candidates than the majority of blacks." *Gingles*, 478 U.S. at 83 (White, J., concurring); *see also id.* at 101 ("I agree with Justice White.") (O'Connor, J., concurring). All courts to examine the issue have required proof of racial bloc voting as opposed to ordinary partisan polarization.

If it were otherwise, the statute would be a partisan tool, not a hedge against racial discrimination. Districts where Democrats win would be fine because black voters prefer Democrats, but districts where Republicans win (even *black* Republicans) would draw scrutiny for the same reason. Inevitably, this would require proportional representation, *Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995), which the statute emphatically rejects, 52 U.S.C. § 10301(b). Section 2 mandates equal voting opportunity, "not a process that favors one group over another." *Gonzalez v. City of Aurora*, 535 F.3d 594, 598 (7th Cir. 2008).

Under the correct standard, Plaintiffs cannot establish a § 2 violation. They did not even try to prove that voting patterns in Georgia were driven by race rather than ordinary partisanship. They found that black and white Georgians tend to vote for different candidates but did not explain why. Doc. 386 at 5-6. That makes sense because the evidence proved that partisan preference

is the causal variable. The majority supports white and black candidates at identical rates. Black-preferred candidates enjoy immense success, but where they lose, they lose because the majority prefers Republicans, which is entirely legal.

**B.** Even setting aside that basic error, Plaintiffs failed to establish vote dilution. The totality of the circumstances shows that black Georgians face no barriers to participating in the political process. The district court found otherwise only because it misapplied the Senate Factors: it confused disparate impact for intentional discrimination, it again ignored evidence that polarization is driven by partisanship rather than race, and it stunningly found that black Georgians have had only "isolated" political success when they are in fact widely represented in state and federal offices. By any reasonable standard, Georgia is a beacon of voting equality and openness.

**II.** If § 2 actually requires explicit race-based remedies even in the circumstances of this case, it is unconstitutional. Prophylactic legislation must remain congruent and proportional to the constitutional harm (here, intentional race discrimination) it aims to deter. *City of Rome*, 446 U.S. at 173-75; *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Critically, because § 2 "imposes current burdens," it "must be justified by current needs." *Nw.*

*Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

Even if § 2 was congruent and proportional when amended four decades ago, it is not today. The "authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring). If Congress wants to continue § 2—at least as interpreted by the district court—it must "updat[e]" the law to "ensure" that it "speaks to current conditions." *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). But Congress has not revisited the statute in the last 40 years, and that alone makes it unconstitutional.

Moreover, the country has "changed dramatically" in the last 40 years. *Id.* at 547. "[M]inority candidates hold office at unprecedented levels," *Nw. Austin*, 557 U.S. at 202, and black Americans register and vote at rates similar to the majority. Even the district court "commend[ed]" Georgia for its success in "increasing the access and availability of voting." Doc. 333 at 232-33. There is no justification for imposing a broad, race-based remedy to solve a phantom problem.

**III.** Lastly, Plaintiffs do not have a private cause of action to begin with. Section 2 provides no such right, and courts long ago

exited the business of reading such rights into statutes. It makes perfect sense that private individuals can sue to stop *actual* constitutional violations via § 1983, while only the Attorney General can sue regarding the purely prophylactic expanse of § 2, and that is what the text provides.

## ARGUMENT

### I. Plaintiffs failed to prove a § 2 violation.

A claim for vote dilution is a claim that minority voters are "submerg[ed]," *Gingles*, 478 U.S. at 46, in a voting district to "invidiously … cancel out or minimize the[ir] voting strength," *Regester*, 412 U.S. at 765 (citations omitted). To prove such a claim, Plaintiffs must establish the three *Gingles* preconditions: (1) a sufficiently large and geographically compact minority, (2) that is politically cohesive, and (3) "racial bloc voting" (also known as "racially polarized voting") that prevents minority voters from having an equal opportunity to elect their preferred candidates. 478 U.S. at 50-51, 52 n.18. Plaintiffs must also prove that the "totality of the circumstances" shows discriminatory results. 52 U.S.C. § 10301(b).

Plaintiffs proved neither. *First*, Plaintiffs did not even try to establish that *race*, rather than ordinary partisan politics, explains voting patterns in Georgia, nor could they. So they

cannot prove the third *Gingles* precondition: racial bloc voting. *Second*, even assuming that a failure to prove racial causation is somehow less than dispositive, the district court made numerous legal and factual errors in examining the totality of the circumstances. Black-preferred candidates won the presidential electoral college votes, both Senate seats, and large portions of the Congressional and state legislative seats, and nothing suggests black voters face any meaningful barriers to voting. If that is not "equal opportunity," it is hard to understand what is.

## A. Plaintiffs did not prove that they have lesser opportunity "on account of race."

Section 2 of the Voting Rights Act prohibits the use of any "practice" or "procedure" that "results in [the] denial or abridgement of the right … to vote on account of race." 52 U.S.C. § 10301(a). Section 2 goes beyond the Fifteenth Amendment, which covers only intentional discrimination. *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality). Indeed, Congress specifically amended § 2 to codify a "results test" after this Court held that the Fifteenth Amendment reaches only intentional discrimination. *See* S.Rep. No. 97-417, at 2 (1982). Thus, § 2 is "prophylactic." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721,

727-28 (2003). It prohibits conduct that is not itself a violation of the Fifteenth Amendment in order to deter *actual* violations. *Id.*

Here, for instance, Plaintiffs allege vote dilution. The crux of their claim is not that they face intentional discrimination—which would be covered by the Fifteenth Amendment—but that they have been "submerge[ed]" within a majority that votes as a "racial bloc" against them. *Gingles*, 478 U.S. at 46, 49-52.

Nevertheless, a § 2 vote dilution claim, even where it reaches beyond the Fifteenth Amendment's ban on intentional discrimination, still requires bloc voting *caused* by race. It is not enough that some voters simply fail to win elections. After all, in a majoritarian system, "numerical minorities lose elections." *Holder v. Hall*, 512 U.S. 874, 901 (1994) (Thomas, J., concurring). And federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause,* 139 S. Ct. 2484, 2501 (2019) (quotation omitted). So if voting patterns are simply *partisan* in nature—the majority votes for Republicans and the minority prefers Democrats—there is no vote dilution.

But Plaintiffs did not even *try* to disentangle race from ordinary partisanship, and all the evidence in this case points to partisan disagreement, not racial causation. The majority simply prefers Republicans, regardless of race.

**1. To prove vote dilution "on account of race," Plaintiffs must show racial, not partisan, bloc voting.**

The text of § 2, judicial precedent, relevant constitutional principles, and common sense all establish that there is no *racial* bloc voting where, as here, voting patterns are readily explained by race-neutral partisan politics. The district court disagreed, but it relied on a plain misreading of *Gingles* and confused causation with intent.

**a.** Section 2's text explicitly requires racial causation because it applies only to injury "*on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). Plaintiffs must show that the political process is "not *equally open* … in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Putting that together, Section 2 requires plaintiffs to show that a "challenged law … caused" them, "on account of race," to have less opportunity than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1330 (11th Cir. 2021) (quoting 52 U.S.C. § 10301(a)).

The text plainly does not "guarantee" partisan victories or "electoral success." *LULAC*, 548 U.S. at 428 (citation omitted). If black voters' preferred candidates lose elections for non-racial

reasons, then they have exactly the same opportunity as "other members of the electorate." 52 U.S.C. § 10301(b). As Justice Marshall framed it, a voting system does not racially discriminate if the minority "community's lack of success at the polls was the result of partisan politics." *Bolden*, 446 U.S. at 109 (Marshall, J., dissenting). Section 2 does not, in other words, relieve minorities of the "obligation to pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S. at 1020.

Precedent and history confirm that § 2 requires racial, not partisan, bloc voting. Start with *Gingles*—the seminal vote-dilution precedent decided in the wake of the 1982 amendment to § 2—where the Supreme Court explicitly held that § 2 plaintiffs must prove "racial bloc voting." 478 U.S. at 46. Justice Brennan's plurality opinion argued that a mere difference in voter preference between minority and majority was sufficient to establish racial bloc voting (or "racially polarized voting"). *Id.* at 61-74. But a majority of the Court explicitly rejected that view, insisting that § 2 plaintiffs must show a *racial* explanation for voting patterns in order to establish *racial* polarization.

Justice White—who in all other respects joined Justice Brennan's opinion—wrote separately to specify that he did "not agree" with the plurality that "there is polarized voting" merely

because "the majority of white voters vote for different candidates than the majority of the blacks." *Id.* at 83 (White, J., concurring). Justice White gave an example where six white and two black Democrats ran against six white and two black Republicans; under the plurality view, there would be polarized voting if the Republicans win while "80% of the blacks in the predominantly black areas vote Democratic." *Id.* But that would be "interest-group politics rather than … racial discrimination." *Id.*

Justice O'Connor, writing for herself and three others, "agree[d] with Justice White" that § 2 plaintiffs must do more than simply show that black and white voters prefer different candidates. *Id.* at 101; *see also id.* at 100 (noting that "[o]nly three Justices of the Court join[ed]" Justice Brennan's view on how § 2 plaintiffs can show "racially polarized voting"). She explained that a rule ignoring racial causation would "give no effect whatever to [Congress's] repeated emphasis on 'intensive racial politics,' on 'racial political considerations,' and on whether 'racial politics … dominate the electoral process.'" *Id.* at 101 (quoting S.Rep. No. 97-417 at 33-34). And it would fly in the face of precedent requiring that courts differentiate between cases where "racial animosity" drives voting patterns and cases where the partisan preferences of racial groups simply "diverge." *Id.* at 100-01.

Justice O'Connor pointed to *Whitcomb*, which explicitly rejected the idea that there can be vote dilution where a racial minority loses elections for partisan reasons. 403 U.S. at 152-55. *Whitcomb* is one of two vote-dilution cases that the amended § 2 was "intended to codify." *Gingles*, 478 U.S. at 83 (O'Connor, J., concurring). And in *Whitcomb*, black voters in the "ghetto" area of Marion County, Indiana, lost elections because they "vote[d] predominantly Democratic" in a district that favored Republicans. 403 U.S. at 153. "[H]ad the Democrats won," black voters "would have had no justifiable complaints about representation." *Id.* at 152. And the fact that *Democrats* lost elections was insufficient to show vote dilution. Black voters were no "more underrepresented than poor ghetto whites who also voted Democratic and lost." *Id.* at 154.

Another key historical precedent is *City of Mobile v. Bolden*, 446 U.S. 55 (1980). The trial court in *Bolden* succinctly explained that § 2 is concerned with "polarization in the white and black voting," which meant "white voting for white and black for black if a white [candidate] is opposed to a black [candidate], or if the race is between two white candidates and one is ... identified with sponsoring particularized black needs." 423 F. Supp. 384, 388 (S.D. Ala. 1976). The court understood racial polarization as a

form of "white backlash" against "the black candidate or the white candidate identified with the blac[k] [community]." *Id.* On appeal, the Fifth Circuit and the Supreme Court did not challenge the district court's understanding of racial polarization. *See* 571 F.2d 238, 243 (5th Cir. 1978); 446 U.S. at 71.

The Supreme Court ultimately reversed for the separate reason that the Fifteenth Amendment (and by extension, the unamended § 2) concerns "discriminatory purpose," 446 U.S. at 62, but it was precisely to *reinstate* the understanding of the district court that Congress amended § 2. Congress wanted to return to the understanding of *Whitcomb*, *Regester*, and the *Bolden* district court. *See* S.Rep. at 2, 22, 24 n.88. Thus, Congress picked the understanding of racial bloc voting that requires *racial causation*. It just rejected the notion that there must be discriminatory legislative *intent*.

Common sense and canons of construction confirm that § 2 *must* require plaintiffs to establish polarization in terms of race, not partisanship. If § 2 requires only divergent voting patterns, the statute would be a one-way partisan ratchet. Districts in which Democrats form a majority would be legal because black voters' preferred candidates (Democrats) will routinely win. But districts with Republican majorities would violate § 2 simply

because the majority (regardless of its racial composition) has a different ideological preference than a black minority. Section 2 cannot be rationally interpreted to prohibit election schemes where Republicans win but bless virtually identical jurisdictions where Democrats win.

The district court's view would also eviscerate another aspect of § 2: its emphatic rejection of a right to proportionality. *See* 52 U.S.C. § 10301(b). If minority voters could establish racially polarized voting without proving any racial causality, it would "facilitat[e] a back-door approach to proportional representation." *Uno*, 72 F.3d at 982. Virtually anywhere that a racial minority votes cohesively, § 2 would demand separate majority-minority districts to ensure minority voters elect their preferred candidates. Of course, the *Gingles* preconditions, including racial bloc voting, are not sufficient to establish liability, but "only [in] the very unusual case" will a plaintiff satisfy the "*Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020) (quotation omitted).

The district court's interpretation would at least raise serious doubts about § 2's constitutionality, as Congress lacks authority to

simply prefer one political party, *see infra* Part II. That is doubly true where the district court's interpretation "upset[s] the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The text of § 2 does not suggest, much less require, the district court's counter-intuitive reading, and this Court should reject it.

Given all this, it should be no surprise that other circuits reject the district court's view. Numerous Circuits have held or indicated that racial bloc voting requires proof that "race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855 (quotation omitted); *see also Uno*, 72 F.3d at 981; *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 496 (2d Cir. 1999) (favorably citing *Clements*); *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994); *see also Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (en banc) (opinion of Tjoflat, J.) (explaining that § 2 requires patterns of voting attributable to race, not partisanship). This Court should do the same.

**b.** The district court relied on two erroneous rationales to hold that racial polarization does not require racial causation. First, the district court simply misread *Gingles*, asserting that Justice O'Connor "agreed that the reasons that [b]lack voters and white

27

voters vote differently are irrelevant to proving the existence of the second and third *Gingles* preconditions." Doc. 268 at 41. But that is blatantly wrong. Justice Brennan's opinion—which was only a plurality on this point precisely because Justice White refused to join this section—was the *only* one to conclude that "the reasons black and white voters vote differently have no relevance to the central inquiry of § 2." 478 U.S. at 63. Justice O'Connor specifically rejected Justice Brennan's view and "agreed with Justice White." *Id.* at 101 (O'Connor, J., concurring). Regardless, Justice O'Connor rejected the entire project of Justice Brennan's opinion. *See generally id.* at 84-105. So even if there were uncertainty as to her view on this point, there is no *Marks*-based counting that could benefit Plaintiffs. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

Second, the district court mistakenly reasoned that § 2 must not require evidence that divergent voting patterns are caused by race because "the [§] 2 analysis is an effects test," not an intent test. Doc. 268 at 42. That is a red herring because intent and causation are entirely distinct concepts. One is about a mental state, the other is about whether A led to B. *See, e.g.*, Restatement (Second) of Torts §§ 8A, 9 (1965) (separate definitions for "Intent" and "Legal Cause"); Model Penal Code §§ 2.02(2), 2.03(1) (distinct

*mens rea* and causation requirements for criminal liability).
Section 2 does not require intentional racial discrimination, but it
does require racial *causation*—if it did not, it would be utterly
incoherent.

### 2. The evidence here shows ordinary partisanship, not racial bloc voting.

Plaintiffs never tried to establish that race, rather than
ordinary partisanship, is the cause of divergent voting patterns in
Georgia. Even if it were the Secretary's burden to produce
evidence on this score, he easily satisfied it. To the extent the
district court concluded otherwise—and the district court barely
examined the question, since it did not believe it necessary—the
district court plainly erred.

**a.** In their briefing and statements at trial, Plaintiffs
repeatedly and explicitly disclaimed any obligation to distinguish
racial polarization from ordinary partisan preference. *See* Doc. 244
at 30, 32-38 & Doc. 325 at 18-19, 30-31, No. 1:21-cv-05337; Doc.
173-1 at 29-30, Doc. 189 at 19-21, & Doc. 295 at 20-24, No. 1:21-cv-
05339; Doc. 189-1 at 26-27, No. 1:22-cv-00122. Not surprisingly,
then, Plaintiffs did not produce any evidence that polarization in
Georgia is attributable to race rather than party.

One of their polarization experts, Dr. Palmer, testified that his investigation did not discern the "explanations for the voting patterns" he identified; such an inquiry was "beyond the scope of [his] report[s]." Doc. 326 at 94. Plaintiffs' other polarization expert, Dr. Handley, testified similarly. Her analysis revealed that white voters generally prefer Republicans and black voters prefer Democrats but did not address the critical issue of causation. Doc. 385 at 102, 105. "[N]othing in [her] report," she conceded, "explains why the voting patterns [she] analyzed are occurring" or otherwise "speaks to causation." Doc. 386 at 5-6.

If anything, Dr. Handley's testimony indicated that polarization in Georgia is the result of partisanship, not race. She acknowledged, for instance, that black voters *always* support Democratic candidates, regardless of a candidate's race. Doc. 385 at 102-03. And her analysis of Democratic primaries—where the effects of partisanship are reduced—showed they are "not a barrier" to black candidates in Georgia. *Id.* at 120. Even when white voters slightly preferred different Democratic primary candidates, white Democrats support the black-preferred nominee in the general election just as enthusiastically as they do white-preferred Democratic nominees. Doc. 332 at 33-34. Contrast that

with *Gingles*, where white Democrats voted against black-preferred candidates *of their own party*. 478 U.S. at 59.

The district court, for its part, made clear that it would not attempt to distinguish race from partisanship. *See, e.g.*, Doc. 333 at 236. Indeed, the district court seemed to think that doing so was impossible, relying on the assertion that race is the best *predictor* of partisan preference. *See, e.g.*, *id.* at 454. But correlation is not causation, and the fact that one factor can predict another does not mean it *causes* it.

Distinguishing race from partisanship is the only way to differentiate cases of actual "racial animosity" from cases where the partisan preferences of racial groups merely "diverge." *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Plaintiffs have not even "attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855 (quotation omitted). This failure alone demands reversal.

**b.** Even if the Secretary shouldered some burden of production on the issue of polarization, *cf. Uno*, 72 F.3d at 983, he satisfied that burden here. And of course, the ultimate "burden of proof at all times remains with the plaintiffs." *Id.*

Most critically, there is *no distinction* in vote share when the race of the candidate changes, as opposed to the *party* of the candidate. In recent statewide elections, every Democratic nominee received at least 95.5% of the black vote, regardless of the candidate's race. Doc. 34-2 at 14, No. 1:21-cv-05339. And the Democratic nominee (a.k.a. the black-preferred candidate) received, on average, 11.2% of the white vote if they were black and 11.8% of the white vote if they were white. *Id.* In other words, white support for non-Republican candidates is virtually identical, no matter the race of the candidate. And white voters cohesively support black candidates when they are Republicans—a point to which Plaintiffs stipulated. Doc. 270-5 at 53. Defendant's expert Dr. Alford was able to easily and correctly conclude that "party" is "a bigger factor than race." Doc. 332 at 12, No. 1:22-cv-05337.

Perhaps the best indication that voting in Georgia is motivated by partisanship, not race, is an examination of the 2021 and 2022 U.S. Senate elections. In the 2021 runoff election, both the Democrat (Jon Ossoff) and the Republican (David Perdue) where white. According to Dr. Handley, across the different regions considered in her report, Ossoff received an average of 12.1% of the white vote and Perdue received 87.9%. *See* Doc. 229 at 365-83. In the 2022 election, the Democrat (Raphael Warnock)

and Republican (Herschel Walker) were both black. Warnock received an average of 14.4% of the white vote and Walker received 84.8%. *Id.* at 364-82. That means white support for the Republican, and white opposition to the Democrat, was functionally identical in both elections, regardless of the candidate's race.

This evidence is critical because identical support for candidates of different races is one of the tell-tale signs of partisan, as opposed to racial, bloc voting. That was the entire point of Justice White's concurrence in *Gingles*. *See* 478 U.S. at 83 (White, J., concurring); *see also id.* at 101 (O'Connor, J., concurring) ("I agree with Justice White."). Comparing majority support for candidates of different races is a crucial mechanism for distinguishing between "racial discrimination" and everyday "interest-group politics." *Id.* at 83 (White, J., concurring). *Gingles* itself was based on evidence that "most white voters were extremely reluctant to vote for black candidates." *Id.* at 54. But where, as here, voters "suppor[t] minority candidates … at levels equal to or greater than those of [non-minority] candidates," the "proper" conclusion is that polarization is driven by "partisan affiliation." *Goosby*, 180 F.3d at 496 (quoting *Clements*, 999 F.2d

at 861). There is no "white backlash" to be found here. *Bolden*, 423 F. Supp. at 388.

To the extent the district court tried to establish that race, rather than partisanship, causes voting patterns in Georgia, it pointed only to testimony indicating that black candidates for the state legislature in 2020 were less likely to be elected in districts with more white voters. Doc. 333 at 455-57. But that is just another way of saying white and black voters tend to prefer different candidates, and it says nothing about whether those voting patterns are partisan or racial in nature. It restates something we already know to be true: where Democrats of any race run in Republican strongholds, they are going to lose. That means Democrats of *all* backgrounds—white, black, Asian-American, Latino, etc.—are likely to lose. But § 2 requires an "electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez*, 535 F.3d at 598. If everyone is in the same boat, black voters have precisely the same "opportunity" as everyone else. 52 U.S.C. § 10301.

<center>*     *     *</center>

"Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process

to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part and dissenting in part) (citation omitted). This Court should reject that outcome here.

## B. Black voters enjoy equal opportunity and broad success in Georgia elections.

Even setting aside the race/partisanship issue, Plaintiffs failed to establish vote dilution. They did not prove that black voters in Georgia have "less opportunity" to participate and elect "on account of race." 52 U.S.C. § 10301. Black voters have no barriers to participation and show extraordinary success—usually punching above their weight. The district court could only hold otherwise by making numerous errors of law and fact as it examined the Senate Report Factors.

Senate Factors 1 & 3. The district court analyzed these two factors—"a history of voting-related [official] discrimination" and "voting practices … [that] enhance the opportunity for discrimination" together, *Gingles*, 478 U.S. at 44-45, and it erred as a matter of law. No one doubts that, in the long past, Georgia engaged in official discrimination—the Secretary stipulated as much. Doc. 387 at 128. "But past discrimination cannot, in the manner of original sin, condemn governmental action that is not

35

itself unlawful." *Bolden*, 446 U.S. at 74. And with respect to anything from the past *four decades*, the district court came up empty.

So instead, the district court changed the rules, looking to policies that (supposedly) have a "disparate impact" on black voters. Doc. 333 at 225, 227, 437 n.95, 444; *see also id.* at 214, 219, 224, 229, 431, 437, 442, 447, 484 ("disproportionate impact"). That was error; the question is whether the jurisdiction has engaged in "pervasive purposeful discrimination," not policies that (arguably) have a disparate impact. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

This case is a good example as to *why* courts do not look to supposed "disparate impacts"—these questions inevitably turn into policy disputes. For example, the district court faulted Georgia for enacting voter ID laws, enacting laws regulating absentee and early voting, and updating voter registration lists. Doc. 333 at 224-30. But not only are these laws plainly legal, *see, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), this same district court *upheld* many of them against legal challenge, *see* Doc. 333 at 224, 443. The district court attempted to explain this discrepancy, *id.* at 225-27, 443-45, but it makes no sense. To say that these laws are legal but somehow evince a

"history of official discrimination" is incoherent. Factor 1 is concerned with *intentional discrimination*, not disagreements on election-administration policies.

Likewise, Factor 3 looks to electoral devices that can "enhance the opportunity for discrimination," like "unusually large election districts, majority vote requirements, [or] anti-single shot provisions." S.Rep. at 29. But the district court did not rely on any of these sorts of devices. And how could it? The record shows that a majority-vote requirement in 2020 led to the election of the black-preferred U.S. Senate candidate, Jon Ossoff, who would have otherwise lost. Doc. 270-5 at 55.

At best, the district court looked to isolated incidents. It criticized polling place closures—as reported by newspapers—in the 2020 primary. Doc. 333 at 222-24, 440-42. These declarations from newspapers are inadmissible and the court should have excluded them. *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) ("[N]ewspaper articles [are] classic, inadmissible hearsay."). In any event, the articles reveal little about Georgia's typical election practices because the June 2020 primary was unique in modern American history. Even assuming Georgia's response to COVID was not perfect, that hardly establishes that Georgia's modern election practices tend to "enhance the

opportunity for discrimination against the minority group." S.Rep. at 29.

Likewise, the court pointed to the at-large electoral system for Fayette County elections, successfully challenged in 2015. Doc. 333 at 439-40. But Fayette County can hardly speak for the State. *See Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) (en banc) (explaining that the "actions of … one county" do not reflect the whole of "a geographically vast, highly populous, and very diverse state"). Even if it could, that is a single example of a supposedly problematic electoral device over *decades* of Georgia history, and it does nothing to "enhance the opportunity for discrimination" in the State's enacted districting maps.

Senate Factor 2. Even if the partisan causation of voting patterns is not dispositive, it critically undermines any claim of racial polarization. *See supra* § I.A. There is no evidence *at all* that majority voters change their votes in some sort of "backlash" against black candidate success. *Bolden*, 423 F. Supp. at 388. If majority voters were concerned about the success of black and black-preferred U.S. Senate candidates, their response— nominating *two* black U.S. Senate candidates in 2022—is inexplicable. The district court obviously erred in concluding that Factor 2 favors Plaintiffs.

<u>Senate Factor 4.</u> The district court acknowledged that no party uses a slating process that could injure minority voters. Doc. 333 at 242 n.57, 458 n.105, 483 n.128.

<u>Senate Factor 5.</u> The district court relied on small statistical disparities to conclude that black voters were "hinder[ed]" in the political process, Doc. 333 at 212, 243-45, 459-61, and even those small disparities are overstated because the district court legally erred in its chosen comparators. The district court compared black voter turnout to *white* voter turnout to conclude that black voters are at a disadvantage, but the court should have compared black voter turnout to *majority* voter turnout. Section 2 asks whether a minority is deprived as compared to the *majority*, not the plurality or some fraction of the majority. *See, e.g., LULAC*, 548 U.S. at 444 (examining whether "Anglos and Latinos" in the majority would defeat black candidates). To take one example, the district court noted a 13.3-point gap between black and white voter turnout in the 2022 general election, but the gap between black and *non-black* turnout was only 7.9 points. *See* Doc. 333 at 244; Ga. Sec'y of State, *Data Hub – November 8, 2022 General Election*, available at https://bit.ly/3wbMPoi. "Properly understood, the statistics show only a small disparity that provides little support for concluding that [Georgia's] political processes are not equally open."

*Brnovich*, 141 S. Ct. at 2345. And when it comes to voter *registration*, there is no disparity to speak of. Around 98% of *all* eligible voters are registered. Doc. 332 at 103.

Senate Factor 6. The district court acknowledged that campaigns in Georgia are not characterized by racial appeals, yet even here it succumbed to describing partisan activity as racial in nature. To use just one example, it classified a Governor Kemp ad—in which he promised to round up illegal immigrants in his truck—as "racial" in nature, apparently on the basis that opposing illegal immigration is not an acceptable point of view. Doc. 333 at 251 & n.63, 466 & n.112; *but see Brnovich*, 141 S. Ct. at 2349 ("[P]artisan motives are not the same as racial motives."). The district court did not afford "great weight" to Factor 6, Doc. 333 at 252, 467, but it still veered into misplaced criticism of partisan campaign ads.

Senate Factor 7. To repeat: Georgia's black voting age population is 31.7%. Doc. 333 at 265. Black candidates make up 35.7% of Georgia's congressional delegation. *Id.* at 266. They make up 50% of the Senate delegation. *Id.* at 491. Both nominees for U.S. Senate in 2022 were black. Black candidates make up roughly 25% of the General Assembly. Doc. 333 at 255. They routinely win state-wide office. *Id.*; *see also supra* at 6-7.

Stunningly, against this backdrop, the district court declared that black Georgians have experienced only "isolated" success and they "continue to be underrepresented." Doc. 333 at 253, 468.

The district court's conclusion here is, for lack of a better term, preposterous. Black Georgians occupy huge swaths of Georgia's elected offices: slightly above proportional in federal offices, slightly below in state offices. To conclude otherwise, the district court had to resort to "misleading … statistics." *Brnovich*, 141 S. Ct. at 2345. For example, it noted that "only 12 Black candidates" have been elected to Congress, but that overlooks that numerous candidates served in Congress for *decades*, like John Lewis and Sanford Bishop. Doc. 333 at 254, 468. These long-serving, repeatedly re-elected representatives are a sign of political strength, not weakness. Likewise, the district court minimized the number of statewide offices that black candidates have successfully obtained, but again, many of these candidates won repeatedly, like former Attorney General Thurbert Baker. *Id.* at 253, 468.

Courts have often called Factor 7 the "most important" factor; if minority candidates are constantly winning elections, there can be no serious claim of vote dilution. *Gingles*, 478 U.S. at 48 n.15. That is obviously the case in Georgia, and there is no clearer

example of the district court's plain errors than its backwards understanding of Factor 7.

Additional factors. The district court acknowledged that there was no evidence that Georgia officeholders fail to respond to particularized concerns of the black community, and, critically, it found that the policies underlying the enacted maps were *partisan*, not *racial* in nature. Doc. 333 at 260-62, 475-76, 489-91. In other words, the maps are *not* intentionally discriminatory or anywhere close—they were designed to, in certain instances, "capitalize on a partisan advantage." *Id.* at 262.

Finally, to the extent proportionality is relevant, the district court's conclusion that black Georgians *lack* proportional representation is simply false. *Id.* at 265-66. By pure proportionality, black Georgians are slightly "overrepresented" in federal offices and slightly "underrepresented" in state offices. *See supra* at 40-41. And black-*preferred* candidates (Democrats) are "overrepresented" across the board. Doc. 333 at 491.

*     *     *

It is easy to get bogged down in details, but at bottom the totality analysis is supposed to determine whether minority voters "have less opportunity" to "participate" and "elect." 52 U.S.C. § 10301(b). Black voters have broad success in electing their

preferred candidates and black candidates. There are no barriers to registration and voting, which are extraordinarily easy in Georgia. Section 2 is "meant to hasten the waning of racism in American politics." *De Grandy*, 512 U.S. at 1020. The district court found no racism in this case, and this Court should reverse.

## II. The district court's race-based remedy is not justified by present-day circumstances.

If § 2 requires what the district court ordered—racial gerrymandering to solve a nonexistent problem—it is unconstitutional as applied. Prophylactic statutes like § 2 must be justified by the problem they address. *See City of Boerne*, 521 U.S. at 520. And they must be justified by conditions *today*, not when they were enacted. *Shelby County*, 570 U.S. at 536. So even if Congress at some point possessed authority to require electoral racial segregation as a remedy for purported vote dilution, that "authority … cannot extend indefinitely into the future." *Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring).

If Congress wants to continue demanding that Georgia and other states racially segregate their voters, *Congress* must explain that decision with detailed, current evidence justifying such a heavy intrusion on state authority. But Congress has not even attempted to do so since 1982 (arguably 1965), and this "sordid

business" must stop, *LULAC*, 548 U.S. at 511 (Roberts, C.J., concurring in part and dissenting in part), at least in cases where there is no evidence of any actual constitutional violation.

### A. Prophylactic legislation must reflect current conditions, but Congress has not updated § 2 in half a century.

**1.** Congress enacted § 2 of the Voting Rights Act under its "power to enforce the [Fifteenth Amendment] by appropriate legislation." U.S. Const. amend. XV, § 2; *City of Rome*, 446 U.S. at 179. Of course, the Fifteenth Amendment prohibits only "purposeful discrimination." *Bolden*, 446 U.S. at 72. Section 2 goes further, prohibiting not intentional discrimination but anything that "results" in the denial or abridgement of the right to vote "on account of race or color." 52 U.S.C. § 10301(a). Courts have interpreted that prohibition to reach far beyond the bounds of intentional discrimination. *See, e.g.*, *Greater Birmingham Ministries*, 992 F.3d at 1328-29.

Here, for instance, Plaintiffs allege vote dilution. Of course, if a legislature *intentionally* places racial groups in particular districts to reduce their voting power, that is outright racial gerrymandering. To the extent § 2's targets such circumstances, where jurisdictions really do sort voters into districts "on account

of race," it simply replicates the Constitution's ban on racial gerrymanders.

But courts have instead understood the results test to require a complicated multi-factor balancing test, examining disparate facts like the socioeconomic status of a minority group, the jurisdiction's "history" of official discrimination, and the policy justifications for the legislature's choices—none of which has any obvious bearing on intentional, present-day discrimination. *See supra* at 35-43. Courts are supposed to find that a legislative map "results" in vote dilution if, through some unclear alchemy, these various factors demonstrate that it does. All while being careful not to require *proportional* representation, which § 2 explicitly disclaims.

And the remedy § 2 imposes differs drastically from the remedy imposed for actual racial gerrymandering. Courts remedy racial gerrymandering by ordering jurisdictions to redraw districts without regard for race. Section 2, by contrast, *requires* assigning voters to districts based on their race to increase the number of majority-minority districts. *Milligan*, 599 U.S. at 30-31.

To be sure, Congress can, within narrow guardrails, prohibit state action that is not itself a violation of the Fifteenth Amendment's substantive provisions. *City of Boerne*, 521 U.S. at

517-18. It may bar "a somewhat broader swath of conduct" in order to deter *actual* constitutional violations. *Hibbs*, 538 U.S. at 727. But "so-called prophylactic legislation" may not "substantively redefine the States' legal obligations." *Id.* at 727-28 (quotation omitted). Congress cannot use the power to enforce the Amendment to "alte[r] the meaning." *City of Boerne*, 521 U.S. at 519. So, to ensure such legislation remains within its constitutional bounds, it must be congruent and proportional to the constitutional violations it purports to deter. *Id.* at 520.

Congruence and proportionality require Congress to compile evidence of pervasive unconstitutional conduct by the states and then craft an "appropriately limited response" to address that particular pattern of misconduct. *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 771, 773 (11th Cir. 2020); *see also Allen v. Cooper*, 140 S. Ct. 994, 1004 (2020). And "[t]he appropriateness of remedial measures must be considered in light of the evil presented," *City of Boerne*, 521 U.S. at 530, so a heavy-handed remedy is justified only if the pattern of misconduct it aims to address is itself severe and pervasive.

Section 2, to the extent it requires sorting voters into electoral districts based solely on their race, is an especially heavy-handed remedy. "[D]istricting maps that sort voters on the basis of race

are by their very nature odious." *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022) (quotation omitted). The Supreme Court, though, has indicated that § 2, as a tool for combatting unconstitutional racial gerrymandering, was within Congress's "remedial authority" when it was enacted in 1965. *Milligan*, 599 U.S. at 41.

But just because § 2 was justified when it was enacted in 1965—or when it was last amended in 1982—does not mean it remains so today. Because "the Act imposes current burdens," it "must be justified by current needs." *Nw. Austin*, 557 U.S. at 203. Political and social conditions change over time, and conditions at the time of enactment—no matter how dire—cannot justify race-based remedies forever. *See Shelby County*, 570 U.S. at 547 (since the Act was passed, "things have changed dramatically"). Congruence and proportionality, in other words, are time-dependent inquiries that require contemporary evidence of pervasive unconstitutional state action. The question is *not* whether a remedy was permissible when the statute was enacted; "[t]he question is whether [the statute's] extraordinary measures … *continue* to satisfy constitutional requirements." *Id.* at 536 (emphasis added).

The Supreme Court has demonstrated these points both in and outside the elections context. In *City of Boerne*, for instance, the Court held that the Religious Freedom Restoration Act was not adequately "confined" in part because it lacked a "termination date or termination mechanism." 521 U.S. at 532. The Court observed that such mechanisms, although not necessarily required, "tend to ensure Congress's means are proportionate." *Id.* at 533. That is just another way of saying that a legislative act must be congruent and proportional over time, not just at the exact moment it is passed.

In an even more on-point example, the Supreme Court held invalid portions of the Voting Rights Act that relied on outdated evidence—even after it found that same evidence constitutionally sufficient in earlier cases. In *South Carolina v. Katzenbach*, 383 U.S. 301, 337 (1966), the Supreme Court upheld § 5's preclearance requirement against constitutional attack. It was an "extraordinary measur[e]," but the nation faced "an extraordinary problem." *Shelby County*, 570 U.S. at 534. Decades later, the factual ground had shifted. In *Shelby County*, the Court held the preclearance requirement's coverage formula unconstitutional precisely because it was based on outdated evidence. *Id.* at 556-57. "At the time [of enactment], the coverage formula—the means of

linking the exercise of the unprecedented authority with the problem that warranted it—made sense." *Id.* at 546. But "[n]early 50 years later, things ha[d] changed dramatically." *Id.* at 547. "Voter turnout and registration rates … approach[ed] parity. Blatantly discriminatory evasions of federal decrees [were] rare. And minority candidates [held] office at unprecedented levels." *Id.* at 540 (quotation omitted). There was no longer a justification for the extreme prophylactic measure Congress had chosen: § 5 imposed "substantial federalism costs" based on data from 1965, but "history did not end in 1965." *Id.* at 540, 552 (quotation omitted). Simply put, "while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions." *Id.* at 557. That is because the Fifteenth Amendment "is not designed to punish for the past; its purpose is to ensure a better future." *Id.* at 553.

**2.** Using the same constitutional test here, the district court's application of § 2 is plainly invalid. To require racial gerrymandering as a remedy for purported vote dilution, Congress must adduce evidence that states *today* continue to engage in pervasive racial gerrymandering for the purpose of suppressing minority votes. It may not rely on a long-past history that has no

bearing on present-day political conditions. *See Veasey*, 830 F.3d at 232; *Greater Birmingham Ministries*, 992 F.3d at 1325.

But, as multiple members of the Supreme Court have suggested, that is precisely what § 2 does in the vote dilution context. It relies on a "generalized assertion of past discrimination [to] justify race-based redistricting" today. *Milligan*, 599 U.S. at 84 (Thomas, J., dissenting) (quotation omitted); *id.* at 45 (Kavanaugh, J., concurring) (echoing Justice Thomas's concern). And it has no built-in "termination date" or logical endpoint; rather, it purports to govern state districting practices indefinitely. *Id.* at 83 (Thomas, J., dissenting) (quotation omitted).

Consider that the evidence Congress mustered in support of § 2 is, at this point, more than four decades old. *See* Pub. L. 97-205, § 3, 96 Stat. 131 (1982). And that's just the 1982 amendment; the original version of the statute was enacted almost *60 years ago* in 1965. *See* Pub. L. 89-110, § 2, 79 Stat. 437 (1965). The Supreme Court's treatment of the statute is likewise dated. *See Milligan*, 599 U.S. at 41 (the Court last considered § 2's propriety "over 40 years ago," before the results test was adopted). In practical terms, this means the evidence supposedly justifying § 2 is older than the evidence the Supreme Court found too outdated to

support the Act's coverage formula in *Shelby County*, 570 U.S. at 538, 556 (roughly 40 years old).

That alone is enough to render the statute unconstitutional. Congress has an obligation to "ensure" that prophylactic legislation "speaks to current conditions." *Shelby County*, 570 U.S. at 557. It must "updat[e]" legislation to reflect changes on the ground. *Id.* And that requires compiling contemporary evidence and making the findings necessary to the statute's factual premises. Congress "cannot rely simply on the past." *Id.* at 553.

That remains true even if present-day conditions actually do, in theory, justify continued application of the statute. Courts will not search for their own evidence justifying continued application; their role is limited to evaluating the "evidence before Congress." *Hibbs*, 538 U.S. at 738; *see also Allen*, 140 S. Ct. at 1004 ("That assessment usually … focuses on the legislative record."); *Board of Trustees v. Garrett*, 531 U.S. 356, 370-71 (2001) (focusing on evidence "submitted … directly to Congress" and its corresponding "legislative findings"). So if Congress wishes to continue § 2, it must do the necessary work. Where it has not, courts are left "with no choice but to declare [the statute] unconstitutional." *Shelby County*, 570 U.S. at 557.

**B. In any event, political conditions today no longer justify § 2's racialized remedy.**

**1.** That § 2 is premised on "decades-old data" is already fatal, *Shelby County*, 570 U.S. at 551, but even if it weren't, it is clear from the evidence we have about political conditions today that race-based redistricting under § 2 is no longer justified. As with the coverage formula rejected in *Shelby County*, "things have changed dramatically," 570 U.S. at 547, and § 2's racialized remedy for vote dilution no longer bears any reasonable relationship to the situation on the ground.

Across the nation, minority communities today enjoy considerable political success. "[M]inority candidates hold office at unprecedented levels." *Nw. Austin*, 557 U.S. at 202. Back in 2006, Congress itself—reflecting on progress made since the Voting Rights Act was enacted—noted "significant increases in the number of African-Americans serving in elected offices," including a 1,000 percent increase in the six states, Georgia among them, originally covered by the Act's preclearance requirements. H.R. Rep. No. 109-478 at 18 (2006). In those six states, voter registration and participation rates today are roughly equal for white and black voters; in some cases, black rates *exceed* white rates. *See* Dep't of Commerce, Census Bureau, *Reported Voting and Registration of the Total Voting-Age Population, by Sex, Race*

*and Hispanic Origin, for States: November 2022* (Table 4b), available at https://bit.ly/3tx312Q. That, of course, is a drastic improvement over the large gaps in registration rates—as high as 63.2 points—in those states in 1965. *See* H.R. Rep. No. 109-478 at 12.

The evidence in this case proves much the same for Georgia, as noted above. *Supra* Part I.B. The extensive success of black and black-preferred candidates is the furthest thing from "isolated." Doc. 333 at 257. Black Georgians are thoroughly represented in the State's politics, a testament to the fact that voting in Geogia is "equally open" to all. *Brnovich*, 141 S. Ct. at 2338.

The district court's decision does not reflect this present-day reality. Indeed, when it surveyed the history of racial discrimination in Georgia's voting practices, the court found no instance of intentional discrimination more recent than the early 20th century. Doc. 333 at 216-17. The court even acknowledged that intentional discrimination does not characterize Georgia today and "commend[ed]" the State for its success in "increasing the access and availability of voting." *Id.* at 232-33; *see also id.* at 258 (noting that the success of black candidates in Georgia is "promising"). The court had to rely on early history—Georgia in

the "Reconstruction Era," not Georgia today—to justify its order. *Id.* at 214-15; *see also id.* at 258, 431-32, 472.

And in a maneuver that does as much as anything to show that either the district court was wrong or § 2 is unconstitutional, the court faulted Georgia legislators for their supposed "leadership position in challenging the [2006] reauthorization of the [Voting Rights Act]." *Id.* at 219 (quotation omitted). Without any evidence, the district court assumed Georgia opposed reauthorization to "resis[t] the expansion of voting rights to Black citizens." *Id.* (quotation omitted). But there are many principled reasons to oppose the Act's reauthorization, including the belief that courts often interpret it to require racial segregation to benefit one political party—as the district court did here. *See also, e.g.*, *Shelby County*, 570 U.S. at 540 (noting that the Act "imposes substantial federalism costs" (quotation omitted)). If opposition to the district court's view of the Voting Rights Act is *itself* evidence supporting § 2 liability, it only proves the point that the Act is unconstitutional as applied.

Most fatally, the district court found no evidence that Georgia, or any state, continues to engage in intentional racial gerrymandering, the wrong that race-based redistricting under § 2 purports to deter. In this case, the district court explicitly *found*

that the enacted maps were the result of partisan politics, not intentional racial discrimination. Doc. 333 at 260-62, 475-77, 489-91. But partisan gerrymandering is not racial gerrymandering. *See supra* § I.A.1. If the district court's erroneous understanding of § 2 is correct, it is simply not constitutional as applied.

**2.** If, on the other hand, § 2 has not yet achieved its laudable goals, it is unclear when its explicitly racial remedies would ever become obsolete. When will it end? If the overwhelming success of black and black-preferred candidates in Georgia isn't sufficient to render explicitly racial remedies unnecessary, what would be? If the unprecedented and irrefutable access to registration and the polls aren't sufficient, what would be? Black voters in Georgia strongly prefer one political party, and they have enormous influence in that political party; again, if this isn't enough to make racial gerrymandering obsolete, what would be? As the Supreme Court reiterated last term, racial classifications of *any kind* must be temporary. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 212 (2023). But on the district court's interpretation, § 2 will continue to sort voters based on race with "no end … in sight." *Id.* at 213.

Statutes that classify Americans based on race, like § 2, "are by their very nature odious" to the Constitution's promise of equal

protection. *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quotation omitted). So any race-based policy, if it is constitutional at all, "must have a logical endpoint." *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003). The alternative—permanent racial preferences— necessarily violates the "fundamental equal protection principle." *SFFA*, 600 U.S. at 212 (quotation omitted).

Neither Congress nor anyone else has explained how much time must pass, or what metric must be achieved, before § 2 will stop sorting voters into districts based on their race. *Cf. id.* at 214 ("[I]t is unclear how courts are supposed to measure any of these goals."). If the drastic improvements Georgia has already made— equal or approaching-equal rates of voter participation, unprecedented numbers of black representatives, easy access to the ballot—are not enough, it's hard to see what would be. The Voting Rights Act certainly played a role in bringing about this preferable state of affairs, *see Shelby County*, 570 U.S. at 548, but that is a reason to say "job well done," not a reason to continually expand the Act's scope to reach conditions further and further removed from the imaginations of those who enacted it.

On the other hand, if a half-century of race-based redistricting has *not* alleviated the problem Congress set out to address, it is difficult to see how the statute is an "appropriate

response" to that problem. *Nat'l Ass'n of the Deaf*, 980 F.3d at 771 (quotation omitted). Either the Act has accomplished its goals (in which case the statutorily imposed racial segregation must end) or it has failed to do so in over half a century (in which case that "remedy" has proved futile).

The Constitution does not permit such an endeavor to go on forever without explanation. Congress must explain its choices with contemporary evidence. And "at some point," every government-enforced racial classification "must end." *SFFA*, 600 U.S. at 212.

*       *       *

All of this can be avoided. If the Court holds that the district court erred here, that is enough. But if § 2 actually requires racial gerrymandering to create black-majority districts in modern-day Georgia, it has gone far beyond its constitutional prerogative.

## III. There is no private cause of action to enforce § 2.

Courts have frequently assumed a private right to enforce § 2, but it remains an "open question." *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring). The Eighth Circuit, in the only thoroughly reasoned opinion on the issue, recently held that no private cause of action exists. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). This Court

should reach the same conclusion. Section 2 provides no express cause of action for private plaintiffs, and the text and structure of the Voting Rights Act make it clear that Congress did not intend to implicitly create one. Nor may courts judicially "create one, no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

## A. The Act's text and structure show that Congress did not create a private cause of action.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S at 286 (citation omitted). So the Court must look to "the statute Congress has passed" to determine whether plaintiffs have a cause of action. *Id.* And as with all statutory interpretation, text and structure are key. *Id.* at 288.

Section 2 itself contains no express cause of action. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality); 52 U.S.C. § 10301. Plaintiffs' claims thus fail unless they can show that the Act impliedly confers a cause of action. In a bygone era, federal courts would liberally read causes of action into statutes to effectuate the courts' loose view of "congressional purpose." *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964). But the Supreme Court has long since "sworn off the habit." *Sandoval*, 532 U.S. at

287; *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) (repudiating "the heady days in which [the] Court assumed common-law powers to create causes of action" (quotation omitted)). "[C]reating a cause of action is a legislative endeavor," requiring a careful cost-benefit analysis for which courts are ill-equipped. *Egbert*, 596 U.S. at 491.

And Congress knows this. It is "undoubtedly aware" that federal courts will not discover causes of action where it has not specified one. *Krahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 536 (1989). The Supreme Court's decisions, many of which preceded the 1982 amendment to § 2, have "apprise[d]" Congress "that the ball" is "in its court." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 718 (1979) (Rehnquist, J., concurring) (collecting cases). Accordingly, federal courts today demand "clear evidence of congressional intent" before they will recognize a cause of action, *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). And if there is "even a single sound reason" to think Congress did not intend a private cause of action, the court "must refrain from creating" one. *Egbert*, 596 U.S. at 491 (quotation omitted and alteration adopted).

The textual evidence here shows that Congress specifically did *not* create a private cause of action to enforce § 2. Instead, in

§ 12 of the Act, Congress expressly empowered the Attorney General to enforce § 2 and the Act's other provisions through criminal and civil actions. 52 U.S.C. § 10308(c). But § 12, like § 2, says nothing about private plaintiffs or private remedies. And that omission is critical. "The express provision of one [cause of action] suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

The inclusion of another cause of action is entitled to such great weight that it may "preclude[e]" a "private right of action even though other aspects of the statute … suggest the contrary." *Id.* (citation omitted). Remember, the Voting Rights Act is a multi-pronged statute with a detailed enforcement process. *See* 52 U.S.C. §§ 10302, 10308, 10310. When Congress, in such a "comprehensive legislative scheme," opts to specify public enforcement, the only permissible inference is that the private remedy was "deliberately omitted." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (quotation omitted).

Federalism concerns and clear statement rules point the same way. If § 2 authorizes a broad category of individuals to upset a state's redistricting process through private lawsuits, that would represent a significant intrusion upon states' traditional authority to regulate elections. *See Shelby County*, 570 U.S. at 543. And

when Congress intends to invade an area of "quintessential" state power, "[w]e ordinarily expect a clear and manifest statement" expressing that intent. *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality) (quotation omitted); *see also Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

"If the 1965 Congress 'clearly intended' to create a private right of action, then why not say so in the statute? If not then, why not later, when Congress amended § 2?" *Ark. State Conf. NAACP*, 86 F.4th at 1214. The readily apparent reason is that Congress vested enforcement power in the Attorney General, not private parties.

## B. The district court's arguments to the contrary are unavailing.

Neither the district court nor Plaintiffs offered any compelling reason to recognize a private cause of action under § 2. The district court, for its part, gave the issue very little attention. *See* Doc. 65 at 31-34. Though it ultimately concluded that § 2 does create a private cause of action, it neglected to address the substance of the Secretary's arguments or independently analyze the text of the Voting Rights Act. *See id.*

Instead, the district court uncritically deferred to a series of decisions from other district courts. *See* Doc. 65 at 32-33. But those decisions themselves failed to seriously engage with the merits of the private-cause-of-action debate, instead relying on the many times courts have simply *assumed* a private cause of action. *See id.* (collecting cases).

The district court also erroneously relied on *Morse*, 517 U.S. at 232. *See* Doc. 65 at 33. As the Eighth Circuit explained, *Morse* was a deeply fractured decision that considered the private enforceability of § 10 of the Voting Rights Act, not § 2. *Ark. State Conf. NAACP*, 86 F.4th at 1215-16. To the extent certain justices referred to a "private right of action under Section 2," *Morse*, 517 U.S. at 232 (quotation omitted), that was a mere "background assumptio[n]," and the various opinions offered no explanation as to *why* § 2 would be privately enforceable. *Ark. State Conf. NAACP*, 86 F.4th at 1215-16. The statements were "mere dicta at most." *Id.* at 1215; *see also Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring) (noting that the Court has not decided the question).

Plaintiffs, for their part, tried to find a cause of action in § 3 of the Act. *See* Doc. 47 at 24-25. Section 3 authorizes various remedies, like appointing federal observers and suspending

discriminatory voting tests, "[w]henever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a).

But § 3 undermines Plaintiffs' view. Unlike § 12, which explicitly empowers the Attorney General to enforce the Act's substantive provisions through civil actions, § 3 does not authorize anyone to file a lawsuit. *Compare* § 10302(a) (§ 3) *with* § 10308(d) (§ 12). It references suits brought by "aggrieved person[s]," but it does not *create* a cause of action on their behalf. It merely recognizes private causes of action that *already* existed when that term was added to the statute in 1975, like constitutional challenges under 42 U.S.C. § 1983, "suits under § 5," or any other causes of action "that [the Court] might recognize in the future." *Morse*, 517 U.S. at 289 (Thomas, J., dissenting); *see also Ark. State Conf. NAACP*, 86 F.4th at 1211 (same).

Plus, if the plaintiffs' reading is correct, § 3 would create a private cause of action not just for § 2 but for *all* voting rights statutes. *See* 52 U.S.C. § 10302 (referring to actions "under any statute"). That blank-check interpretation would upend the general principle that Congress must clearly and specifically express its intent to create a cause of action. *In re Wild*, 994 F.3d

at 1255. Congress did not hide such a large elephant in such a small mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted.

|  |  |
|---|---|
| | */s/ Stephen J. Petrany* |
| Bryan P. Tyson | Christopher M. Carr |
| Bryan F. Jacoutot | *Attorney General of Georgia* |
| Diane F. LaRoss | Stephen J. Petrany |
| *Special Asst. Att'ys General* | *Solicitor General* |
| Taylor English Duma LLP | Paul R. Draper |
| 1600 Parkwood Circle | *Deputy Solicitor General* |
| Suite 200 | Office of the Georgia |
| Atlanta, Georgia 30339 | Attorney General |
| (678) 336-7249 | 40 Capitol Square, SW |
| btyson@taylorenglish.com | Atlanta, Georgia 30334 |
| | (404) 458-3408 |
| | spetrany@law.ga.gov |

*Counsel for the Secretary of State of Georgia*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,971 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Stephen J. Petrany*
Stephen J. Petrany