No. 23-13914
*(Consolidated with Nos. 23-13916 & 23-13921)*

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ALPHA PHI ALPHA FRATERNITY, INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; *et al.*,

*Plaintiffs-Appellees,*

UNITED STATES OF AMERICA,

*Intervenor-Appellee,*

*v.*

SECRETARY, STATE OF GEORGIA, in his official capacity,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-cv-5537 (Hon. Steve C. Jones)

## BRIEF OF PLAINTIFFS-APPELLEES

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
MAURA DOUGLAS
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
  GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

SOPHIA LIN LAKIN
ARI J. SAVITZKY
MING CHEUNG
CASEY SMITH
ACLU FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
Telephone: (212) 519-7836

*Counsel for Plaintiffs-Appellees Alpha Phi Alpha Fraternity, Inc. et al. (No. 23-13914)*

April 8, 2024

ADDITIONAL COUNSEL ON INSIDE COVER

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

SONIKA R. DATA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1–26.1-3, Appellees *Alpha Phi Alpha, Inc., Sixth District of the African Methodist Episcopal Church, Eric T. Woods, Katie Bailey Glenn, Phil Brown, and Janice Stewart* identify all Counsel, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1. ACLU Foundation, Inc., *Counsel for Plaintiffs-Appellees*;

2. ACLU Foundation of Georgia, Inc., *Counsel for Plaintiffs-Appellees*;

3. Adegbile, Debo P., *Counsel for Plaintiffs-Appellees*;

4. Aiken, D'Ericka, *Counsel for Plaintiffs-Appellees*;

5. Albert M. Pearson LLC, *Counsel for Amicus*;

6. Allensworth, Robert M., *Attempted Amicus*;

7. Alpha Phi Alpha, Inc., *Plaintiff-Appellee;*

8. Arbuthnot, Jacqueline Faye, *Grant Plaintiff-Appellee*;

9. Bokat-Lindell, Noah B., *Counsel for Intervenor*

10. Boone, Robert, *Counsel for Plaintiffs-Appellees*;

11. Bowles, Jasmine, *Amicus*;

12. Boyle Jr., Donald P., *Counsel for Defendant-Appellant*;

13. Brown, Phil, *Plaintiff-Appellee;*

14.     Brown, Theron, *Grant Plaintiff-Appellee*;

15.     Bush, Jacquelyn, *Grant Plaintiff-Appellee*;

16.     Carr, Christopher, *Counsel for Defendant-Appellant*;

17.     Calvo-Friedman, Jennesa, *Former Counsel for Plaintiffs-Appellees*;

18.     Cheung, Ming, *Counsel for Plaintiffs-Appellees*;

19.     Common Cause, *Amicus*;

20.     Conner, Mary Nell, *Grant Plaintiff-Appellee*;

21.     Crowell & Moring LLP, *Counsel for Amicus*;

22.     Data, Sonika, *Counsel for Plaintiffs-Appellees*;

23.     Davis, Alexander S., *Counsel for Amicus*;

24.     Dechert LLP, *Counsel for Amicus*;

25.     DiGiuseppe, Marisa A., *Counsel for Plaintiffs-Appellees*;

26.     Dixit, Anuj, *Counsel for Plaintiffs-Appellees*;

27.     Douglas, Maura, *Counsel for Plaintiffs-Appellees*;

28.     Draper, Paul R, *Counsel for Defendant-Appellant*;

29.     Election Law Clinic at Harvard Law School, *Amicus*;

30.     Elias Law Group LLP, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

31.     Fair Districts GA, *Amicus*;

32.     Flynn, Erin H., *Counsel for Intervenor*;

33. Ford, Christina Ashley, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

34. Freeman, Daniel J., *Counsel for Intervenor*;

35. GALEO Latino Community Development Fund, Inc., *Amicus*;

36. Garabadu, Rahul, *Former Counsel for Plaintiffs-Appellees*;

37. Geaghan-Breiner, Charlotte, *Counsel for Plaintiffs-Appellees*;

38. Geiger, Soren, *Counsel for Amicus*;

39. Genberg, Jack, *Counsel for Amicus*;

40. Georgia Coalition for the People's Agenda, *Amicus*;

41. Georgia Department of Law, *Counsel for Defendant-Appellant*;

42. Georgia State Conference of the NAACP, *Amicus*;

43. Glaze, Ojuan, *Pendergrass Plaintiff-Appellee*;

44. Glenn, Katie Bailey, *Plaintiff-Appellee;*

45. Grant, Annie Lois, *Grant Plaintiff-Appellee*;

46. Graves, Cheryl, *Amicus*;

47. Greenbaum, Jon, *Counsel for Amicus*;

48. Greenwood, Ruth M., *Counsel for Amicus*;

49. Harrison, Keith, *Counsel for Amicus*;

50. Hawley, Jonathan Patrick, *Formal Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

51. Holtzman Vogel, PLLC, *Counsel for Amicus*

52. Heard, Bradley E., *Counsel for Amicus*;

53. Heaven, Astor H.L., *Counsel for Amicus*;

54. Hennington, Elliott, *Pendergrass Plaintiff-Appellee*;

55. Hessel, Daniel J., *Counsel for Amicus*;

56. Houk, Julie M., *Counsel for Amicus*;

57. Howell, Quentin T., *Grant Plaintiff-Appellee*;

58. Isaacson, Cory, *Counsel for Plaintiffs-Appellees*;

59. Ivey, Marvis McDaniel, *Amicus*;

60. Jacoutot, Bryan Francis, *Counsel for Defendant-Appellant*;

61. Jackson, Toni Michelle, *Counsel for Amicus*;

62. James, Triana Arnold, *Grant and Pendergrass Plaintiff-Appellee*;

63. Jamieson, Nathan, *Counsel for Amicus*;

64. Jones, Michael Brandon, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

65. Jones, Steve C., *District Court Judge*;

66. Kastorf Law LLP, *Counsel for Amicus*;

67. Kastorf, Kurt, *Counsel for Amicus*;

68. Khanna, Abha, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

69. Kim, Eliot, *Counsel for Plaintiffs-Appellees*;

70. Kim, Taeyoung, *Counsel for Plaintiffs-Appellees*;

71. Krevolin & Horst LLC, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

72. LaCour, Edmund, *Counsel for Amicus*;

73. Lakin, Sophia Lin, *Counsel for Plaintiffs-Appellees*;

74. LaRoss, Diane Festin, *Counsel for Defendant-Appellant*;

75. Lawyers' Committee for Civil Rights Under Law, *Counsel for Amicus*;

76. League of Women Voters of Georgia, *Amicus*;

77. Lee, Theresa J., *Counsel for Amicus*;

78. Lewis, Joyce Gist, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

79. Love-Olivo, Cassandra Nicole, *Counsel for Amicus*;

80. May, Caitlin Felt, *Counsel for Plaintiffs-Appellees*;

81. McGowan Charlene, *Former Counsel for Defendant-Appellant*;

82. Miller, Alex W., *Counsel for Plaintiffs-Appellees*;

83. Miller, Kelsey A., *Former Counsel for Plaintiffs-Appellees*;

84. Mitchell, Cassie, *Counsel for Plaintiffs-Appellees*;

85. National Republican Redistricting Trust, *Amicus*;

86. O'Donnell, Courtney, *Counsel for Amicus*;

87. Osher, Daniel C., *Former Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

88. Paradise, Loree Anne, *Former Counsel for Defendant-Appellant*;

89. Pearson, Albert Matthews, *Counsel for Amicus*;

90. Pendergrass, Coakley, *Pendergrass Plaintiff-Appellee*;

91. Perkins Coie LLP, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

92. Perkins, Brianne, *Amicus*;

93. Petrany, Stephen J., *Counsel for Defendant-Appellant*;

94. Raffensperger, Bradford J., *Defendant-Appellant*;

95. Reynolds, Garrett, *Grant Plaintiff-Appellee*;

96. Richards, Roberts, *Pendergrass Plaintiff-Appellee*;

97. Rollins-Boyd, David, *Counsel for Amicus*;

98. Rosenberg, Ezra D., *Counsel for Amicus*;

99. Rueckert, Jens, *Pendergrass Plaintiff-Appellee*;

100. Ruiz Toro, Juan M., *Counsel for Plaintiffs-Appellees*;

101. Rutahindurwa, Makeba, *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

102. Savitzky, Ari J., *Counsel for Plaintiffs-Appellees*;

103. Shaw, Abigail, *Former Counsel for Plaintiffs-Appellees*;

104. Sivaram, Anuradha, *Former Counsel for Plaintiffs-Appellees*;

105. Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellee;*

106. Solomon, Elbert, *Grant Plaintiff-Appellee*;

107. Southern Poverty Law Center, *Counsel for Amicus*;

108. Sparks, Adam M., *Counsel for Grant and Pendergrass Plaintiffs-Appellees*;

109. Smith, Casey Katharine, *Counsel for Plaintiffs-Appellees*;

110. Steiner, Neil, *Counsel for Amicus*;

111. Stewart, Janice, *Plaintiff-Appellee;*

112. Stewart, Michael Elliot; *Counsel for Intervenor*;

113. Strickland, Frank B., *Counsel for Defendant-Appellant*;

114. Sykes, Eunice, *Grant Plaintiff-Appellee*;

115. Taylor English Duma LLP, *Counsel for Defendant-Appellant*;

116. Thomas, Ursula, *Amicus*;

117. Tolbert, Elroy, *Grant Plaintiff-Appellee*;

118. Torchinsky, Jason B., *Counsel for Amicus*;

119. Tsai, Denise, *Counsel for Plaintiffs-Appellees*;

120. Tyson, Bryan P., *Counsel for Defendant-Appellant*;

121. United States Department of Justice, *Intervenor*;

122. Varghese, George P., *Counsel for Plaintiffs-Appellees*;

123. Vaughan, Elizabeth Marie Wilson, *Former Counsel for Defendant-Appellant*;

124. Weigel, Daniel H., *Counsel for Defendant-Appellant*;

125. Webb, Bryan K., *Counsel for Defendant-Appellant*;

126. Weitzman, Samuel, *Former Counsel for Plaintiffs-Appellees*;

127.  Willard, Russell D., *Counsel for Defendant-Appellant*;

128.  Williams, Ayana, *Former Counsel for Plaintiffs-Appellees*;

129.  Williams, H. Benjamin, *Amicus*;

130.  Williams, Edward, *Former Counsel for Plaintiffs-Appellees*;

131.  Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Plaintiffs-Appellees;*

132.  Wimbish, Dexter, *Grant Plaintiff-Appellee*;

133.  Woods, Eric T., *Plaintiff-Appellee;*

134.  Young, Sean Jengwei, *Former Counsel for Plaintiffs-Appellees*;

135.  Zabel, Joseph D., *Former Counsel for Plaintiffs-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Plaintiffs-Appellees state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: April 8, 2024

*/s/ Sophia Lin Lakin*
SOPHIA LIN LAKIN
*Counsel for Plaintiffs-Appellees*
*Alpha Phi Alpha Fraternity, Inc. et al.*
*(No. 23-13914)*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees agree with Defendant-Appellant that oral argument could assist the Court in resolving this appeal.

Page

CERTIFICATE OF INTERESTED PERSONS ....................................................C1

DISCLOSURE STATEMENT ............................................................................C9

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF AUTHORITIES ..............................................................................iv

STATEMENT OF ISSUES ..................................................................................1

INTRODUCTION ...............................................................................................2

STATEMENT OF THE CASE.............................................................................4

      A.     Georgia's Redistricting Process Does Not Reflect
             Massive Black Population Growth........................................4

      B.     Plaintiffs Prevail on Vote Dilution Claims ..........................6

STANDARD OF REVIEW ................................................................................10

SUMMARY OF ARGUMENT ...........................................................................11

ARGUMENT .....................................................................................................12

I.     THE DISTRICT COURT'S FINDINGS ESTABLISH THAT THE
      ENACTED PLANS VIOLATE SECTION 2 ...........................................12

      A.     The District Court Did Not Err on the *Gingles*
             Preconditions .......................................................................14

            1.     "Racially Polarized Voting" for Purposes of
                  *Gingles* 3 Does Not Require Racial Causation.........................15

            2.     The District Court Appropriately Considered
                  Evidence of Partisanship at the Totality of the
                  Circumstances ..........................................................24

      B.     The District Court Did Not Err on the Totality of the
             Circumstances Analysis .......................................................31

II.      S<span>ECTION</span> 2 M<span>AY</span> B<span>E</span> E<span>NFORCED</span> B<span>Y</span> P<span>RIVATE</span> P<span>ARTIES</span> .....................................37

III.    S<span>ECTION</span> 2 <span>IS A</span> P<span>ERMISSIBLE</span> E<span>XERCISE OF</span> C<span>ONGRESSIONAL</span>
       A<span>UTHORITY</span> ..................................................................................45

CONCLUSION....................................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004) ..................................................................................45

*Alabama State Conference of NAACP v. Alabama*, 949 F.3d 647 (11th Cir. 2020) ..........................................................................40

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...........................................41

*Allen v. Milligan*, 599 U.S. 1 (2023) ...............................................*passim*

*Allen v. State Board of Elections*, 393 U.S. 544 (1969) .........................42

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................54

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)..................................................................................35, 44

*Chisom v. Roemer*, 501 U.S. 380 (1991) ...........................................17, 49

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ....................45, 48, 49, 50

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ........................................20

*City of Rome v. United States*, 446 U.S. 156 (1980) ..............................47

*Clarke v. City of Cincinnati*, 40 F.3d 807 (6th Cir. 1994).....................22

*Coca v. City of Dodge City*, 669 F. Supp. 3d 1131 (D. Kan. 2023) .......40

*Cooper v. Harris*, 581 U.S. 285 (2017) ..................................................11

*Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998).....................................30

*Florida International University Board of Trustees v. Florida National University, Inc.*, 830 F.3d 1242 (11th Cir. 2016) ..........36

*Ford v. Strange*, 580 F. App'x 701 (11th Cir. 2014)..............................40

*Georgia State Conference of NAACP v. Georgia*, 269 F. Supp. 3d 1266 (N.D. Ga. 2017) ....................................................................40

*Georgia State Conference of NAACP v. Fayette County Board of Commissioners*, 775 F.3d 1336 (11th Cir. 2015) .........................14

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ...................................................38

*Goosby v. Town Board of Hempstead*, 180 F.3d 476 (2d Cir. 1999) .....................22

*Greater Birmingham Ministries v. Secretary of Alabama*, 992 F.3d 1299 (11th Cir. 2021) ....................................................................20

*Growe v. Emison*, 507 U.S. 25 (1993) ...................................................................13

*Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023)....................................................................................37

*Jackson v. Georgia Department of Transportation*, 16 F.3d 1573 (11th Cir. 1994) ....................................................................................41

*Johnson v. De Grandy*, 512 U.S. 997 (1994).....................................................23, 30

*Johnson v. Hamrick*, 196 F.3d 1216 (11th Cir. 1999) .......................................24, 47

*Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795 (11th Cir. 2017) ....................................................................................32

*League of United Latin America Citizens v. Perry*, 548 U.S. 399 (2006)......................................................................13, 31, 35

*League of United Latin American Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) ...........................20, 21, 30

*Liu v. SEC*, 140 S. Ct. 1936 (2020).......................................................................40

*Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999) .......................................................40

*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996).......................................................................12, 38, 39, 42, 43

*Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) ...............................18, 19, 24, 25

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) .............................40

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) .............................................40, 55

*Rogers v. Lodge*, 458 U.S. 613 (1982)....................................................50

*Sanchez v. State of Colorado*, 97 F.3d 1303 (10th Cir. 1996)................................19

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ...............................................38, 42

*Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006) .................................40

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)......................................39

*Shelby County v. Holder*, 570 U.S. 529 (2013) .............................................4, 45, 52

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022) ...........29, 32, 34, 39, 40

*Solomon v. Liberty County Commissioners*, 221 F.3d 1218 (11th Cir. 2000) ...................................................................................25

*Solomon v. Liberty County*, 957 F. Supp. 1522 (N.D. Fla. 1997) ...........................23

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ..........................................48, 49

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ..........................................................53

*Teague v. Attala County*, 92 F.3d 283 (5th Cir. 1996) ..........................................22

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...........................................................48, 50

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .................................................*passim*

*United States v. Blaine County*, 363 F.3d 897 (9th Cir. 2004)...........................50, 53

*United States v. Charleston County*, 365 F.3d 341 (4th Cir. 2004)........................19

*United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir. 1984) .............................................. 19, 24, 33, 47, 49, 53

*Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995)............................................22

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)..........................................23, 33, 49

*Whitcomb v. Chavis*, 403 U.S. 124 (1971)................................................................21

*Worthy v. City of Phenix City*, 930 F.3d 1206 (11th Cir. 2019) ............................26

*Wright v. Sumter County Board of Elections & Registration*,
    301 F. Supp. 3d 1297 (M.D. Ga. 2018)....................................33, 34

*Wright v. Sumter County Board of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ........................................10, 11, 14

## STATUTORY PROVISIONS

42 U.S.C. § 1983................................................4, 11, 37, 38, 45

52 U.S.C.
    § 10301 ................................................12, 37, 38, 43
    § 10302 ................................................................42, 43

Voting Rights Act of 1965 (codified 52 U.S.C. § 10301) ........................................2

## LEGISLATIVE MATERIALS

Cong. Globe, 40th Cong., 3d Sess. 725 (1869) ........................................47

Cong. Globe, 41st Cong., 2d Sess. 3670 (1870)........................................47

H.R. Rep. No. 97-227 (1981)................................................44

H.R. Rep. No. 109-478 (2006)................................................44

S. Rep. No. 94-295 (1975)................................................42, 44

S. Rep. No. 97-417 (1982)................................................39, 44, 50, 52

## OTHER AUTHORITIES

Crum, Travis, *Reconstructing Racially Polarized Voting*,
    70 Duke L.J. 261 (2020) ................................................51

Gerken, Heather K., *A Third Way for the Voting Rights Act*,
    106 Colum. L. Rev. 708 (2006)................................................51

## STATEMENT OF ISSUES

1. Whether the district court clearly erred in determining that Georgia's state legislative districts violate § 2 of the Voting Rights Act based on extensive factual findings and credibility determinations following an eight-day trial.

2. Whether the district court correctly determined, as binding precedent requires, that there is a private cause of action to enforce § 2 of the Voting Rights Act.

3. Whether the district court correctly determined, as binding precedent requires, that § 2 of the Voting Rights Act is constitutional.

**INTRODUCTION**

Following an eight-day bench trial featuring 19 witnesses, and thousands of pages of exhibits, expert reports, briefs, and post-trial filings, the district court issued a 519-page opinion detailing vote dilution in certain parts of Metro Atlanta and Macon in violation of Section 2 of the Voting Rights Act of 1965 (the "VRA"). Applying the Supreme Court's recent decision in *Allen v. Milligan*, 599 U.S. 1 (2023), to a comprehensive trial record, the district court found that the rapidly growing Black population in those areas could support additional, reasonably configured majority-Black State Senate and House districts. It found that the enacted district lines will fragment the growing Black populations in those areas into White-majority districts where Black-preferred candidates will lose due to persistent and extreme racial polarization in voting. And it found that the totality of circumstances demonstrated that opportunities for Black voters to participate and elect candidates of choice to the General Assembly in the areas of focus in the litigation are not equal, notwithstanding "the great strides" Georgia has made since the VRA's passage. Doc. 333 ("Op.") at 9.

The Secretary identifies no error in these comprehensive and careful findings. To the contrary—many of the key facts are undisputed. The parties agree, for example, that Georgia's demographics have transformed since the last Census, with racial minorities driving all the state's population growth. And the parties agree that

in the focus areas, White and Black voters cohesively support different candidates, with White voters consistently bloc-voting to defeat candidates preferred by Black voters except in Black-majority districts. On those undisputed facts and others established at trial, faithful application of recent, binding precedent requires this Court to affirm.

The Secretary asks the Court to countermand last year's Supreme Court decision in *Milligan* reaffirming the *Gingles* framework and gut the VRA by adding an onerous new "racial causation" prerequisite. For decades, vote dilution plaintiffs have shown legally significant racially polarized voting under Section 2 by demonstrating cohesive voting by Black voters in support of their preferred candidates and by White voters in opposition to those candidates, such that Black voters are shut out when drawn into White-majority districts. Plaintiffs are not required to probe White voters' subjective intent, nor affirmatively prove that their opposition to Black-preferred candidates is caused by race and not partisanship. The Secretary's contrary position is not the law, and it never has been.

The Secretary also asks the Court to eliminate voters' long-established ability to vindicate their own rights under the VRA—a similarly radical departure from controlling precedent. For decades, the people whose votes are actually diluted have enforced their rights under federal law, as the Supreme Court, this Court, and numerous other courts, along with Congress itself, have confirmed. In any event,

Plaintiffs also brought their claim under 42 U.S.C. § 1983, which provides a statutory right of action to enforce federal laws like the VRA and renders the Secretary's argument irrelevant in addition to being wrong.

The Secretary last resorts to claiming that the VRA is subject to an unwritten constitutional time limit. No precedent supports that position—indeed, the Supreme Court expressly rejected it, recognizing Section 2 as a *permanent*, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013) (emphasis added). The fact that, due to the VRA, Georgia now offers more political opportunities for Black voters than it did in 1965 does not mean the law has passed some fictitious expiration date. Rather, as the district court found in an exacting opinion that accepted some but not all of Plaintiffs' claims, starkly racially polarized voting persists, and the promise of equal opportunity has not yet been met, in the areas where new districts were ordered. The Secretary's policy views on whether Section 2 remains necessary are irrelevant. On the law and facts, this Court should affirm.

## STATEMENT OF THE CASE

### A. Georgia's Redistricting Process Does Not Reflect Massive Black Population Growth

Georgia's Black population has experienced massive growth over the last 20 years. Between 2000 to 2020, the number of Black Georgians increased by over 1.1 million, a nearly 50% increase equal to the population of six State Senate districts

and more than 19 State House districts.  Op. 32-34.[1]  Over the last decade alone, Georgia's Black population increased by nearly 500,000, while the White population declined.  Op. 33-34.  Black population growth was especially substantial in Metro Atlanta, increasing by over 900,000 people between 2000 and 2020, and over 400,000 in the last decade alone.  Op. 34-37.  Counties in South Metro Atlanta saw some of the highest rates of change, experiencing nearly 300% Black population growth over the last two decades even as the White population fell.  Op. 36-37.  In addition, counties in the Metropolitan Macon area saw the Black population increase while the White population decreased.  Op. 39.

Georgia's redistricting after the 2020 Census did not reflect these seismic demographic shifts.  Instead, the General Assembly passed State House and Senate maps (the "Enacted Plans") that effectively froze the number of Black-majority legislative districts—the number of Senate districts stayed the same; the number of House districts increased by two.  Op. 54.  The General Assembly passed the Enacted Plans just two weeks after they were publicly revealed, without the vote of a single Black representative.  Op. 47.

---

[1]  As used herein, "Black" refers to persons who are any-part Black, *i.e.*, single-race Black or of two or more races and some part Black.  Op. 32 n.14.

## B. Plaintiffs Prevail on Vote Dilution Claims

Plaintiffs brought this lawsuit under Section 2 of the VRA, alleging vote dilution in certain areas of the Enacted Plans, including South Metro Atlanta, and moved for a preliminary injunction. Separate plaintiffs also challenged the Enacted Plans in *Grant v. Raffensperger*, No. 22-cv-00122 (N.D. Ga.), and a third set of plaintiffs challenged Georgia's congressional districts in *Pendergrass v. Raffensperger*, No. 21-cv-05339 (N.D. Ga.). After a six-day hearing in all three cases, the district court held that Plaintiffs were likely to succeed on the merits with respect to Senate and House districts in the Metro Atlanta area and elsewhere. Doc. 134 at 93, 237. However, the court denied preliminary relief because it concluded it was too close to the 2022 election to order new lines. Doc. 134 at 237. The 2022 election proceeded using the Enacted Plans.

Following the 2022 election and extensive discovery, the district court held a two-week consolidated trial in the three cases. The district court found that Plaintiffs had demonstrated a lack of equal openness in Georgia's election system as to some (but not all) of the challenged areas in the Enacted Plans, including South Metro Atlanta. Op. 514. The court permanently enjoined the use of the Enacted Plans in any future election and, based on the proofs in the state legislative cases, ordered new maps that would include two additional Black-majority Senate districts in South Metro Atlanta, three additional Black-majority House districts in the South and West

Metro Atlanta areas, and two additional Black-majority House districts in Metro Macon. Op. 512-514.

The court made specific and detailed findings as to each of the *Gingles* preconditions in the challenged areas where Plaintiffs were granted relief. On *Gingles* 1, it found that Plaintiffs had shown via mapping expert William Cooper's Illustrative Plans that the Black population in and around Illustrative Senate Districts 17 and 28 and Illustrative House District 74 (all in South Metro Atlanta) is "sufficiently [large and geographically] compact" to form a majority in a reasonably configured district. Op. 286, 295, 301. The court found that those Illustrative districts also complied with all traditional redistricting criteria, that they performed comparably to or better than the Enacted Plans based on numerous objective metrics, and that Mr. Cooper considered communities of interest when configuring his maps. Op. 274-309. Those findings were based on the court's careful credibility determinations following Mr. Cooper's live testimony. *See* Op. 61-65, 274-309.

The court next concluded that Plaintiffs satisfied *Gingles* 2, that "minority group members constitute a politically cohesive unit." *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The court found—indeed, the Secretary stipulated—that Black voters are "highly cohesive in supporting a single preferred candidate" in the areas of Georgia (including South Metro Atlanta) analyzed by expert political scientist Dr. Lisa Handley. Op. 411-413. Dr. Handley's analysis, which the court credited, was

based on 16 recent general and runoff statewide elections and 54 recent State legislative elections in the focus areas, which consistently showed that nearly all Black voters supported a single preferred candidate. Op. 408-412.

The district court also found that Plaintiffs established *Gingles* 3—that "the Black-preferred candidate will typically be defeated by white voters in majority-white districts." Op. 420. Indeed, the Secretary stipulated that "white voters were 'very cohesive' in their support for their preferred candidates in both statewide and State legislative general elections." Op. 418. And the court determined "the uncontested evidence shows white voters in the relevant areas only vote for the Black-preferred candidate between 9.8% to 11.2% of the time." Op. 420. As Dr. Handley testified, these voting patterns demonstrated "starkly racially polarized" voting in general elections. Doc. 385 Tr. 862:4-6 (Sept. 7). Due to this starkly racially polarized voting, the court found that the Black-preferred candidate will typically be defeated by White voters in majority-White districts in the focus areas. Op. 419-420. In making its findings, the court deemed credible the expert report and in-court testimony of Dr. Handley, whose statistical analysis the Secretary did not challenge. Op. 73-75, 419-420.

Finally, the district court found that based on the totality of circumstances Georgia's electoral system is not equally open to Black voters with respect to state legislative elections in the focus areas. Op. 429, 480-481. For example, Plaintiffs

had provided "concrete recent examples of the discriminatory impact of recent Georgia practices, some specifically in the area of the districts proposed." Op. 449-450. Plaintiffs also demonstrated that "Black voters have lower voter turnout rates than white voters" and "that Black Georgians suffer from significant socioeconomic disparities." Op. 482 n.124, 462-465. The court recognized that Black candidates had been elected to office in Georgia, but found that "the Black population is underrepresented in Georgia's statewide elected offices." Op, 467-472. These findings relied on the testimony and reports of, among others, Dr. Traci Burch (a political scientist specializing in political participation and behavior), Op. 161-164, 455, 459-465, 473, and Dr. Adrienne Jones (a political scientist focusing on voting discrimination and Black political development), Op. 159-161, 435-436, 439-443, 445-446, 466-467. The court found Dr. Burch's and Dr. Jones's testimony and analyses credible. Op. 160-163.

In evaluating the totality of circumstances, the court expressly considered and rejected the State's argument that partisanship, rather than race, explained polarization. Following a careful evaluation of a comprehensive record, it found that the evidence of racial polarization "weigh[ed] heavily in favor of finding a Section 2 violation." Op. 458. In so finding, the court considered Dr. Handley's report, "indicating strong evidence of racial polarization in voting," Op. 453, and her testimony about the "strong connection between race and partisanship as it currently

exists in Georgia," Op. 453-454. The court also considered and deemed credible the testimony of Dr. Jason Ward (a historian specializing in race and politics in Georgia), Op. 163-164, 454-455, 466, and Dr. Orville Vernon Burton (a historian focusing on race discrimination and voting), Op. 156-158, 434, 442, 447, 454-456, 469, that race has historically driven voting patterns in Georgia. Defendants presented no evidence to rebut this analysis.

Based on hundreds of pages of careful findings and credibility determinations, the district court determined that the majority of the Senate Factors weighed in favor of relief, and ultimately found that Plaintiffs had proven vote dilution violations in the focus areas with respect to the Enacted Plans. Op. 480-481.

## STANDARD OF REVIEW

The *Gingles* framework is "peculiarly dependent upon the facts of each case," and requires courts to "conduct an intensely local appraisal," and a "searching practical evaluation of the past and present reality." *Allen v. Milligan*, 599 U.S. 1, 19 (2023) (cleaned up). Such fact-intensive determinations are reviewed for clear error. *Wright v. Sumter Cnty. Bd. of Elections & Registration* ("*Wright II*"), 979 F.3d 1282, 1301 (11th Cir. 2020). Under that standard, an appellate court may not "reverse the finding of the trier of fact simply because [it is] convinced [it] would

have decided the case differently." *Id.* (cleaned up). Credibility determinations garner "singular deference." *Cooper v. Harris*, 581 U.S. 285, 309 (2017).

## SUMMARY OF ARGUMENT

The district court's ruling was correct under binding and recent Supreme Court precedent and based on comprehensive factual findings. This Court should affirm.

*First*, the Secretary provides no basis to second-guess the district court's findings and conclusions, many of which are undisputed facts. The Secretary concedes that *Gingles* 1 and 2 are met. He challenges only the application of *Gingles* 3 and disputes the court's factual findings regarding the totality of circumstances. On the former, the Secretary stipulated to all the facts necessary to find *Gingles* 3 under current law and wrongly asks this Court to contravene precedent. On the latter, the Secretary's arguments reduce to mere disagreements with the district court's factual findings, not clear error.

*Second*, the Secretary seeks to rewrite the law by contending there is no implied private right of action to enforce Section 2. The Secretary's argument is irrelevant and wrong. The Secretary ignores that Plaintiffs also brought their claim pursuant to 42 U.S.C. § 1983, which provides a presumptive statutory right to enforce federal laws like the VRA. And as for an implied right of action, the Supreme Court has made clear that the "the existence of the private right of action

11

under Section 2 … has been clearly intended by Congress since 1965," *Morse v. Republican Party of Virginia*, 517 U.S. 186, 232 (1996) (Stevens, J., plurality op.), and the VRA's legislative history and decades of court decisions reinforce that reality.

*Finally*, the Secretary claims that Section 2 is unconstitutional because Black Georgians no longer need the VRA's protections.  But in the regions at issue here, the district court found that the evidence proves otherwise.  The Secretary's remaining constitutional arguments (to the extent they are not waived) likewise flout both settled law and congressional authority.

## ARGUMENT

## I.   THE DISTRICT COURT'S FINDINGS ESTABLISH THAT THE ENACTED PLANS VIOLATE SECTION 2

Section 2 renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a); *see also Thornburg v. Gingles*, 478 U.S. 30, 36 (1986).  Section 2 does not require intent to discriminate: "[I]t is patently clear that Congress has used the words 'on account of race or color' in the [VRA] to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination."  *Allen v. Milligan*, 599 U.S. 1, 25 (2023) (quotations omitted).

A Section 2 vote dilution claim has two components. First, Plaintiffs must satisfy the three preconditions set forth in *Gingles*, 478 U.S. at 49-50, by demonstrating that: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" (*Gingles* 1); (2) the minority group is "politically cohesive" (*Gingles* 2); and (3) the majority votes "sufficiently as a bloc to enable it … [usually] to defeat the minority's preferred candidate" (*Gingles* 3). *See Milligan*, 599 U.S. at 18 (cleaned up); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) ("*LULAC*") (quoting *Gingles*, 478 U.S. at 50-51). Together, the three preconditions establish the dilution-by-submergence dynamic identified in *Gingles*. 478 U.S. at 46-51, 59 n.28; *accord Milligan*, 599 U.S. at 17-18. In such circumstances, the challenged districting "operates to minimize or cancel out minority voters' ability to elect their preferred candidates" in a particular area by unnecessarily fragmenting large minority populations across White-majority districts, such that minority voters are "submerged in a majority voting population that regularly defeats their choices" and effectively shuts minority voters out of power. *Milligan*, 599 U.S. at 17-18 (cleaned up); *accord Growe v. Emison*, 507 U.S. 25, 40 (1993).

Second, Plaintiffs must demonstrate that, looking to the totality of circumstances, the challenged districting scheme results in the abridgment of their right to participate in politics on equal terms and elect candidates of choice in the

challenged areas. *See Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015); 52 U.S.C. § 10301(b); *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45-46). That "'intensely local appraisal'" is a grounded, fact-intensive exercise. *Milligan*, 599 U.S. at 19.

Taken together, it is "the very unusual case in which a plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright II*, 979 F.3d 1282, 1304 (11th Cir. 2020) (cleaned up). That is because the dilution-by-submergence dynamic, as established by the *Gingles* preconditions, by its nature means that Black voters in the focus areas are being fragmented, shut out of power due to racially polarized voting, and denied the opportunity to elect candidates of choice as compared to the White majority. *E.g.,* 478 U.S. at 46-57 & n.11; *accord Milligan*, 599 U.S. at 18.

Here, there was no clear error in the court's factual findings or determination that, in the focus areas, Black voters do not have an equal opportunity to participate in politics and elect candidates of choice in state legislative elections under the Enacted Plans.

## A. The District Court Did Not Err as to the *Gingles* Preconditions

The Secretary does not contest that Plaintiffs satisfied *Gingles* 1 and 2. He challenges only *Gingles* 3—whether White bloc voting typically defeats Black-preferred candidates—because, in his view, Section 2 "requires bloc voting *caused*

by race." Appellant Br. 19-20 ("Br."). Based on his interpretation, the Secretary claims the evidence points to "partisan disagreement, not racial causation." Br. 20.

Precedent forecloses the Secretary's argument. To satisfy *Gingles* 3, Plaintiffs must establish only that "whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates," *Gingles*, 478 U.S. at 56, not that race *causes* the bloc voting. The existence of such White bloc voting is undisputed here. And to the extent evidence of causation is ever relevant, the court made a fact-intensive examination of the nature of racial polarization at the totality of circumstances stage, correctly finding in Plaintiffs' favor.

### 1. "Racially Polarized Voting" for Purposes of *Gingles* 3 Does Not Require Racial Causation

*Gingles* 3 is met "where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 17-18. As *Milligan*'s emphasis on the race of voters and electoral outcomes makes clear, *Gingles* 3 does not require any inquiry into *why* voters are polarized, including the role of partisanship. Thus, *Milligan* found *Gingles* 3 established on factual findings indistinguishable from those here: "Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote" and expert testimony showed that racially

polarized voting in Alabama was "intense, very strong, and very clear." 599 U.S. at 22 (quotations omitted).

The Secretary concedes the facts necessary to establish *Gingles* 3 under *Milligan*. The Secretary stipulated that "white voters were 'very cohesive' in their support for their preferred candidates in both statewide and State legislative general elections" and that the White voting bloc in the focus areas is "voting against the candidates preferred by Black voters." Op. 418. Similar to *Milligan*, Dr. Handley showed here that "Black-preferred candidates typically received only 11.2% of the white vote," leading the district court to conclude that "the starkly racially polarized voting in the areas she analyzed 'substantially impedes' the ability of Black voters to elect candidates of their choice." Op. 417-418. Further, the "uncontested evidence" demonstrated that White voters in Georgia "vote in opposition to the Black-preferred candidate at a higher rate than in Alabama … where the Supreme Court affirmed the three-judge court's finding of 'very clear' racial polarization." Op. 420.

The Secretary disputes none of this. Instead, he argues that Plaintiffs had to affirmatively prove that race, rather than partisanship, *caused* these stark and uncontested patterns of racial bloc voting, and that Plaintiffs had to disprove the potential role of partisan affiliation in the defeat of Black-preferred candidates.

Br. 21-29. *Milligan*, the statutory text, and decades of precedent squarely foreclose such a requirement.

The Secretary wrongly contends that Section 2's text "explicitly" requires racial causation because it uses the words "on account of race." *E.g.*, Br. 21. But as *Milligan* held, "it is patently clear that Congress has used the words 'on account of race or color' in [Section 2] to mean 'with respect to' race or color, and *not* to connote any required purpose of racial discrimination." 599 U.S. at 25 (emphasis added). *Milligan* then applied that understanding to evidence indistinguishable from the *Gingles* 3 trial record here and concluded that legally significant racially polarized voting had been shown. *Id.* at 22; *see supra* Section I.A.1. Nothing in *Milligan* turned on the independent proof of racial causation, foreclosing the Secertary's position.

And *Milligan*'s approach necessarily followed from prior precedent. *Chisom v. Roemer* held that "Congress made clear that a violation of [Section] 2 could be established by proof of discriminatory results alone," 501 U.S. 380, 404 (1991), whereas the Secretary demands more. Likewise, none of the opinion in *Gingles* itself requires plaintiffs to "show a racial explanation for voting patterns in order to establish racial polarization." Br. 24. As the district court reasoned, all but Justice White "agreed that the reasons that Black voters and white voters vote differently are irrelevant to proving the existence of the second and third *Gingles*

preconditions." Doc. 268 at 41. In a portion of the lead opinion joined by four Justices, Justice Brennan explained that "the reasons [B]lack and white voters vote differently have no relevance to the central inquiry of [Section] 2." *Gingles*, 478 U.S. at 63. In Justice O'Connor's concurrence, four more "agree[d] that defendants cannot rebut [a] showing [of divergent racial voting patterns] by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race[.]" *Id.* at 100 (O'Connor, J., concurring). The Secretary is thus wrong that any Justice in Gingles suggested Section 2 plaintiffs must disprove non-racial causes of voting patterns. Br. 23-24. Rather, Justice O'Connor merely agreed with Justice White that "Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting … is not necessary to the disposition of this case." 478 U.S. at 101 (concurring); *see also id.* at 83 (White, J., concurring) (disagreeing that "the race of the candidate is irrelevant").

This Court, like *Gingles* and *Milligan*, has also rejected the relevance of racial causation to racial bloc voting at the *Gingles* 3 stage. *See Nipper v. Smith*, 39 F.3d 1494, 1524 n.60 (11th Cir. 1994) (en banc) (plurality op.) ("[B]y demonstrating the absence of racial bias, a defendant is not rebutting the plaintiff's evidence of racial bloc voting."). Other circuits are in accord, holding that "expanding the inquiry into the third *Gingles* precondition to ask not merely whether, but also why, voters are racially polarized … would convert the threshold test into precisely the wide-

ranging, fact-intensive examination it is meant to precede." *United States v. Charleston Cnty.*, 365 F.3d 341, 348 (4th Cir. 2004); *Sanchez v. State of Colo.*, 97 F.3d 1303, 1321 (10th Cir. 1996) (reversible error to "adopt[] the State's statistical theory on the mistaken view that why voters vote a certain way answers Gingles' question about the existence of racial bloc voting").

All of this authority rejecting any requirement to affirmatively prove race as the cause of stark racial polarization in voting is further consistent with this Court's observation that a showing of racially polarized voting itself creates an inference that race is driving political behavior: "The surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

The Secretary's insistence that a vote dilution plaintiff must affirmatively prove "racial causation" to the exclusion of all other factors that might contribute to racial polarization would thus amount to a major rewrite of Section 2 in contravention of Supreme Court and circuit precedent. Every applicable authority instead provides that Plaintiffs are not required "to prove the negative" to show racial polarization based on Section 2's text. *Nipper*, 39 F.3d at 1525 (plurality op.).

*Greater Birmingham Ministries v. Secretary of Alabama*, on which the Secretary relies (Br. 21), is not to the contrary. In that case, which involved a voter ID law and not redistricting or vote dilution, this Court held that the challenged law

itself must cause the complained-of vote denial. 992 F.3d 1299, 1330 (11th Cir. 2021). Here, the district court found the Enacted Plans do just that, because they result in the minimization of Black voters' voting strength in particular areas. Insofar as the Secretary reads *Greater Birmingham* to mean that a Section 2 plaintiff must show denial or abridgement of the right to vote *because of* race rather than *with respect to* race, *Milligan* (again) expressly forecloses such a reading. 599 U.S. at 25-26.

Nor does *City of Mobile v. Bolden*, 446 U.S. 55 (1980), support the Secretary's proposed racial causation requirement. Br. 24-25. That decision was abrogated when "Congress substantially revised [Section] 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test.'" *Gingles*, 478 U.S. at 35; *see also Milligan*, 599 U.S. at 10-14 (describing *Bolden*, subsequent backlash, and ultimate passage of 1982 amendments).

The out-of-circuit cases on which the Secretary relies (Br. 27) are also unavailing. In *League of United Latin American Citizens, Council No. 4434 v. Clements*, the Fifth Circuit held that the district court erred when it categorically "*excluded* evidence" that "indisputably prove[d] that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens." 999 F.2d 831, 850-851 (5th Cir. 1993) (en banc) (emphasis added). That excluded

evidence, which is nothing like the trial record here, included very high levels of White crossover voting for minority-preferred candidates, *and* evidence that both parties "aggressively recruited" minority candidates, such that there was a track record of minority candidates winning elections in the focus areas repeatedly and "without fail" with support primarily from White voters, including in contests against White candidates. *Id.* at 860-861. This evidence demonstrated the presence of two genuinely multi-racial coalitions operating in politics, which is absent here.[2] The court also expressly declined to impose a rule requiring Section 2 plaintiffs to affirmatively establish racial causation for voter polarization. *Id.* at 860. And in any case, subsequent Fifth Circuit precedent holds that evidence of "'objective, nonracial

---

[2]  The Secretary's reliance (Br. 22-24) on *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and Justice White's concurrence in *Gingles* is similarly unavailing because they too describe scenarios with competing multi-racial coalitions, totally unlike the record here. In *Whitcomb*, low-income Black and White voters in one county section were voting for one party, while higher-income voters elsewhere were voting for the other—but both parties were nominating and electing Black candidates, with White support. 403 U.S. at 149-153 & nn.29-30. Likewise in his *Gingles* concurrence, Justice White described a scenario in which both parties were nominating racially mixed slates of candidates, such that White voters were supporting and electing Black candidates and vice versa. 478 U.S. 30, 83 (White, J., concurring). The Fifth Circuit contemplated these scenarios, where party "best explains the divergent voting patterns," *Clements*, 999 F.2d at 834, 850, but evidence of a political process characterized by competing multi-racial coalitions is absent from this record.

factors'" is considered "'under the totality of the circumstances standard.'" *Teague v. Attala Cnty.*, 92 F.3d 283, 292, 294-295 (5th Cir. 1996).

The Secretary's other out-of-circuit cases (Br. 27) expressly contravene his position. In *Goosby v. Town Board of Hempstead*, the Second Circuit concluded that "the best reading of the several opinions in *Gingles*, … is one that treats causation as *irrelevant* in the inquiry into the three *Gingles* preconditions, but relevant in the totality of circumstances inquiry." 180 F.3d 476, 493 (2d Cir. 1999) (citation omitted and emphasis added). That is precisely what the district court did here. In *Uno v. City of Holyoke*, the First Circuit similarly held that a defendant may offer causation evidence for consideration in the totality-of-circumstances analysis. 72 F.3d 973, 980 (1st Cir. 1995). It expressly rejected the Secretary's proposed approach: "[E]stablishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting." *Id.* at 983. In *Clarke v. City of Cincinnati*, the Sixth Circuit agreed that "a candidate's race can be relevant to a § 2 inquiry," but it did not hold or indicate that proof of racial causation is required (let alone for *Gingles* 3). 40 F.3d 807, 812 (6th Cir. 1994).

Failing on the law, the Secretary asserts that a racial causation requirement is a matter of "common sense" because otherwise the VRA would operate as a "one-way partisan ratchet." Br. 25. But whether the enforcement of a federal statute happens to disadvantage one political party in some particular place or time has zero

legal significance—there is no safe harbor for illegal vote dilution merely because it might work to some politicians' momentary political advantage. *Cf. Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) ("Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive" and thus "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory."). Moreover, the record demonstrates that racially polarized voting can exist regardless of the partisan makeup of a jurisdiction. Indeed, Dr. Handley's analysis of Democratic primaries showed that, even when holding partisanship constant, the majority of Democratic primaries analyzed were racially polarized. Doc. 385 Tr. 880:7-11, 881:13-18 (Sept. 7).[3]

\* \* \*

*Gingles* 3 asks whether "minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices," without regard for the cause of

---

[3] The Secretary's suggestion that, unless the Court adopts his new legal standard, Section 2 would facilitate a proportionality requirement (Br. 25) is equally without merit. *See Solomon v. Liberty Cnty.*, 957 F. Supp. 1522, 1553 (N.D. Fla. 1997) (lack of racial bias requirement "does not lead to proportional representation"), *aff'd*, 221 F.3d 1218 (11th Cir. 2000); *see also Milligan*, 599 U.S. at 28-29 (observing that proportionality requirement is inconsistent with the *Gingles* framework). As the Supreme Court reasoned in *Johnson v. De Grandy*, proportionality is not dispositive to a Section 2 challenge, but rather "a relevant fact in the totality of circumstances." 512 U.S. 997, 1000, 1013-1014 (1994).

racial bloc voting.  *Milligan*, 599 U.S. at 17-18.  That is the law the district court applied and found met on the extensive record.

### 2. The District Court Appropriately Considered Evidence of Partisanship at the Totality of Circumstances Stage

To the extent non-racial causes of polarization were relevant, the district court considered them at the totality of circumstances stage, and found, based on extensive witness testimony and expert analysis regarding how race drives voting patterns, that the extent of racial polarization favors Section 2 liability.  And while a defendant can attempt to rebut the inference of race conscious politics established with the Gingles preconditions by bringing forward evidence of non-racial causes, the Secretary did not meet his burden and identifies no clear error now in the district court's findings on this fact-intensive question.

When a plaintiff proves *Gingles* 2 and 3—"demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate"—such proof is itself "circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process."  *Nipper*, 39 F.3d at 1524-1526 & n.64 (plurality op.); *accord Johnson v. Hamrick*, 196 F.3d 1216, 1220 (11th Cir. 1999); *Marengo Cnty.*, 731 F.2d at 1567.  But at the totality-of-circumstances stage, "[t]he defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by

other, non-racial circumstances." *Nipper,* 39 F.3d at 1524 (plurality op.); *see also Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225-1226 (11th Cir. 2000).[4]

There was no clear error in the district court's conclusion, at the totality-of-circumstances stage, that Plaintiffs "have shown sufficient evidence of racial polarization in Georgia voting for [Senate Factor 2] to weigh in favor of finding a Section 2 violation." Op. 453. Extensive evidence adduced by Plaintiffs at trial and relied on by the district court supported that conclusion.

For one, the district court relied on Dr. Handley's report, "indicating strong evidence of racial polarization in voting," Op. 453, and her testimony about the "strong connection between race and partisanship as it currently exists in Georgia," Op. 453-454. Dr. Handley testified that "race impacts the decision on who you're going to vote for, what party you're going to support. [T]o say that it is party instead of race is ignoring the fact that actually race explains party in part." Doc. 385 Tr. 876:12-17 (Sept. 7); *see also* Op. 454. The Secretary's own expert, Dr. John Alford, agreed. *See* Doc. 332 Tr. 2240:19-22 (Sept. 14).

---

[4]    The Secretary argues (Br. 38) that Plaintiffs "did not produce *any* evidence that polarization in Georgia is attributable to race rather than party," and "never tried to establish that race, rather than ordinary partisanship, is the cause of divergent voting patterns in Georgia," Br. 29. That is wrong. *See supra* pp. 22-31. But in any case, "[S]ection 2 plaintiffs [are] under no obligation to search [such non-racial causes] out and disprove them preemptively." *Nipper* 39 F.3d at 1525 n.64.

Indeed, Plaintiffs also adduced evidence that, even when holding partisanship constant, the majority of Democratic primaries Dr. Handley analyzed were racially polarized, and White support for Black-preferred Black candidates was typically very low. Doc. 357-12 at 11; Doc. 385 Tr. 880:7-11, 881:13-18 (Sept. 7). These results indicate White resistance to supporting Black-preferred candidates even when controlling for party.[5] Dr. Alford conceded that the Democratic primary "provides an opportunity to see how voters are voting when that party cue at the candidate level is removed," which is "valuable." Doc. 332 Tr. 2234:1-4 (Sept. 14).

The court also considered extensive testimony by Drs. Burton and Ward that race has historically driven and continues to drive voting patterns in Georgia. It considered Dr. Burton's testimony that included how, in the 1960s, there was a "huge shift of African-Americans from the party of Lincoln, the Republican party, to the Democratic party and the shift of white conservatives from the Democratic party to the Republican party." Doc. 387 Tr. 1445:4-7, 1496:17-1497:1 (Sept. 11); Op. 454. It also considered Dr. Ward's testimony that racially polarized voting has "been the predominant trend through political eras and political cycles," Op. 454; Doc. 329 Tr. 1343:17-20 (Sept. 11), and that "race has consistently been the best

_____

[5] While the court's decision did not rely upon this evidence, this Court may "affirm for any reason supported by the record, even if not relied upon by the district court[.]" *Worthy v. City of Phenix*, 930 F.3d 1206, 1216-1217 (11th Cir. 2019).

predictor" of partisan preference since the Civil War, *see* Op. 454; Doc. 329 Tr. 1343:14-25 (Sept. 11); Doc. 357-11 at 24. The district court also cited Dr. Burton's study of Black candidate success in light of the percentage of White voters in the district, noting that "[c]learly there is a meaningful difference in Black candidate success depending on the percentage of white voters in a district." Op. 456.

Plaintiffs also offered evidence that race has consistently divided the political parties in Georgia. For example, Dr. Jones explained that, since 1908, the Republican Party has elected only two Black state legislators—amounting to 0.5% of Republican-elected officials. Doc. 357-9 at 47. Meanwhile, between 2000 and 2020, 59% of Democratic Party elected officials were Black. *Id*. Dr. Jones's analysis of the 2020 state legislative elections also reflected this racial division: Of the 138 seats won by Republicans, none were won by Black legislators; 68 of the 99 seats secured by the Democrats went to Black candidates. *Id*.

And Plaintiffs also presented evidence, which the district court credited, that this racial division is at least partly explained by differences in racial attitudes. *See* Op. 455. Dr. Burton highlighted "the opposing positions that members of Georgia's Democratic and Republican parties take on issues inextricably linked to race." *Grant* Doc. 313-4 at 74. Dr. Handley explained, "Black and white voters have, for over decades, realigned their partisan affiliations based on the political parties' positions with respect to racial equality and civil rights," and, today, this trend is

"reflected in attitudes about things like affirmative action and racial justice. There is a decided difference between the two parties." *See* Doc. 385 Tr. 884:22-885:9, 886:3-7 (Sept. 7). Dr. Diane Evans testified that she observes fewer problems related to racial issues within the Democratic Party than within the Republican Party, Doc. 327 Tr. 641:22-642:19 (Sept. 7), and Bishop Reginald Jackson testified that voters "want to vote in their best interest," which "depends upon who the candidates are, [and] their positions on the issues," Doc. 326 Tr. 389:18-21 (Sept. 6). Dr. Jones testified that this racial division persists today. *See* Doc. 328 Tr. 1199:12-1200:13 (Sept. 8).

The Secretary neither refuted this extensive evidence regarding the racial nature of polarized voting in Georgia nor provided a viable alternative explanation. Dr. Alford agreed that personal preferences, influenced by factors like race, drive voter behavior more than party. *See* Doc. 332 Tr. 2182:4-5, 2183:4-7 (Sept. 14) (THE COURT: So could it be said that voters are not necessarily voting for the party; they're voting for a person that follows their philosophy or they think is going to respond to their needs?" DR. ALFORD: "…That's what's going on."); *see* Op. 452. Dr. Alford disclaimed any suggestion that he could disentangle race and party, concluding that "one cannot causally determine whether the data is best explained by party affiliation or racial polarization." Op. 452-453 (citing Doc. 332 Tr. 2226:7-18 (Sept. 14)).

And in terms of any affirmative analysis, Dr. Alford's entire offering consisted of "data from the most recent Republican primary election where Herschel Walker was a [U.S. Senate] candidate and received 60% of both Black and white voters' votes." Op. 457; *see* Doc. 360-10. Even there, Dr. Alford could not conclude that Herschel Walker was the Black-preferred candidate because the number of Black voters who voted in the Republican primary was too small. *See* Doc. 332 Tr. 2237:18-10 (Sept. 14). As the district court found, Dr. Alford's "remaining analysis involved descriptive conclusions based on Dr. Handley's data set and, most importantly, did not offer additional support for a conclusion that voter behavior [was] caused by partisanship rather than race." Op. 457-458. Such scant "evidence" was hardly enough to meet the Secretary's burden of showing that party rather than race best explains stark and persistent racially polarized voting patterns. *Accord Singleton v. Merrill*, 582 F. Supp. 3d 924, 1019 (N.D. Ala. 2022) (per curiam) ("One election of one Black Republican is hardly a sufficient basis for us to ignore" a "veritable mountain of undisputed evidence" that voting is racially polarized), *aff'd sub nom. Milligan*, 599 U.S. 1 (2023). The district court's decision to credit Plaintiffs' much more extensive showing to the contrary was not even close to clear error.

The Secretary misplaces reliance on evidence of "identical support for candidates of different races" in two U.S. Senate elections, one with two Black

candidates and another with two White candidates. Br. 32-33. Neither of those contests was biracial, and thus insofar as candidate race matters (as the Secretary suggests), neither contest is especially probative of whether White voters will vote to elect Black candidates against White opponents. *See Davis v. Chiles*, 139 F.3d 1414, 1417 n.5 (11th Cir. 1998) ("[E]vidence drawn from elections involving black candidates is more probative in Section Two cases[.]"); *cf. Clements*, 999 F.2d at 860-861 (party best explained polarized voting patterns where White voters consistently voted to elect minority candidates against White opponents). Moreover, the fact that voters were polarized *along racial lines* in those two contests is consistent with the extensive evidence, credited by the district court, that race shapes party affiliation, both as a historical matter and in light of the parties' divergent positions on racial issues that matter to voters. *See supra* Section I.A.2.

Nor are plaintiffs required to demonstrate that the "majority voters change their votes in some sort of 'backlash' against black candidate success" in order to satisfy Senate Factor Two. Br. 38. No case holds anything of the sort. Rather, the Supreme Court has expressly—and repeatedly—rejected any requirement that would shift the focus from the race of the voters to the race of the candidate. *See* Op. 410, 455 n.104 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1027 (1994) ("The assumption that majority-minority districts elect only minority representatives, or

that majority-white districts elect only white representatives, is false as an empirical matter.")); *LULAC*, 548 U.S. at 427.

Plaintiffs adduced, and the district court largely credited, a mountain of unrebutted evidence demonstrating starkly racially polarized voting, racial polarization even in party primaries, and extensive historical and descriptive analysis from multiple experts on the relationship between race and party. The Secretary offered a single expert who did virtually no original analysis, who could not even offer a conclusion on the issue now pressed on appeal, and whose analysis the court did not credit. The district court committed no clear error in finding that the extent of racial polarization in Georgia supports liability.

## B. The District Court Did Not Err on the Totality of Circumstances Analysis

The Secretary's remaining arguments on the totality of circumstances merely quibble with the district court's factual findings. Those extensive findings amply supported the bottom-line conclusion that, in the focus areas, "Black voters have *less* of [an] opportunity to partake in the political process than white voters," which "supports finding a Section 2 violation." Op. 428.

*Senate Factors One and Three*: The Secretary's arguments on these Senate Factors miss the mark. First, the Secretary incorrectly asserts that the district court did not cite any evidence of Georgia's voting-related discrimination "from the past *four decades*." Br. 36. That ignores record evidence that (among numerous other

examples) Georgia legislators "took a leadership position in challenging the reauthorization" of the VRA in 2006; that, following the 2000 redistricting cycle, Georgia's State Senate plan was struck down under Section 5 of the VRA; and that Fayette County, in South Metro Atlanta, maintained an at-large elections system until it was struck down under the VRA in 2015. Op. 436-450. [6]

Next, the Secretary quotes *Bolden* for the proposition that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Br. 35-36. But *Bolden* was an intentional discrimination case and thus "that instruction was issued in a different context (that did not involve the Senate Factors, which expressly include an historical focus)[.]" *Singleton*, 582 F. Supp. 3d at 1020 (three-judge panel). The Secretary's reliance on *Veasey* is similarly misplaced. Br. 49-50. In *Veasey*, another intentional discrimination case, the Fifth Circuit explained that the "actions of county officials in one county" were not probative as to "the intent of legislators in the Texas legislature," an entirely separate

_____

[6] The district court also credited Dr. Jones' expert report, which discussed polling place closures and other contemporary burdens on Black voters. Op. 441. The Secretary claims this was improper because Dr. Jones cited newspaper articles, which are "classic, inadmissible hearsay." Br. 37 (citation omitted). But "an expert may rely on hearsay evidence as part of the foundation for [her] opinion so long as the hearsay evidence is 'the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject.'" *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 809 (11th Cir. 2017). As Dr. Jones testified, news articles are among the sources that experts commonly rely on in her field. *See* Doc. 328 Tr. 1148:3-13 (Sept. 8).

political entity. 830 F.3d at 232. But in Section 2 vote dilution cases, any circumstances which lead to unequal burdens and opportunities for Black voters are relevant to whether the challenged map results in vote dilution. *See Milligan*, 599 U.S. at 18. That a county in the vote dilution area used an illegal, vote-dilutive election system *until less than a decade ago* is plainly relevant. Op. 437-450.

The Secretary also contends that the district court should have considered "whether the jurisdiction has engaged in 'pervasive purposeful discrimination.'" Br. 36 (citing *Marengo Cnty.*, 731 F.2d at 1567). But the court did just that, discussing Georgia's history of voting discrimination at length and finding that such discrimination "persisted in the wake of the VRA and even in the present through various voting patterns that disproportionately affect Black voters." Op. 437-450. *Marengo County* itself recognized the connection between past discrimination and present-day burdens on the right to vote is a relevant fact issue in the totality-of - circumstances analysis. 731 F.2d at 1567 ("past discrimination can severely impair the present-day ability to participate on equal footing in the political process" and can be "important evidence of … discriminatory results").

Nor is there any inconsistency between the district court's ruling in a different case, that voter list purges and voter ID laws are not in themselves unlawful (Br. 36-37), and its conclusion here that these voting practices nevertheless "enhance the opportunity for discrimination." Op. 212, 214, 430; *cf. Wright v. Sumter Cnty. Bd.*

*of Elections & Registration*, 301 F. Supp. 3d 1297, 1319-1320 (M.D. Ga. 2018) (finding use of staggered terms and majority-vote requirements weighed in plaintiffs' favor for Senate Factor Three because, despite being legal, such practices "have long been recognized as enhancing an opportunity for discrimination"), *aff'd*, 979 F.3d 1282 (11 Cir. 2020). The district court appropriately applied different tests to answer distinct legal questions.

*Senate Factor Two*: As previously discussed, *supra* Section I.A.2, the court did not err in finding "strong evidence of racial polarization in voting." Op. 453. And, "most importantly," Dr. Alford "did not offer additional support for a conclusion that voter behavior [is] caused by partisanship rather than race." Op. 488.

*Senate Factor Five*: The Secretary admits a substantial turnout gap, but claims the district court should have compared Black voter turnout to non-Black rather than White voter turnout. Br. 39. But the court's approach is exactly how courts have analyzed Senate Factor Five. *See, e.g.*, *Singleton*, 582 F. Supp. 3d at 1021-1022 (crediting expert testimony "about current socioeconomic disparities between Black Alabamians and white Alabamians" and how "these disparities hinder Black Alabamians' opportunity to participate in the political process today"); *Wright*, 301 F. Supp. 3d at 1320-1321 (similar). The Secretary's attempt to turn this factual nitpick into a legal issue sputters: His conclusory citation to *LULAC* leads

to a portion of that decision discussing the first *Gingles* precondition, not the totality of circumstances.  Br. 39 (citing *LULAC*, 548 U.S. at 444 (plurality op.)).[7]

*Senate Factor Six*:  The Secretary claims that the district court erred in finding that a particular ad from Governor Kemp's 2018 campaign was a racial appeal rather than a partisan campaign ad.  Br. 40.  But that factual determination was based on the court's assessment and crediting of Dr. Ward.  *See* Op. 466 n.112 (citing Dr. Ward's testimony discussing the ad).  Such disagreement with a trial court's credibility determination is not clear error.

*Senate Factor Seven*:  With respect to Black candidates' lack of success, the district court's findings relied on the parties' stipulations as well as Dr. Burton's testimony and report.  Op. 468-470.  The court acknowledged that "Black candidates have achieved some success in statewide elections following 2000,"[8] but also found

---

[7]    The Secretary cannot dismiss the racial turnout-gap in the 2022 general election as a "small statistical discrepancy" by relying on *Brnovich v. Democratic National Committee*.  Br. 39-40.  The issue in *Brnovich* was the lower court's conclusion that "minority voters in Arizona cast [out-of-precinct] ballots at twice the rate [1% compared to 0.5%] of white voters."  141 S. Ct. 2321, 2345 (2021).  Here, the district court appropriately concluded, after hearing expert testimony, that an 8% turnout gap is hardly a "small disparity."  *Id*.

[8]    The Secretary wrongly claims (Br. 41) that the district court "minimized the number of statewide offices that black candidates have successfully obtained" by undercounting Black candidates that have "won repeatedly, like former Attorney General Thurbert Baker."  But the court explicitly stated that "in 1998, 2002, and 2006[,] Thurbert Baker was elected Georgia Attorney General" and noted the electoral victories of other statewide Black officials.  Op. 468.

that there are only 14 Black State Senators and 41 Black State Representatives (both well under the Black population percentage), that Georgia has never elected a Black Governor, and that before Senator Raphael Warnock, Georgia has had "230 years of exclusively white [U.S.] Senators." Op. 468. The court also followed guidance from *Gingles* that courts should not treat the success of a few minority candidates as dispositive. Op. 470-471 (citing *Gingles*, 478 U.S. at 76).

Citing the same stipulations and data, the Secretary would instead draw the inference that Black candidates "routinely win state-wide office" and that "Black Georgians occupy huge swaths of Georgia's elected offices." Br. 40-41. Even if the Secretary's view of this evidence were reasonable, it would not amount to clear error. *See Florida Int'l Univ. Bd. of Trs. v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").[9]

---

[9] The Secretary wrongly calls the fact that "only 12 Black candidates" have been elected to Congress since Reconstruction "misleading … statistics." Br. 41. It is wholly accurate. And nothing would change if, as the Secretary suggests, the district court had instead cited the number of congressional *terms* won. As Dr. Jones testified, of those 12, 11 were elected to Congress since 1965, and in the period between 1965 and 2023, those 11 elected officials represented approximately "20 percent of the 364 congressional seats that were available to Georgia," which was "a very small swath in a state where Black[] [voters] are politically active and interested in being a part of the political environment[.]" *See* Doc. 328 Tr. 1201:11-20 (Sept. 8).

Overall, the Secretary's arguments fall far short of meeting his steep burden, given the "trial court's particular familiarity with the indigenous political reality." *Gingles*, 478 U.S. at 79. The district court's findings on the totality of circumstances easily pass muster under clear error review.

## II. SECTION 2 MAY BE ENFORCED BY PRIVATE PARTIES

The Secretary asks this Court to override binding law, decades of persuasive authority, clear legislative history, and the VRA's text and structure to conclude Section 2 is not privately enforceable. While the Secretary's interpretation of Section 2 is flatly wrong, this Court need not consider his argument because Plaintiffs have a clear cause of action under Section 1983.

Plaintiffs invoked Section 1983 in bringing their Section 2 claim. *See* Doc. 141 ¶¶ 137-141; *see also* Doc. 141 ¶ 7 (challenge arises under "52 U.S.C. § 10301 and 42 U.S.C. § 1983"). The Secretary suggests that only "constitutional challenges under 42 U.S.C. § 1983" create a cause of action. Br. 63. That is wrong. Section 1983 provides for enforcement against violations of rights "secured by the Constitution *and laws*." 42 U.S.C. § 1983 (emphasis added). With statutory rights no less than constitutional ones, "[Section] 1983 can presumptively be used to enforce unambiguously conferred federal individual rights." *E.g.*, *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 172 (2023) (recognizing cause of action under Section 1983 to enforce rights conferred by Federal Nursing Home

Reform Act). Thus, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

Here, the Secretary does not dispute that Section 2 confers such a presumptively enforceable individual right. The statute prohibits any voting standard, practice, or procedure that "results in a denial or abridgement of *the right of any citizen of the United States to vote on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). When assessing whether a statute creates a right, courts consider whether it is "phrased in terms of the persons benefited" and whether it uses "explicit rights-creating terms." *See, e.g.*, *Gonzaga*, 536 U.S. at 284. Section 2 is phrased *entirely* in terms of the persons benefited—individual citizens—and it explicitly identifies the "right" to vote free from race discrimination. *Accord Schwier v. Cox*, 340 F.3d 1284, 1296-1297 (11th Cir. 2003) (federal voting statute protecting "'the right of any individual to vote in any election'" enforceable via Section 1983).

And even if Plaintiffs had not invoked Section 1983, precedent, longstanding practice, and text all support an independent implied right of action under Section 2 itself.

To start, five justices agreed in *Morse v. Republican Party of Virginia* that "the existence of the private right of action under Section 2 ... has been clearly

intended by Congress since 1965." 517 U.S. 186, 232 (1996) (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417, at 30 (1982)); *accord id.* at 240 (Breyer, J., concurring) (on behalf of three justices, expressly agreeing that Section 2 confers a private right of action); *see also Singleton*, 582 F. Supp. 3d at 1031 (three-judge panel). The Secretary does not dispute this but claims that the Court's clear statement was a "background assumption" and dicta, because the particular case involved a challenge under Section 10. Br. 62. The relevant language is not dicta; it is an integral part of the Court's reasoning and itself binding. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). In *Morse*, the Supreme Court found that Section 10 was privately enforceable in large part *because* of the "anomal[y]" of treating Section 2 and 10 differently, despite their nearly identical text. *See* 517 U.S. at 232 (Stevens, J., plurality op.). Both Justice Stevens and Justice Breyer relied on the conclusion that Section 2 confers a private right of action as a necessary element of finding Section 10 enforceable. *See id.*; *id.* at 240 (Breyer, J., concurring). *Morse*'s holding is binding and controls the issue.[10]

---

[10]   Even if the relevant language in *Morse* were dicta (it is not), "dicta from the Supreme Court is not something to be lightly cast aside[,]" and at a minimum is of

Decades of additional decisions reinforce *Morse*'s Section 2 analysis that "Section 2 provides a private right of action." *Robinson v. Ardoin*, 86 F.4th 574, 587-591 (5th Cir. 2023); *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614-615 (5th Cir. 2017) (same); *Mixon v. Ohio*, 193 F.3d 389, 398-399 (6th Cir. 1999) (same); *see also Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) (per curiam) ("A majority of the Supreme Court has indicated that section 2 of the Voting Rights Act contains an implied private right of action."); *Georgia State Conf. of NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court) ("Section 2 contains an implied private right of action"). Indeed, courts have heard "scores if not hundreds of cases" brought by private plaintiffs under Section 2. *Coca v. City of Dodge City*, 669 F. Supp. 3d 1131, 1140 (D. Kan. 2023); *see also Singleton*, 582 F. Supp. 3d at 1031 (collecting cases). For example, this Court unambiguously observed that "[t]he VRA, as amended, clearly expresses an intent to allow private parties to sue the States." *Alabama State Conf. of NAACP v. Alabama*, 949 F.3d

---

considerable persuasive value. *Schwab v. Crosby*, 451 F.3d 1308, 1325-1326 (11th Cir. 2006) (citation omitted). All the more so because in 2006, Congress ratified Section 2's private right when it reauthorized the VRA with full awareness of *Morse* and the numerous other decisions affording a private right of action. *See Liu v. SEC*, 140 S. Ct. 1936, 1947 (2020).

647, 652, 654 (11th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 2618 (2021).[11]

Arguing otherwise, the Secretary points only to a single outlier decision from another circuit issued late last year. Br. 57, 61-62. That ruling, which subverts Section 2's text and history, cannot overcome the weight of decades of contrary authority.

Even if this Court were starting on a blank slate, Section 2's text and structure compel the conclusion that Section 2 is privately enforceable. Br. 58-59. To determine whether a statute creates an implied cause of action, courts must determine that the statute at issue (1) contains a "private right," evident by "'rights-creating' language;" and (2) provides for "a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286-288 (2001). Section 2 satisfies both prongs.

*First*, as already discussed in the Section 1983 context, Section 2 contains clear "'rights-creating' language" that demonstrates Congress's "'intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (citation omitted). Again, the Secretary does not dispute this.

*Second*, the VRA's text and structure reflect Congress's intent to provide a "private remedy" to enforce Section 2 rights. Section 3—entitled "Proceeding to

---

[11]  Although *Alabama State Conference of NAACP* was vacated on mootness grounds, it remains persuasive authority. *See Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1578 n.7 (11th Cir. 1994).

enforce the right to vote," 52 U.S.C. § 10302—provides broadly for relief in "proceeding[s]" brought by "the Attorney General *or an aggrieved person*" "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id*. § 10302(a) (emphasis added); *see also id.* § 10302(b) (repeating this language); *id.* § 10302(c) (same). The express reference to "aggrieved person[s]"—as a separate category from "the Attorney General"—shows that Congress intended "to provide the same remedies to private parties as … to the Attorney General alone." *Morse*, 517 U.S. at 233 (Stevens, J., plurality op.) (cleaned up). In fact, when reauthorizing the VRA in 1975, Congress stated that it was "amend[ing] Section 3 of the [VRA] to afford to private parties the same remedies which Section 3 [then afforded] only to the Attorney General." S. Rep. No. 94-295, at 39-40 (1975).[12] And relief for proceedings brought "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment," 52 U.S.C. § 10302(a), by definition includes relief under Section 2 because the VRA is "designed

---

[12] Contrary to the Secretary's arguments, Section 12's express cause of action for the Attorney General is not incompatible with private enforcement of Section 2. Br. 63. The Attorney General's Section 12(d) enforcement power is *supplemented* by private VRA enforcement, as is the case with other provisions of the VRA that are enforceable by both the Attorney General and private parties. *See, e.g.*, *Morse*, 517 U.S. at 233-234 (Stevens, J., plurality op.) (Section 10); *Allen v. Board of Elections*, 393 U.S. 544, 557 (1969) (Section 5); *see also Schwier v. Cox*, 340 F.3d 1284, 1296-1297 (11th Cir. 2003) (voting rights protection in Civil Rights Act was privately enforceable notwithstanding express authorization of Attorney General suits).

for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments," *Morse*, 517 U.S. at 233-234 (Stevens, J., plurality op.).[13]  Putting Sections 2 and 3 together demonstrates that Congress intended to permit "aggrieved person[s]" to bring proceedings against "any State or political subdivision" for abridging their right to vote on account of race.  52 U.S.C. §§ 10301, 10302.

The Secretary does not dispute that Section 3 provides for remedies in a proceeding brought by private parties, but claims that it extends only to actions for which a private right had already been recognized by Congress or already implied by the Court, relying primarily on Justice Thomas's dissent in *Morse*.  Br. 62-63.  The express language of the statute contains no such limitation, and speaks instead of proceedings "under *any* statute to enforce" constitutional voting rights guarantees.  That text embodies Congress's intent with the 1975 amendment to the VRA to broadly "provide private remedies."  517 U.S. at 233-234 (Stevens, J., plurality op.); *id*. at 240 (Breyer, J., concurring).  The Secretary also claims that reading Section 3 as including private remedies for violations of Section 2 private action would mean all voting rights statutes are privately enforceable.  Br. 63-64.  But Section 3 demonstrates Congress's intent to make privately enforceable those statutes that both

---

[13]   Section 14(e) similarly contains private remedies for actions that "enforce the voting guarantees of the fourteenth and fifteenth amendment," *see* 52 U.S.C. § 10302(a), which again includes Section 2 actions.

(1) unambiguously confer a private right and also (2) enforce the constitutional voting guarantees.  Section 2 is one of those statutes.

The Secretary's position is also completely at odds with legislative history.  The Senate Judiciary Committee Report for the 1975 amendment confirmed that "private persons are authorized to request the application of the Act's special remedies in voting rights litigation," and explained that it is "sound policy" to establish a "dual enforcement mechanism" for VRA enforcement (*i.e.*, both private and Attorney-General enforcement).  S. Rep. No. 94- 295 at 9-10, 40.  The Judiciary Committee Report that accompanied the 1982 amendments "reiterate[d] the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965."  S. Rep. No. 97-417, at 30; *see also Gingles*, 478 U.S. at 43 & n.7 (describing 1982 Senate Report as "authoritative source for legislative intent" behind Section 2); *Brnovich*, 141 S. Ct. at 2332-2233.  The corresponding House Committee Report similarly declared that "[i]t is intended that citizens have a private cause of action to enforce their rights under Section 2."  H.R. Rep. No. 97-227, at 32 (1981); *see also, e.g., Brnovich*, 141 S. Ct. at 2332 (relying on the 1981 House Report).  Finally, the House Report to the 2006 reauthorization similarly recognized that the actions of "private citizens … has been critical to" enforcing the VRA's protections.  H.R. Rep. No. 109-478, at 42 (2006).

Plaintiffs may enforce Section 2, either under Section 1983 or Section 2 directly.  The Secretary's arguments to the contrary must be rejected.

## III.    SECTION 2 IS A PERMISSIBLE EXERCISE OF CONGRESSIONAL AUTHORITY

The Secretary's contention that the district court adopted an unconstitutional interpretation of Section 2 also fails.  The Constitution empowers Congress to enact laws guarding against discrimination and racial inequality in the political process.  Section 2's prohibition against vote dilution under the *Gingles* standard is a paradigmatic example.  The Secretary's position would overturn decades of practice and precedent.

Relying principally on *City of Boerne v. Flores*, 521 U.S. 507 (1997) and *Shelby County v. Holder*, 570 U.S. 529 (2013), the Secretary argues that Section 2 is a "[p]rophylactic statute[]" that exceeds Congressional authority.  Br. 43.  This argument fails for multiple reasons.  To begin, the Secretary forfeited any argument under *Boerne* by failing to raise it below.  "'[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered in this court.'"  *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).  Not once did the Secretary argue below that *Boerne* applies, or that Section 2 is not congruent and proportional to the Fourteenth and Fifteenth Amendments' aims.  Instead, he raised a perfunctory and generalized constitutional challenge below that the district

court properly rejected. Op. 508. His failure to make any semblance of his congruence-and-proportionality argument below precludes him from raising it now.

Regardless, the Secretary's argument fails on the merits. Courts, including the Supreme Court and this Court, have repeatedly affirmed that Section 2 is a permissible exercise of Congressional authority. In *Milligan*, the Supreme Court either expressly or implicitly rejected all the arguments the Secretary makes here. The Secretary argues that the Reconstruction Amendments do not authorize federal intervention based on the vote dilution shown here, but the Supreme Court in *Milligan* rejected the argument that the *Gingles* framework exceeds constitutional bounds, affirming that Congress's enforcement powers allow it to "outlaw voting practices that are discriminatory in effect" under that standard. 599 U.S. at 25, 41 (quotations omitted). And in *Milligan*, as here, the state argued that "even if the Fifteenth Amendment authorizes the effects test of § 2, that Amendment does not authorize race-based redistricting as a remedy for § 2 violations." *Id.* at 41. The Court also rejected that argument, pointing out that for decades "race-based redistricting" has been allowed "as a remedy for state districting maps that violate § 2," and expressly holding that "§ 2 as interpreted in *Gingles*" does not "exceed[] the remedial authority of Congress." *Id.*

The Secretary tries to sidestep this by describing his constitutional arguments as merely a challenge to the court's application of Section 2, but the essential nature

of his challenge is facial. The district court faithfully applied the law as reaffirmed in *Milligan*, and tailored its factual findings to that well-settled standard. Any claim that Section 2, so applied, is unconstitutional merely restates Alabama's argument that any Section 2 liability predicated on the results test is unconstitutional. Again, *Milligan* controls. And this Court's precedents are fully in accord. *See, e.g.*, *Marengo Cnty.*, 731 F.2d at 1556-1563 (Section 2 liability permissibly extends to bar conduct not prohibited directly by the Constitution); *Johnson*, 196 F.3d at 1219 n.3 (*Marengo County* forecloses argument that Section 2 is unconstitutional).

Controlling case law ends the matter. But as a matter of first principles, the Secretary's arguments are also irreconcilable with the Reconstruction Amendments.

In the Civil War's immediate aftermath, the Fifteenth Amendment's Framers understood that "[i]t is difficult by any language to provide against every imaginary wrong or evil which may arise in the administration of the law of suffrage in the several States." Cong. Globe, 40th Cong., 3d Sess. 725 (1869). In designing a source of enforcement authority, the Framers opted for *McCulloch* as the touchstone of Congress's enforcement authority, "enabling Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870); *see also City of Rome*, 446 U.S. at 175 ("Congress' authority under § 2 of the Fifteenth Amendment … was no less broad than its authority under the Necessary and Proper Clause."). Thus the Framers

empowered Congress to "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Section 2's limited remedy—relief from vote dilution and imposition of a limited requirement that states ensure that their legislative maps treat all voters equally—falls well within that authority. That was true when Section 2 was enacted, true when *Gingles* was decided, and true today.

The Secretary's argument ignores that the VRA was passed under both the Fourteenth *and Fifteenth* Amendments, and for obvious reason—*Boerne* has never been extended to the Fifteenth Amendment. Driving the Court's concern in *Boerne* was the in-theory-limitless breadth of the Fourteenth Amendment's protections. *See Tennessee v. Lane*, 541 U.S. 509, 562-563 (2004) (Scalia, J., dissenting). But the Fifteenth Amendment is narrower: It protects against only the denial or abridgement of the right to vote on account of race or color. In that regard, *Boerne*'s concern with legislation that "alters the meaning" of the constitutional provision—or that seeks "to determine what constitutes a constitutional violation"—is inapposite to the Fifteenth Amendment, where the substantive scope of the rights at issue is already well-defined and limited. 521 U.S. at 519.

And even if *Boerne*'s congruence-and-proportionality test applied, Section 2 would satisfy it. As this Court observed in *Marengo County*, Congress exercised its authority under the Reconstruction Amendments carefully when enacting and

amending the VRA, "conduct[ing] extensive hearings and debate on all facets of the [VRA]," and concluding that "the 'results' test was necessary to secure the right to vote and to eliminate the effects of past purposeful discrimination." 731 F.2d at 1557. Congress may impose race-conscious remedies to remedy harms caused by voting practices that are racially disparate in effect. *Milligan*, 599 U.S. at 41; *Chisom*, 501 U.S. at 403 (quoting *Katzenbach*, 383 U.S. at 315). Because the scope of Section 2—and of the Gingles test in particular—focuses on "whether any … abridgment [of the right to vote] has occurred 'on account of race,' … Section 2's protections remain closely tied to the power granted Congress by the Fifteenth Amendment." *Veasey*, 830 F.3d at 253 & n.47 (collecting cases "uph[olding] the constitutional validity of the Section 2 results test").

*Boerne* itself recognized that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." 521 U.S. at 518. Indeed, *Boerne* specifically acknowledged "the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination"—discussing specifically the VRA (and citing, among other

authorities, *Katzenbach* and *City of Rome*).  *Id.* at 526.[14]  Section 2's design is tethered closely to the constitutional violation it seeks to remedy and deter.  The *Gingles* test requires that plaintiffs prove that under the totality of circumstances— including the history of discrimination and its ongoing effects, and through a "searching and practical evaluation of the past and present reality," *Milligan*, 599 U.S. at 19—the electoral process remains "not 'equally open' to minority voters." *Id.* at 18.  Indeed, Congress adopted factors for Section 2 discriminatory results liability (*i.e.*, the Senate Factors) that are among the precise circumstances the Supreme Court has held are relevant to establishing unconstitutional discriminatory intent.  *See Gingles*, 478 U.S. at 36-37; *see also, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 623-24 (1982).

The Secretary's argument also ignores a key feature of Section 2's design:  As Congress observed when adopting the results test, "Section 2 avoids the problem of potential over-inclusion entirely by its own self-limitation."  S. Rep. 97-417, at 43; *accord United States v. Blaine Cnty.*, 363 F.3d 897, 906 (9th Cir. 2004).  Vote

---

[14]  For this reason, the Secretary's suggestion that Section 2 "substantively redefine[s] the State's legal obligations" fails.  Br. 46.  Section 2 does no such thing. The Secretary's sleight of hand—treating states' Section 2 obligations as akin to a racial gerrymandering requirement—is incorrect, as the Supreme Court found in *Milligan* just last term.  All that states must do under Section 2 is refrain from drawing maps that are "discriminatory in effect, if not in intent"—a clearly permissible exercise of federal authority.  *Lane*, 541 U.S. at 520.

dilution liability under Section 2 is triggered only for as long as a particular jurisdiction's politics is plagued by racial polarization and the enduring effects of centuries of race discrimination, including residential segregation. Once racial polarization and division in politics subside, Plaintiffs can no longer establish a Section 2 claim. *See* Crum, *Reconstructing Racially Polarized Voting*, 70 Duke L.J. 261, 279 (2020); Gerken, *A Third Way for the Voting Rights Act*, 106 Colum. L. Rev. 708, 745 (2006). The genius of Section 2 is in its self-liquidating nature.

This case well demonstrates that Georgia is not there yet. Despite the massive growth of the Black population in Georgia (especially in South Metro Atlanta), the number of Black-majority state legislative districts has remained stagnant. Op. 54, 58. There also remain massive levels of racial polarization in those areas, and the on-the-ground conditions—including the persistence of electoral practices that disparately impact Black voters, and the socioeconomic, educational, and employment disparities between Black and White voters—combine to all but guarantee that absent Section 2 relief, Black voters in those areas will be shut out of power, despite their growth. At trial, Plaintiffs established those facts and showed, as the district court's findings amply demonstrate, that in those areas where the vote-dilution dynamic is occurring, "current needs" (Br. 47) call for the remedy that Section 2 provides. That remedy remains congruent and proportional to Congress's

*interest* in eradicating *all* race discrimination in the political process—whether that discrimination is intentional or in effect.

In a last-ditch effort, the Secretary floats the possibility that Section 2 is subject to some durational limitation, based on Supreme Court precedents from an entirely different realm—the constitutionality of affirmative action in college admissions. The analogy is misguided for at least four reasons.

*First*, as the Supreme Court observed in *Shelby County*, the statute's language contemplates no temporal limitation or legislatively imposed end-date. Rather, Section 2 "applies nationwide" and "*is permanent*." 570 U.S. at 537 (emphasis added). That unequivocal pronouncement directly and completely forecloses the Secretary's assertion that Section 2 is temporary.

*Second*, and totally unlike the affirmative action cases, nothing in Section 2 imposes racial preferences. Just the opposite: Its protection against vote-dilution-by-submergence simply reinforces the principle of equality and ensures that no voter's rights are undermined due to their race. Section 2 seeks to ensure that all voters are treated the same and is triggered only when plaintiffs show that voters are *differently* situated with respect to their race. In adopting Section 2's results test, Congress sought to *eliminate* all "discriminatory election systems or practices which operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness of minority groups." S. Rep. No. 97-417, at 28. To prevail,

a Section 2 plaintiff must show (among other things, and as was shown here) a "pattern of racially polarized voting"—the "surest indication of race-conscious politics." *Marengo Cnty.*, 731 F.2d at 1567. And all Section 2 does is require that states remedy those racially discriminatory effects so that Black voters have equal opportunity to elect candidates of their choice. That is no "racial preference."

*Third*, unlike affirmative action, where the Court worried that race-based admissions would go on "indefinitely," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 227-228 (2023), Section 2 poses no such risk because (as discussed *supra*) it is self-liquidating: Once the conditions requiring its remedy, such as racially polarized voting, subside, Section 2 claims will no longer be viable. *See Blaine Cnty.*, 363 F.3d at 906 (finding that this "'self-limitation'" renders Section 2 "undoubtedly constitutional").

And finally, the temporal limits on affirmative action arose in a context that is nowhere present here—including the specific compelling interest at issue there (diversity in higher education), and concerns that the interest could not justify the indefinite extension of racial preferences in admissions. *See Robinson*, 86 F.4th at 593 ("Drawing a comparison between voting redistricting and affirmative action occurring at Harvard is a tough analogy."). The Secretary does not try to argue otherwise: He does not attempt to adapt those cases to the compelling interest that inheres in Section 2—ensuring that no voter is denied equal opportunity on the basis

of their race—or to assess whether Section 2's limited, self-liquidating remedy is tailored to that interest. Nor does he claim that the affirmative action cases addressed Congress's authority under Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment—including what proscriptions Congress may impose on racially discriminatory conduct, and what conduct is necessary for states to avoid race discrimination. Simply put, the unique and exceptional circumstances that led the Court to conclude that the constitutionality of affirmative action was time-limited are not present in the Section 2 context. The Secretary has done nothing to show otherwise.

Section 2 guards against racial vote dilution where the combination of district lines and racially polarized voting means that large populations of minority voters "are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Milligan*, 599 U.S. at 18. As the district court found, that remains the case in certain areas of Georgia. "[R]acial discrimination and racially polarized voting are not ancient history," and "[m]uch remains to be done to ensure that citizens of all races have equal opportunity to share and participate in our democratic processes and traditions." *Bartlett v. Strickland*, 556 U.S. 1, 25 (2009) (plurality op.). The district court's careful decision brings Georgia one step closer to that goal.

## CONCLUSION

For these reasons, the Court should affirm.

Respectfully submitted.

_/s/ Sophie Lin Lakin_

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
MAURA DOUGLAS
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

SOPHIA LIN LAKIN
ARI J. SAVITZKY
MING CHEUNG
CASEY SMITH
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7836

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
   GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

SONIKA R. DATA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

*Counsel for Plaintiffs-Appellees*
*Alpha Phi Alpha Fraternity, Inc. et al. (No. 23-13914)*

April 8, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Red. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and 11th Circuit Rule 32-4, the brief contains 12,879 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: April 8, 2024         */s/ Sophia Lin Lakin*
                             SOPHIA LIN LAKIN

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will automatically send a notice of the electronic filing to all registered CM/ECF users who have entered an appearance in the case.

Dated: April 8, 2024                    */s/ Sophia Lin Lakin*
                                        SOPHIA LIN LAKIN