No. 23-13914
*(consolidated with Nos. 23-13916 & 23-13921)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

ALPHA PHI ALPHA FRATERNITY, INC., et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

UNITED STATES' SUPPLEMENTAL APPENDIX

———————————

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA 30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

No. 23-13916
*(consolidated with Nos. 23-13914 & 23-13921)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

COAKLEY PENDERGRASS, et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

UNITED STATES' SUPPLEMENTAL APPENDIX

———————————

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

AILEEN BELL HUGHES
  Georgia Bar No. 375505
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA 30303
  (404) 581-6000

KRISTEN CLARKE
  Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 598-0243

No. 23-13921
*(consolidated with Nos. 23-13914 & 23-13916)*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

ANNIE LOIS GRANT, et al.,

Plaintiffs-Appellees

v.

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

UNITED STATES' SUPPLEMENTAL APPENDIX

———————————

RYAN K. BUCHANAN
 United States Attorney
 Northern District of Georgia

AILEEN BELL HUGHES
 Georgia Bar No. 375505
 Assistant U.S. Attorney
 Office of the United States Attorney
 600 U.S. Courthouse
 75 Ted Turner Drive, SW
 Atlanta, GA 30303
 (404) 581-6000

KRISTEN CLARKE
 Assistant Attorney General

ERIN H. FLYNN
NOAH B. BOKAT-LINDELL
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C. 20044-4403
 (202) 598-0243

# INDEX OF SUPPLEMENTAL APPENDIX

**DOCUMENT:**                                             **DOCKET/TAB #**

**Alpha Phi Alpha Fraternity:**

Defendant's Answer to Plaintiffs' Complaint ...................................................... 125

Defendant's Brief in Support of Motion for Summary Judgment .................... 230-1

Defendant's Supplemental Brief on *Allen v. Milligan* ......................................... 263

Pretrial Order (excerpts:  pp. 21-31) ................................................................... 280

Defendant's Proposed Findings of Fact and Conclusions of Law
    (excerpts:  pp. 172-175) .............................................................................. 317

Order Certifying Constitutional Question ............................................................. 319

United States' Notice of Intervention and Brief in Support ................................. 335

Response to the United States on Constitutionality of Section 2
    of the Voting Rights Act .............................................................................. 340

**Grant:**

Amended Complaint ............................................................................................... 96

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY
INC., et al.,

     *Plaintiffs*,

v.

BRAD RAFFENSPERGER,

     *Defendant*.

CIVIL ACTION

FILE NO. 1:21-CV-05337-SCJ

## DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant Brad Raffensperger, in his official capacity as Secretary of the State of Georgia (the "Defendant" or the "Secretary"), answer Plaintiffs' Complaint [Doc. 1] (the "Complaint") as follows:

### FIRST AFFIRMATIVE DEFENSE

The allegations in Plaintiffs' Complaint fail to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred for failure to name necessary and indispensable parties.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs lack constitutional standing to bring this action.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs lack statutory standing to bring this action.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs' federal claims against Defendant are barred by the Eleventh Amendment to the United States Constitution.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred by sovereign immunity.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no provide right of action.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred because they should be heard by a three-judge panel.

**NINTH AFFIRMATIVE EFENSE**

Defendant denies that Plaintiffs have been subjected to the deprivation of any right, privilege, or immunity under the Constitution or laws of the United States.

**TENTH AFFIRMATIVE DEFENSE**

Defendant reserves the right to amend his defenses and to add additional ones, including lack of subject matter jurisdiction based on the

mootness or ripeness doctrines, as further information becomes available in discovery.

Defendant answers the specific numbered paragraphs of Plaintiffs' Complaint as follows:

1.     Paragraph 1 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

2.     Defendant admits the allegations set forth in Paragraph 2 of the Complaint.

3.     Defendant denies the allegations set forth in Paragraph 3 of the Complaint.

4.     Defendant admits that the State House of Representatives map includes two additional majority-Black districts. Defendant denies the remaining allegations set forth in Paragraph 4 of the Complaint.

5.     Defendant denies the allegations set forth in Paragraph 5 of the Complaint.

6.     Defendant admits that the Complaint seeks declaratory and injunctive relief. Defendant denies the remaining allegations set forth in Paragraph 6 of the Complaint.

7.     Defendant admits that this Court has federal-question jurisdiction for claims arising under the Voting Rights Act. Defendant denies the remaining allegations set forth in Paragraph 7 of the Complaint.

8.     Defendant admits the allegations set forth in Paragraph 8 of the Complaint.

9.     Defendant admits that the sole claim in the Complaint is based on the Voting Rights Act. The remaining allegations in Paragraph 9 of the Complaint set forth legal conclusions to which no response is required, and therefore, Defendant denies the same.

10.     Defendant admits the allegations set forth in Paragraph 10 of the Complaint.

11.     Defendant admits the allegations set forth in Paragraph 11 of the Complaint.

12.     The allegations in Paragraph 12 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

13.     The allegations in Paragraph 13 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

14.     The allegations in Paragraph 14 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

15.     The allegations in Paragraph 15 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

16.     The allegations in Paragraph 16 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

17.     The allegations in Paragraph 17 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

18.     The allegations in Paragraph 18 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

19.     The allegations in Paragraph 19 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

20.     The allegations in Paragraph 20 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

21.     The allegations in Paragraph 21 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

22.     The allegations in Paragraph 22 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

23.     Defendant admits that he is the Secretary of State of Georgia and that the Secretary of State is designated by statute as the chief election official. Defendant further admits that he has responsibilities under law

related to elections. Defendant denies the remaining allegations contained in Paragraph 23 of the Complaint.

24.    Defendant admits the allegations set forth in Paragraph 24 of the Complaint.

25.    Paragraph 25 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

26.    Paragraph 26 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

27.    Paragraph 27 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

28.    Paragraph 28 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

29.    Paragraph 29 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph, including its footnote, are denied.

30.     Defendant admits that Georgia's population grew by over 1 million people to 10.71 million people which is a 10.6% increase from 2010. The remaining allegations in Paragraph 30 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

31.     Defendant admits that Georgia's Black population increased by almost half a million people from 2010 to 2020. The remaining allegations in Paragraph 31 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

32.     Defendant admits that, as a percentage of the electorate, the white percentage has decreased and the percentage of voters of color has increased over the last ten years. The remaining allegations in Paragraph 32 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

33.     Defendant admits that, as of the 2019 American Community Survey, the Black voting-eligible population had reached a record high of 2.5 million eligible voters. The remaining allegations in Paragraph 33 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

34.     Defendant admits that many counties in metro Atlanta have seen significant population growth, including Black population growth. The

7

remaining allegations in Paragraph 34 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

35.    Defendant admits that Georgia's Black Belt consists of predominantly rural counties across the central and southern part of the state. Defendant further admits that many counties in the Black Belt have large Black populations. The remaining allegations in Paragraph 35 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

36.    Defendant denies the allegations set forth in Paragraph 36 of the Complaint.

37.    Defendant admits that Georgia is no longer required to seek preclearance of its redistricting plans prior to implementing them. The remaining allegations in Paragraph 37 set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

38.    Defendant admits that, prior to 2013, it was a covered jurisdiction under Section 4 of the Voting Rights Act and was required to seek preclearance of election laws prior to enforcement. The remaining allegations in Paragraph 38 set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

39.     Defendant admits the allegations set forth in Paragraph 39 of the Complaint.

40.     The allegations in Paragraph 40 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

41.     Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

42.     The allegations in Paragraph 42 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

43.     Defendant admits the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendant admits that the Redistricting Committees held a series of town-hall meetings to gather public input before the COVID-delayed Census data was released. The remaining allegations in Paragraph 44 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

45.     The allegations in Paragraph 45 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

46.     Defendant admits that hundreds of Georgians participated in the town hall meetings. The remaining allegations in Paragraph 46 of the

Complaint are outside Defendant's knowledge and are therefore denied on that basis.

47.    Defendant admits that members of the public could submit comments to the Redistricting Committees via a web portal. The remaining allegations in Paragraph 47 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

48.    Defendant admits the allegations set forth in Paragraph 48 of the Complaint.

49.    Defendant admits the allegations set forth in Paragraph 49 of the Complaint.

50.    Defendant admits the allegations set forth in Paragraph 50 of the Complaint.

51.    Defendant denies the allegations set forth in Paragraph 51 of the Complaint.

52.    Defendant admits the allegations set forth in Paragraph 52 of the Complaint.

53.    Defendant denies the allegations set forth in Paragraph 53 of the Complaint.

54.    The allegations in Paragraph 54 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

55.     Defendant admits the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendant denies the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendant admits the allegations set forth in Paragraph 57 of the Complaint.

58.     The allegations in Paragraph 58 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

59.     Defendant admits the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendant admits that Governor Kemp signed S.B. 1EX and H.B. 1EX into law on December 30, 2021. The remaining allegations in Paragraph 60 of the Complaint are denied.

61.     Defendant denies the allegations set forth in Paragraph 61 of the Complaint.

62.     Defendant denies the allegations set forth in Paragraph 62 of the Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendant denies the allegations set forth in Paragraph 65 of the Complaint.

66.     Defendant denies the allegations set forth in Paragraph 66 of the Complaint.

67.     Defendant denies the allegations set forth in Paragraph 67 of the Complaint.

68.     Defendant denies the allegations set forth in Paragraph 68 of the Complaint.

69.     Defendant denies the allegations set forth in Paragraph 69 of the Complaint.

70.     Defendant denies the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendant denies the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the Complaint.

75.     Defendant denies the allegations set forth in Paragraph 75 of the Complaint.

76.     Defendant admits that there are two additional majority-Black state House districts on the 2021 adopted state House plan. Defendant denies the remaining allegations set forth in Paragraph 76 of the Complaint.

77.     Defendant denies the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendant admits that Black and white voters vote in blocs and prefer different candidates. Defendant denies the remaining allegations set forth in Paragraph 78 of the Complaint.

79.     Defendant denies the allegations set forth in Paragraph 79 of the Complaint.

80.     Defendant denies the allegations set forth in Paragraph 80 of the Complaint.

81.     Defendant denies the allegations set forth in Paragraph 81 of the Complaint.

82.    Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. Defendant denies the remaining allegations set forth in Paragraph 82 of the Complaint.

83.    Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 83 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

84.    Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 84 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

85.    Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 85 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

86.    Paragraph 86 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

87.    Paragraph 87 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

88.     Defendant admits that plans drawn when Democrats controlled Georgia government were objected to in 1971, 1981, 1991, and 2001. The remaining allegations of Paragraph 88 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

89.     Defendant admits that plans drawn when Democrats controlled Georgia government were objected to in 1971, 1981, 1991, and 2001. The remaining allegations of Paragraph 89 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

90.     Paragraph 90 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

91.     Paragraph 91 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

92.     Defendant denies the allegations set forth in Paragraph 92 of the Complaint.

93.     Paragraph 93 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

94.     Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of

Paragraph 94 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

95.     The allegations in Paragraph 95 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

96.     Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 96 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

97.     Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 97 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

98.     Paragraph 98 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

99.     Defendant admits that, in past elections, Black voters cohesively supported Democratic candidates. Defendant denies the remaining allegations set forth in Paragraph 99 of the Complaint.

100.    Defendant admits that, in past elections, Black voters cohesively supported Democratic candidates. Defendant denies the remaining allegations set forth in Paragraph 100 of the Complaint.

16

101.   Defendant admits that, in past elections, white voters cohesively supported Republican candidates. Defendant denies the remaining allegations set forth in Paragraph 101 of the Complaint.

102.   Defendant denies the allegations set forth in Paragraph 102 of the Complaint.

103.   Defendant admits that Georgia has a majority-vote requirement for most of its elections. Defendant denies the remaining allegations set forth in Paragraph 103 of the Complaint.

104.   Defendant admits that Georgia has a past history of state-sanctioned discrimination against Black voters. The remaining allegations of Paragraph 104 of the Complaint set forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

105.   The allegations in Paragraph 105 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

106.   Defendant denies the allegations set forth in Paragraph 106 of the Complaint.

107.   Paragraph 107 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same.

108.   Defendant denies the allegations set forth in Paragraph 108 of the Complaint.

109.   Defendant denies the allegations set forth in Paragraph 109 of the Complaint.

110.   The allegations in Paragraph 110 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

111.   The allegations in Paragraph 111 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

112.   The allegations in Paragraph 112 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

113.   The allegations in Paragraph 113 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

114.   The allegations in Paragraph 114 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

115.   The allegations in Paragraph 115 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

116.   Defendant denies the allegations set forth in Paragraph 116 of the Complaint.

117.   Defendant denies the allegations set forth in Paragraph 117 of the Complaint.

118.   Defendant denies the allegations set forth in Paragraph 118 of the Complaint.

119.   The allegations in Paragraph 119 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

120.   The allegations in Paragraph 120 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

121.   The allegations in Paragraph 121 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

122.   The allegations in Paragraph 122 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

123.   The allegations in Paragraph 123 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

124.   The allegations in Paragraph 124 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

125.   Defendant admits that Georgia elected its first Black U.S. Senor in 2021 and has not yet elected a Black Governor or Secretary of State. The remaining allegations in Paragraph 125 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

126.   The allegations in Paragraph 126 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

127.   Defendant denies the allegations set forth in Paragraph 127 of the Complaint.

128.   Defendant denies the allegations set forth in Paragraph 128 of the Complaint.

129.   Defendant admits that Democratic-aligned interest groups opposed S.B. 202. Defendant denies the remaining allegations set forth in Paragraph 129 of the Complaint.

130.   Defendant denies the allegations set forth in Paragraph 130 of the Complaint.

131.   The allegations in Paragraph 131 of the Complaint are outside Defendant's knowledge and are therefore denied on that basis.

132.   Defendant denies the allegations set forth in Paragraph 132 of the Complaint.

133.   Paragraph 133 of the Complaint sets forth legal conclusions to which no response is required and, therefore, Defendant denies the same. The remaining allegations in this Paragraph are denied.

134.   Defendant denies the allegations set forth in Paragraph 134 of the Complaint.

135.   Defendant denies the allegations set forth in Paragraph 135 of the Complaint.

136.   Defendant incorporates his responses to Paragraphs 1 through 123 as if fully set forth herein.

137.   Defendant denies the allegations set forth in Paragraph 137 of the Complaint.

138.   Defendant denies the allegations set forth in Paragraph 138 of the Complaint.

139.   Defendant denies the allegations set forth in Paragraph 139 of the Complaint.

140.   Defendant denies the allegations set forth in Paragraph 140 of the Complaint.

## Prayer for Relief

Defendant denies that Plaintiffs are entitled to any relief they seek. Defendant further denies every allegation not specifically admitted in this Answer.

Respectfully submitted this 25th day of February, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General

Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 678600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the

foregoing DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT has

been prepared in Century Schoolbook 13, a font and type selection approved

by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson

230-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, <br><br>     *Defendant*. | CASE NO. 1:21-CV-05337-SCJ |

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

After engaging in a months-long process in 2021 that sought broad input and despite COVID-related Census delays, Georgia implemented redistricting maps for the General Assembly that split fewer counties than prior plans, paired very few incumbents, and increased or maintained the number of majority-Black districts. Plaintiffs claim these maps result in "a denial or abridgement of the right . . . to vote on account of race or color," 52 U.S.C. § 10301(a), because they say the General Assembly had an obligation to draw 17 majority-Black Senate districts instead of 14 in the enacted plan and 54

majority-Black House districts instead of 49 in the enacted plan, so the adopted maps constitute illegal vote dilution.

But Section 2 does not allow this court to infer vote dilution "from mere failure to guarantee a political feast," *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) (majority op.), because the "[f]ailure to maximize cannot be the measure of § 2." *Id.*

This means that Section 2 is not simply a checklist—"do we have a map with more districts, polarized voting, and a history of discrimination? End of analysis!"—instead, this Court is required to "conduct an intensely local appraisal of the design and impact of a voting system." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997)). And the alleged dilution of the right to vote "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc)); *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2359 (2021) (Kagan, J, dissenting) (Section 2 asks whether an election law interacts with conditions "to ***cause*** race-based inequality in voting opportunity" (emphasis added)). This local appraisal also does not mean the adopted plans have to beat Plaintiffs'

2

maps in a "beauty contest." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (O'Connor, J.). This is at least in part because "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022).

Thus, instead of engaging in a wholesale review of the legislature's choices, this Court must answer two fundamental questions, in an area of law that is "notoriously unclear and confusing," *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring):

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew a Senate map without three additional majority-Black Senate districts in metro Atlanta and Augusta? If so, which of these districts should have been drawn and why?

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew a House map without five additional majority-Black House districts in metro Atlanta, Macon, Augusta, and/or[1]

---

[1] Given the conflicting views of Plaintiffs' experts in this case and *Grant* on where these additional districts should be located, the "and/or" is important in determining what Plaintiffs say the General Assembly failed to do.

Southwest Georgia? If so, which of these districts should have been drawn and why?

As discussed below, Plaintiffs cannot prevail on their claims after discovery. This Court should determine that Plaintiffs have failed to present evidence that Georgia's legislative maps dilute the right to vote on account of race or color and dismiss this case.

First, the maps proposed by Plaintiffs do not meet prong one of *Thornburg v. Gingles*, 478 U.S. 30 (1986), because they are improperly focused on race and thus cannot be implemented and because they do not demonstrate the State should have drawn additional majority-Black districts. Plaintiffs' expert utilized racial shading, racial splits, and other tools while drawing and could not identify communities beyond race when preparing the maps that united disparate communities of Black voters. Indeed, if Georgia had used the same processes Plaintiffs' experts used, it would be accused of racial gerrymandering.[2]

---

[2] In fact, while Georgia is accused of not considering race enough in this case by failing to draw a sufficient number of majority-Black districts, it is accused of considering race too much by plaintiffs who say the congressional plans are racial gerrymanders in the *Ga. NAACP* and *Common Cause* three-judge panel cases.

Second, the second and third prongs of *Gingles* are not met because Plaintiffs' experts studiously avoided any analysis of the cause of the polarization they found, opting instead to refer to any voting pattern where the majority votes to defeat the minority as "racially polarized." But the requirement of Section 2's text that any vote dilution be "on account of race or color" requires that it not be "on account of politics." Plaintiffs' failure to address this issue in discovery is fatal to their claims.

As discussed below, after discovery, there is no material fact in dispute that could cause this case to continue. This Court should grant judgment as a matter of law to Defendant.

## FACTUAL BACKGROUND[3]

### I.   Georgia's redistricting plans.

Following the delayed release of Census data in 2021,[4] the Georgia General Assembly began working on redistricting maps ahead of its November

---

[3] As required by this Court's instructions, III. I., all citations to the record are included in the brief and in the accompanying Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

[4] That Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points. SMF ¶ 1; Cooper Report, ¶ 50. But further Census data has shown decreases in the Black Citizen Voting Age Population between 2019 and 2021. SMF ¶ 2; Cooper Dep. 99:11-23, 100:10-16.

2021 special session. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. SMF ¶ 3; Wright Dep. 68:17-69:7. Consistent with past redistricting cycles, the joint House and Senate committees also held a series of "listening sessions" across the state to hear from citizens about maps, including several Zoom meetings. SMF ¶ 4; Kennedy Dep. 171:13-20, 194:1-195:10. And for the first time in 2021, the General Assembly provided a public comment portal online, seeking comments from the public. SMF ¶ 5; Wright Dep. 252:20-253:4. After holding a committee education day where a variety of stakeholder groups presented about map-drawing, the committees adopted guidelines to govern the map-drawing process. SMF ¶ 6; Kennedy Dep. 161:1-4; Rich Dep. 214:19-215:7.

To prepare maps, Gina Wright, the director of the Joint Reapportionment Office, drafted "blind" maps for the House and Senate, drawing based on her own knowledge of Georgia and the historic districts. SMF ¶ 7; Wright Dep. 45:15-25 (Senate map); 62:17-62:24 (House map). The chairs of the House and Senate committees then met with Ms. Wright to adjust district boundaries based on the input they received from members and from

others.[5] SMF ¶ 8; Wright Dep. 54:3-20, 77:2-7 (Senate map); 197:2-6 (House map). The chairs and Ms. Wright also consulted with counsel about compliance with the Voting Rights Act. SMF ¶ 11; Wright Dep. 92:8-20. While racial data was available, the chairs of each committee focused on past election data to evaluate the partisan impact of the new plans while drawing with awareness of Republican political performance. SMF ¶ 12; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14.

The resulting Senate map reduced the number of split counties from the prior plan, did not pair any incumbents of either party, and maintained the same number of majority-Black districts as prior plans. SMF ¶ 13; Cooper Report ¶ 116, Figure 21; Kennedy Dep. 106:4-11; Cooper Report ¶ 70, Figure 11. Similarly, the state House maps also reduced the number of split counties, increased the number of majority-Black districts in metro Atlanta, and paired a small number of incumbents. SMF ¶ 14; Cooper Report ¶ 189, Figure 37; Rich Dep. 125:4-11, 196:17-22; Cooper Report, ¶ 132, Figure 23. The Governor

---

[5] When Democrats requested changes, some of those changes were included. SMF ¶ 9; Wright Dep. 59:5-60:7 (Sen. Rhett). Information about draft maps was also shared with members of the Democratic caucus, which had its own counsel and map-drawers. SMF ¶ 10; Wright Dep. 223:14-224:4, 226:11-17; Jackson Dep. 12:9-21.

signed the plans on December 30, 2021, and they were used in the 2022 elections. SMF ¶ 15; [Doc. 141, ¶ 60].

## II.   The individual Plaintiffs.

All of the individual plaintiffs in this case consider themselves to be members of the Democratic Party, have held positions in the Democratic Party, and most of them have never voted for a Republican candidate. SMF ¶¶ 16-31; Woods Dep. 27:13-19, 19:9-25, 28:19-29:7; Glenn Dep. 25:2-14, 25:19-24, 28:13-15; Brown Dep. 36:7-16, 24:4-32:3, 37:15-18; Stewart Dep. 25:11-25. Given the political nature of the polarization discussed below and the partisan impact of this case, the political goals of Plaintiffs are relevant for this Court's consideration.

## III.   Plaintiffs' proposed maps.

Plaintiffs began planning for this litigation before the Georgia maps were even complete—retaining experts to begin drawing alternative maps before the special session convened. SMF ¶ 32; Cooper Dep. 24:18-25:11. After the Governor signed the maps, Plaintiffs immediately sued.

### A. Overall *Alpha Phi Alpha* maps.

Plaintiffs' goal in offering their illustrative plans was to determine whether they could draw additional majority-Black[6] districts beyond those drawn by the state plans. SMF ¶ 33; Cooper Dep. 34:24-35:5. When creating the various plans, Plaintiffs' map-drawer expert could not explain compliance with other traditional factors, but instead focused on the racial makeup of the plans.

Plaintiffs' expert, Mr. Cooper, does not believe that a metric can identify whether race predominated in the drafting of a district plan. SMF ¶ 35; Cooper Dep. 40:21-41:7. But when he was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located. SMF ¶ 36; Cooper 60:10-18, 61:16-22. Unlike the legislature, Mr. Cooper did not have any political data available to him. SMF ¶ 37; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14; Cooper Dep. 68:17-68:3. He also did not review any public comments. SMF ¶ 38; Cooper Dep. 128:20-25. Mr. Cooper also views all Black Americans as sharing a community of interest for

---

[6] Map-drawers distinguish "majority-minority" from "majority-Black." Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district. SMF ¶ 34; Cooper Dep. 37:23-38:1, 38:25-39:5.

purposes of his map-drawing. SMF ¶ 39; Cooper Dep. 94:15-94:20, 95:1-6. Mr. Cooper's preliminary-injunction plans contained the maximum number of Black districts he drew for any legislative plan in Georgia. SMF ¶ 40; Cooper Dep. 34:24-35:5.

### B. Illustrative Senate plan.

Although Mr. Cooper created five additional majority-Black Senate districts for the preliminary-injunction proceedings, his expert report only includes four additional majority-Black Senate districts. SMF ¶ 41; Cooper Dep. 66:25-67:11. In order to create the additional Senate districts, Mr. Cooper changed more than half of all districts from the enacted plan. SMF ¶ 42; Cooper Dep. 156:20-157:11.

In drafting the illustrative Senate districts, Mr. Cooper sacrificed traditional redistricting principles to create majority-Black districts, connecting Black voters wherever he could find them. To create Senate District 23, Mr. Cooper crossed his own regions and the boundaries of various regional commissions to connect Black voters separated by intervening white populations. SMF ¶ 43; Cooper Dep. 142:15-143:7. Despite not being able to identify which counties are in the Black Belt, SMF ¶ 44, Cooper Dep. 80:19-21, Mr. Cooper relied on counties in illustrative District 23 as being in the Black Belt for any possible connections. SMF ¶ 45; Cooper Dep. 144:20-145:9, 145:20-

146:4. Mr. Cooper also made racial splits of counties in the creation of illustrative District 23, including higher concentrations of Black voters in counties while excluding lower concentrations of Black voters when a county was split. SMF ¶ 46; Morgan Report, ¶¶ 33-37.

To create Senate Districts 17 and 28, Mr. Cooper strategically cut counties to ensure that areas with higher concentrations of Black voters were connected with more distant concentrations of white voters. SMF ¶ 47; Morgan Report, ¶¶ 25-30. This resulted in the largest counties by population in illustrative Senate Districts 17 and 28 not containing a majority of Black individuals. SMF ¶ 48; Cooper Dep. 118:12-17, 119:23-120:7. Mr. Cooper could not identify a community of interest between northern Clayton County and rural Spalding County in his configuration of this South Metro area beyond the race of the individuals in both parts of the district. SMF ¶ 49; Cooper Dep. 130:14-131:2.

Further, the illustrative Senate plan does not comply with traditional redistricting principles when compared to the enacted Senate plan. Although the illustrative plan has a similar number of county splits, that is only because Mr. Cooper unsplit counties in parts of the state unrelated to the additional majority-Black districts to make the total split number appear more similar. SMF ¶ 50; Morgan Report, ¶¶ 36-39.

**C. Illustrative House plan.**

Mr. Cooper offered the same increase of five majority-Black House districts on his preliminary-injunction plan and expert report, but located those five districts in different places. SMF ¶ 51; Cooper Dep. 167:11-17. In order to create the additional House districts, Mr. Cooper changed more than half of all of the House districts from the enacted plan. SMF ¶ 52; Cooper Dep. 205:7-205:11.

In drafting the illustrative House districts, Mr. Cooper again sacrificed traditional redistricting principles to create majority-Black districts, connecting Black voters wherever he could find them. To create House District 133 as a new majority-Black district, Mr. Cooper had to add county splits in the area over the enacted plan, including splitting *seven* rural counties in several adjoining districts. SMF ¶ 53; Morgan Report, ¶¶ 59-62; Cooper Dep. 187:2-9; 187:20-188:6. To create House District 145 as a new majority-Black district, Mr. Cooper had to adjust Macon districts so that no House district is wholly within Bibb County and each of the majority-Black districts in that area includes population from downtown Macon, including one district that crosses out of the Macon Census statistical area. SMF ¶ 54; Cooper Dep. 196:21-197:18, 198:7-198:11. To create Districts 74 and 117 in metro Atlanta, Mr. Cooper had to connect portions of counties with higher concentrations of Black

voters with more-rural, white areas. SMF ¶ 55; Cooper Dep. 174:10-20, 175:20-176:7. Finally, in southwest Georgia, when he created District 171, Mr. Cooper did not rely on the Corridor Management Plan he cited until after drawing the district and did not verify that all parts of the historic route were included. SMF ¶ 56; Cooper Dep. 191:14-21, 192:9-16, 192:23-193:12. Illustrative District 171 also connects disparate enclaves of Black population and splits additional counties to include Black population in the district. SMF ¶ 57; Morgan Report, ¶¶ 65-66.

To create the additional majority-Black districts on his illustrative House plan, Mr. Cooper elongates other surrounding districts to create "room" for the new districts to connect racially disparate populations. SMF ¶ 58; Morgan Report, ¶¶ 50-54, 56. This impacts the compactness of the districts, lowering the overall compactness of the districts created in the illustrative plan. SMF ¶ 59; Morgan Report, ¶ 55 Chart 8.

Further, the illustrative House plan does not comply with traditional redistricting principles when compared to the enacted House plan. It has higher total population deviations than the enacted plan. SMF ¶ 60; Cooper Dep. 200:7-11. Although the illustrative plan has a number of county splits similar to the enacted plan, that is only because Mr. Cooper unsplit counties

in parts of the state unrelated to changes to make the total split number appear more similar. SMF ¶ 61; Morgan Report, ¶¶ 68-76; Cooper Dep. 202:22-203:14.

### D. Lack of agreements among experts.

Plaintiffs' experts in this case do not necessarily agree with experts in other cases. For example, unlike Mr. Cooper, Mr. Esselstyn did not draw any new majority-Black House districts in east Georgia or in southwest Georgia. SMF ¶ 62; Esselstyn Report, ¶ 48, Figure 13. Unlike Mr. Esselstyn, Mr. Cooper only drew one additional majority-Black state House district in Macon and did not draw an additional majority-Black district in western metro Atlanta. SMF ¶ 63; Cooper Report, ¶ 153.

Mr. Cooper and Mr. Esselstyn also located their new majority-Black Senate districts in metro Atlanta in different places, with Mr. Cooper drawing his District 28 without Coweta County and his District 17 into DeKalb County as opposed to the placement on Mr. Esselstyn's plans. SMF ¶ 64; Cooper Report, ¶¶ 85-86; Esselstyn Report, ¶ 27, Figure 4.

### ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out

the absence of evidence to support the non-moving party's case. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County, Ga.* 821 F. Supp.

685, 687 (N.D. Ga. 1993).

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting

the strength of minority voters through a "standard, practice, or procedure"

"which results in a denial or abridgement of the right of any citizen of the

United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof

of illegal vote dilution is established through a "totality of the circumstances"

analysis. 52 U.S.C. § 10301(b).

In order to show a Section 2 violation, a plaintiff bears the burden of first

proving *each* of the three *Thornburg v. Gingles*, 478 U.S. 30 (1986),

preconditions[7]:

> Specifically, plaintiffs in vote dilution cases must establish as a
> threshold matter: (1) that the minority group is "sufficiently large and
> geographically compact to constitute a majority in a single-member
> district"; (2) that the minority group is "politically cohesive"; and (3) that
> sufficient racial bloc voting exists such that the white majority usually
> defeats the minority's preferred candidate.

*Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994) (quoting *Gingles*, 478 U.S.

at 50-51). Only after establishing the three preconditions does a court begin a

---

[7] These preconditions are also frequently referred to in cases as the *Gingles*
"prongs." *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 17 (2009); *Johnson*, 296
F.3d at 1073.

review of the so-called "Senate Factors" to assess the totality of the circumstances. *Id*. at 1512; *Gingles*, 478 U.S. at 79; *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1567 (11th Cir. 1997). And of course, while these preconditions are *necessary* to proving a Section 2 claim, they are not *sufficient*. *Johnson,* 512 U.S. at 1011 (*Gingles* preconditions are not "sufficient" to "prove a § 2 claim.").

## I.     Plaintiffs cannot establish the first *Gingles* precondition.

As this Court already found, illustrative plans cannot "subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2." *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1264 (N.D. Ga. 2022) (citing *Davis*, 139 F.3d at 1424). The evidence demonstrates that Plaintiffs have gone beyond that limitation here.

As Mr. Cooper testified, he used racial shading and other techniques in his efforts to create majority-Black districts. *See Miller v. Johnson*, 515 U.S. 900, 925 (1995) (use of racial shading in district maps). He was unable to

identify factors that connected areas of his new majority-Black districts beyond the common community of interest shared by all Black individuals. And when he split counties, he did so in ways that ensured higher concentrations of Black voters were included in the portions of counties in the new majority-Black districts. This cannot meet prong one because Mr. Cooper used techniques that constitute racial gerrymandering, which make his districts improper as a potential remedy.

The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F.3d at 1530-31; *see also Burton*, 178 F.3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). Whatever plan is used to demonstrate the violation of the first prong of *Gingles* must also be a remedy this Court can impose. *Nipper*, 39 F.3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Id.* at 1530-31.

Additionally, Plaintiffs have presented no evidence of the geographic compactness of the Black community in the proposed new districts aside from the fact that they are drawn. This absence of evidence supports a grant of summary judgment to Defendant. *Marion*, 821 F. Supp. at 687. The Supreme

17

Court requires that the size and geographic compactness portions of the first *Gingles* prong relate to the community, not to any potential district created by a plaintiff: "The first *Gingles* condition refers to *the compactness of the minority population*, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (emphasis added) (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)).

Mr. Cooper's districts combine distinct minority communities, often with intervening white population, and often barely achieve majority-Black status. Mr. Cooper could identify practically nothing beyond the race of the voters in a number of his districts that united them—in clear violation of the requirements of *LULAC*: "there is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *Id.*; SMF ¶ 65; Cooper Dep. 130:14-131:2.

## II.   Plaintiffs cannot establish the second and third *Gingles* preconditions.

Even if Plaintiffs have shown a proper remedy, they still cannot prevail because they have not shown legally significant racially polarized voting. The basis for a Section 2 vote-dilution claim must be more than a simple failure to win elections—because, in a majoritarian system, "numerical minorities lose

elections." *Holder v. Hall,* 512 U.S. 874, 901 (1994) (Thomas, J., concurring) (citations omitted). In order to succeed, Plaintiffs must show that minority voters, though able to vote, are unable to elect their preferred candidates because their votes have been "submerge[ed]" in a majority that votes as a "racial bloc" against them. *Gingles,* 478 U.S. at 46, 49-52. And this racial bloc voting, by its very terms, must be attributable to *race*, rather than, for example, race-neutral partisan politics. Otherwise, it is just *majority* bloc voting or, as Justice White put it, "interest-group" politics. *Id.* at 83 (White, J., concurring). And "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993).

**A. To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not *majority* bloc voting attributable to ordinary partisan politics.**

In its ruling denying Plaintiffs' respective motions for preliminary injunction in this action, this Court "conclude[d] as a matter of law that, to satisfy the second *Gingles* precondition, Plaintiffs need not prove the causes of racial polarization, just its existence." *Alpha Phi Alpha Fraternity*, 587 F. Supp. 3d at 1303. Relying on the plurality opinion in *Gingles,* this Court stated "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates

19

neither causation nor intent. *It means simply that the race of voters correlates with the selection of a certain candidate or candidates*; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* (emphasis original) (quoting *Gingles*, 478 U.S. at 62). But a closer review of the opinions shows that a majority of the justices in *Gingles* declined to endorse this approach to majority-bloc voting.

Justice White, in a concurring opinion, called it little more than "interest-group politics." *Gingles,* 478 U.S. at 83. Justice O'Connor, writing for the remaining justices, declared flatly that "I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not necessary to the disposition of this case." *Id.* at 101 (O'Connor, J., concurring). And it is important to note that Justice O'Connor arrived at this conclusion after endeavoring to construe what she called the "compromise legislation" of the amended Section 2. That is, the calculated equivocation in Part B of Section 2 that expressly disclaims a right to proportional representation cannot be given any substantive effect if all that matters when establishing racially polarized voting is whether minority voters and majority voters are voting differently. But the plurality view does just that:

> [T]he combination of the Court's definition of minority voting
> strength and its test for vote dilution results in the creation of a
> right to a form of proportional representation in favor of all
> geographically and politically cohesive minority groups that are
> large enough to constitute majorities if concentrated within one or
> more single-member districts. *In so doing, the Court has
> disregarded the balance struck by Congress in amending § 2* and
> has failed to apply the results test as described by this Court in
> *Whitcomb* and *White.*

*Id.* at 85 (emphasis added) (O'Connor, J., concurring in the judgment). Thus, while this Court was correct in identifying what a plurality of Justices in *Gingles* described as "racially polarized voting," it is just as true that an equally sized plurality of the *Gingles* Court rejected that view. When combined with Justice White's admonition against construing Section 2 as enshrining interest-group politics into law, the former plurality does not carry the day.

But even if this Court still disagrees with Defendant on this point, there is a remaining issue: The contrary view—that racial bloc voting is present anywhere a minority happens to vote for a different candidate than the majority—would raise serious questions about the constitutionality of Section 2, which cannot be validly understood to require changes in districts solely because of partisan voting behavior.

### 1. *Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting."*

Section 2 is designed to root out racially discriminatory laws. The text requires Plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). It is Plaintiffs' burden to show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens… in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Section 2 thus requires Plaintiffs to show that the "challenged law… *caused*" them, "on account of race" to have less opportunity to elect their preferred candidates than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.,* 992 F.3d 1299, 1329 (11th Cir. 2021) (emphasis in original).

The text explicitly does *not* "guarantee" partisan victories or "electoral success." *LULAC,* 548 U.S. at 428 (citation omitted). If minority voters' preferred candidates lose for non-racial reasons, such as failing to elect

22

candidates because they prefer Democrats in Republican-dominated areas, they nonetheless have *precisely* the same opportunity as "other members of the electorate," and they have correspondingly not suffered any "abridgement" of their right to vote "on account of race." 52 U.S.C. § 10301. Section 2 does not, in other words, relieve racial minorities of the same "obligation to pull, haul, and trade to find common political ground" that affects all voters. *De Grandy,* 512 U.S. at 1020.

This view is not some recent legal phenomenon, but rather was borne out in *Gingles* itself. Indeed, as Justice O'Connor explained, the view advocated by Plaintiffs here (and the view espoused by the plurality in *Gingles*) would effectively overturn *Whitcomb v. Chavis*, 403 U.S. 124 (1971), one of the two Supreme Court precedents that the "[a]mended § 2 intended to codify." *Gingles,* 478 U.S. at 83 (citations omitted). In *Whitcomb,* the Court explained that although residents in one area of Marion County consistently lost elections, that was because they "vote[d] predominantly Democratic," and Republicans generally won elections in the county. 403 U.S. at 153. "[H]ad the Democrats won all of the elections or even most of them, the ghetto would have no justifiable complaints about representation." *Id.* at 152. And the failure of *Democrats* was insufficient to show illegality. Thus, in *Gingles,* Justice O'Connor stressed that *Whitcomb* required courts to differentiate between

23

situations where race explains voting patterns from those where the partisan "interests of racial groups" simply "diverge." 478 U.S. at 100.

Section 2 cannot be rationally interpreted as prohibiting certain election practices when Republicans are in the majority but requiring other election practices where Democrats dominate. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird v. Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). Instead, as the Senate Report makes clear, the amended Section 2 applies only where "racial politics … dominate the electoral process." S. Rep. at 33 (emphasis added).

The alternative view would mandate not only a partisan preference but a racial preference. Here, for instance, Black Democrats—like white Democrats, Asian Democrats, and Latino Democrats—ordinarily fail to elect their preferred candidates because the majority of Georgia voters generally choose Republicans.[8] Although Plaintiffs claim that Black voters alone among that group are entitled to districts in which they are guaranteed electoral success, "Section 2 requires an electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez v. City of Aurora*, 535

---

[8] With several notable exceptions in statewide races in 2020, 2021, and 2022.

F.3d 594, 598 (7th Cir. 2008). Section 2 does not require courts to mandate that Black Democrats vote more successfully than white Democrats. *Clements*, 999 F.2d at 861 ("[W]hite Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent.").

Moreover, to hold that there is no racial component beyond simply observing that majority and minority vote differently would also eviscerate another aspect of Section 2: its emphatic rejection of a right to proportionality. 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Avoiding a *requirement* of proportionality was a central focus of Congress in amending Section 2. *See Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).

Given all this, it should be no surprise that other circuits have rejected a view of Section 2 that showing polarization is enough. The Fifth Circuit, for instance, has held that Section 2 plaintiffs cannot succeed when they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political

preference." *Clements*, 999 F.2d at 855. Likewise, the First Circuit holds that "plaintiffs cannot prevail on a VRA Section 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to [race]." *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995). And Judge Tjoflat has opined that, even if a plaintiff has provided evidence of racial bloc voting, a "defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances." *Nipper*, 39 F.3d at 1524 (plurality opinion).

To be sure, the courts disagree on whether the third *Gingles* factor or the totality phase is the appropriate time to ensure racial, as opposed to merely partisan, polarization exists. The Fifth Circuit, for instance, holds that there is no third *Gingles* factor without proof of racial, as opposed to partisan, polarization. *Clements*, 999 F.2d at 892. The Second Circuit—as this Court held in its Order denying the preliminary injunction—holds that the inquiry should be conducted at the totality-of-the-circumstances phase of analysis. *Goosby v. Town Bd.*, 180 F.3d 476, 493 (2d Cir. 1999); *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (noting differences among circuit courts).

26

But this minor disagreement does not matter much. The key point is that Plaintiffs, who bear the ultimate burden of proof, must establish that race is the reason they supposedly lack equal "opportunity." 52 U.S.C. § 10301(b). And if voting patterns establish, instead, that Republicans always win (regardless of race), then non-Republican voters of *all* races have exactly the same opportunity to elect their candidates of choice, in every case. This is why this Court should require proof of racial bloc voting as part of the third *Gingles* factor (if race is not the "domina[nt]" reason for bloc voting, there can be no "racial bloc voting." S. Rep. at 33 (emphasis added)), even if the analysis is ultimately the same. As discussed below, Plaintiffs' lack of evidence on this point is fatal to their claims here.

## 2. *If § 2 allowed partisan bloc voting to form the basis of a claim, it would be unconstitutional.*

Beyond being irreconcilable with the text or binding precedent, a view that racial bloc voting requires only that the majority and minority voters vote differently would also make Section 2 unconstitutional. Congress enacted Section 2 under its power to enforce the Fifteenth Amendment, which prohibits only "purposeful discrimination," not laws that merely "resul[t] in a racially disproportionate impact." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980) (citation omitted); *see also* U.S. CONST. amend. XV. Section 2's results test goes

beyond the constitutional provision that it purports to enforce, which makes sense to the extent that Section 2 can be understood as a tool for addressing invidious racial discrimination. But Congress certainly cannot privilege a particular political party in a favored electoral position. Congress may use its enforcement power only as a "congruen[t] and proportional[] ... means" to "remedy or prevent" the unconstitutional "injury" of intentional discrimination. *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). The Fifteenth Amendment's enforcement power does not allow Congress to "alter[] the meaning" of the Constitution. *Id*. at 519. Accordingly, to ensure that Section 2 stays within the bounds of the Fifteenth Amendment, the results test must be "limited to those cases in which constitutional violations [are] most likely." *Id*. at 533 (citation omitted).

If Section 2 were interpreted in a way that plaintiffs can establish racial bloc voting merely by showing the minority and majority vote differently, it would not fit within those constitutional bounds. As Justice White explained in his dissent in *Bolden*, the original results test was designed to target "objective factors" from which discrimination "*can be inferred*." 446 U.S. at 95 (emphasis added). The amendments to Section 2 were meant to "restore" that test. *Gingles*, 478 U.S. at 43-44 & n.8 (citations omitted). And as Defendant

will further explain below, their interpretation does not alter this "objective factors" test.

What is more, interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause by compelling state action to benefit one racial group at the expense of others. *See* U.S. CONST. amend. XIV, § 1. "[S]ubordinat[ing] traditional race-neutral districting principles" to increase minority voting strength violates the Constitution. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Where Section 2 is used not to undo racial bias but to undo a pattern of partisan voting, in favor of one (and only one) racial minority, that must be unconstitutional.[9]

---

[9] At a minimum, such an interpretation of Section 2 raises constitutional questions and should be avoided if possible. "When a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). That is doubly true where the interpretation would "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts should interpret statutes to do so only when congressional intent is "unmistakably clear." *Id.* (citations omitted).

**B. There is no racial bloc voting here because partisan politics, not race, explains the voting patterns highlighted by Plaintiffs, and Plaintiffs' experts offer no evidence disputing this.**

With the proper rule in place, Plaintiffs' claim fails under Section 2 because they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not ... partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855.

As established above, a successful Section 2 claim requires that *race*, not *party*, is the cause of "divergent voting patterns." *Id.* at 861. Plaintiffs must, therefore, *prove* as much. But Plaintiffs here did not even try to do so, instead just throwing up their hands or arguing that race and party are too inseparable ever to be considered separately. As the Plaintiffs' expert explained, "It's irrelevant, the race of the candidate that voters are supporting. It's only relevant who they're supporting and whether they're supporting the same candidate or not." SMF ¶ 66; Handley Dep. 95:24-96:02. And while Dr. Handley did examine some primary contests in the relevant areas she analyzed, she ignored their impact when arriving at her conclusion that the voting in Georgia is racially polarized. "A hundred percent of the general elections were polarized… That's higher than 55 percent [of the primaries I analyzed]." SMF ¶ 67; Handley Dep. 97:04-11. In other words, as soon as party was taken out of

the equation, the undisputed facts demonstrate that voters' behavior significantly altered. Dr. Handley, however, ignored these results and instead looked only at general elections to arrive at her conclusion that voting in Georgia is racially polarized. "[M]y conclusion that voting is polarized in Georgia is based on the general elections." SMF ¶ 68; Handley Dep. 98:07-13.

But one cannot determine whether the voting patterns of Georgia voters are due to *racial* politics when they only examine general elections because, as Plaintiffs' experts own reports clearly indicate, Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans. This is true regardless of the race of the candidate. *See* SMF ¶ 69-73; Alford Dep. 112:13-117:13. It is true when the Democratic candidate is white. *Id.* It is true when the Democratic candidate is Black. *Id.* It is true when the Republican candidate is white. *Id.* It is true when the Republican candidate is black. *Id.* Thus the only thing Plaintiffs' expert has shown in her data is that Black Georgians vote cohesively for Democrats.

Plaintiffs' evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party. This is, as Justice White described in *Gingles,* "interest group" politics. Plaintiffs' own political goals in bringing this case further illustrate that the issues in this case are not a matter

of race, but rather that the "most political activity in America"[10] had political consequences they do not like.

Moreover, the data and analysis provided by Plaintiffs' own experts plainly demonstrate that when party is removed from the equation, as in Dr. Handley's Democratic primaries analysis, the level of polarization drops off dramatically. That is simply not enough for Plaintiffs to carry their burden of proving racial polarization sufficient to satisfy prongs two and three of *Gingles*. To the contrary, all the Court has before it is evidence establishing that party, rather than race, explains the "diverge[nt]" voting patterns at issue. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Plaintiffs' failure to offer any other evidence ends this case, because they failed to show that prongs two and three of *Gingles* are met.

## CONCLUSION

After discovery, there remains no issue of any material fact. Plaintiffs have not shown their proposed remedial map can function as a remedy, but even if they have, the lack of evidence of racially polarized voting is fatal to their claims because they have not shown the *Gingles* preconditions are met.

---

[10] *See, e.g.*, Charles S. Bullock III, *Redistricting: The Most Political Activity in America* (2nd Ed. 2021).

This Court should grant summary judgment to Defendant and dismiss this case.

Respectfully submitted this 20th day of March, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519

dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | CASE NO. 1:21-CV-05337-SCJ |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, | |
| *Defendant*. | |

## SUPPLEMENTAL BRIEF REGARDING SUMMARY JUDGMENT BRIEFING BASED ON <u>ALLEN v. MILLIGAN</u>

# INTRODUCTION

As much as the parties and this Court anticipated the Supreme Court's ruling in Allen v. Milligan, Case No. 21-1086, 2023 WL 3872517 (U.S. June 8, 2023), the decision provided far less direction for the future of this case than expected because it did not alter or clarify the law of Section 2. Many of the arguments made by Alabama that were rejected by the majority are not raised by Defendants in this case. On other points, such as the impact of race on illustrative plans, only four Justices agreed on any particular approach. Alabama also did not advance the substantive arguments raised on several critical points contested in this case, including the issue of partisan polarization.

Ultimately, the ruling in Allen underscores a key issue in Voting Rights Act cases—the facts matter because the application of Gingles remains "peculiarly dependent on the upon the facts of each case." Roberts,[1] p. 11 (quoting Thornburg v. Gingles, 478 U.S. 30, 79 (1986)). This Court must still carefully apply the relevant law to the facts of this case to determine whether

_____

[1] For ease of reference, this brief references the PDF slip opinion released by the Supreme Court by the name of the Justice and page of that Justice's opinion. That opinion is available at https://www.supremecourt.gov/opinions/22pdf/21-1086_1co6.pdf

the lack of electoral success Plaintiffs claim is occurring is because they are numerical minorities who lose elections in a majoritarian system or because they are facing vote dilution "on account of race or color." <u>Holder v. Hall</u>, 512 U.S. 874, 914 (1994) (Thomas, J., concurring). The undisputed material facts demonstrate that Plaintiffs have not put forward sufficient evidence demonstrating they are facing vote dilution on account of race or color as a result of Georgia's redistricting plans. Accordingly, this Court should grant judgment in favor of Defendants.

**DIFFERENCES IN <u>ALLEN</u> AND DEFENDANTS' ARGUMENTS**

To review the impact of <u>Allen</u>, it is first important to note the arguments Alabama advanced that the majority rejected, but which are not raised in this case. Defendants are not arguing for the map-comparison test sought by Alabama. Roberts, pp. 27-28. Nor are Defendants arguing for an intent standard in map design or that Section 2 does not apply to single-member redistricting. Roberts, pp. 29-34. Nor are Defendants seeking to overturn <u>Gingles</u>—but rather to apply it faithfully. Kavanaugh, pp. 1-2.

The complete lack of any discussion about partisanship driving voting patterns at the <u>Gingles</u> preconditions phase is also a huge difference in <u>Allen</u> and this case. The only reference in the opinions to primary elections is when Justice Thomas explains that the plaintiffs offered evidence of racial voting

2

patterns in the Republican primary—unlike this case. Thomas, pp. 26-27. Thus, Alabama apparently did not press any issues at the Supreme Court related to the impact of race and partisanship as Defendants do here.

Further, Alabama did not contest any of the factual findings of the district court, instead (apparently) opting to make legal arguments only on the appeal. Roberts, pp. 14-15.

The difference in the arguments by Alabama and Defendants limits the benefit of <u>Allen</u> in this case, because the major issues ruled on by the majority are not at issue in this case. And especially in light of the apparent confusion over Alabama's actual arguments (<u>see</u>, <u>e.g.</u>, Alito, p. 9), and the clear-error review standard (Roberts, pp. 14-15), the opinions do not break new ground in a way that materially assists this Court with resolving these cases.

## APPLYING <u>ALLEN</u>

Turning to the points where <u>Allen</u> offers at least some direction in this case, it is important for this Court to carefully review what the Supreme Court said and especially what portions are binding precedent.

## I. The first <u>Gingles</u> precondition.

### A. The <u>Allen</u> opinions on the first <u>Gingles</u> precondition.

First, the Justices disagreed with each other about the proper application of the first <u>Gingles</u> precondition, which was apparently the primary

focus of Alabama's argument. Chief Justice Roberts' opinion commanded five votes for all sections except for III–B–1, which addressed a similar issue to that raised by Defendants in this case—the question of how to assess racial predominance in the illustrative plans. That portion received only four votes. Justice Thomas' dissent likewise received four votes for Parts II–A and II–B, which addressed racial predominance in the illustrative plans and questions related to proportionality. As discussed below, all of the various comments made by the pluralities on this point are relevant to the pending motions.

All the Justices who touched the topic agree that race cannot predominate in the creation of illustrative plans, even if "the line between racial predominance and racial consciousness can be difficult to discern." Roberts, p. 23; compare Thomas, pp. 10-11. But no method for determining where that line is drawn garnered a majority of votes on the Court.

Justice Thomas, joined by three others, would have determined that Section 2 plaintiffs "cannot satisfy their threshold burden of showing that a reasonably configured alternative plan with a proposal that could only be viewed as a racial gerrymander if enacted by the State." Thomas, p. 21. The four Justices in that portion of the dissent criticize the Allen plaintiffs' map-drawers for prioritizing "race over neutral districting criteria" even when the

map-drawers testified that they did not make this prioritization. <u>Compare</u> Thomas, p. 14 <u>with</u> Roberts p. 23.

In contrast, Chief Justice Roberts, also with three other votes, was willing to accept the testimony of Bill Cooper (one of plaintiffs' mapping experts), over the relative lack of evidence from Alabama of racial predominance. Roberts, p. 23-24. But the Chief Justice's opinion acknowledges that the eleven illustrative maps in that case were "districting maps that Alabama could enact." Roberts, p. 12. Justice Kavanaugh does not address the issue.

The majority noted that the only apparent counterarguments by Alabama to the illustrative plans was that they divided the Gulf Coast region, which was a community of interest in the southwest area of the state, and that the adopted plan performed better on core retention. Roberts, pp. 12-13. The majority then relied on the testimony about the community-of-interest nature of the Gulf Coast and the fact that a community of interest would be divided under either the state's plan or the illustrative plans. Roberts, p. 13. Notably absent from the portion of the Chief Justice's opinion that garnered five votes is any analysis of the particular boundaries involved—only the general arguments made by Alabama.

But the approaches taken by both Chief Justice Roberts and Justice Thomas demonstrate that race predominated in the creation of the illustrative plans in this case. Unlike Alabama, Defendants here do not argue that every illustrative plan hits a racial target. Roberts, p. 25. Instead, Defendants focus particularly on boundaries and design of the illustrative plans, all of which would be considered racial gerrymanders if enacted by the State—and thus maps the State could not enact, unlike the maps in Allen. Roberts, p. 12.

**B.     The illustrative plans in this case.**

When Mr. Cooper was creating his illustrative maps for the Senate and House, he turned on features in the software to indicate where Black individuals were located. [Doc. 231, ¶ 36]. And Mr. Cooper did not have any political data available to him. Id. at ¶ 37. He also did not review any public comments. Id. at ¶ 38. Plaintiffs' goal in offering their illustrative plans was a racial one: to determine whether they could draw additional majority-Black districts beyond those drawn by the state plans. Id. at ¶ 33.

If the legislature had used racial shading, did not use political data, and drew without reviewing any public comments, it would be accused of racial gerrymandering—exactly as it has been in the three-judge panel cases. There is no indication in the Allen decision that Alabama advanced any arguments about the nature of the drawing process beyond its proposed race-neutral,

alternative benchmark. Under the facts here, clearly Plaintiffs "cannot satisfy their threshold burden of showing that a reasonably configured alternative plan" by presenting a plan that would be a racial gerrymander if enacted by a state. Thomas, p. 21.

Moving to each specific plan, Mr. Cooper changed more than half of all districts from the enacted Senate plan. [Doc. 231, ¶ 42]. In drafting the illustrative Senate District 23, Mr. Cooper connected Black voters separated by intervening white populations. Id. at ¶ 43. Mr. Cooper also made racial splits of counties in the creation of illustrative District 23, including higher concentrations of Black voters in counties while excluding lower concentrations of Black voters when a county was split. Id. at ¶ 46. All of these facts distinguish this district from the challenged district in Allen, where Alabama apparently relied solely on a theory that a community of interest was divided. Roberts, pp. 12-13.

Further, to create Senate Districts 17 and 28, Mr. Cooper strategically cut counties to ensure that areas with higher concentrations of Black voters were connected with more distant concentrations of white voters. [Doc. 231, ¶ 47]. This resulted in the largest counties by population in illustrative Senate Districts 17 and 28 not containing a majority of Black individuals—a features that infects many of Mr. Cooper's illustrative districts. Id. at ¶ 48. Unlike the

plaintiffs in <u>Allen</u>, Mr. Cooper could not identify a basis to connect northern Clayton County and rural Spalding County in his configuration of this South Metro area beyond the race of the individuals in both parts of the district. [Doc. 231, ¶ 49].

Finally, unlike the similar metrics of the Alabama plan, Mr. Cooper's illustrative Senate plan only has a similar number of county splits because Mr. Cooper unsplit counties in parts of the state unrelated to the additional majority-Black districts to make the total split number appear more similar. [Doc. 231, ¶ 50]. This is distinctly different from the <u>Allen</u> illustrative plans. Roberts, p. 12.

Turning to the illustrative House plan, Mr. Cooper changed more than half of all of the House districts from the enacted plan. [Doc. 231, ¶ 52]. To create House District 133 as a new majority-Black district, Mr. Cooper had to add county splits in the area above the total in the enacted plan, including splitting <u>seven</u> rural counties in several adjoining districts. <u>Id</u>. at ¶ 53. To create House District 145 as a new majority-Black district, Mr. Cooper had to adjust Macon districts so that no House district is wholly within Bibb County and each of the majority-Black districts in that area includes population from downtown Macon, including one district that crosses out of the Macon Census statistical area. <u>Id</u>. at ¶ 54. To create Districts 74 and 117 in metro Atlanta,

8

Mr. Cooper had to connect portions of counties with higher concentrations of Black voters with more-rural, white areas. Id. at ¶ 55. Finally, in southwest Georgia, illustrative District 171 connects disparate enclaves of Black population and splits additional counties to include Black population in the district. Id. at ¶ 57.

To create the additional majority-Black districts on his illustrative House plan, Mr. Cooper elongates other surrounding districts to create "room" for the new districts to connect racially disparate populations. [Doc. 231, ¶ 58]. This impacts the compactness of the districts, lowering the overall compactness of the districts created in the illustrative plan. Id. at ¶ 59.

Finally, Mr. Cooper's illustrative House plan has higher total population deviations than the enacted plan. [Doc. 231, ¶ 60]. Although the illustrative plan has a number of county splits similar to the enacted plan, that is only because Mr. Cooper unsplit counties in parts of the state unrelated to changes to make the total split number appear more similar. Id. at ¶ 61.

Mr. Cooper's illustrative plans in this case are thus categorically different than the plans in Allen. They split more counties, have higher deviations, and have features that are unexplainable on grounds other than race.

**C.      Applying <u>Allen</u> to the first <u>Gingles</u> precondition.**

Defendants agree with how Justice Alito proposes to address the issue—that a plaintiff must "show at the outset that such a[n additional majority-minority] district can be created without making race the predominant factor in its creation." Alito, p. 5. And this is Plaintiffs' burden. <u>Id</u>. This is also consistent with Chief Justice Roberts' approach, that the illustrative plans had to be maps the state could enact. Roberts, p. 12.

Because the illustrative plans in this case could not be enacted by the State, the Plaintiffs have not put forth evidence sufficient to satisfy the first <u>Gingles</u> precondition. As a result, Plaintiffs have failed to carry their burden, and Defendants are entitled to judgment as a matter of law.

**II.      The third <u>Gingles</u> precondition.**

The majority opinion does not provide much direct guidance for lower courts on a plaintiff's evidentiary burden in satisfying the third <u>Gingles</u> precondition, because that precondition was not squarely at issue in <u>Allen</u>. Unlike Defendants here, Alabama conceded that the third precondition was satisfied, so there was no reason for the District Court or the Supreme Court to address any other arguments. But to the extent the majority says anything about the third <u>Gingles</u> precondition (racial polarization), it supports Defendants here.

**A.      Chief Justice Roberts' majority opinion reinforces the Defendants' interpretation of the evidence required to establish the third <u>Gingles</u> precondition.**

Chief Justice Roberts recounts the history of the events leading to the 1982 amendments to Section 2 of the Voting Rights Act. And he focuses on <u>City of Mobile v. Bolden</u>, the case that catalyzed changes to the Act proposed and adopted by Congress just two years later. 446 U.S. 55 (1980). The majority noted the sharp disagreement surrounding the <u>Bolden</u> decision in Congress, with one side of the debate clamoring for a rework of the statutory language to allow for an "effects" test, and others expressing concern that such a test would create a right to proportional representation among the races in elected bodies, thereby entrenching "more, not less, racial and ethnic polarization." Roberts, p. 4. (quoting <u>Wall Street J.</u>, Jan. 19, 1982, p. 28). This initial recognition of racial polarization is appropriate, because returning to the <u>Bolden</u> case as Chief Justice Roberts did demonstrates how policymakers viewed the term "racial polarization" at the time the amendments were passed. Thus, to understand the analysis in <u>Allen</u>, we have to review <u>Bolden</u>.

11

1. ***The <u>Bolden</u> case--from trial court to Supreme Court and through the 1982 amendments it inspired--offers support for Defendants' view on racial polarization.***

Though not using the magic words of "racial polarization," the <u>Bolden</u> trial court provides a comprehensive definition of racial polarization, offering a view of what a plaintiff is required to show in order to demonstrate it:

> In the 1960's and 1970's there has been general [racial] polarization in the white and black voting. The polarization has occurred with **white voting for white** and **black for black** if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs. When this occurs, **a white backlash** occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks.

<u>Bolden v. Mobile</u>, 423 F. Supp. 384, 388 (S.D. Ala. 1976) (emphasis added). Thus, in the period before the 1982 amendments, the race of the candidate and corresponding voter behavior was paramount to a polarized-voting analysis. If a Black candidate is running against a white candidate, racial polarization occurs "with white voting for white and black for black if a white is opposed to a black...." <u>Id</u>. We can also see that when the only option to voters is a choice between white candidates, race still underlies the racial polarization inquiry. That is because the trial court first concluded it must determine which white candidate is <u>associated</u> with "the black wards" or "identified with sponsoring particularized black needs." If such candidate is readily identifiable, the court

12

then must determine whether "a white backlash" occurred resulting in the usual defeat of the Black-preferred white candidate. Id. The use of the term "backlash" here is important because it suggests a change or alteration in voting patterns by a white majority that occurs on account of race. In other words, it is because the candidate is Black, or it is because a white candidate is identified with Black interests, that gives rise to the inference of racial polarization in differential racial bloc voting patterns. It is not merely differential racial voting patterns standing alone.

On appeal, the Fifth Circuit agreed with the factual finding that the plaintiffs presented sufficient evidence to show racial polarization. "No black had achieved election to the city commission due, in part, to racially polarized voting of an acute nature." Bolden v. Mobile, 571 F.2d 238, 243 (5th Cir. 1978). The Supreme Court also accepted the trial court definition: "[T]he District Court based its conclusion of unconstitutionality primarily on the fact that no Negro had ever been elected to the City Commission, apparently because of the pervasiveness of racially polarized voting in Mobile." Bolden, 446 U.S. at 71.

Of course, the presence of racially polarized voting did not alter the outcome in Bolden because the Court determined that intent was necessary to a Section 2 case, and it was against this backdrop that Congress enacted the 1982 amendments to override the Court's decision in Bolden, as Chief Justice

Roberts explained. But neither the text of amended Section 2 nor the Senate Report discussing the amendment process purport to alter or recast what was understood to be racially polarized voting at the time. Accordingly, the <u>Bolden</u> trial court's definition of racial polarization remains undisturbed. And this definition is in line with how the Supreme Court viewed it almost ten years earlier in <u>Whitcomb v. Chavis</u>, which the 1982 amendments sought to restore after <u>Bolden</u>. 403 U.S. 124 (1971).

> [T]he failure of the [minority residents] to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against poor [minorities]. The voting power of [minority] residents may have been "cancelled out" as the District Court held, but this seems a mere euphemism for political defeat at the polls.

<u>Id</u>. at 153.

Of course, Justice Brennan attempted in <u>Gingles</u> to change the definition of racially polarized voting into one concerned purely with the mathematical results of voting patterns, but his view was specifically rejected by five Justices on this point. <u>See</u>, <u>e.g.</u>, <u>Gingles,</u> 478 U.S. at 83 (White, J., concurring) ("I doubt that this is what Congress had in mind in amending § 2 as it did, and it seems quite at odds with the discussion in <u>Whitcomb</u> . . ."); <u>see also</u>, <u>id</u>. at 101 (O'Connor, J., concurring the judgment) ("I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant

in identifying racially polarized voting conflicts with <u>Whitcomb</u>"). Instead, Justice White (who dissented in <u>Bolden</u> and authored the majority opinion of the Court in <u>Whitcomb</u>) specifically would have held that racially polarized voting requires a showing of racial causation. <u>Id</u>.

>    ### 2. *The Roberts majority opinion reaffirms the vitality of the <u>Whitcomb</u> and <u>Bolden</u> definitions of racial polarization in its brief discussion of the third <u>Gingles</u> precondition.*

After discussing <u>Bolden</u> and the subsequent amendments, the majority opinion in <u>Allen</u> noted that "[t]he third [<u>Gingles</u>] precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' ***at least plausibly on account of race***." Roberts, p. 11 (emphasis added) (citing to <u>Growe v. Emison</u>, 507 U.S. 25, 40 (1993)). It is significant that the Chief Justice recognizes the racial causation element not just in the context of the broader Section 2 inquiry, but also <u>within</u> the discrete inquiry into whether the plaintiffs have proven the third <u>Gingles</u> precondition. The existence of this causal element harkens back to the <u>Bolden</u> trial court's definition of racial polarization that requires a "white backlash," <u>i.e.</u>, a majority voting bloc motivated in some identifiable way "on account of race."

### 3. *The majority opinion could not affect or change its third Gingles precondition jurisprudence because the issue was not before the Court in any meaningful way.*

But the next mention in the majority opinion of the third <u>Gingles</u> precondition explains why the Supreme Court did not offer any additional clarity on it—because there was "no reason to disturb the District Court's careful factual findings, which are subject to clear error review **and have gone unchallenged by Alabama in any event.**" Roberts, p. 14 (emphasis added). And this lack of dispute removed from the majority decision any discussion of the issue raised by Defendants here. [2]

So, unlike here, there was no consideration of what kind of statistical evidence is necessary at the third <u>Gingles</u> precondition to demonstrate <u>racial</u> polarization in the electorate as distinct from <u>partisan</u> polarization. Put

---

[2] Although it should not matter, even in the district court, Alabama hardly pressed a partisan polarization argument, as it conceded that voting <u>was</u> racially polarized. The Alabama defendants' expert "testified that he and [the plaintiffs' expert] 'both found evidence of racially polarized voting in Alabama." <u>Singleton v. Merrill</u>, 582 F. Supp. 3d 924, 991 (N.D. Ala. 2022). And "[t]he only evidence Defendants offer to support their assertion that party, not race, may be the real issue is the recent election of a Black Republican, Kenneth Paschal, to the Alabama House from a majority-white district." <u>Merrill</u>, 582 F. Supp. 3d at 1019. By contrast, Defendants here have pressed the point that partisan polarization best explains the data at every opportunity and articulated the insufficiency of the statistical analysis provided by Plaintiffs, which only shows bloc voting on account of party in Georgia elections.

differently, there was no discussion of whether the data supported the position that Black voters were losing at the polls due to bloc voting "at least plausibly on account of race," (Roberts, p. 11) or whether those losses simply reflected "a mere euphemism for political defeat at the polls." <u>Whitcomb</u>, 403 U.S. at 153.[3]

Next, the Supreme Court credited the District Court with "faithfully appl[ying]" its precedents. Roberts, p. 15. And this is unsurprising because, unlike Defendants here, Alabama's litigation strategy was apparently that "<u>Gingles</u> must be overruled." Roberts, p. 25 (four justices); <u>see also,</u> Kavanaugh, p. 1 ("[T]he upshot of Alabama's argument is that the Court should overrule <u>Gingles</u>."). But as Defendants have repeatedly noted in briefing and at oral argument: <u>Gingles</u> remains the standard for Section 2 cases, and Defendants' legal analysis is perfectly in line with existing precedent. The key is that courts must give effect to <u>all</u> the aspects of the

---

[3] Plaintiffs may suggest that the causal elements of racially polarized voting identified in <u>Whitcomb</u>, <u>White</u>, <u>Bolden</u>, and the majority of justices in <u>Gingles</u> means that they can satisfy their evidentiary burden as to the third <u>Gingles</u> precondition by an <u>inference</u> of racial causation. But, at least in the Eleventh Circuit, Section 2 plaintiffs "must be careful not to infer that <u>racial</u> targeting is, in fact, occurring based solely on evidence of partisanship." <u>League of Women Voters of Fla. Inc. v. Fla. Sec'y of State</u>, 66 F. 4th 905, 924 (11th Cir. 2023)

Gingles opinion (including the concurring opinions) and take into account still relevant (and controlling) pre-amendment Supreme Court precedent.

**B.    The third Gingles precondition operates as a temporal limitation on the reach of Section 2, thus assuaging concerns raised by Justice Kavanaugh in his concurring opinion.**

Justice Kavanaugh references an argument not made by Alabama—a "temporal argument" that calls into question the constitutionality of Section 2, which creates an additional reason for the Court to adopt Defendants' argument on the third Gingles precondition. Kavanaugh, p. 4. Defendants' approach to this precondition operates as a naturally occurring temporal limitation on the reach of Section 2. Since the passage of the 1982 amendments, voting patterns have doubtless become far more partisan. But, crucially, as Plaintiffs' evidence demonstrates, they have also become less focused on the race of the candidate so that the race of the candidate is irrelevant in current Georgia elections.[4]

Unlike during the time of Gingles, white voters consistently support Black and Black-preferred candidates who are nominated in their party's primary. Lately, this has been true of both major political parties in Georgia.

---

[4] Plaintiffs' own expert reports make this abundantly clear.

Adopting Defendants' interpretation of the third <u>Gingles</u> precondition anchors the Act in—as its text dictates—correcting the problem of invidious racial discrimination that results in a jurisdiction that is not equally open to minority voters. Over time, the trend may be that the disadvantages associated with invidious discrimination in elections are addressed to such a degree that Section 2 no longer need be invoked to ensure "equal openness" to the election process. Thus, there is no concern about the timing of continuing race-based districting into the future because a proper interpretation of the third <u>Gingles</u> precondition addresses that exact concern in a way that preserves not just the Supreme Court's decades of jurisprudence interpreting the Act, but the Act itself.

### C. Failing to adopt the Defendants' interpretation of the third <u>Gingles</u> precondition puts Section 2 on a problematic constitutional path.

While a majority of the Supreme Court approved the ongoing constitutionality of Section 2, a minority of four justices called it into question. More importantly, Justice Kavanaugh's concurring opinion—the <u>fifth</u> vote—makes abundantly clear that the constitutionality of the law is not at all settled into the future. And like the broader inquiry into the third <u>Gingles</u> precondition itself, the question of whether it is appropriate to declare Section 2 unconstitutional because of a temporal limitation was not squarely before

the Court. Kavanaugh, p. 4. Only Defendants' interpretation of the third
Gingles precondition, consistent with voting patterns in Georgia, helps ensure
Section 2 endures unless and until it is determined, in the wisdom of Congress,
that it has outlived its usefulness.

## III.   The totality of the circumstances.

Section 2 is aimed at equal openness in the political processes of a state.
52 U.S.C. § 10301. Thus, a "district is not equally open, in other words, when
minority voters face—unlike their majority peers—bloc voting along racial
lines, arising against the backdrop of substantial racial discrimination within
the State, that renders a minority vote unequal to a vote by a nonminority
voter." Roberts, p. 17 (emphasis added). That is the question this Court must
answer under Section 2. If minority voters face voting against the backdrop of
substantial political polarization within a state, their votes are not unequal—
because numerical minorities lose elections. Hall, 512 U.S. at 901 (Thomas, J.,
concurring).

That is why, unlike what Alabama argued, the totality of the
circumstances is not based on a single circumstance, but must be carefully
weighed by this Court to look for racial discrimination in the Georgia election
system. Roberts, p. 18. And this requires an "intensely local appraisal" and a

"searching practical evaluation." Roberts, p. 11 (quoting <u>Gingles</u>, 478 U.S. at 79).

Beyond those points, <u>Allen</u> does not offer any direction to this Court on how to apply the totality of the circumstances. Accordingly, Defendants rely on their earlier briefing in opposition to Plaintiffs' motion for summary judgment about why that determination is inappropriate at this stage of the case.

## THE UNANSWERED QUESTIONS

Despite hopes of further clarifying Section 2 law, the <u>Allen</u> majority ultimately left a number of unanswered questions that must be addressed here. The majority made clear that Section 2 required Alabama to divide a single community of interest to create an additional majority-Black district, primarily because a community would be divided either way and it did not affect the overall plan metrics. Roberts, pp. 12-13.

While that seems straightforward, much more is at issue in this case, and Plaintiffs' approach here would extend the reach of federal law far deeper into districting decisions by legislatures. For example:

- Does Section 2 require the division of more <u>counties</u> to create additional majority-Black districts? If so, how many and why?

- Does Section 2 require the state to increase its <u>population deviations</u> to create additional majority-Black districts? If so, how much and why?

- Does Section 2 require the state to draw additional majority-Black districts even if those districts result in other districts that are unexplainable based on traditional districting principles in other parts of the state? If so, why, and are there any protections for traditional principles in non-majority-Black districts?

- How many additional districts does Section 2 require? If the legislature is able to draw seven additional majority-Black legislative districts, does Section 2 require it to keep adding districts up to proportionality so long as there are no "tentacles and appendages" (<u>see</u> Roberts, p. 12)? Or is that racial gerrymandering?

- How can this Court determine the nature of the polarized voting without more evidence?

Defendants submit that these questions are where Plaintiffs' lack of evidence is most glaring. If Plaintiffs had submitted illustrative plans with the same population deviation and the same number of split counties, been able to explain the overall design of the other districts, or provided evidence of racial

voting behavior in primaries, then this case would be more like <u>Allen</u>. But they have not done so and have not proposed any limiting principle beyond the districts they challenge—which is not enough for the State to have clarity on the law of Section 2 moving forward.

## CONCLUSION

The Voting Rights Act need not remain forever ambiguous, but <u>Allen</u> does not offer this Court much assistance with the salient questions before it, especially given the different arguments made by Alabama and Defendants. The facts of this case demonstrate that Plaintiffs have failed to carry their burden regarding material facts necessary to the <u>Gingles</u> preconditions and that judgment should be entered for Defendants.

Respectfully submitted this 22nd day of June, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**

40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for Defendants*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Supplemental Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson

**ATTACHMENT D**

**I.   Defendants' succinct factual statement and affirmative defenses.**

*A.  Alpha Phi Alpha*

Plaintiffs filed this case on December 30, 2021, seeking injunctive relief regarding the State's 2021 State Senate and State House of Representatives redistricting plans under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [APA Doc. 1]. Specifically, Plaintiffs claim that three additional majority-Black State Senate districts and five additional majority-Black State House districts should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate that the redistricting plans result in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plans were drawn primarily based on race and thus cannot be used to show additional districts the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority

21

voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-3). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on account of race," *Allen v. Milligan*, 216 L. Ed. 2d 60, 75 (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

**B. *Grant***

Plaintiffs filed this case on January 11, 2022, seeking injunctive relief regarding the State's 2021 State Senate and State House of Representatives redistricting plans under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [Grant Doc. 1]. Specifically, Plaintiffs claim that three additional majority-Black State Senate districts and five additional majority-Black State House districts should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate

23

that the redistricting plans result in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plans were drawn primarily based on race and thus cannot be used to show additional districts the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-2, *supra*). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on account of race," *Allen v. Milligan*, 216 L. Ed. 2d 60, 75 (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the statewide success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

24

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

### C. *Pendergrass*

Plaintiffs filed this case on December 30, 2021, seeking injunctive relief regarding the State's 2021 congressional redistricting plan under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [Pendergrass Doc. 1]. Specifically, Plaintiffs claim that one additional majority-Black congressional district should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate that the congressional redistricting plan results in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plan was drawn primarily based on race and thus cannot be used to show an additional district the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-1). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on

account of race," *Allen v. Milligan*, <u>216 L. Ed. 2d 60, 75</u> (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the statewide success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

## II. <u>All relevant rules, regulations, statutes, ordinances, and illustrative case law relied upon as creating a defense in these lawsuits.</u>

1. *African Am. Voting Rights Legal Def. Fund v. Villa*, <u>54 F.3d 1345</u> (8th Cir. 1995)
2. *Ala. State Conference of the NAACP v. Alabama*, No. 2:16-CV-731-WKW [WO], <u>2020 U.S. Dist. LEXIS 18938</u> (M.D. Ala. Feb. 5, 2020)
3. *Ala. State Conference of the NAACP v. Alabama*, <u>949 F.3d 647</u> (11th Cir. 2020)
4. *Alden v. Maine*, <u>527 U.S. 706, 715</u>, <u>119 S. Ct. 2240</u> (1999)
5. *Allen v. Milligan*, Case No. 21-1086, <u>2023 WL 3872517</u> (U.S. June 8, 2023)
6. *Alltel Commc'ns, Inc. v. City of Macon*, <u>345 F.3d 1219</u> (11th Cir. 2003)
7. *Alpha Phi Alpha Fraternity v. Raffensperger*, <u>587 F. Supp. 3d 1222</u> (N.D. Ga. 2022)
8. *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-01239-LPR, <u>2022 U.S. Dist. LEXIS 29037</u> (E.D. Ark. Feb. 17, 2022)
9. *Baird v. Indianapolis*, <u>976 F.2d 357</u> (7th Cir. 1992)
10. *Bartlett v. Strickland*, <u>556 U.S. 1</u> (2009)
11. *Bolden v. Mobile*, <u>423 F. Supp. 384, 388</u> (S.D. Ala. 1976)
12. *Bolden v. Mobile*, <u>571 F.2d 238, 243</u> (5th Cir. 1978)
13. *Brnovich v. Democratic Nat'l Committee*, <u>141 S.Ct. 2321</u> (2021)
14. *Brooks v. Miller*, <u>58 F.3d 1230</u> (11th Cir. 1998)

15. *Brown v. Jacobsen*, 590 F. Supp. 3d 1273 (D. Mont. 2022)
16. *Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999)
17. *Bush v. Vera*, 517 U.S. 952, 977 (1996)
18. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)
19. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)
20. *City of Boerne v. Flores*, 521 U.S. 507 (1997)
21. *City of Mobile v. Bolden,* 446 U.S. 55 (1980)
22. *Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022)
23. *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998)
24. *Earl Old Person v. Brown*, 312 F.3d 1036 (9th Cir. 2002)
25. *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291 (5th Cir. 2016)
26. *Franklin v. Massachusetts*, 505 U.S. 788 (1992)
27. *GA. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2005)
28. *Gill v. Whitford,* 138 S. Ct. 1916 (2018)
29. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F. 3d 1299 (11th Cir. 2021)
30. *Growe v. Emison,* 507 U.S. 25, 40 (1993)
31. *Gonzalez v. City of Aurora*, 535 F.3d 594 (7th Cir. 2008)
32. *Goosby v. Town Bd.*, 180 F.3d (2d Cir. 1999)
33. *Gregory v. Ashcroft*, 501 U.S. 452 (1991)
34. *Holder v. Hall*, 512 U.S. 874 (1994)
35. *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020)
36. *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)
37. *Johnson v. Bd. of Regents*, 263 F.3d 1234 (11th Cir. 2001)
38. *Johnson v. De Grandy*, 512 U.S. 997 (1994)
39. *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335 (11th Cir. 2000)
40. *Johnson v. Governor of Fla.*, 405 F.3d 1314 (11th Cir. 2005)
41. *Johnson v. Hamrick*, 296 F.3d 1065 (11th Cir. 2002)
42. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)
43. *La. State Conference of the NAACP v. Louisiana*, 490 F. Supp. 3d 982 (M.D. La. 2020)
44. *Lance v. Coffman*, 549 U. S. 437 (2007)
45. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993)

29

46. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006)
47. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F. 4th 905 (11th Cir. 2023)
48. *Lewis v. Alamance County, N.C.*, 99 F.3d 600 (4th Cir. 1996)
49. *Lewis v. Governor of Ala.*, 944 F. 3d 1287 (11th Cir. 2019)
50. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)
51. *Marion v. DeKalb County, Ga.* 821 F. Supp. 685 (N.D. Ga. 1993)
52. *Merrill v. Milligan*, 142 S.Ct. 879 (2022)
53. *Miller v. Johnson*, 515 U.S. 900 (1995)
54. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)
55. *Negron v. City of Miami Beach, Fla*., 113 F.3d 1563 (11th Cir. 1997)
56. *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994)
57. *Purcell v. Gonzalez*, 549 U.S. 1 (2006)
58. *Raines v. Byrd*, 521 U.S. 811 (1997)
59. *Repub. Nat'l Comm. v. Dem. Nat'l Comm*., 140 S. Ct. 1205 (2020)
60. *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)
61. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)
62. *Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022)
63. *Solomon v. Liberty Cty.*, 899 F.2d 1012 (11th Cir. 1990)
64. *Solomon v. Liberty Cty. Comm'rs*, 221 F. 3d 1218 (11th Cir. 2000)
65. *Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281 (11th Cir. 1995)
66. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)
67. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999)
68. *Thornburg v. Gingles*, 478 U.S. 30 (1986)
69. *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144 (1977)
70. *United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926)
71. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984)
72. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982)
73. *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995)
74. *Voinovich v. Quilter*, 507 U.S. 146 (1993)
75. *Warth v. Seldin*, 422 U.S. 490 (1975)
76. *Whitcomb v. Chavis*, 403 U.S. 124 (1971)
77. *White v. Regester*, 412 U.S. 755 (1983)

78.   *Wood v. Raffensperger*, <u>981 F.3d 1307, 1313</u> (11th Ci<u>r. 2020)</u>

<u>79</u>.   *Wright v. Sumter Cty. Bd. of Elections & Registration*, <u>301 F. Supp. 3d 1297</u> (M.D. Ga. 2018)

80.   <u>O.C.G.A § 21-2-31</u>

<u>81</u>.   <u>O.C.G.A. § 21-2-153</u>

<u>82</u>.   <u>52 U.S.C. § 10301</u>

83.   <u>Fed. R. Evid. 401</u>

84.   <u>Fed. R. Evid. 403</u>

85.   <u>Fed. R. Evid. 602</u>

86.   <u>Fed. R. Evid. 801</u>

87.   <u>Fed. R. Evid. 803</u>

88.   <u>Fed. R. Evid. 807</u>

89.   <u>Fed. R. Evid. 901</u>

90.   <u>U.S. Const. Art. I</u>, Sec. III, Para. 2

91.   <u>U.S. Const. Amendment XIV</u>

<u>92</u>.   <u>U.S. Const. Amendment XV</u>

317

candidate of choice on an equal basis with other voters.'" <u>Alabama State Conf. of</u>

<u>NAACP,</u> 612 F. Supp. 3d at 1253 (quoting <u>Voinovich v. Quilter,</u> 507 U.S. 146, 153

(1993)).

762.    The Court has weighed each Senate factor and determines that the

factors overwhelmingly demonstrate that Georgia's voting system and the

challenged redistricting plans do not demonstrate that any lack of success of Black

voters is "on account of race or color"—ultimately the votes of Black voters in

Georgia are not unequal to those of white voters. <u>Allen</u>, 599 U.S. at 25 (quoting 52

U.S.C. § 10301(b)).

### b. Constitutional and temporal considerations regarding facts in Georgia.

763.    Although the Court has determined that the challenged maps do not

render Black votes unequal to those votes of white voters in Georgia, the Court

addresses one other issue regarding why this finding is so important to uphold

the purpose and effect of the VRA.

764.    The Constitution "restricts consideration of race and the VRA

demands consideration of race." <u>Abbott v. Perez</u>, 138 S. Ct. 2305, 2315 (2018).

765.    This tension runs through VRA jurisprudence, with the Supreme

Court regularly assuming without deciding that compliance with the VRA justifies

race-based redistricting.

766.    At least one Justice has discussed this tension: "the authority to conduct race-based redistricting cannot extend indefinitely into the future." Allen, 599 U.S. at 45 (Kavanaugh, J., concurring in part).

767.    In other contexts, the Supreme Court determined that race-based programs had to have an end point. "To manage these concerns, Grutter imposed one final limit on race-based admissions programs. At some point, the Court held, they must end." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 143 S. Ct. 2141, 2165 (2023).

768.    The Court's finding in this case demonstrates that no such limitation need be applied to the VRA, because the properly applied Gingles test is self-regulating.

769.    If the Court had found a violation of Section 2 on these facts, it would call into question the constitutionality of race-based redistricting because it would be unclear what additional factors Georgia would have to meet to have its election system considered equally open.

770.    If the VRA requires Georgia to elect more Democratic candidates to be equally open or requires proportional representation (which it specifically denies in the text), then Section 2 may very well be unconstitutional.

771. But a finding of equal openness on these facts demonstrates that Gingles addresses these concerns because this Court need not reach the constitutional issues when Gingles is properly applied.

772. As the Supreme Court addressed in another VRA case,

> There is no denying, however, that the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions. By 2009, 'the racial gap in voter registration and turnout [was] lower in the States originally covered by §5 than it [was] nationwide.' Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 203-204, 129 S. Ct. 2504, 174 L. Ed. 2d 140 (2009). Since that time, Census Bureau data indicate that African-American voter turnout has come to exceed white voter turnout in five of the six States originally covered by §5, with a gap in the sixth State of less than one half of one percent. See Dept. of Commerce, Census Bureau, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Nov. 2012) (Table 4b).

Shelby County v. Holder, 570 U.S. 529, 535 (2013).

773. Because this Court's decision upholding Georgia's redistricting plans is based on current data and current issues, it does not suffer the constitutional concerns at issue in Shelby County.

## CONCLUSION

774. Having considered the totality of the circumstances after a searching local appraisal of the facts, this Court finds Plaintiffs have failed to carry their burden of demonstrating a lack of equal openness in Georgia's election system as a result of the challenged redistricting plans. For all the foregoing reasons, this

Court finds **IN FAVOR** of Defendant and against Plaintiffs on all counts of Plaintiffs' Complaint.

775. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is **DIRECTED** to enter judgment and close this case.

This 25th day of September, 2023.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br>    Defendant. | CIVIL ACTION FILE<br><br>No. 1:21-CV-5337-SCJ |
| COAKLEY PENDERGRASS et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER et al.,<br>    Defendants. | CIVIL ACTION FILE<br><br>No. 1:21-CV-5339-SCJ |
| ANNIE LOIS GRANT et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER et al.,<br>    Defendants. | CIVIL ACTION FILE<br><br>No. 1:22-CV-122-SCJ |

## ORDER

Pursuant to 28 U.S.C. § 2403(a), the Court hereby certifies to the United States Attorney General that the constitutionality of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(b) has been called into question in the above-stated litigations as affirmative defenses in the Pretrial Order. Alpha Phi Alpha Fraternity, Inc., et al. v. Brad Raffensperger, 1:21-cv-5337- SCJ (N.D. Ga. Aug. 15, 2023) Doc. No. [280], 24; Coakley Pendergrass, et al. v. Brad Raffensperger, et al., 1:21-cv-5339-SCJ (N.D. Ga. Aug. 15, 2023) Doc. No. [231], 24; Annie Lois Grant, et al. v. Brad Raffensperger, et al., 1:22-cv-122-SCJ (N.D. Ga. Aug. 15, 2023) Doc. No. [243], 24. The Attorney General is requested to submit his position as to intervention in reference to this issue no later than **60 DAYS** of the date of this Certification Order. The Clerk is **DIRECTED** to mail a copy of this Order to: the Honorable Merrick Garland, United States Attorney General, at the following address: 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001.

2

IT IS SO ORDERED this ___4th___ day of October, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br><br>Defendant. | Case No. 1:21-cv-5337-SCJ |
| COAKLEY PENDERGRASS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No. 1:21-cv-5339-SCJ |
| ANNIE LOIS GRANT *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No. 1:22-cv-122-SCJ |

**UNITED STATES' NOTICE OF INTERVENTION
PURSUANT TO 28 U.S.C. § 2403(a)**

On October 4, 2023, this Court issued Orders certifying to the Attorney

General that the constitutionality of Section 2 of the Voting Rights Act, 52 U.S.C.

§ 10301, has been called into question in *Alpha Phi Alpha Fraternity, Inc. v.

Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 4, 2023), ECF No. 319;

*Pendergrass v. Raffensperger*, No. 1:21-cv-5339 (N.D. Ga. Oct. 4, 2023), ECF No.

272; and *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga. Oct. 4, 2023), ECF

No. 280.  The Court requested the Attorney General to submit his position on

intervention no later than sixty days from the date of those orders.  *Id.*

Subsequently, on October 26, 2023, the Court released an Opinion,

Memorandum of Decision, and Order in each case granting partial judgment to the

Plaintiffs on their claims under Section 2 and rejecting Defendants' constitutional

challenges.  *See Alpha Phi Alpha v. Raffensperger*, No. 1:21-cv-5337, 2023 WL

7037537 (Oct. 26, 2023).  The Court gave the Georgia General Assembly until

December 8, 2023 to adopt remedial plans consistent with its Order and retained

jurisdiction "to determine whether the remedial plans adopted by the General

Assembly remedy the Section 2 violations," and, "[i]n the event that the State is

unable or unwilling to enact [satisfactory] remedial plans by December 8, 2023,"

2

to "draw or adopt remedial plans." *Id.* at *143.  Defendant Raffensperger has indicated that he "plans to the appeal the rulings in the [*Alpha Phi Alpha*] cases on the merits."  Def.'s Notice of Decision Not to Seek Stay, *Ga. State Conference of the NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Nov. 1, 2023), ECF No. 203. A notice of appeal has not yet been filed.

Pursuant to 28 U.S.C. § 2403(a) and in response to the Court's Certification Order, *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 4, 2023), ECF No. 319; *Pendergrass v. Raffensperger*, No. 1:21-cv-5339 (N.D. Gal. Oct. 4, 2023), ECF No. 272; *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga. Oct. 4, 2023), ECF No. 280, the United States hereby respectfully notifies the Court that it exercises its right to intervene in this proceeding to defend the constitutionality of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. The United States is also submitting a brief today addressing Defendants' constitutional arguments.

Date:  November 3, 2023

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SPARKLE SOOKNANAN
Principal Deputy Assistant Attorney
General

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

*/s/ Daniel J. Freeman*
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
MICHAEL E. STEWART
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961

4

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the

foregoing with the clerk of the court using the CM/ECF system, which will send

notification of this filing to counsel of record.


*/s/ Daniel J. Freeman*
DANIEL J. FREEMAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, DC 20530
Phone: (800) 253-3931
Fax: (202) 307-3961

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br><br>Defendant. | Case No.<br>1:21-cv-5337-SCJ |
| COAKLEY PENDERGRASS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No.<br>1:21-cv-5339-SCJ |
| ANNIE LOIS GRANT *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>Defendants. | Case No.<br>1:22-cv-122-SCJ |

GEORGIA STATE CONFERENCE OF
THE NAACP, *et al.*,

        Plaintiffs,

        v.

STATE OF GEORGIA, *et al.*,

        Defendants.

Case No.
1:21-cv-5338-ELB-SCJ-SDG
Three-Judge Court

# BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY OF
SECTION 2 OF THE VOTING RIGHTS ACT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................................2

STATUTORY BACKGROUND.............................................................5

ARGUMENT .................................................................................6

I.    The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's Authority to Enact Section 2 of the Voting Rights Act. ............7

II.   Supreme Court Precedent Forecloses Defendants' Constitutional Arguments. ...............................................................................11

    A.    The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for Section 2 Violations. ...........................................12

    B.    There Are No Constitutional Concerns That Require Revisiting the *Gingles* Preconditions. .......................................................18

CONCLUSION ...............................................................................23

# TABLE OF AUTHORITIES

## Cases

*Allen v. Milligan*, 599 U.S. 1 (2023) .................................................................... passim

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha I*), No. 1:21-
      cv-5337, 2023 WL 5674599 (N.D. Ga. July 17, 2023) ...................... 4, 15, 19, 21

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha II*), No. 1:21-
      cv-05337, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) ............................ passim

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015). ........................10

*Clark v. Martinez*, 543 U.S. 371 (2005) ....................................................... 8, 10, 11

*Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025
      (N.D. Ga. Oct. 26, 2023) ............................................................................ passim

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) .............................................................8

*Johnson v. Hamrick*, 196 F.3d 1216 (11th Cir. 1999) .............................................14

*Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) .........................13

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................ 1, 16, 17, 18

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218 (11th Cir. 2000)
      (en banc) .................................................................................................. 10, 22

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .............................................18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600
      U.S. 181 (2023) .......................................................................................18

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................................................... 1, 5, 6, 9

*United States v. Apel*, 571 U.S. 359 (2014) ...................................................... 10, 11

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984)..... 14, 23

**Statutes**

28 U.S.C. § 2284 .............................................................................................2

28 U.S.C. § 2403 .............................................................................................2

52 U.S.C. § 10301 ...................................................................................... passim

**Rules**

Federal Rule of Civil Procedure 5.1(a) .......................................................3

**Other Authorities**

Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends*, Fig. 7

(2022), https://perma.cc/MH6P-XMZR ............................................................22

Heather K. Gerken, *A Third Way for the Voting Rights Act*, 106 Colum. L. Rev.

708 (2006) ...........................................................................................17

## PRELIMINARY STATEMENT

The United States intervened in these actions to defend the constitutionality of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Section 2 is a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  The Supreme Court has repeatedly upheld the Section 2 prohibition on any state-imposed "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 10301(a), as an appropriate exercise of Congress's remedial powers under the Fourteenth and Fifteenth Amendments. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 41 (2023).  Courts can apply Section 2 to redistricting claims consistent with the Fourteenth and Fifteenth Amendments, under the well-settled and recently reaffirmed test set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

The United States takes no position on any factual dispute in these matters nor on any legal question other than the constitutionality and appropriate application of Section 2.  Furthermore, the United States' intervention in defense of the constitutionality of Section 2 need not disturb the single-judge Court's post-trial opinion or judgment in the *Alpha Phi Alpha* cases or the three-judge Court's summary judgment opinion and order in *Georgia NAACP*.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In these four cases, Plaintiffs challenge various aspects of Georgia's congressional and statewide redistricting maps as impermissibly diluting minority voting strength. Three cases—*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. filed Dec. 30, 2021), *Grant v. Raffensperger*, No. 1:22-cv-122 (N.D. Ga. filed Jan. 11, 2022), and *Pendergrass* v. *Raffensperger*, No. 1:21-cv-5339 (N.D. Ga. filed Dec. 30, 2021) (collectively the *Alpha Phi Alpha* cases)—raise claims only under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and are consolidated for litigation before a single-judge district court. The fourth case, *Georgia State Conference of the NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. filed Dec. 30, 2021), also involves claims under Section 2, as well as claims of unconstitutional racial gerrymandering and intentional vote dilution in violation of the Fourteenth and Fifteenth Amendments. That case is before a three-judge district court convened pursuant to 28 U.S.C. § 2284(a).[1]

In both the *Alpha Phi Alpha* cases and *Georgia NAACP*, the Courts have now issued orders pursuant to 28 U.S.C. § 2403(a) certifying that the "constitutionality of Section 2 of the Voting Rights Act of 1965, 52 U.S.C.

---

[1] Another case raising only racial gerrymandering claims under the Fourteenth and Fifteenth Amendments is also before the three-judge court. *See Common Cause v. Raffensperger*, No. 1:22-cv-90 (N.D. Ga. filed Jan. 7, 2022). The United States has not intervened in that case, which does not raise issues related to Section 2.

§ 10301(b)[,] has been called into question" and requesting the Attorney General to submit his position on intervention within 60 days.  Order, *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 4, 2023), ECF No. 319; Order, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 4, 2023), ECF No. 181.  Defendants have since filed notices of constitutional questions pursuant to Federal Rule of Civil Procedure 5.1(a).  *See* Notice, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Oct. 10, 2023), ECF No. 322; Notice, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 10, 2023), ECF No. 184.

After certification of the constitutional challenge to the Attorney General in the *Alpha Phi Alpha* cases, but before the period for intervention elapsed, the Court issued a post-trial opinion, order, and judgment granting Plaintiffs relief in part. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha II*), No. 1:21-cv-05337, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023).  The Court rejected Defendants' arguments that finding them liable for a Section 2 violation would trigger constitutional concerns, explaining that "Defendants offered no argument or support for this assertion through motion practice or at trial" and that the Supreme Court's recent decision in *Milligan* foreclosed a facial challenge to Section 2. *Alpha Phi Alpha II*, 2023 WL 7037537, at *142 (citing *Milligan*, 599 U.S. at 41). The Court also explained that Plaintiffs were not required to prove or disprove

potential causes of racially polarized voting to meet preconditions to Section 2 liability under *Gingles*, *id.* at \*55, concluding that explanations for polarization were relevant only under the totality of the circumstances inquiry, *see, e.g.*, *id.* at \*22, \*65.[2]

*Georgia NAACP* has proceeded past summary judgment.  *See Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023).  Relevant here, the Court rejected Defendants' argument on summary judgment that Plaintiffs must prove that racially polarized voting is caused by racial animus (rather than partisanship) to meet the *Gingles* preconditions, as well as Defendants' contention that a contrary construction of *Gingles* "somehow runs afoul of the Constitution."  *Id.* at 19-20 & n.33.  Trial was scheduled to begin on November 13, 2023, *see* Scheduling Order, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Mar. 20, 2023), ECF No. 126, but on November 1, 2023, the Court stayed all deadlines and continued trial pending the resolution of any appeal in the *Alpha Phi Alpha* cases, *see Ga. State*

---

[2] These conclusions were consistent with the Court's prior order denying cross-motions for summary judgment, which rejected (among other arguments) Defendants' contentions that Section 2 is unconstitutional if a plaintiff is not required to prove racial causation when establishing racial bloc voting as part of the *Gingles* preconditions and that there are temporal limitations to the longevity of Section 2.  *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger* (*Alpha Phi Alpha I*), No. 1:21-cv-5337, 2023 WL 5674599, at \*1, \*19-20 (N.D. Ga. July 17, 2023).

*Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Nov. 1, 2023), ECF No. 198.

On November 3, 2023, the United States intervened in these four cases to defend the constitutionality of Section 2.  This consolidated brief follows.

## STATUTORY BACKGROUND

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority group.  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47.  Section 2 prohibits vote dilution, including the use of districting schemes "to minimize or cancel out the voting strength of racial [minorities in] the voting population."  *Id.* (alteration in original) (quotation mark omitted); *see also Milligan*, 599 U.S. at 40-41.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court set out the requirements for a vote dilution claim, including three preconditions to liability. *See Milligan*, 599 U.S. at 17-18.  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  "Second, the

minority group must be able to show that it is politically cohesive." *Id.* at 51.

"Third, the minority must be able to demonstrate that the white majority votes

sufficiently as a bloc to enable it—in the absence of special circumstances, such as

the minority candidate running unopposed—usually to defeat the minority's

preferred candidate." *Id.* (citations omitted).  If plaintiffs establish all three

preconditions, consideration proceeds to a totality of the circumstances analysis.

*See id.* at 36-37 (enumerating relevant factors); *see also Milligan*, 599 U.S. at 18-

19 (explaining and reaffirming *Gingles* procedure).

## ARGUMENT

It is well established that Section 2 of the Voting Rights Act is a permissible

exercise of Congress's Fourteenth and Fifteenth Amendment enforcement powers.

In their notices identifying constitutional questions, Defendants do not facially

challenge Section 2's constitutionality.  Instead, they argue that the Courts either

must interpret Section 2 in ways that conflict with the Supreme Court's recent

ruling in *Milligan* and find against liability as a matter of constitutional avoidance

or must find Section 2 unconstitutional as applied to the facts of these cases.

Defendants' arguments are neither novel nor correct.

To begin, Defendants misapply the canon of constitutional avoidance, which

is not a means to relitigate a settled statutory construction.  Their arguments may

be rejected on that basis alone.  And even if Defendants' arguments were properly

presented, they are indistinguishable from arguments rejected in *Milligan*.  There, the Supreme Court reaffirmed the constitutionality of race-based remedies for Section 2 violations and reiterated that the second and third *Gingles* preconditions do not require proof of racial causation.  Accordingly, Defendants' constitutional arguments pose no obstacle to liability or an appropriate remedy.[3]

## I.    The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's Authority to Enact Section 2 of the Voting Rights Act.

Courts may resolve Section 2 vote dilution claims using the well-established *Gingles* test, a standard "repeatedly applied" by federal courts "for the last four decades."  *Milligan*, 599 U.S. at 41 (citing *Gingles*, 489 U.S. at 30).  Despite this clear and consistent standard, Defendants contend in the *Alpha Phi Alpha* cases

---

[3] Defendants have also argued in both the *Alpha Phi Alpha* cases and *Georgia NAACP* that "Section 2 of the Voting Rights Act provides no private right of action."  Answer, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Feb. 25, 2022), ECF No. 280; Answer to Am. Compl., *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Oct. 11, 2022), ECF No. 92.  The Courts have already rejected these arguments.  *See Alpha Phi Alpha II*, 2023 WL 7037537, at *47; Order, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Jan. 28, 2022), ECF No. 65; Order, *Ga. State Conf. NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Sept. 26, 2022), ECF No. 89.  For the reasons the United States has articulated in briefing before the Eighth Circuit, the Northern District of Georgia, and other courts, private plaintiffs may enforce Section 2.  *See, e.g.*, U.S. Amicus Br., *Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, No. 22-1395 (8th Cir. Apr. 22, 2022), https://perma.cc/5MAE-9DSR; U.S. Statement of Interest, *Chandler v. Allen*, No. 2:21-cv-1531 (N.D. Ala. Sept. 22, 2023), ECF No. 110, https://perma.cc/8SML-P2RE; U.S. Statement of Interest 5 n.3, *Ga. State Conf. of NAACP v. Raffensperger*, No. 1:21-cv-1259 (N.D. Ga. July 26, 2021), ECF No. 55, https://perma.cc/K648-GKNZ.

that the Court should read Section 2 in whatever manner upholds Georgia's maps, so that it "need not reach the constitutional issues" implicated by finding a Section 2 violation. Defs.' Proposed Findings of Fact & Conclusions of Law ¶ 771, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Sept. 25, 2023), ECF No. 317 (Defs.' Proposed Findings & Conclusions). And in *Georgia NAACP*, Defendants assert that the Court must read the second and third *Gingles* preconditions to require proof that racial considerations cause racially polarized voting (*i.e.*, racial causation) to avoid a reading of Section 2 that would be unconstitutional or would raise constitutional doubts. Defs.' Summ. J. Br. 30-32 & n.11, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. Mar. 27, 2023), ECF No. 141-1 (*Ga. NAACP* Summ. J. Br.); *see also Ga. NAACP*, 2023 WL 7093025, at *19-20 (rejecting argument). Because neither argument properly applies the canon of constitutional avoidance, the Court properly addressed them without engaging in unnecessary constitutional analysis. *See Ga. NAACP*, 2023 WL 7093025, at *19-20; *Alpha Phi Alpha II*, 2023 WL 7037537, at *55, *142.

The canon of constitutional avoidance is a tool for choosing between competing plausible statutory interpretations, *Clark v. Martinez*, 543 U.S. 371, 385 (2005), and "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction," *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark*, 543 U.S. at

385).  In the *Alpha Phi Alpha* cases, Defendants raise constitutional concerns

regarding race-based remedies for Voting Rights Act violations.  Defs.' Proposed

Findings & Conclusions ¶¶ 764-767.  However, Defendants also concede—as they

must—that the Voting Rights Act "demands consideration of race."  *Id.* ¶ 764

(quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018)).  As they are unable to

articulate an alternative construction of the Voting Rights Act that avoids the racial

considerations they deem suspect, Defendants' constitutional avoidance arguments

in the *Alpha Phi Alpha* cases fail.

Defendants similarly fail to present a permissible alternative construction to

support their arguments in *Georgia NAACP*.  Although Defendants assert that

finding racial bloc voting under the second and third *Gingles* preconditions without

also finding racial causation would transmute Section 2 into legislation exceeding

Congress's authority under the Fourteenth and Fifteenth Amendments, *Ga. NAACP*

Summ. J. Br. 31, the Supreme Court long ago rejected Defendants' proffered

reading of the statute.  Eight Justices held in *Gingles* that plaintiffs need show

"neither causation nor intent" to prove racially polarized voting under the

preconditions.  478 U.S. at 62 (plurality opinion); *see also id.* at 100 (O'Connor, J.,

joined by Burger, C.J., Powell, J., and Rehnquist, J., concurring in the judgment)

("I agree that defendants cannot rebut this showing by offering evidence that the

divergent racial voting patterns may be explained in part by causes other than

9

race."). The Supreme Court has trodden the same path ever since. *See, e.g.*, *Milligan*, 599 U.S. at 18; *see also* Section II.B, *infra*. Moreover, the *en banc* Eleventh Circuit and this Court have already applied these decisions to relegate causation to the totality of the circumstances stage. *See Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc); *Ga. NAACP*, 2023 WL 7093025, at \*20. "[B]ecause [the Supreme] Court's cases are so clear, there is no ambiguity . . . to sidestep through constitutional avoidance." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 151 (2015).

Fundamentally, avoidance "is not a method of adjudicating constitutional questions by other means," *United States v. Apel*, 571 U.S. 359, 372 (2014), or a vehicle for defendants to render federal statutes "inoperative" in individual cases, *Clark*, 543 U.S. at 384. Nonetheless, in the *Alpha Phi Alpha* cases Defendants frame avoidance as an "affirmative defense," couching their arguments in terms of how the Court would have to interpret Section 2 to "grant the relief Plaintiffs seek." Pretrial Order 23, *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga. Aug. 15, 2023), ECF No. 280 (*Alpha Phi Alpha* Pretrial Order). And they warn the Court that it must not find Section 2 liability "on these facts" because doing so "would call into question the constitutionality of race-based redistricting," Defs.' Proposed Findings & Conclusions ¶ 769. Avoidance principles do not authorize courts to "'interpret' statutes" this way, "by

10

gerrymandering them with a list of exceptions that happen to describe a party's case." *Apel*, 571 U.S. at 372 (citation omitted).

Finally, in the *Alpha Phi Alpha* cases Defendants suggest that the passage of time has undermined the constitutionality of Section 2. *See* Defs.' Proposed Findings & Conclusions ¶¶ 772-773 (citing *Shelby County*, 570 U.S. at 535). This argument is incompatible with the canon of constitutional avoidance as a tool of statutory interpretation. The canon "rest[s] on the reasonable presumption that Congress did not intend" a statutory reading "which raises serious constitutional doubts." *Clark*, 543 U.S. at 381. But Defendants' temporal argument necessarily concedes that Section 2, as interpreted and applied in *Gingles*, was constitutional when Congress last amended this portion of the Voting Rights Act in 1982. *See also Milligan*, 599 U.S. at 13-14. There is no basis for then assuming—as application of the avoidance canon would require—that Congress intended Section 2 to mean one thing in 1982 and something else 40 years later. *See Clark*, 543 U.S. at 382 (rejecting contention that avoidance may require statutory meaning to "change" in the presence of new constitutional concerns).

## II.   Supreme Court Precedent Forecloses Defendants' Constitutional Arguments.

In *Milligan*, the Supreme Court recently reaffirmed the constitutionality of Section 2's race-based remedies and the *Gingles* framework for resolving Section 2 claims. *See* 599 U.S. at 25-26. Defendants' as-applied constitutional defenses are

11

flatly inconsistent with *Milligan*.  There, the Supreme Court held that Section 2's remedial regime, including race-based remedies where appropriate, is within Congress's enforcement powers.  *See id.* at 41.  And the Supreme Court declined Alabama's invitation to alter the *Gingles* framework by adding stringent evidentiary requirements beyond the statutorily enacted "totality of the circumstances" test, *id.* at 25-26, as Defendants attempt to do here by inserting a new "racial causation" requirement.  Despite Defendants' vague invocation of "changed circumstances," their arguments are substantively indistinguishable from the arguments raised and rejected in *Milligan*, as both Courts have already recognized.

### A. The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for Section 2 Violations.

The Supreme Court was clear when it rejected Alabama's arguments in *Milligan* that Section 2 exceeds Congressional enforcement powers.  Consistent with prior cases, *Milligan* explained that Congress may "pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect," and that the Voting Rights Act's "'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'"  599 U.S. at 41 (quoting *City of Rome v. United States*, 446 U.S. 156, 173, 177 (1980)).  And the Supreme Court specifically upheld the use of race to remediate Section 2 violations, stating that "for the last four decades," courts

12

"have repeatedly applied the effects test of § 2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Id.*; *see also id.* at 44 (Kavanaugh, J., concurring in part) (agreeing that "the effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters" to remedy violations). Accordingly, the majority rejected the argument that "§ 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Id.* at 41 (majority opinion).

Nevertheless, Defendants assert in the *Alpha Phi Alpha* cases "that finding for Plaintiffs requires interpreting [Section 2] in a way that calls its constitutionality into question, because [Section 2]'s inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments." *Alpha Phi Alpha* Pretrial Order 22. This argument cannot withstand *Milligan*. *See* 599 U.S. at 38, 41; *id.* at 45 (Kavanaugh J., concurring in part) (stating that, "[a]s the Court explains," the argument that Section 2 exceeds Congress's Fourteenth and Fifteenth Amendment powers "is not persuasive"); *see also Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) (affirming three-judge court decision where appellants asserted that Section 2's results test exceeded Congress's Fifteenth Amendment powers). Nor can it

13

withstand consistent Eleventh Circuit precedent rejecting challenges to Section 2's constitutionality.  *See United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1556-63 (11th Cir. 1984); *see also Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999) (holding *Marengo County* foreclosed constitutional challenge to Section 2).

Indeed, Defendants' arguments are indistinguishable from Alabama's assertions in *Milligan*.  There, the State argued that "[r]equiring racial preferences in single-member districts exceeds any remedial measure the Fifteenth Amendment could authorize."  Br. for Appellants at 71, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146.  And it further asserted that "[r]acial gerrymanders under the auspices of §2 compliance serve no compelling interest that can justify" a race-based remedy consistent with the Fourteenth Amendment.  *Id.* at 76.  Here, Defendants similarly argue that finding them liable would "call into question the constitutionality of race-based redistricting," Defs.' Proposed Findings & Conclusions ¶ 769—an untenable argument after *Milligan*.[4]

---

[4] In *Georgia NAACP*, Defendants relatedly argue that "interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause."  *Ga. NAACP* Summ. J. Br. 31.  This Court rejected that argument.  *See Ga. NAACP*, 2023 WL 7093025, at *20 & n.33.  Alabama in *Milligan* likewise framed race-conscious remedies as racial preferences and pressed the same constitutional arguments that Defendants do here.  *See* Br. for Appellants 76, 79, *Milligan*, 599 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (arguing that "allegations of past discrimination or societal discrimination

14

In the pretrial order, Defendants seemingly attempted to distinguish their arguments from Alabama's by raising as an affirmative defense the "temporal argument" that race-based redistricting to remedy a Section 2 violation is no longer constitutional.  *Cf. Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring in part) (stating that Alabama did not raise this "temporal argument").  But this argument is undeveloped, unsupported, and unavailing.

The Court has already found the "temporal argument" unsubstantiated in Defendants' filings.  *See Alpha Phi Alpha II*, 2023 WL 7037537, at *142; *Alpha Phi Alpha I*, 2023 WL 5674599, at *20.  Nothing in their proposed pretrial order, post-trial proposed findings of fact and conclusions of law, or Rule 5.1 notice suggests any basis for concluding that changed conditions require reconsideration of the settled constitutionality of race-based remedies for Section 2 violations. Instead, Defendants' proposed findings of fact and conclusions of law reveal that Defendants' "constitutional concerns" are little more than a reformulation of their argument against factual liability.  Defendants argue only that, if the Court were to apply Section 2 to them "on these facts," it must be unconstitutional.  Defs.' Proposed Findings & Conclusions ¶ 769.  But that merely reflects Defendants'

_____

. . . are inadequate to justify race-based redistricting" and asserting that litigants may not, under the Equal Protection Clause, use Section 2 to justify "transparent gerrymandering that boosts one group's chances at the expense of another" (quotation marks omitted)).  *Milligan* forecloses these arguments.  *See Milligan*, 599 U.S. at 41-42; *id.* at 45 (Kavanaugh, J., concurring in part).

disagreement with plaintiffs about whether the facts here present one of "'those instances of intensive racial politics' where the 'excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate.'" *Milligan*, 599 U.S. at 30 (alterations in original) (citation omitted). The *Gingles* preconditions and totality of the circumstances analysis are the mechanisms to determine these questions. Given the established constitutionality of the *Gingles* framework, Defendants identify no constitutional infirmity with the liability judgment against them.

Finally, even if Defendants had meaningfully pursued the temporal argument, it would fail. Defendants incorrectly suggest that finding Section 2 liability would present the same "constitutional concerns at issue in *Shelby County*," Defs.' Proposed Findings & Conclusions ¶ 773. But *Shelby County* turned on two primary concerns: (1) that preclearance imposed extraordinary burdens on states by requiring advance permission from the federal government "to implement laws that they would otherwise have the right to enact and execute on their own," *Shelby County*, 570 U.S. at 544; and (2) that "Congress—*if it is to divide the States*—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." *Id.* at 553 (emphasis added).

Neither of those concerns is present here. Section 2 does not require preclearance and applies only after imposition or application of a "standard,

16

practice, or procedure." 52 U.S.C. § 10301(a).  As the Supreme Court observed in

*Shelby County*, there are "important differences between [post-enactment lawsuit]

proceedings and preclearance proceedings."  570 U.S. at 545.  And Section 2

cannot impinge on the "equal sovereignty" of the states, *id.* at 544, because it

applies "nationwide" to all States and political subdivisions, *id.* at 537.

Ultimately, as Defendants acknowledge, "no [temporal] limitation need be

applied to the [Voting Rights Act], because the properly applied *Gingles* test is

self-regulating," Defs.' Proposed Findings & Conclusions ¶ 768, thus ensuring its

continued constitutionality.  To establish a Section 2 violation, a plaintiff must

satisfy both the *Gingles* preconditions and the totality-of-circumstances test, which

turns on up-to-date considerations.  For example, as the Supreme Court noted in

*Milligan*, "as residential segregation decreases—as it has 'sharply' done since the

1970s—satisfying [the first precondition] becomes more difficult."  *Milligan*, 599

U.S. at 28-29 (internal quotation marks omitted); *see also* Heather K. Gerken, *A

Third Way for the Voting Rights Act*, 106 Colum. L. Rev. 708, 745 (2006)

(recognizing that "[w]hen people cease to vote along racial lines," plaintiffs will be

unable to satisfy the second and third preconditions).  Similarly, when the effects

of earlier discrimination and the use of racial appeals diminish in a jurisdiction, a

plaintiff will have a harder time proving, under the totality of circumstances, that it

is a place in which the "excessive role of race in the electoral process . . . denies

17

minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 30 (citation and alterations omitted).

The rigorous standard for proving a Section 2 claim is well within Congress's power to "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *cf. Shelby County*, 570 U.S. at 556 (invalidating separate Voting Rights Act provision only after finding that Congress's justification was "irrational" under the *Katzenbach* test); *id.* at 557 ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."). And because that standard is inherently and by design sensitive to "changing conditions" and calibrated to the ongoing need for a race-based remedy, Section 2 provides its own "logical end point," alleviating any temporal concerns. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221 (2023) (citation omitted); *see also Milligan*, 599 U.S. at 29 (noting decline in successful Section 2 challenges over time). This Court can accordingly apply Section 2 to Defendants and remediate any liability consistent with the Constitution.

## B.   There Are No Constitutional Concerns That Require Revisiting the *Gingles* Preconditions.

The Supreme Court's decision in *Milligan* also forecloses Defendants' argument in *Georgia NAACP* that Section 2 would exceed Congress's Fifteenth

18

Amendment authority if "plaintiffs can establish racial bloc voting" under the second and third *Gingles* preconditions "merely by showing that minorities and majorities vote differently." *Ga. NAACP* Summ. J. Br. 31.  The Court has already rejected this argument.  *See Ga. NAACP*, 2023 WL 7093025, at *19-20; *Alpha Phi Alpha II*, 2023 WL 7037537, at *55; *Alpha Phi Alpha I*, 2023 WL 5674599, at *16-19.  Causation is appropriately considered in the totality of the circumstances analysis, not as part of the *Gingles* preconditions.

In *Milligan*, Alabama similarly argued that the Section 2 framework is unconstitutional because "racial polarization 'provides no evidence about why people vote the way they do'" and does not "say[] anything about racial animus." Br. for Appellants 76-77, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (alteration in original).[5]  The Supreme Court disagreed.  It laid out the second and third *Gingles* preconditions precisely as it had in *Gingles*: "the minority group must be able to show that it is politically cohesive," and "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51) (alteration in original); *see also id.* at

---

[5] *But see* Defs.' Summ. J. Supp. Br. 3, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338 (N.D. Ga. June 23, 2023), ECF No. 178 (*Ga. NAACP* Supp. Br.) (incorrectly asserting that "Alabama apparently did not press any issues at the Supreme Court related to the impact of race and partisanship").

26 (declining to "revise and reformulate the *Gingles* threshold inquiry") (quoting *Bartlett v. Strickland*, 556 U.S. 1, 16 (2009)).  Nowhere did the Supreme Court require a showing of racial causation.

To the contrary, *Milligan* reiterated the explanation in *Gingles* that the "risk" of the sort of inequality Section 2 guards against "is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices."  *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 48) (alteration in original).  That formulation does not turn on the reasons why minority voters are cohesive and the majority opposes minority voters' choices.  The Supreme Court then agreed with the district court that the plaintiffs had met the *Gingles* preconditions because, "on average, Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote."  *Id.* at 22 (internal quotation marks omitted).  The Supreme Court never discussed whether the plaintiffs had shown or could show a racial cause for Alabama's racially polarized voting when it found "no reason to disturb the District Court's careful factual findings" or "to upset the District Court's legal conclusions," affirming that the court "faithfully applied [the Court's] precedents."  *Id.* at 23.  And the Supreme Court then upheld the *Gingles*

framework, as the district court had applied it, as a proper exercise of Congress's constitutional powers.  *See id.* at 41.

Notably, the Supreme Court described the purpose of the third *Gingles* precondition in a manner that explains why it is constitutional without a racial causality requirement.  As the Supreme Court explained, the majority bloc voting requirement does provide some evidence of discrimination: "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' *at least plausibly on account of race*."  *Milligan*, 599 U.S. at 19 (alteration in original) (emphasis added) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

This language does not—as Defendants suggest, *see Ga. NAACP* Supp. Br. 13—mean that the Supreme Court imposed a racial causation requirement, a contention already rejected in the *Alpha Phi Alpha* cases, *see Alpha Phi Alpha I*, 2023 WL 5674599, at \*18 n.32.  Rather, this discussion means that the very existence of racially polarized voting creates a plausible inference that race is at least one reason for minority voters' lack of success.  In other words, the third precondition shows that "minority voters face—unlike their majority peers—bloc voting along racial lines."  *Milligan*, 599 U.S. at 25.  However, it is the "totality of circumstances" test, 52 U.S.C. § 10301(b), that ultimately determines whether the "district is not equally open" because that bloc voting, "arising against the

21

backdrop of substantial racial discrimination within the State, . . . renders a minority vote unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. This comprehensive standard is sufficiently robust to permit race-conscious remedies under Congress's authority to enforce the Fourteenth and Fifteenth Amendments. *See id.* at 41; *see also* Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends*, Fig. 7 (2022) (recognizing declining case counts and success rates), https://perma.cc/MH6P-XMZR.[6]

In any event, Defendants' arguments do not require constitutionalizing the *Gingles* preconditions, which are a judicially created gatekeeping mechanism to screen out claims that lack merit. *See Milligan*, 599 U.S. at 26. The *Gingles* preconditions do not represent Section 2's full "totality of circumstances" test, 52 U.S.C. § 10301(b). Partisan explanations for racially polarized voting can be considered at the totality-of-circumstances stage, *see, e.g.*, *Solomon*, 221 F.3d at 1225, but nothing in Section 2 or the Fifteenth Amendment requires plaintiffs to

---

[6] Defendants' alternative reading mislocates the harm Section 2 seeks to remedy. Their reading suggests the injury stems from individual voters casting votes in a racially polarized manner, which no law can remedy. Rather, Section 2 addresses the harm resulting from a jurisdiction's use of a method of election or districting plan that interacts with racially polarized voting in a manner that eliminates equality of electoral opportunity under the totality of circumstances. *See Milligan*, 599 U.S. at 25 ("A district is not equally open, in other words, when minority voters face . . . bloc voting along racial lines . . . *that renders a minority vote unequal to a vote by a nonminority voter*." (emphasis added)).

disprove partisan explanations for racially polarized voting merely to proceed past the preconditions.  *See Milligan*, 599 U.S. at 25-26, 41-42; *see also, e.g.*, *Marengo Cnty.*, 731 F.2d at 1567 ("The surest indication of race-conscious politics is a pattern of racially polarized voting.").[7]

## CONCLUSION

For the foregoing reasons, the Courts should reject Defendants' challenges to the constitutionality of Section 2 of the Voting Rights Act.

---

[7]  Although Defendants separately suggest in *Georgia NAACP* that a racial causality requirement is a necessary "temporal limitation on the reach of Section 2," *Ga. NAACP* Supp. Br. 16, *Milligan* recognized that the *Gingles* framework already provides a self-regulating mechanism.  *See* Section II.A, *supra*.

Date:  November 3, 2023

Respectfully submitted,


RYAN K. BUCHANAN                              KRISTEN CLARKE
United States Attorney                        Assistant Attorney General
Northern District of Georgia                  Civil Rights Division

                                              SPARKLE SOOKNANAN
                                              Principal Deputy Assistant Attorney
                                              General


/s/ Aileen Bell Hughes                        /s/ Daniel J. Freeman
AILEEN BELL HUGHES                            TIMOTHY F. MELLETT
Georgia Bar No. 375505                        DANIEL J. FREEMAN
Assistant U.S. Attorney                       MICHAEL E. STEWART
Office of the United States Attorney          Attorneys, Voting Section
600 U.S. Courthouse                           Civil Rights Division
75 Ted Turner Drive, SW                       U.S. Department of Justice
Atlanta, GA 30303                             4 Constitution Square
Phone: (404) 581-6000                         150 M Street NE, Room 8.923
Fax: (404) 581-6181                           Washington, D.C. 20530
                                              Phone: (800) 253-3931
                                              Fax: (202) 307-3961

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Daniel J. Freeman
DANIEL J. FREEMAN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, DC 20530
Phone: (800) 253-3931
Fax: (202) 307-3961

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>BRAD RAFFENSPERGER,<br><br>  *Defendant*. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05337-SCJ |
| COAKLEY PENDERGRASS, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>  *Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>  *Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:22-CV-00122-SCJ |

GEORGIA STATE CONFERENCE
OF THE NAACP, *et al.*,

       *Plaintiffs,*

     v.

STATE OF GEORGIA, *et al.*,

       *Defendants.*

CIVIL ACTION

FILE NO. 1:21-CV-5338-ELB-SCJ-SDG

## RESPONSE TO UNITED STATES ON CONSTITUTIONALITY OF SECTION 2 OF THE VOTING RIGHTS ACT

1

## INTRODUCTION

In its brief related to the constitutionality of Section 2 of the Voting Rights Act (VRA),[1] the Department of Justice (DOJ) begins with a point of agreement with Defendants—that "Defendants do not facially challenge Section 2's constitutionality." DOJ Brief, p. 11. As Defendants have repeatedly stated in these cases, properly applying the *Gingles* preconditions and Senate Factor 2 avoids the constitutional questions raised by Justice Kavanaugh in the *Allen* case and addresses the tension between the Constitution, "which prohibits restricts consideration of race" and the VRA, which "demands consideration of race." *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018).

The Court acknowledged in the Section 2-only cases that Georgia has made "great strides . . . to increase the political opportunities of Black voters in the 58 years since the passage of the Voting Rights Act." *Alpha Phi Alpha* Doc. 333, p. 9. Those strides demand the conclusion that Defendants' constitutional claims are valid and require this Court to carefully consider whether Section 2, as applied to Georgia's redistricting plans, is constitutional.

---

[1] The DOJ filed the same brief in all four redistricting cases raising Section 2 claims about Georgia's 2021 redistricting plans. For ease of reference, the term "DOJ Brief" refers to the brief filed at the following docket entries in each case: *Alpha Phi Alpha* Doc. 335-1, *Grant* Doc. 296-1, *Pendergrass* Doc. 296-1, *Ga. NAACP* Doc. 206-1. While a formal response may not necessarily be required given the posture of the cases, Defendants file this response to ensure the record is complete.

## ARGUMENT

### I.   Defendants have consistently raised constitutional arguments in these cases.

Throughout these cases, as DOJ acknowledges, Defendants have consistently raised constitutional arguments regarding the proper scope of Section 2 of the VRA in applying that statute to the facts in Georgia. That includes motions for summary judgment (*Alpha Phi Alpha* Doc. 230-1, pp. 21, 27–29; *Grant* Doc. 190-1, pp. 24, 30–32; *Pendergrass* Doc. 175-1, pp. 20, 26–28; *Ga. NAACP* Doc. 141-1, pp. 33–35), after the *Allen v. Milligan* decision (*Alpha Phi Alpha* Doc. 263, pp. 19-21; *Grant* Doc. 228, pp. 19-21; *Pendergrass* Doc. 214, pp. 17-19; *Ga. NAACP* Doc. 178, pp. 17-19), in the pretrial orders (*Alpha Phi Alpha* Doc. 280, pp. 22–24; *Grant* Doc. 243, pp. 24–25; *Pendergrass* Doc. 231, pp. 27–29; *Ga. NAACP* Doc. 194, pp. 28–29), at opening argument in the trial of the single-judge Section 2 cases (Trial Tr. Sept. 5, 2023 at 39:22–40:20), in closing arguments in the trial of the single-judge Section 2 cases (Trial Tr. Sept. 14, 2023 at 2419:15–2421:19), and in proposed findings of fact and conclusions of law (*Alpha Phi Alpha* Doc. 317, ¶¶ 10, 763–773; *Grant* Doc. 277, ¶¶ 10, 697–707; *Pendergrass* Doc. 268, ¶¶ 10, 561–571).

While the Court in the Section 2-only cases found that Defendants "offered no argument or support" for their constitutional claims during the trial, *Alpha Phi Alpha* Doc. 333, p. 508, DOJ clearly was able to respond to a

number of arguments made by Defendants that were articulated in briefs and trial argument. Those arguments require this Court to consider carefully the constitutional issues raised in these cases.

## II.     The unique nature of the Voting Rights Act.

In its brief, DOJ fails to acknowledge a key point regarding the VRA—a proper interpretation by the courts is critical to maintaining its constitutionality given its required focus on race. Throughout prior redistricting cycles, the Supreme Court has explained that the Constitution prohibits racial gerrymandering. *Shaw v. Reno*, 509 U.S. 630, 648 (1993). This matters because "a racial gerrymander may exacerbate the very patterns of racial bloc voting that majority-minority districting is sometimes said to counteract." *Id*.

In cases DOJ does not even cite, the Supreme Court has denied claims by states that the VRA required particular race-based districting schemes, including in Georgia, based on concerns about how those readings would take the VRA beyond the Constitution. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 921 (1995). While the Supreme Court has always assumed without deciding that compliance with federal antidiscrimination laws can justify race-based districts, the challenged district must be "reasonably necessary under a ***constitutional reading and application of those laws***." *Id*. (citing *Shaw*, 509 U.S. at 653-655) (emphasis added). This is because a state is "vulnerable

to 'competing hazards of liability'" between the Constitution and the VRA when creating redistricting plans. *Abbott*, 138 S. Ct. at 2315 (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality op.)).

Thus, an improper interpretation of Section 2 which "unnecessarily infuse race into virtually every redistricting," would "rais[e] serious constitutional questions." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 446 (2006) (*LULAC*). In other words, in the redistricting context, the proper application of statutes like the VRA is critically important, because an improper reading and application of the VRA means the statute cannot justify race-based decision-making that the VRA otherwise requires.

In other contexts, the Supreme Court determined that race-based programs must have an end point: "To manage these concerns, *Grutter* imposed one final limit on race-based admissions programs. At some point, the Court held, they must end." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2165 (2023). Thus, "the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring in part). If a Court improperly applies Section 2, it is creating problems of constitutional import because the Constitution places limits on the very race-based decisionmaking that Section 2 requires.

III.   **Properly interpreting Section 2 avoids constitutional questions.**

DOJ begins by claiming that the canon of constitutional avoidance does not apply, criticizing Defendants for being "unable to articulate an alternative construction of the Voting Rights Act that avoids the racial considerations they deem suspect." DOJ Brief, p. 14. But such an alternative construction is exactly what was at issue in *LULAC* and *Miller*—claims that certain districts are required by the VRA when they were not. If courts require the drawing of districts based on race as a result of an improper interpretation of the VRA, that would bring forth the very "constitutional questions" the Supreme Court warned of in *LULAC*. 548 U.S. at 446. Indeed, DOJ later agrees with Defendants that a *proper* application of Section 2 avoids constitutional questions. DOJ Brief, pp. 22-23.

A.   **The facts in these cases raise constitutional questions.**

As Defendants argued throughout all of these cases, the constitutional questions about Section 2 necessarily result from Plaintiffs' legal theories, because Plaintiffs would require the application of race-based remedies to a state with an equally open election system for purposes of Section 2. If Section 2 requires the continued application of race-based districting to Georgia under the facts before the Court—including the statewide elections of Black and Black-preferred candidates for the United States Senate, the election of a Black-preferred candidate for President, the success of Black candidates in five

out of 14 districts for the House of Representatives, and widespread success of Black-preferred candidates in the Georgia General Assembly—then the Court must consider whether the statute is constitutional as applied to Georgia. Answering this question is not just a reweighing or repackaging of the evidence. It is critical to determining what burden Section 2 actually places on the state of Georgia in enacting its redistricting plans. This is not using the avoidance canon to adjudicate "constitutional questions by other means," *United States v. Apel*, 571 U.S. 359, 372 (2014),[2] but rather to properly apply a statute that has significant tension with the requirements of the Constitution.

### B.    DOJ's view of racially polarized voting is too narrow.

DOJ also overreads the conclusions in *Gingles* regarding racially polarized voting. Questions related to the scope of racially polarized voting are far less clear than DOJ claims.

During consideration and passage of the 1982 amendments to the Voting Rights Act, the term "racially polarized voting" was understood and not at all subject to debate. For example, the 1976 District Court decision in *Bolden v. Mobile*, which would eventually make its way to the Supreme Court and spark the call for amending Section 2, defined the term in two parts. First, the court

---

[2] While DOJ cites to *Apel* for this proposition, it involved First Amendment claims, not VRA claims, and the Court of Appeals had not ruled on the plaintiff's constitutional claims. 571 U.S. at 372-73.

stated that racial polarization occurs with "white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs." 423 F. Supp. 384, 388 (S.D. Ala. 1976). When these preconditions are observed, racial polarization is present if "a ***white backlash*** occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks." *Id.* (Emphasis added). The use of term "white backlash"—as distinct from a more innocuous requirement of mere "white bloc voting"—suggests an inquiry into the *reasons* or *causes* behind the majority bloc voting pattern.

The Fifth Circuit would later affirm the opinion containing this definition. *See Bolden v. Mobile*, 571 F.2d 238, 243 (5th Cir. 1978) (citing with approval the district court's finding that "[n]o black had achieved election to the city commission due, in part, to racially polarized voting of an acute nature."). Later, the Supreme Court did nothing to question the legitimacy of the trial court's definition of racially polarized voting. *Mobile v. Bolden*, 446 U.S. 55, 64 (1980).

The result of the Supreme Court's decision in *Bolden* led to the 1982 amendments to the VRA and the modification of Section 2 that effectively overturned the Supreme Court. *Gingles*, 478 U.S. at 35 ("[T]he amendment was largely a response to this Court's plurality opinion in *Mobile v. Bolden*, 446

U.S. 55 (1980)... to make clear that a violation [under Section 2] could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court in *White v. Regester*, 412 U.S. 755 (1973), and by other federal courts before *Bolden*...").

But despite targeting the Supreme Court's decision in *Bolden*, nothing in the amendments nor the Senate Report explaining them suggests Congress understood the definition of "racial polarization" or "racially polarized voting" as anything other than what had been firmly established by the courts up to that point (*i.e.*, the definition employed by the *Bolden* district court).

And retaining the "white backlash" component of the trial court test for racial polarization makes sense in the context of the amendments because it faithfully adheres to the Supreme Court's analysis in *Whitcomb v. Chavis*, 403 U.S. 124 (1971) which the Senate Report also relied on in its efforts to return to the pre-*Bolden* legal standard, S. Rep. at 21-24. *Whitcomb* required a finding of "invidious discrimination" that could be observed in voting patterns and the way they interact with electoral system such that "[minority] residents have less opportunity" to participate in the system than do their white counterparts. 403 U.S. at 149. If this pattern is not observed, then what appears to be the discriminatory "cancel[ing] out" of Black voting power is likely "a mere euphemism for political defeat at the polls." *Id*. at 153.

Contrary to DOJ's claims, defining racially polarized voting in this way does not revive the intent test Congress sought to stamp out with the 1982 amendments. Rather, it simply anchors the results test in precedent and accomplishes what Justice O'Connor accuses the *Gingles* plurality opinion of failing to do: respecting "the balance struck by Congress in amending § 2" and preserving "the results test as described by this Court in *Whitcomb* and *White*." *Gingles*, 478 U.S. at 85 (O'Connor, J. concurring).

Despite the continuing focus on racial polarization in Section 2 cases, the Report of the Committee from the Senate to the 1982 amendments mentions racial polarization just two times. One time is when it approvingly cites the factors considered by the *Bolden* District Court. *See* Senate Report, p. 24 at n. 88. And the second time is when it is detailing the substance of Senate Factor 2. *Id.*, p. 29. Neither instance suggests any departure from the meaning articulated by the *Bolden* district court. When Congress designed the amendment specifically to overturn the Supreme Court, it declined to alter or refine the definition of racial polarization utilized by the courts at the time. Thus, there is nothing to suggest a departure from the interpretive maxim that "[w]ords must be given the meaning they had when the text was adopted." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012).

Moreover, the District Court in *Gingles v. Edminsten*, 590 F. Supp. 345 (E.D.N.C. 1984) (three-judge court), which would later become the seminal Supreme Court case interpreting Section 2, *Thornburg v. Gingles*, agreed with the definition of racially polarized voting established by the *Bolden* district court. In finding racial polarization, the *Gingles* trial court noted that in "none of the elections, ***primary or general***, did a black candidate receive a majority of white votes cast." 590 F. Supp. at 368 (emphasis added). Moreover, "[o]n the average, 81.7% of white voters did not vote for any black candidate in the primary elections." *Id*. And, crucially, "approximately two-thirds of [Democratic] white voters did not vote for black candidates in general elections even after the candidate had won the Democratic primary and the only choice was to vote for a Republican or no one." *Id*.

This observed behavior of white Democratic voters refusing to vote for the Black candidate (or the Black-preferred white candidate) even when the only other option was a "a Republican or no one," is precisely the "white backlash" that the *Bolden* district court identified as a critical component of racial polarization. If the polarization occurred as a result of something more benign, like partisanship, there would be no "white backlash" observed and you would see white Democratic voters would coalesce around the Black or Black-preferred Democrat in the general election.

11

For purposes of determining liability under Section 2, Defendants earlier urged this Court to adopt the definition utilized by the *Bolden* district court and well-known to Congress at the time of consideration and adoption of the 1982 amendments as a method of avoiding the constitutional problems discussed in this case. Not only must the data indicate that white voters vote cohesively in opposition to the Black-preferred candidate. But there also must be an observable "white backlash" where the statistical or anecdotal evidence indicates that white voters are casting aside partisan labels and motivations in order to oppose Black candidates or Black-preferred candidates. That is simply not present on the facts of this case and demonstrates the constitutional problems with Plaintiffs' proposed application of Section 2. Without this proper definition, partisan voting patterns and racial voting patterns will be treated the same—which runs headlong into constitutional problems with how Section 2 is interpreted.

## IV.   Defendants' arguments are not foreclosed by precedent.

DOJ next claims that Defendants' constitutional claims about Section 2 are foreclosed by existing precedent. Not so.

Unlike Alabama, Defendants here do not claim that race-based redistricting is unconstitutional at all times. DOJ's claim to the contrary is clearly foreclosed by Defendants' position in the pretrial order, which it quotes. DOJ Brief, p. 18 (quoting *Alpha Phi Alpha* Pretrial Order at 22). There may be

jurisdictions where continuing conditions on the ground justify remedial districts. But Georgia in 2023 is not one of those jurisdictions. Far from being "untenable," this is the appropriate resolution of the tension the Supreme Court has consistently recognized between the requirements of the Constitution and the requirements of the VRA. *Abbott*, 138 S. Ct. at 2315.

Time and facts matter. In 1982 and in other jurisdictions, the Supreme Court has upheld the provisions of Section 2. But if courts continue to apply Section 2 in a way that requires race-based redistricting in states where there is a lack of the "intensive racial politics" Section 2 was designed to address, *Allen*, 599 U.S. at 29, where there is not a lack of equal opportunity to participate in the political process on account of race, not only are they acting beyond what the statute requires, but also beyond what the Constitution allows.

As Defendants asked in opening argument:

If Georgia's electoral system is not equally open to Black voters, what would that system look like? What would have to change?

Would it look like proportionality where there is an exact representation of majority Black districts to the proportion of population? This Court has already said in its summary judgment orders that that cannot be the standard. You can't measure equal opportunity based on, as a benchmark -- proportionality as a benchmark for equal opportunity.

Would it be more Democrats being elected to the Legislature or to Congress? If that's the standard, we now are into constitutional questions about what Section 2 is actually protecting and whether it's congruent or proportional to the needs of the statute.

13

Section 2 Trial Tr. Sept. 5, 2023 at 36:24–37:13; *see also Alpha Phi Alpha* Doc. 317 (Defendant's Proposed Finding of Fact and Conclusions of Law ¶¶ 1090-1094). If Section 2 continues to place the burden of race-based remedies on Georgia today, then it runs headlong into the same constitutional problems as the proposed interpretation of the VRA in *Miller*, 515 U.S. at 921.

Thus, contrary to DOJ's claims, the temporal argument was developed during the trial because it must relate to the facts on the ground. Partisan voting patterns are simply not enough to invoke the sweeping powers of the federal judicial to order a state to adopt new, race-based districts.

While DOJ dismisses concerns about equal sovereignty issues with Section 2, DOJ Brief, pp. 21-22, its reading of Section 2 can result in requiring partisan outcomes in some states but not others based solely on partisan voting patterns. Again, this emphasizes the importance of carefully policing whether a voting pattern is racial or partisan.

DOJ cannot simply dismiss Defendants' arguments as foreclosed by precedent when the very precedent in this arena demands their consideration. Forcing states with widespread electoral success of Black and Black-preferred candidates to enact race-based redistricting schemes runs afoul of the Constitution.

## V. Causation matters, whether during the *Gingles* preconditions or at the totality of the circumstances.

DOJ then devotes the remainder of its brief to discussing the *Gingles* preconditions and racially polarized voting. Not only is DOJ's argument about racially polarized voting foreclosed by the discussion of the proper definition above, but it misses a key point—causation matters. Indeed, DOJ agrees that causation related to polarized voting patterns should be considered at the totality of the circumstances phase. DOJ Brief, p. 24.

*Where* causation is considered does not matter nearly as much as the fact that it *must* be considered. While it makes far more sense to address whether voting patterns are partisan or racial during the preconditions, which are designed to screen claims, the nature of the voting patterns requires close inspection because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon v. Liberty County Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000).

Thus, if dilution is not happening on account of race, then Section 2 does not apply because "[u]nless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 581 U.S. 285,

335 (2017) (Alito, J., concurring in the judgment in part and dissenting in part) (quoting *Miller*, 515 U.S. at 916). This danger is heightened in cases like these because Plaintiffs seek not to vindicate a complete lack of political success, but rather they seek to weaponize Section 2 to achieve "more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012-13 (1994). But this Court cannot "conflat[e] discrimination on the basis of party affiliation with discrimination on the basis of race." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023) (citations omitted).

Ultimately, DOJ tries to avoid the reality that "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). And federal courts are "not responsible for vindicating generalized partisan preferences." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019). Without proper consideration of causation related to voting patterns, whether during the preconditions or otherwise, a court seeking to enforce Section 2 would be acting beyond constitutional limits.

## CONCLUSION

The Voting Rights Act is a critically important statute for the protection of voters. The way to ensure it can continue to carry out its important mission is to apply it consistent with the U.S. Constitution. And it cannot be constitutionally applied to Georgia's 2021 redistricting plans given the facts on the ground in Georgia today.

Respectfully submitted this 17th day of November, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339

17

Telephone: 678-336-7249

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Response Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; THERON BROWN; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; DEXTER WIMBISH; GARRETT REYNOLDS; JACQUELINE FAYE ARBUTHNOT; JACQUELYN BUSH; and MARY NELL CONNER,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; JANICE JOHNSTON, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board,<br><br>　　　　Defendants. | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |

## <u>AMENDED COMPLAINT</u>

1.　　Plaintiffs bring this action to challenge the Georgia Senate Redistricting

Act of 2021 ("SB 1EX") and the Georgia House of Representatives Redistricting

Act of 2021 ("HB 1EX") on the ground that they violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

2.      In undertaking the latest round of redistricting following the 2020 decennial census, the Georgia General Assembly diluted the growing electoral strength of the state's Black voters and other communities of color. Faced with Georgia's changing demographics, the General Assembly has ensured that the growth of the state's Black population will not translate to increased political influence in the Georgia State Senate and Georgia House of Representatives.

3.      The 2020 census data make clear that minority voters in Georgia are sufficiently numerous and geographically compact to form a majority of eligible voters—which is to say, a majority of the voting age population[1]—in multiple legislative districts throughout the state, including two additional majority-Black

---

[1] The phrases "majority of eligible voters" and "majority of the voting age population" have been used by courts interchangeably when discussing the threshold requirements of a vote-dilution claim under Section 2 of the Voting Rights Act. *Compare, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("[T]he first *Gingles* precondition . . . 'requires only a simple *majority of eligible voters* in a single-member district.'" (emphasis added) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991))), *with Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.) ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up *more than 50 percent of the voting-age population* in the relevant geographic area?" (emphasis added)). The phrase "majority of eligible voters" when used in this Complaint shall also refer to the "majority of the voting age population."

State Senate districts in the southern Atlanta metropolitan area, one additional majority-Black State Senate district in the central Georgia Black Belt region, two additional majority-Black House districts in the southern Atlanta metropolitan area, one additional majority-Black House district in the western Atlanta metropolitan area, and two additional majority-Black House districts anchored in Bibb County. These additional majority-Black legislative districts can be drawn without reducing the total number of districts in the region and statewide in which Black and other minority voters are able to elect their candidates of choice.

4.     Rather than draw these State Senate and House districts as those in which Georgians of color would have the opportunity to elect their preferred candidates, the General Assembly instead chose to "pack" some Black voters into limited districts in these areas and "crack" other Black voters among rural-reaching, predominantly white districts.

5.     Section 2 of the Voting Rights Act prohibits this result and requires the General Assembly to draw additional legislative districts in which Black voters have opportunities to elect their candidates of choice.

6.     By failing to create such districts, the General Assembly's response to Georgia's changing demographics has had the effect of diluting minority voting strength throughout the state.

7.     Accordingly, Plaintiffs seek an order (i) declaring that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act; (ii) enjoining Defendants from conducting future elections under SB 1EX and HB 1EX; (iii) requiring adoption of valid plans for new State Senate and House districts in Georgia that comport with Section 2 of the Voting Rights Act; and (iv) providing any and such additional relief as is appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357.

9.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.    Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

11.    Plaintiff Annie Lois Grant is a Black citizen of the United States and the State of Georgia. Ms. Grant is a registered voter and intends to vote in future legislative elections. She is a resident of Greene County and located in Senate District 24 and House District 124 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate despite strong electoral

support for those candidates from other Black voters in her community. Ms. Grant resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn State Senate district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Grant and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

12.    Plaintiff Quentin T. Howell is a Black citizen of the United States and the State of Georgia. Mr. Howell is a registered voter and intends to vote in future legislative elections. He is a resident of Baldwin County and located in Senate District 25 and House District 133 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Howell resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Howell and

denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

13.    Plaintiff Elroy Tolbert is a Black citizen of the United States and the State of Georgia. Mr. Tolbert is a registered voter and intends to vote in future legislative elections. He is a resident of Bibb County and located in Senate District 18 and House District 144 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Tolbert resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Tolbert and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

14.    Plaintiff Theron Brown is a Black citizen of the United States and the State of Georgia. Ms. Brown is a registered voter and intends to vote in future legislative elections. She is a resident of Houston County and located in Senate District 26 and House District 145 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong

electoral support for those candidates from other Black voters in her community. Ms. Brown resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Brown and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

15.   Plaintiff Triana Arnold James is a Black citizen of the United States and the State of Georgia. Ms. James is a registered voter and intends to vote in future legislative elections. She is a resident of Douglas County and located in Senate District 30 and House District 64 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. James resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. James and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

16.    Plaintiff Eunice Sykes is a Black citizen of the United States and the State of Georgia. Ms. Sykes is a registered voter and intends to vote in future legislative elections. She is a resident of Henry County and located in Senate District 25 and House District 117 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Sykes resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Sykes and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

17.    Plaintiff Elbert Solomon is a Black citizen of the United States and the State of Georgia. Mr. Solomon is a registered voter and intends to vote in future legislative elections. He is a resident of Spalding County and located in Senate District 16 and House District 117 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other

Black voters in his community. Mr. Solomon resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Solomon and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

18.    Plaintiff Dexter Wimbish is a Black citizen of the United States and the State of Georgia. Mr. Wimbish is a registered voter and intends to vote in future legislative elections. He is a resident of Spalding County and located in Senate District 16 and House District 74 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Wimbish resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Wimbish and

denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

19.     Plaintiff Garrett Reynolds is a Black citizen of the United States and the State of Georgia. Mr. Reynolds is a registered voter and intends to vote in future legislative elections. He is a resident of Fayette County and located in Senate District 16 and House District 68 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate despite strong electoral support for those candidates from other Black voters in his community. Mr. Reynolds resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn State Senate district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Reynolds and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

20.     Plaintiff Jacqueline Faye Arbuthnot is a Black citizen of the United States and the State of Georgia. Ms. Arbuthnot is a registered voter and intends to vote in future legislative elections. She is a resident of Paulding County and located in Senate District 31 and House District 64 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives

despite strong electoral support for those candidates from other Black voters in her community. Ms. Arbuthnot resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Arbuthnot and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

21.     Plaintiff Jacquelyn Bush is a Black citizen of the United States and the State of Georgia. Ms. Bush is a registered voter and intends to vote in future legislative elections. She is a resident of Fayette County and located in Senate District 16 and House District 74 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Bush resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Bush and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

22.     Plaintiff Mary Nell Conner is a Black citizen of the United States and the State of Georgia. Ms. Conner is a registered voter and intends to vote in future legislative elections. She is a resident of Henry County and located in Senate District 25 and House District 117 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Conner resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Conner and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

23.     Defendant Brad Raffensperger is the Georgia Secretary of State and is named in his official capacity. Secretary Raffensperger is Georgia's chief election official and is responsible for administering the state's elections and implementing election laws and regulations, including Georgia's legislative redistricting plans. *See* O.C.G.A. § 21-2-50; Ga. Comp. R. & Regs. 590-1-1-.01–.02 (specifying, among other things, that Secretary of State's office must provide "maps of Congressional,

State Senatorial and House Districts" when requested). Secretary Raffensperger is also an ex officio nonvoting member of the State Election Board, which is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. §§ 21-2-30(d), -31(2).

24.     Defendant Sara Tindall Ghazal is a member of the State Election Board and is named in her official capacity. In this role, she must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

25.     Defendant Janice Johnston is a member of the State Election Board and is named in her official capacity. In this role, she must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

26.     Defendant Edward Lindsey is a member of the State Election Board and is named in his official capacity. In this role, he must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

27.     Defendant Matthew Mashburn is a member of the State Election Board and is named in his official capacity. In this role, he must "formulate, adopt, and

promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

## LEGAL BACKGROUND

28.     Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Thus, in addition to prohibiting practices that deny the exercise of the right to vote, Section 2 prohibits vote dilution.

29.     A violation of Section 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

30.     Such a violation might be achieved by "cracking" or "packing" minority voters. To illustrate, the dilution of Black voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters"—cracking—"or from the concentration of blacks into districts where they constitute an excessive majority"—packing. *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

31.    In *Thornburg v. Gingles*, the U.S. Supreme Court identified three necessary preconditions for a claim of vote dilution under Section 2: (i) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (ii) the minority group must be "politically cohesive"; and (iii) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51.

32.    Once all three preconditions are established, Section 2 directs courts to consider whether, "based on the totality of circumstances," members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

33.    The Senate Report on the 1982 amendments to the Voting Rights Act identified several non-exclusive factors that courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the challenged electoral device results in a violation of Section 2. *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1288–89 (11th Cir. 2020). These "Senate Factors" include:

a.    the history of official voting-related discrimination in the state or political subdivision;

b.      the extent to which voting in the elections of the state or political

subdivision is racially polarized;

c.      the extent to which the state or political subdivision has used

voting practices or procedures that tend to enhance the opportunity for

discrimination against the minority group, such as unusually large election

districts, majority-vote requirements, or prohibitions against bullet-voting;

d.      the exclusion of members of the minority group from candidate-

slating processes;

e.      the extent to which minority group members bear the effects of

discrimination in areas such as education, employment, and health, which

hinder their ability to participate effectively in the political process;

f.      the use of overt or subtle racial appeals in political campaigns;

and

g.      the extent to which members of the minority group have been

elected to public office in the jurisdiction.

34.    The Senate Report itself and the cases interpreting it have made clear

that "there is no requirement that any particular number of factors be proved, or that

a majority of them point one way or the other." *United States v. Marengo Cnty.*

*Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417,

at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL BACKGROUND

### The 2020 Census

35.     Between 2010 and 2020, Georgia's population increased by more than 1 million people.

36.     The population growth during this period is entirely attributable to the increase in Georgia's minority population. The 2020 census results indicate that Georgia's Black population grew by over 15 percent and now comprises 33 percent of Georgia's total population. Meanwhile, Georgia's white population *decreased* by 4 percent over the past decade. In total, Georgia's minority population now comprises just under 50 percent of the state's total population.

### The 2021 Legislative Redistricting Plan

37.     In enacting Georgia's new State Senate and House maps, the Republican-controlled General Assembly diluted the political power of the state's minority voters.

38.     On November 9, 2021, the Georgia State Senate passed SB 1EX, which revised that chamber's district boundaries. The House passed SB 1EX on November 15.

39.     On November 10, 2021, the Georgia House of Representatives passed HB 1EX, which revised that chamber's district boundaries; the State Senate passed HB 1EX on November 12.

40.     On December 30, 2021, Governor Kemp signed SB 1EX and HB 1EX into law.

41.     Democratic and minority legislators were largely excluded from the redistricting process and repeatedly decried the lack of transparency. Moreover, lawmakers and activists from across the political spectrum questioned the speed with which the General Assembly undertook its redistricting efforts, observing that the haste resulted in unnecessary divisions of communities and municipalities.

42.     The Republican majority's refusal to draw districts that reflected the past decade's growth in the state's minority communities was noted by lawmakers. Commenting on the new State Senate map, Senator Michelle Au observed, "It's our responsibility to ensure the people in this room are a good reflection of the people in this state. This map before us does not represent the Georgia of today. It does not see Georgia for who we have become." Senator Elena Parent remarked, "This map

is designed to shore up the shrinking political power of the majority. As proposed, it fails to fairly reflect Georgians['] diversity."

43.     Minority lawmakers in the House also objected to their chamber's new map, noting that it packed minority voters and diluted their voting strength.

44.     Rather than create additional State Senate and House districts in which Georgia's growing minority populations would have the opportunity to elect candidates of their choice, the General Assembly did just the opposite: it packed and cracked Georgia's minority voters to dilute their influence.

45.     SB 1EX packs some Black voters into the southern Atlanta metropolitan area and cracks others into rural-reaching, predominantly white State Senate districts. Specifically, Black voters in the southwestern Atlanta metropolitan area are packed into Senate Districts 34 and 35 and cracked into Senate Districts 16, 28, and 30. In the southeastern Atlanta metropolitan area, Black voters are packed into Senate Districts 10 and 44 and cracked into Senate Districts 17 and 25. Two additional majority-Black State Senate districts could be drawn in the southern Atlanta metropolitan area without reducing the total number of minority-opportunity districts in the enacted map.

46.     SB 1EX also cracks Black voters in the Black Belt among Senate Districts 23, 24, and 25. An additional majority-Black State Senate district could be

drawn in this area without reducing the total number of minority-opportunity districts in the enacted map.

47.   HB 1EX packs some Black voters into the southern and western Atlanta metropolitan area and cracks others into rural-reaching, predominantly white districts. Specifically, Black voters in the western Atlanta metropolitan area are packed into House District 61 and cracked into House District 64. In the southern Atlanta metropolitan area, Black voters are packed into House Districts 69, 75, and 78 and cracked into House Districts 74 and 117. Two additional majority-Black House districts could be drawn in the southern Atlanta metropolitan area, and one additional majority-Black House district in the western Atlanta metropolitan area, without reducing the total number of minority-opportunity districts in the enacted map.

48.   HB 1EX further packs Black voters into two House districts anchored in Bibb County—House Districts 142 and 143—even though two additional majority-Black House districts could be drawn in this area by uncracking House Districts 133, 144, 145, 147, and 149, without reducing the total number of minority-opportunity districts in the enacted map.

49.   This combination of cracking and packing dilutes the political power of Black voters in the Atlanta metropolitan area and central Georgia. The General

Assembly could have instead created additional, compact State Senate and House districts in which Black voters, including Plaintiffs, comprise a majority of eligible voters and have the opportunity to elect their preferred candidates, as required by Section 2 of the Voting Rights Act. Significantly, this could have been done without reducing the number of other districts in which Black voters have the opportunity to elect candidates of their choice.

50.    Unless enjoined, SB 1EX and HB 1EX will deny Black voters throughout the state the opportunity to elect candidates of their choice.

51.    The relevant factors and considerations readily require the creation of majority-Black districts under Section 2.

### Racial Polarization

52.    This Court has recognized that "voting in Georgia is highly racially polarized." *Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (three-judge panel).

53.    "Districts with large black populations are likely to vote Democratic." *Id.* Indeed, during competitive statewide elections over the past decade—from the 2012 presidential election through the 2021 U.S. Senate runoff elections—an average of 97 percent of Black Georgians supported the Democratic candidate.

54.     White voters, by striking contrast, overwhelmingly vote Republican. An average of only 13 percent of white Georgians supported the Democratic candidate in competitive statewide elections over the past decade.

55.     Georgia's white majority usually votes as a bloc to defeat minority voters' candidates of choice, including in the areas where Plaintiffs live and the Black population could be united to create a new majority-Black district.

### History of Discrimination

56.     Georgia's past discrimination against its Black citizens, including its numerous attempts to deny Black voters an equal opportunity to participate in the political process, is extensive and well documented. This prejudice is not confined to history books; the legacy of discrimination manifests itself today in state and local elections marked by racial appeals and undertones. And the consequences of the state's historic discrimination persist to this day, as Black Georgians continue to experience socioeconomic hardship and marginalization.

57.     This history dates back to the post-Civil War era, when Black Georgians first gained the right to vote and voted in their first election in April 1868. Soon after this historic election, a *quarter* of the state's Black legislators were either jailed, threatened, beaten, or killed. In 1871, the General Assembly passed a resolution that expelled 25 Black representatives and three senators but permitted

the four mixed-race members who did not "look" Black to keep their seats. The General Assembly's resolution was based on the theory that Black Georgians' right of suffrage did not give them the right to hold office, and that they were thus "ineligible" to serve under Georgia's post-Civil War state constitution.

58.     After being denied the right to hold office, Black Georgians who attempted to vote also encountered intense and frequently violent opposition. The Ku Klux Klan and other white mobs engaged in a campaign of political terrorism aimed at deterring Black political participation. Their reigns of terror in Georgia included, for instance, attacking a Black political rally in Mitchell County in 1868, killing and wounding many of the participants; warning the Black residents of Wrightsville that "blood would flow" if they exercised their right to vote in an upcoming election; and attacking and beating a Black man in his own home to prevent him from voting in an upcoming congressional election.

59.     In the General Assembly, fierce resistance to Black voting rights led to more discriminatory legislation. In 1871, Georgia became the first state to enact a poll tax. At the state's 1877 constitutional convention, the General Assembly made the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. The poll tax reduced turnout among Black voters in Georgia by half and has been described as the single most effective disenfranchisement law

ever enacted. The poll tax was not abolished until 1945—after it had been in effect for almost 75 years.

60.    After the repeal of the poll tax in 1945, voter registration among Black Georgians significantly increased. However, as a result of the state's purposeful voter suppression tactics, not a *single* Black lawmaker served in the General Assembly between 1908 and 1962.

61.    Georgia's history of voter discrimination is far from ancient history. As recently as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end this practice, a local Macon leader declared that the federal government was ruining "every vestige of the local government."

62.    Other means of disenfranchising Georgia's Black citizens followed. The state adopted virtually every one of the "traditional" methods to obstruct the exercise of the franchise by Black voters, including literacy and understanding tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that Black voters would be left waiting in line when the polls closed, and the adoption of "white primaries."

63.     Attempts to minimize Black political influence in Georgia have also tainted redistricting efforts. During the 1981 congressional redistricting process, in opposing a bill that would maintain a majority-Black district, Joe Mack Wilson—a Democratic state representative and chair of the House Reapportionment Committee—openly used racial epithets to describe the district; following a meeting with officials of the U.S. Department of Justice, he complained that "the Justice Department is trying to make us draw [n*****] districts and I don't want to draw [n*****] districts." Speaker of the House Tom Murphy objected to creating a district where a Black representative would certainly be elected and refused to appoint any Black lawmakers to the conference committee, fearing that they would support a plan to allow Black voters to elect a candidate of their choice. Several senators also expressed concern about being perceived as supporting a majority-Black congressional district.

64.     Indeed, federal courts have invalidated Georgia's redistricting plans for voting rights violations numerous times. In *Georgia v. United States*, the U.S. Supreme Court affirmed a three-judge panel's decision that Georgia's 1972 reapportionment plan violated Section 5 of the Voting Rights Act, at least in part because it diluted the Black vote in an Atlanta-based congressional district in order to ensure the election of a white candidate. *See* 411 U.S. 526, 541 (1973); *see also*

*Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (per curiam) (three-judge panel) (invalidating legislative plans that reduced number of majority-minority districts).

65.     Due to its lengthy history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act upon its enactment in 1965, prohibiting any changes to Georgia's election practices or procedures (including the enactment of new redistricting plans) until either the U.S. Department of Justice or a federal court determined that the change did not result in backsliding, or "retrogression," of minority voting rights.

66.     Accordingly, between 1965 and 2013—at which time the U.S. Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013)—Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice.

67.     Georgia's history of racial discrimination in voting, here only briefly recounted, has been thoroughly documented by historians and scholars. Indeed, "[t]he history of the state['s] segregation practice and laws at all levels has been

rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, <u>848 F. Supp. 1548, 1560</u> (S.D. Ga. 1994); *see also, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021), <u>ECF No. 636</u> (taking judicial notice of fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting").

68.     Ultimately, as this Court has noted, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, <u>950 F. Supp. 2d 1294, 1314</u> (N.D. Ga. 2013) (quoting *Brooks*, <u>848 F. Supp. at 1560</u>), *aff'd in part, rev'd in part on other grounds*, <u>775 F.3d 1336</u> (11th Cir. 2015).

### Use of Racial Appeals in Political Campaigns

69.     In addition to Georgia's history of discrimination against minorities in voting, political campaigns in the state have often relied on both overt and subtle racial appeals—both historically *and* during recent elections.

70.     In 2016, Tom Worthan, former Republican Chair of the Douglas County Board of Commissioners, was caught on video making racist comments

aimed at discrediting his Black opponent, Romona Jackson-Jones, and a Black candidate for sheriff, Tim Pounds. During the recorded conversation with a Douglas County voter, Worthan asked, "Do you know of another government that's more black that's successful? They bankrupt you." Worthan also stated, in reference to Pounds, "I'd be afraid he'd put his black brothers in positions that maybe they're not qualified to be in."

71.    In the 2017 special election for Georgia's Sixth Congressional District—a majority-white district that had over the previous three decades been represented by white Republicans Newt Gingrich, Johnny Isakson, and Tom Price—the husband of the eventual Republican victor, Karen Handel, shared an image over social media that urged voters to "[f]ree the black slaves from the Democratic plantation." The image also stated, "Criticizing black kids for obeying the law, studying in school, and being ambitious as 'acting white' is a trick the Democrats play on Black people to keep them poor, ignorant and dependent." The image was then shared widely by local and national media outlets.

72.    During that same election, Jere Wood—the Republican Mayor of Roswell, Georgia's eighth-largest city—insinuated that voters in the Sixth Congressional District would not vote for Democratic candidate Jon Ossoff because he has an "ethnic-sounding" name. When describing voters in that district, Wood

said, "If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."[2]

73.     On a separate occasion, State Senator Fran Millar alluded to the fact that the Sixth Congressional District was gerrymandered in such a way that it would not support candidate Ossoff—specifically, because he was formerly an aide to a Black member of Congress. State Senator Millar said, "I'll be very blunt. These lines were not drawn to get Hank Johnson's protégé to be my representative. And you didn't hear that. They were not drawn for that purpose, OK? They were not drawn for that purpose."

74.     Earlier in 2017, Tommy Hunter, a member of the board of commissioners in Gwinnett County—the second-most populous county in the state—called the late Black Congressman John Lewis a "racist pig" and suggested that his reelection to the U.S. House of Representatives was "illegitimate" because he represented a majority-minority district.

---

[2] In actuality, now-U.S. Senator Ossoff's paternal forebears were Ashkenazi Jewish immigrants who fled pogroms during the early 20th century. *See* Etan Nechin, *Jon Ossoff Tells Haaretz How His Jewish Upbringing Taught Him to Fight for Justice*, Haaretz (Dec. 20, 2020), https://www.haaretz.com/us-news/.premium-jon-ossoff-tells-haaretz-how-his-jewish-upbringing-taught-him-to-fight-for-justice-1.9386302.

75.     Racist robocalls targeted the Democratic candidate for governor in 2018, referring to Stacey Abrams as "Negress Stacey Abrams" and "a poor man's Aunt Jemima." The Republican candidate, now-Governor Kemp, posted a statement on Twitter on the eve of the election alleging that the Black Panther Party supported Ms. Abrams's candidacy.

76.     Governor Kemp also ran a controversial television advertisement during the primary campaign asserting that he owned "a big truck, just in case [he] need[s] to round up criminal illegals and take 'em home [him]self."

77.     The 2020 campaigns for Georgia's two U.S. Senate seats were also rife with racial appeals. In one race, Republican incumbent Kelly Loeffler ran a paid advertisement on Facebook that artificially darkened the skin of her Democratic opponent, now-Senator Raphael Warnock. In the other race, Republican incumbent David Perdue ran an advertisement against Democratic nominee Ossoff that employed a classic anti-Semitic trope by artificially enlarging now-Senator Ossoff's nose.

78.     Senator Perdue later mispronounced and mocked the pronunciation of then-Senator Kamala Harris's first name during a campaign rally, even though the two had been colleagues in the Senate since 2017.

79.     Racial appeals were apparent during local elections in Fulton County even within the last few months. City council candidates in Johns Creek and Sandy Springs pointed to Atlanta crime and protests that turned violent to try to sway voters, publicly urging residents to vote for them or risk seeing their cities become home to chaos and lawlessness. *The Atlanta Journal-Constitution* quoted Emory University political scientist Dr. Andra Gillespie, who explained that although the term "law and order" is racially neutral, the issue becomes infused with present-day cultural meaning and thoughts about crime and violence and thus carries racial undertones.

80.     These are just a few—and, indeed, only among the more recent— examples of the types of racially charged political campaigns that have tainted elections in Georgia throughout the state's history.

### Ongoing Effects of Georgia's History of Discrimination

81.     State-sponsored segregation under Georgia's Jim Crow laws permeated all aspects of daily life and relegated Black citizens to second-class status. State lawmakers segregated everything from public schools to hospitals and graveyards. Black Georgians were also precluded from sitting on juries, which effectively denied Black litigants equal justice under the law. Moreover, Black Georgians were excluded from the most desirable manufacturing jobs, which limited their

employment opportunities to primarily unskilled, low-paying labor. And in times of economic hardship, Black employees were the first to lose their jobs.

82.     Decades of Jim Crow and other forms of state-sponsored discrimination—followed by continued segregation of public facilities well into the latter half of the 20th century, in defiance of federal law—resulted in persistent socioeconomic disparities between Black and white Georgians. These disparities hinder the ability of voters in each of these groups to participate effectively in the political process.

83.      Black Georgians, for instance, have higher poverty rates than white Georgians. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 1-Year Estimate, 18.8 percent of Black Georgians have lived below the poverty line in the past 12 months, compared to 9 percent of white Georgians.

84.      Relatedly, Black Georgians have lower per capita incomes than white Georgians. The 2019 ACS 1-Year Estimate shows that white Georgians had an average per capita income of $40,348 over the past 12 months, compared to $23,748 for Black Georgians.

85.      Black Georgians also have lower homeownership rates than white Georgians. The 2019 ACS 1-Year Estimate shows that 52.6 percent of Black Georgians live in renter-occupied housing, compared to 24.9 percent of white

Georgians. And Black Georgians also spend a higher percentage of their income on rent than white Georgians. The 2019 ACS 1-Year Estimate shows that in Georgia, the percent of income spent on rent is a staggering 54.9 percent for Black Georgians, compared to 40.6 percent for white Georgians.

86.     Black Georgians also have lower levels of educational attainment than their white counterparts and are less likely to earn degrees. According to the 2019 ACS 1-Year Estimate, only 25 percent of Black Georgians have obtained a bachelor's degree or higher, compared to 37 percent of white Georgians.

87.     These disparities impose hurdles to voter participation, including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

## CAUSES OF ACTION

### COUNT I:
### SB 1EX Violates Section 2 of the Voting Rights Act

88.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

89.     Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in a denial or abridgement of the right

of any citizen of the United States to vote on account of race or color, or" membership in a language minority group. 52 U.S.C. § 10301(a).

90.     The Georgia State Senate district boundaries, as currently drawn, crack and pack minority populations with the effect of diluting their voting strength, in violation of Section 2 of the Voting Rights Act.

91.     Black Georgians in the southern Atlanta metropolitan area and the central Georgia Black Belt region are sufficiently numerous and geographically compact to constitute a majority of eligible voters in three additional State Senate districts, without reducing the number of minority-opportunity districts already included in the enacted map.

92.     Under Section 2 of the Voting Rights Act, the General Assembly was required to create three additional State Senate districts in which Black voters in these areas would have the opportunity to elect their candidates of choice.

93.     Black voters in Georgia, particularly in and around these areas, are politically cohesive. Elections in these areas reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

94.     The totality of the circumstances establishes that the current State Senate map has the effect of denying Black voters an equal opportunity to participate

in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

95.     By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## COUNT II:
### HB 1EX Violates Section 2 of the Voting Rights Act

96.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

97.     The Georgia House of Representative district boundaries, as currently drawn, crack and pack minority populations with the effect of diluting their voting strength, in violation of Section 2 of the Voting Rights Act.

98.     Black Georgians in the southern and western Atlanta metropolitan area and central Georgia are sufficiently numerous and geographically compact to constitute a majority of eligible voters in five additional House districts, without reducing the number of minority-opportunity districts already included in the enacted map.

99.     Under Section 2 of the Voting Rights Act, the General Assembly was required to create five additional House districts in which Black voters in these areas would have the opportunity to elect their candidates of choice.

100.    Black voters in Georgia, particularly in and around these areas, are politically cohesive. Elections in these areas reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

101.    The totality of the circumstances establishes that the current House map has the effect of denying Black voters an equal opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

102.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.      Declare that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act;

B.      Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the Georgia State Senate districts as drawn in SB 1EX and the boundaries of the Georgia House of Representatives districts as drawn in HB 1EX, including an injunction barring Defendants from conducting any further legislative elections under the current maps;

C.      Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid legislative redistricting plan that includes three additional Georgia State Senate districts and five additional Georgia House of Representatives districts in which Black voters would have opportunities to elect their preferred candidates, as required by Section 2 of the Voting Rights Act, without reducing the number of minority-opportunity districts currently in SB 1EX and HB 1EX;

D.      Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

[signature on following page]

Dated: March 29, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com


Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law


Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law


*Counsel for Plaintiffs*


*Admitted *pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Amended Complaint has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: March 29, 2022        **<u>Adam M. Sparks</u>**
                                      *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing Amended Complaint with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated:  March 29, 2022

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*