# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ALPHA PHI ALPHA FRATERNITY, INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; *et al.*,
*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA,
*Intervenor-Appellee*,

*v.*

SECRETARY, STATE OF GEORGIA, in his official capacity,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-cv-5537 (Hon. Steve C. Jones)

## SUPPLEMENTAL APPENDIX OF PLAINTIFFS-APPELLEES

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
MAURA DOUGLAS
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
  GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

SOPHIA LIN LAKIN
ARI J. SAVITZKY
MING CHEUNG
CASEY SMITH
ACLU FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
Telephone: (212) 519-7836

*Counsel for Plaintiffs-Appellees Alpha Phi Alpha Fraternity, Inc. et al. (No. 23-13914)*

April 10, 2024

ADDITIONAL COUNSEL ON INSIDE COVER

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

SONIKA R. DATA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

# INDEX OF SUPPLEMENTAL APPENDIX

DESCRIPTION                                                      DOCKET/TAB

***Alpha Phi Alpha v. Raffensperger*, No. 1:21-cv-5337 (N.D. Ga.):**

Order Following Coordinated Hearing on Motions for Preliminary
    Injunction) (Excerpts) ........................................................................Doc. 134

Trial Transcript, AM Session (Sept. 6, 2023) (Excerpts) .............................Doc. 326

Trial Transcript, AM Session (Sept. 7, 2023) (Excerpts) .............................Doc. 327

Trial Transcript, PM Session (Sept. 8, 2023) (Excerpts)..............................Doc. 328

Trial Transcript, AM Session (Sept. 11, 2023) (Excerpts) ...........................Doc. 329

Trial Transcript, AM Session (Sept. 14, 2023) (Excerpts) ...........................Doc. 332

Alpha Exhibit No. 2: Expert Report of Dr. Adrienne Jones
    (dated Dec. 5, 2022) (filed Nov. 30, 2023) (Excerpts)...................Doc. 357-9

Alpha Exhibit No. 4:  Expert Report of Dr. Jason Ward
    (dated Dec. 5, 2022) (filed Nov. 30, 2023) (Excerpts).................Doc. 357-11

Alpha Exhibit No. 5: Expert Report of Dr. Lisa Handley
    (dated Dec. 23, 2022) (filed Nov. 30, 2023) (Excerpts)...............Doc. 357-12

Defendants Exhibit No. 8 (DX 8): Expert Report of John R. Alford
    (dated Feb. 6, 2023) (filed Nov. 30, 2023) ...................................Doc. 360-10

Trial Transcript, PM Session (Sept. 7, 2023) (Excerpts).............................Doc. 385

Trial Transcript, PM Session (Sept. 11, 2023) (Excerpts)...........................Doc. 387

***Grant v. Raffensperger*, No. 1:22-cv-00122 (N.D. Ga.):**

*Grant* Exhibit No. 4: Expert Report of Orville Burton
    (dated Dec. 5, 2022) (filed Nov. 30, 2023) (Excerpts)...................Doc. 313-4

CERTIFICATE OF SERVICE

***Alpha Phi Alpha v. Raffensperger***, **No. 1:21-cv-5337 (N.D. Ga.):**

# Doc. 134

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **ALPHA PHI ALPHA FRATERNITY INC., et al.,**<br>    Plaintiffs,<br><br>v.<br><br>**BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,**<br>    Defendant. | **CIVIL ACTION FILE**<br><br>No. 1:21-CV-5337-SCJ |
| **COAKLEY PENDERGRASS, et al.,**<br>    Plaintiffs,<br><br>v.<br><br>**BRAD RAFFENSPERGER, et al.,**<br>    Defendants. | **CIVIL ACTION FILE**<br><br>No. 1:21-CV-5339-SCJ |
| **ANNIE LOIS GRANT, et al.,**<br>    Plaintiffs,<br><br>v.<br><br>**BRAD RAFFENSPERGER, et al.,**<br>    Defendants. | **CIVIL ACTION FILE**<br><br>No. 1:22-CV-122-SCJ<br><br><u>**ORDER FOLLOWING COORDINATED HEARING ON MOTIONS FOR PRELIMINARY INJUNCTION**</u> |

### d)   Grant and Alpha Phi Alpha

The Court finds that the Grant and Alpha Phi Alpha Plaintiffs have sufficiently established that they are substantially likely to succeed on the merits in showing that it is possible to create two additional State Senate Districts and two State House Districts in the Atlanta Metropolitan area and one additional State House District in southwestern Georgia under relevant Gingles considerations.

In addition, as indicated above, Plaintiffs in both the Grant and Alpha Phi Alpha cases allege that the State maps passed in SB 2EX and HB 1EX violate Section 2 of the Voting Rights Act. Both the Grant and Alpha Phi Alpha Plaintiffs allege that the Georgia legislature should have drawn two additional Senate Districts in the southern metropolitan Atlanta area and one additional Senate District in the Eastern Black belt area. Grant Doc. No. [1], ¶¶ 41–42; APA Doc. No. [1], ¶¶ 64–66. While the Illustrative Maps (drawn by redistricting experts, Mr. Esselstyn and Mr. Cooper) presented by the Grant and Alpha Phi Alpha Plaintiffs are not exact replicas, they largely overlap.[22] Compare GPX 3,

---

[22] The Court recognizes that "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." Chen v. City of Houston, 206 F.3d 502, 519 (5th Cir. 2000). And the remedial plan that the Court eventually implements if it finds Section 2 liability need not be one of the maps

cycle. The Court is unable to disregard the <u>Purcell</u> principle given the progress of Georgia's election machinery toward the 2022 election. The merged balancing of the harms and public interest factors weigh against injunctive relief at this time.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** the pending Motions for Preliminary Injunctions in each of the above-stated cases. Doc. Nos. [26], [39], 1:21-cv-5337; Doc. No. [32], 1:21-cv-5339; Doc. No. [19], 1:22-cv-122.[52] Having determined that a preliminary injunction should not issue, the Court cautions that this is an interim, non-final ruling that should not be viewed as an indication of how the Court will ultimately rule on the merits at trial.

Under the specific circumstances of this case, the Court finds that proceeding with the Enacted Maps for the 2022 election cycle is the right decision. But it is a difficult decision. And it is a decision the Court did not make lightly.

---

[52] While the option of halting all proceedings to await a future ruling by the United States Supreme Court was briefly mentioned at the preliminary injunction hearing, in the absence of a formal motion and full briefing, the Court declines to halt these proceedings. To this regard, each of the above-stated cases shall proceed on the same discovery tracks previously set for the three-judge court redistricting cases pending in the Northern District of Georgia. The Court will issue formal scheduling orders at a later date.

# Doc. 326

1                   UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

4 ALPHA PHI ALPHA FRATERNITY,    )DAY 2 - A.M. SESSION
   INC., ET AL.,                  )
5                 PLAINTIFFS,   )
                            )DOCKET NO.1:21-CV-05337-SCJ
6       -VS-                     )
                            )
7 BRAD RAFFENSPERGER,          )
                            )
8                 DEFENDANT.    )
   _____
9 COAKLEY PENDERGRASS,         )
   ET AL.,                     )
10                 PLAINTIFFS,   )
                            )DOCKET NO. 1:21-CV-5339-SCJ
11       -VS-                     )
                            )
12 BRAD RAFFENSPERGER, ET AL.,   )
                            )
13                 DEFENDANTS.   )
   _____
14 ANNIE LOIS GRANT, ET AL.,     )
                            )
15                 PLAINTIFFS,   )
                            )DOCKET NO. 1:22-CV-00122-SCJ
16       -VS-                     )
                            )
17 BRAD RAFFENSPERGER, ET AL.,   )
                            )
18                 DEFENDANTS.    )
   _____
19                    TRANSCRIPT OF BENCH TRIAL
20             BEFORE THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT JUDGE
21               TUESDAY, SEPTEMBER 6, 2023

22

           VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23 OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
              UNITED STATES DISTRICT COURT
24                    ATLANTA, GEORGIA
                      404-215-1479
25           VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

1 **Q.** Yeah, the south conference. Excuse me.

2 **A.** I'm not aware of how many numbers of counties are in each

3 annual conference. In fact, you know, I was born in a state

4 with three counties, lived in a state with 22, and so having

5 159 thrown on me, I have no idea how many counties are in each

6 conference.

7      MR. WEIGEL: Thank you so much, Bishop Jackson. I'm

8 going to briefly confer with my co-counsel, but I think I

9 should be almost done.

10 BY MR. WEIGEL:

11 **Q.** Just one last question for you, Bishop Jackson.

12      In terms of the goals of the district in this litigation,

13 would more success of Democratic candidates indicate Black

14 voters were making their voices heard?

15      MR. GARABADU: Objection, Your Honor. This calls for

16 improper opinion. Mr. Weigel has established that Bishop

17 Jackson is not an expert in that sense and this seeks to

18 elicit expert testimony.

19      THE COURT: I don't think it seeks expert testimony,

20 but I don't quite understand the question. Maybe you can

21 rephrase the question. I think I understand what you're

22 trying to get at, but the question is a little confusing. I

23 understand the goal, and I'm willing to allow you to ask your

24 question, I don't think he has to be an expert, but the

25 question -- did you understand the question?

1    THE WITNESS:  I don't have the foggiest idea.

2    THE COURT:  I thought you were going to say, to be

3  honest with you, Judge...  Can you change the question or

4  rephrase the question in another way?

5    MR. WEIGEL:  I'll attempt to rephrase my question a

6  little bit, both for Your Honor and for the witness.

7  BY MR. SAVITZKY:

8  **Q.**  Bishop Jackson, in terms of the success of Democratic

9  candidates, would Democratic candidates in Georgia having more

10 success result in Black voters having their voices heard in a

11 better way?

12    MR. GARABADU:  Objection, Your Honor.  Speculation.

13    THE COURT:  He can answer that question.

14    THE WITNESS:  Well, I think the presumption is that

15 Democrats -- Blacks, rather, automatically vote Democratic.

16 I'm not sure that perception is true.  I'm not sure that that

17 question is appropriate.

18    I think Blacks, like everybody else in this state,

19 want to vote in their best interests.  And I think their best

20 interest depends upon who the candidates are, their position

21 on the issues.  Our concern is that when you see every year --

22 every election, rather, the number of Blacks in the state have

23 increased, but the opportunity for Blacks to vote for other

24 Blacks is not increasing.  And that -- that is just

25 problematic.

1          Other places where you see where other populations

2     increase, their opportunity to be represented increases, but

3     why is it when it comes to Blacks, it doesn't.  This is not

4     the first election that the Black population has increased,

5     but it's repetitive that the number of Blacks that have an

6     opportunity to serve does not increase.  That's our concern.

7          MR. WEIGEL:  That completes my questioning.  Thank

8     you so much for your time this morning.

9          THE COURT:  Redirect?

10         MR. GARABADU:  No redirect, Your Honor.  We ask that

11    Bishop Jackson be excused.

12         THE COURT:  Good to see you, Bishop Jackson.

13         THE WITNESS:  Good seeing you.  We ought to have

14    lunch.

15         THE COURT:  As soon as I can try all these cases, we

16    can have lunch.  Thanks a lot.

17         Can the bishop be excused?

18         MR. TYSON:  Yes, Your Honor.

19         MS. KHANNA:  Your Honor, the Grant and Pendergrass

20    plaintiffs intend to call Dr. Palmer.

21         THE COURT:  Okay.

22         MS. KHANNA:  With the Court's indulgence, maybe a

23    five-minute break and we can get the technology and the

24    binders set up, and then I think we can get him on and off

25    before lunch.

# Doc. 327

```
                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION


ALPHA PHI ALPHA FRATERNITY,      )DAY 3 - A.M. SESSION
INC., ET AL.,                    )
                   PLAINTIFFS,   )
                                 )DOCKET NO.1:21-CV-05337-SCJ
        -VS-                     )
                                 )
BRAD RAFFENSPERGER,              )
                                 )
                   DEFENDANT.    )
_____
COAKLEY PENDERGRASS,             )
ET AL.,                          )
                   PLAINTIFFS,   )
                                 )DOCKET NO. 1:21-CV-5339-SCJ
        -VS-                     )
                                 )
BRAD RAFFENSPERGER, ET AL.,      )
                                 )
                   DEFENDANTS.   )
_____
ANNIE LOIS GRANT, ET AL.,        )
                                 )
                   PLAINTIFFS,   )
                                 )DOCKET NO. 1:22-CV-00122-SCJ
        -VS-                     )
                                 )
BRAD RAFFENSPERGER, ET AL.,      )
                                 )
                   DEFENDANTS.   )
_____

                  TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE STEVE C. JONES
                  UNITED STATES DISTRICT JUDGE
                  THURSDAY, SEPTEMBER 7, 2023


           VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
    OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                  UNITED STATES DISTRICT COURT
                       ATLANTA, GEORGIA
                        404-215-1479
                VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

1 **A.**   Yes.

2 **Q.**   And you'd agree that there are probably Black and white

3 poor Georgians who are dealing with the same access issues

4 that you described; correct?

5 **A.**   Yes.  Yes, sir.

6 **Q.**   And is it your testimony that the Black voters in your

7 area want reduced property taxes but the white voters, for

8 example, would not?

9 **A.**   I believe what I said is that this would apply to

10 everybody.  And that is not just unique -- you know, I said we

11 want services just like everybody else.  So then if we want

12 services like everybody else, then everybody is included.

13 **Q.**   So from that it would also be fair to say that the

14 education issues you identified, those issues would identify

15 to white voters as well; correct?

16 **A.**   White and brown people.

17 **Q.**   And you -- similarly, you would agree that all voters,

18 regardless of race, want a safe area, too; correct?

19 **A.**   Want a what?

20 **Q.**   A safe area --

21 **A.**   Oh, yes, yes.

22 **Q.**   -- for instance, in relation to the issues with gun

23 safety that you identified.  White voters, all voters, would

24 want that?

25 **A.**   Yes, absolutely.

1    MR. WEIGEL:  Thank you so much, Dr. Evans.  I'm going

2  to briefly confer with my co-counsel, but I should be almost

3  finished with my questions.

4    That completes my questioning.  Thank you so much,

5  Dr. Evans.  I really appreciate you taking the time to speak

6  with me.

7    THE COURT:  Thank you.

8    Redirect?

9    MS. RUTAHINDURWA:  Just a short one, Your Honor.

10  REDIRECT EXAMINATION

11  BY MS. RUTAHINDURWA:

12  **Q.**   Dr. Evans, you just had a brief exchange about how

13  everyone wants the same services.  In your experience do you

14  believe that everyone receives the same services?

15  **A.**   No.  I don't -- I don't believe everybody receives the

16  same services.  Because I've seen it in the past where, even

17  with students, some African-American students are sent to jail

18  for fighting.  And some of their counterparts, they don't --

19  they don't be sent to jail for fighting or anything because

20  their parents come and they're given second chances.  So no.

21  Even -- and that's in education.

22  **Q.**   And you testified a bit about your experience and role in

23  the Democratic Party.  Why do you align yourself with the

24  Democratic Party?

25  **A.**   Well, I've been with the Democratic Party simply because

1  I believe everyone is under the tenet.  When I say that, there
2  are different segments of our society under that tenet.  And
3  when I look at all of the things that are even happening
4  today, I allow myself under that tenet, even though I'm a
5  pastor, I believe that everyone should have a fair chance to
6  be able to marry the person that they want to marry and not be
7  ostracized.
8      I believe that women should get equal pay to men or to a
9  counterpart in that regard.
10     And so there are a whole lot of things that I align
11 myself with that I find that in the other party -- not that I,
12 you know, don't converse with them, it's just the fact that I
13 want to have an opportunity to talk, you know, to do -- to
14 look at our platform.
15 **Q.**   And are there any racial issues that you find -- you
16 align more with in the Democratic Party?
17 **A.**   Sometimes we do have some problems in the Democratic
18 Party, but we don't have as much problems that we do -- that I
19 see in the -- in the other party.
20         MS. RUTAHINDURWA:  No further questions.  Thank you.
21         THE COURT:  Recross?
22         MR. WEIGEL:  No further questions, Your Honor.
23         THE COURT:  Can this witness be excused?
24         MS. RUTAHINDURWA:  Yes, Your Honor.
25         MR. WEIGEL:  No objection, Your Honor.

1    THE COURT:  Thank you, Dr. Evans.  A pleasure to meet
2  you, ma'am.

3    THE WITNESS:  Thank you, sir.

4    THE COURT:  Get a little rest.

5    Call your next witness.

6    MS. RUTAHINDURWA:  Your Honor, the Grant plaintiffs
7  call Fenika Miller to the stand.

8    THE COURT:  Come on up.

9    THE DEPUTY CLERK:  Raise your right hand, please.

10                        * * * * * *

11                      FENIKA MILLER,

12    having been duly sworn, testified as follows:

13                        * * * * * *

14    THE DEPUTY CLERK:  Have a seat.  If you could please
15  state and spell your name for the record.

16    THE WITNESS:  Fenika Miller, F-E-N-I-K-A,
17  M-I-L-L-E-R.

18    THE DEPUTY CLERK:  Thank you.

19    THE COURT:  Ma'am, you may proceed.

20  DIRECT EXAMINATION

21  BY MS. RUTAHINDURWA:

22  **Q.**  Good morning, Ms. Miller.

23  **A.**  Good morning.

24  **Q.**  Where in Georgia do you currently live?

25  **A.**  Warner Robins.

# Doc. 328

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY, INC., ET AL., | )DAY 4 - P.M. SESSION |
| PLAINTIFFS, | ) |
| | )DOCKET NO.1:21-CV-05337-SCJ |
| -VS- | ) |
| BRAD RAFFENSPERGER, | ) |
| DEFENDANT. | ) |

| | |
|---|---|
| COAKLEY PENDERGRASS, ET AL., | ) |
| PLAINTIFFS, | ) |
| | )DOCKET NO. 1:21-CV-5339-SCJ |
| -VS- | ) |
| BRAD RAFFENSPERGER, ET AL., | ) |
| DEFENDANTS. | ) |

| | |
|---|---|
| ANNIE LOIS GRANT, ET AL., | ) |
| PLAINTIFFS, | ) |
| | )DOCKET NO. 1:22-CV-00122-SCJ |
| -VS- | ) |
| BRAD RAFFENSPERGER, ET AL., | ) |
| DEFENDANTS. | ) |

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE
FRIDAY, SEPTEMBER 8, 2023

VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA
404-215-1479
VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

1  BY MR. CHEUNG:

2  **Q.**   Does your study of Black political development also

3  include the extent to which Black candidates have been elected

4  to political office?

5  **A.**   Yes.

6  **Q.**   And, roughly, what time period do you study in your work

7  as a political scientist?

8  **A.**   It spans the entirety of U.S. history.  But if you're

9  thinking about voting rights, you know, it would be smart for

10  me to say the Civil Rights Movement, the period of time since

11  the Civil Rights Movement.  Since 2013, of course, we've had

12  some exciting changes in voting rights law.  So it spans the

13  history.  But there are obviously points where you're looking

14  at particular periods of time.

15  **Q.**   Thank you.

16      What sources and methods are commonly used in the field

17  of political science?

18  **A.**   Usually in political science people are conducting

19  qualitative or quantitative projects, where they're assessing

20  how people have felt about politics or how -- in terms of

21  numbers -- a political phenomena have impacted them.

22      But with American political development, it definitely

23  also includes the history of the politic.  So I'm looking at

24  the impact of politics over time.  So it has a historical

25  element that probably is a little different from some of

1  the -- those who are not studying American political

2  development.

3  **Q.**    Got it.  And I apologize if I missed this, but in your

4  review of historical material, what kinds of material do you

5  tend to look to?

6  **A.**    So I'm looking at academic articles in my field about

7  similar topics.  I'm looking at histories by folks who have

8  thought about and have written about voting developments.  I'm

9  looking at journal articles, news articles.  I'm reading

10  legislative materials.  I'm looking at advertisements that are

11  engaged with elections and campaigns.  I'm looking at campaign

12  speech.  Those are the ones I can think of off the top of my

13  head right now.

14  **Q.**    Thank you.

15        Have you published any peer-reviewed article related to

16  voting?

17  **A.**    I have.  I've published two articles that are derivative

18  of my dissertation.  One talking about Congress and the Voting

19  Rights Act between 1965 and 2013, and the other reflecting on

20  presidents and their interaction with that law.

21  **Q.**    Got it.

22        Do you have any forthcoming academic publications?

23  **A.**    I do.  I'm working on an article now that focuses on the

24  judiciary, which is the structure of my dissertation, and so

25  these articles --

1  THE COURT:  Should I be worried?

2  THE WITNESS:  I don't think so.

3  THE COURT:  Sorry.

4  BY MR. CHEUNG:

5  **Q.**  Dr. Jones, do you believe your testimony would be helpful

6  to the Court today?

7  **A.**  I do.

8  MR. CHEUNG:  Your Honor, pursuant to Rule 702, the

9  APA plaintiffs would offer Dr. Jones as an expert on the

10  history of voting rights and voting-related discrimination,

11  race and politics, and Black political development.

12  THE COURT:  Okay.  Do you wish to voir dire?

13  MS. LaROSS:  Yes.  I have some questions for voir

14  dire, and then I'll address --

15  THE COURT:  Okay.  Come on up.

16  MS. LaROSS:  Thank you, Your Honor.

17  THE COURT:  You may proceed.

18  VOIR DIRE EXAMINATION

19  BY MS. LaROSS:

20  **Q.**  Good afternoon, Dr. Jones.

21  **A.**  Hello.

22  **Q.**  I have a few questions for you, just mostly considering

23  your background.

24  Now, your bachelor of arts is from Brown University;

25  correct?

1    A.    Yes, it is.

2    Q.    And it's a bachelor of arts in semiotics; correct?

3    A.    Yes.

4    Q.    Did I say that correctly?

5    A.    You did.

6    Q.    Okay.  Good.

7          And semiotics, that is the study of signs and symbols;

8    correct?

9    A.    Yes, it is.

10   Q.    And after you received your law degree, you mentioned you

11   had a law degree, you worked for one of the Circuit Courts of

12   Appeal; correct?

13   A.    I did.  I was a staff attorney for the Ninth Circuit.

14   Q.    But you've never practiced as an attorney; correct?

15   A.    Umm, I was staff attorney for the Ninth Circuit.  I --

16   Q.    Other than that?

17   A.    I was a staff attorney for Communication Workers of

18   America.  And I did some landlord/tenant work.

19   Q.    Okay.  And you're not being asked to render any legal

20   opinions in this case; correct?

21   A.    I am not.

22   Q.    And you've never practiced as an attorney in the area of

23   redistricting; correct?

24   A.    I have not.

25   Q.    And this is the first redistricting case that you've been

1  **Q.**   Dr. Jones, does that Herschel Walker ad utilize any

2  racial appeals against Senator Warnock?

3  **A.**   Yes, it does.  First, it negativizes racism itself and a

4  discussion of racism.  There's an aspect of racism in the

5  United States, for Black people, like an exasperation with the

6  problems of slavery or the problem of Jim Crow or talking

7  about racism and it being a continued problem.

8       So this advertisement does a great job of aligning those

9  high-profile Democrats with talking about racism which, you

10  know, might tire the average Georgian who really doesn't want

11  to think about that and definitely doesn't want to acknowledge

12  and engage in a racist future.

13       You notice also there that the slides or the images that

14  are associated with the Democrats and their statements about

15  racism or Blackness are darker in tone.  They look more

16  ominous and menacing than the juxtaposition on Herschel

17  Walker, whose images are bright and more clear and -- with a

18  lighter more suburban-looking background.

19       In this case, I think it was really important for

20  Herschel Walker to use racial appeals in his campaign, because

21  he is a Black man, he is a dark-skinned Black person.  And in

22  this particular election, he was the standard bearer for the

23  Republican party and for white voters.  And so here he's

24  trying to distinguish himself between the Black candidate and

25  himself, who is the candidate for the GOP, so that he can, you

1   know, associate himself with the white voter and make sure

2   that the white voter understands that he's the standard bearer

3   for the GOP, while making the Black candidate look menacing

4   and problematic and still tiredly complaining about racism in

5   the modern day.

6       So these ads, you know, they just sort of subtly have you

7   thinking about -- or not thinking about, just feeling these --

8   this tension with racism.  And I think it helps this process

9   where voters are self-selecting and understanding which

10   candidate and which party they're supposed to support.

11   **Q.**    Thank you, Dr. Jones.

12       In your report on page 44, you cite a Republican source

13   who said that this Herschel Walker ad, quote, isn't designed

14   to appeal to Black voters, it's aimed at white voters.

15       Do you agree with that assessment?

16   **A.**    Yes.  So I found this source that indicates that the

17   campaign is aiming at white voters with this advertisement.

18   And I would argue both to make sure that white voters

19   understand that Herschel Walker is their candidate, but also

20   to do this double work, as we've seen in these other

21   advertisements, to sort of make the Black candidate look

22   problematic as a result of racism and to sort of stimulate

23   that in voters so that they understand what they're voting for

24   and what they're voting against.

25   **Q.**    And so in a state like Georgia, why would a political

1 party or candidate use ads that appeal to only one racial

2 group?

3 A.    The parties are racially polarized.  So it's important to

4 motivate voters to understand sort of where they're supposed

5 to fall on the electoral spectrum, which party they're

6 supposed to be associated with.  And these advertisements help

7 to create that kind of environment during a campaign season.

8 Q.    So what would you say is the effect of a political party

9 using ads that only appeal to one racial group?

10 A.    I think they help voters to self-select and ideally they

11 help voters to, again, understand, if they're white voters,

12 that they should be voting for the Republican party,

13 regardless of what they think about the candidates.  And then

14 what they think about the Black candidate is arguably made

15 negative by the running of these ads.  And these ads aren't

16 just run on television sources.  Right?  They're on social

17 media, people are discussing the ad.  So it's sort of a

18 pervasive environment of, you know, Black candidates are bad,

19 the candidates for the Republican party, usually white

20 candidates, are good and should be voted for in the state of

21 Georgia.

22 Q.    Thank you.

23      In your opinion, do racial appeals continue to

24 characterize political campaigns in Georgia today?

25 A.    Yes.

1  **Q.** I'd like to turn to Senate Factor 7. Let's talk about

2  the extent to which Black people have been elected to federal

3  office in Georgia. In Georgia's history how many Black people

4  have been elected to Congress?

5  **A.** 12.

6  **Q.** And how long is the period that we're talking about?

7  **A.** So we're talking about from the beginning off the state's

8  history there have been 12 Black people sent to Congress from

9  the state. Only one of them went to Congress before 1965.

10 The other 11 have been sent to Congress since 1965.

11 **Q.** So focusing on that period from 1965 to 2023, what

12 percentage of the available congressional seats do those 11

13 Black legislators occupy?

14 **A.** So those legislators have constituted approximately

15 20 percent of the 364 congressional seats available to

16 Georgia. And, you know, that calculation includes candidates

17 or elected officials who served more than one term, like John

18 Lewis. But it's still a very small swath in a state where

19 Blacks are politically active and interested in being a part

20 of the political environment in the state of Georgia.

21 **Q.** Roughly, what percentage of the Georgia population is

22 Black?

23 **A.** Of the population?

24 **Q.** Yes.

25 **A.** About 33 percent.

1  **Q.**    So let's turn to State office.  How many Black people

2  have been elected to statewide non-judicial office in the

3  state's history?

4  **A.**    We've had three people elected to statewide non-judicial

5  office.  Labor Commissioner Mike Thurmond, Public Service

6  Commissioner David Burgess, and Attorney General Thurbert

7  Baker.  We have not had a Black lieutenant governor or

8  governor in the state.

9  **Q.**    Dr. Jones, why do you distinguish between judicial and

10  non-judicial office here?

11  **A.**    Well, these are candidates who are elected to office.

12  And judicial candidates have also been elected, but in general

13  they are appointed first.  And so there's a benefit to

14  incumbency that has an impact on the elections.

15  **Q.**    Thank you.

16       And let's talk about the General Assembly in particular.

17  On Pages 46 of 47 of your report, you contain a few tables

18  containing the election results.  Can you tell us what these

19  tables show?

20  **A.**    These tables basically show that it's impossible for a

21  Black candidate to be elected in a majority white county in

22  the state of Georgia.  Or district.

23  **Q.**    At what point does the white -- white population

24  percentage in the district become so high that no candidate --

25  no Black candidate was able to win in 2020?

# Doc. 329

1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3

4  ALPHA PHI ALPHA FRATERNITY,    )DAY 5 - A.M. SESSION
   INC., ET AL.,                  )
5              PLAINTIFFS,        )
                                  )DOCKET NO.1:21-CV-05337-SCJ
6          -VS-                   )
                                  )
7  BRAD RAFFENSPERGER,            )
                                  )
8              DEFENDANT.         )
   _____
9  COAKLEY PENDERGRASS,           )
   ET AL.,                        )
10             PLAINTIFFS,        )
                                  )DOCKET NO. 1:21-CV-5339-SCJ
11         -VS-                   )
                                  )
12 BRAD RAFFENSPERGER, ET AL.,    )
                                  )
13             DEFENDANTS.        )
   _____
14 ANNIE LOIS GRANT, ET AL.,      )
                                  )
15             PLAINTIFFS,        )
                                  )DOCKET NO. 1:22-CV-00122-SCJ
16         -VS-                   )
                                  )
17 BRAD RAFFENSPERGER, ET AL.,    )
                                  )
18             DEFENDANTS.        )
   _____

19
            TRANSCRIPT OF BENCH TRIAL
20        BEFORE THE HONORABLE STEVE C. JONES
            UNITED STATES DISTRICT JUDGE
21          MONDAY, SEPTEMBER 11, 2023

22

        VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23 OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
            UNITED STATES DISTRICT COURT
24               ATLANTA, GEORGIA
                  404-215-1479
25        VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

1    that you could sign and that you could use to challenge a

2    Black voter individually and specifically for attempting to

3    register or attempting to vote.

4    **Q.**    And were these programs successful in suppressing the

5    Black vote?

6    **A.**    Those coupled with purges.  You know, they're responding

7    to not only federal court decisions, but they're also

8    responding to a dramatic statistical increase in the number of

9    African-Americans who are registering.  It goes up a hundred

10   thousand during the 1940s.  And then you see it start to drop

11   off again with the challenges, the purges, and, again, the

12   larger message, intimidating message that that sends

13   African-Americans.

14   **Q.**    And you mentioned purges.  Can you tell the Court a

15   little bit about what those purges looked like in this era?

16   **A.**    So Stephen Tuck, who is a professor at Oxford University,

17   wrote a book on civil rights and voting in Georgia in this

18   period, and he estimates that over 12,000 voters were struck

19   from the rolls.  And, again, these are rolls that are

20   controlled locally at a time when registrars have broad

21   latitude to reject African-American registrants for any

22   reason.

23   **Q.**    So --

24   **A.**    So coordinating from the top down, but a lot of this is

25   local; right?  It's decisions that people are making at the

1   local level in a period where they have virtually unchallenged

2   authority.

3   **Q.**   Now, Dr. Ward, I want to talk to you about the part of

4   your report which talks about the 1960s to the present.  In

5   your summary of opinions, which is up on the screen in front

6   of you, you state that, quote, racial polarization has defined

7   Georgia politics since the civil war, and that historical

8   trend has incentivized voter suppression and intimidation, end

9   quote.

10      First of all, can you tell us from your view as a

11  historian what racial polarization means?

12  **A.**   A demonstrable and dramatic preference for one party over

13  the other by a racial group.

14  **Q.**   And, Dr. Ward, as a historian, why is it that you say

15  that racial polarization, quote, defined Georgia politics?

16  **A.**   Because it's been the predominant trend through political

17  eras and political cycles.  Black party preference has shifted

18  dramatically from reconstruction to the present, but more

19  often than not, that party preference is dramatic and

20  demonstrable.

21  **Q.**   And in your opinion as a historian, has there been any

22  factor better at predicting party preference in Georgia since

23  the civil war than race?

24  **A.**   Not in my review of the literature and the historical

25  evidence.

1  **Q.**    Now, in your report, you also mention how the 1960s was

2  one of the periods in history where party allegiance is

3  flipped on the basis of race.  Can you explain what exactly

4  happened during that period in terms of racial party

5  preferences?

6  **A.**    Well, the '60s are really where the rubber meets the road

7  in terms of a national trend that's been in the making for a

8  couple of decades, where African-Americans at the national

9  level shift quite quickly and quite dramatically from the

10  Republican Party to the Democratic Party during the Roosevelt

11  area.

12      What needs to happen for that to have a demonstrable

13  effect on Georgia politics is for African-Americans in Georgia

14  to be able to cast ballots and mobilize.  That happens

15  dramatically in the 1960s because of the passage of federal

16  civil rights legislation.

17  **Q.**    And did that racial realignment have anything to do with

18  the party's positions on civil rights?

19  **A.**    Certainly.  You know, certainly in that time period you

20  have a raft of civil rights legislation, civil rights bills,

21  followed by the Voting Rights Act of 1965.  It certainly

22  matters that African-American votes in Georgia equate that

23  legislation with a Democratic president, a

24  Democratic-controlled Congress, and it certainly -- they

25  certainly notice when the Republicans nominated in 1964 one of

**Doc. 332**

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3

 4  ALPHA PHI ALPHA FRATERNITY,    )DAY 8 - A.M. SESSION
    INC., ET AL.,                  )
 5                  PLAINTIFFS,    )
                                   )DOCKET NO.1:21-CV-05337-SCJ
 6          -VS-                   )
                                   )
 7  BRAD RAFFENSPERGER,            )
                                   )
 8                  DEFENDANT.     )
    _____)
 9  COAKLEY PENDERGRASS,           )
    ET AL.,                        )
10                  PLAINTIFFS,    )
                                   )DOCKET NO. 1:21-CV-5339-SCJ
11          -VS-                   )
                                   )
12  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
13                  DEFENDANTS.    )
    _____)
14  ANNIE LOIS GRANT, ET AL.,      )
                                   )
15                  PLAINTIFFS,    )
                                   )DOCKET NO. 1:22-CV-00122-SCJ
16          -VS-                   )
                                   )
17  BRAD RAFFENSPERGER, ET AL.,    )
                                   )
18                  DEFENDANTS.    )
    _____)
19                   TRANSCRIPT OF BENCH TRIAL
20              BEFORE THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT JUDGE
21                THURSDAY, SEPTEMBER 14, 2023

22
             VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23      OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                   UNITED STATES DISTRICT COURT
24                      ATLANTA, GEORGIA
                         404-215-1479
25              VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

1          THE WITNESS:  I've spent a lifetime trying to

2   understand voting behavior and, I would never say something as

3   simple as that.  It's much more complicated than that.  So I'm

4   glad you asked this question, because it's often the source of

5   confusion here.

6          What I'm trying to address is what does the evidence

7   in this table tell us.  Does the evidence in this table tell

8   us why any particular voter might vote in a particular way?

9   No.  It does tell us -- what it does tell us is the party of

10  the candidate, party of the candidate is really important.

11         THE COURT:  But isn't there things that weigh into

12  it?  In other words, like what a particular party represents

13  and what particular voters are looking for in a candidate?  In

14  other words, you and I -- I mean, we're both of a similar age,

15  I'm older than you are, but I grew up in Georgia all my life.

16  And I remember there was a time in Georgia that they had what

17  they would call Yellow Dog Democrats; which means if this is a

18  Democrat, it's a yellow dog, they voted for him.  It didn't

19  make any difference.  You couldn't get elected in Georgia for

20  anything unless you were a Democrat.

21         But then it shifted.  But there are a lot of people

22  that vote Republican now who voted Democratic then.  But isn't

23  it sort of based on what you're looking for in a candidate?

24  In other words, if this candidate is saying things that you

25  believe in and that candidate happened to be a Republican,

1  you're going to vote Republican.  If this guy's saying things

2  you believe in and that person is a Democrat, you're going to

3  vote for the Democrat.

4          THE WITNESS:  I think that's -- again, voting

5  behavior is very complicated.  But I think you've hit on

6  exactly the right point.  So I also know something about

7  Georgia from that era.

8          THE COURT:  Yeah.

9          THE WITNESS:  And one of the things that has been

10 said here a few times is this is not Alabama.  This is also

11 not Georgia.  This is not Georgia in the 1960s; just, frankly,

12 it's not.

13         THE COURT:  That's true.

14         THE WITNESS:  And one of the things that I've noticed

15 about those voters at that time was it's true that the only

16 game in town was the Democratic Party.  Blacks voted

17 Democratic, whites voted Democratic, and nine times out of

18 ten, there was no Republican nominee at all.

19         THE COURT:  Well, see, up until about 1960, Blacks

20 voted heavily Republican in Georgia.  It may not have been

21 50/50, but it was probably more like 35, 40 percent maybe.

22         THE WITNESS:  So you hit it almost exactly -- almost

23 exactly on the mark.  So the majority of Black voters in

24 Georgia, if they got to vote, voted Democratic.  But a

25 substantial proportion, and you're right, about 35 to 40

1   percent.  So it's true, right, that there was some Republican

2   sentiment among Black voters, and that -- that sentiment has

3   evaporated over time.

4           THE COURT:  So could it be said that voters are not

5   necessarily voting for the party; they're voting for a person

6   that follows their philosophy or they think is going to

7   respond to their needs?

8           THE WITNESS:  That's -- with my view, that's what

9   democracy is about.  That's what's going on.  It is the case

10  that in the United States, unlike in most other democracies,

11  party identity is also really important, that we identify with

12  a party.  I always tell my students you can go into a first

13  grade class and you can hold a mock election.  They had one

14  when I was in first grade, and I was amazed to find out that

15  there were people in my class that were supporting Richard

16  Nixon.  And my best friend was supporting Richard Nixon, you

17  know, and I was not.  And I was devastated by that.

18          And I remember one of the things that the teacher

19  asked at the end was -- they asked the people who stood up to

20  represent the candidates, they said and why is it that you're

21  supporting Richard Nixon?  And the answer for a six-year-old

22  was because I like Richard Nixon.  I thought, boy, as a

23  political scientist, right, my favorite campaign slogan was, I

24  Like Ike.  My gosh, that was pretty much all that was there,

25  other than the fact that Ike was a Republican.

1          And so that party loyalty comes really early.  And

2     then we learn about politics and it may change, it may vary.

3     But what I love about this table is this table tells me that

4     Georgia is not the Georgia of 1960.  It, to me, says the

5     Voting Rights Act is maybe the most successful piece of social

6     legislation in the history of the world.

7          Because when you look at this table in 1960, the race

8     of the candidate matters a lot.  As the judges in Gingles

9     note, the race of the candidate matters.  It matters in the

10    primary, it matters in the general.  If we think that day is

11    gone, it's not.

12         I just read the plaintiffs' report on a case in

13    Baltimore and they do the racial polarized analysis, and they

14    show that the race of the candidate matters.  It matters so

15    much in the general elections that in the districts a white

16    Democrat will win and a Black Democrat will lose.  And the

17    polarization of the primary is 80/20, just as big as the

18    polarization in general.  It's possible, and we know in our

19    lifetime, that race can dominate.

20         And so what I'm saying in this table is not that race

21    has no influence, it's that this table, which would clearly

22    have showed that 20 years ago, might even show it in

23    Alabama -- I don't work in Alabama right now --

24         THE COURT:  You don't have to testify about anything

25    in Alabama.  Somebody asked me last night, they said Roll

1  analyzed across the areas of interest in Georgia, you agree

2  that, with small exceptions, white voters are highly cohesive;

3  right?

4  **A.**    Correct.

5  **Q.**    Okay.  And in the general elections that Dr. Handley

6  analyzed across the areas of interest in Georgia, generally

7  speaking, large majorities of Black and white voters are

8  supporting different candidates; right?

9  **A.**    Correct.

10  **Q.**    Do you agree that proving racially polarized voting does

11  not require proof of the cause of voter behavior in the

12  scientific sense of causation?

13          THE COURT:  Hold on.

14          MR. JACOUTOT:  I just would object that -- to the

15  extent he's asking for proving racially polarized voting in a

16  legal sense, I would object as it calls for a legal

17  conclusion.  I suppose if he wants to reshape or reform that

18  question to be more in the statistical sense or in the social

19  sciences sense, political science sense, that's fine.

20          MR. MILLER:  I'd be glad to rephrase, Your Honor.

21          THE COURT:  Rephrase.

22  BY MR. MILLER:

23  **Q.**    In your opinion, to conclude that racially polarized

24  voting exists, does that require proof of the cause of voter

25  behavior in the scientific sense of causation?

1  **A.**    No, it does not.

2  **Q.**    Okay.  And is that because it's actually not possible to

3  establish the cause of voter behavior with the data and

4  methods that statisticians and political scientists have

5  available today?

6  **A.**    I think it would -- with just the -- so there are

7  different kinds of data that are available.  So the kind of

8  data that we use here, which is, you know, ecological and

9  highly abstract data, cannot demonstrate cohesion in sort of

10 its natural form.

11       Much of the work on things like individual-level surveys,

12 exit polls, et cetera, also make it very difficult in a

13 non-experimental setting to demonstrate causation.  It really

14 takes an experimental setting.  So there is some work done in

15 experimental settings, but this is not an area of inquiry that

16 is -- scientific causation in the social sciences is very

17 difficult to establish.  This is not an area where there has

18 been any work that's established that.

19 **Q.**    And just to -- I apologize for interrupting you.  I think

20 you used the word "cohesion" in the first part of that.  You

21 were speaking to causation; is that correct?

22 **A.**    Yes.  Causation.

23 **Q.**    Okay.  And so because of those limitations, you have not

24 offered an opinion in this case as to the cause of Black

25 voters' behavior; correct?

1   **A.**   Correct.

2   **Q.**   Okay.  And in your report in this case, you've not

3   analyzed whether any state legislative district under the

4   illustrative or enacted plans that are at issue in this case,

5   create an opportunity for Black voters to elect the candidate

6   of their choice; right?

7   **A.**   I did not look at -- I didn't do any performance

8   analysis.

9   **Q.**   Okay.  And as you mentioned before, you've not analyzed

10  any of the Democratic -- you've not conducted -- excuse me.

11  Sorry.

12      You've not conducted a statistical analysis of any of the

13  Democratic primaries in Dr. Handley's area of interest; right?

14  **A.**   That's correct.

15  **Q.**   Okay.  And so you haven't offered an opinion in your

16  report in this case about whether primaries in those areas are

17  preventing Black-preferred candidates from being elected to

18  office in the areas that Dr. Handley analyzed; right?

19  **A.**   I'm not sure in exactly those words.  I don't believe the

20  Democratic primary is racially polarized voting, so if that's

21  -- you know, if that's what I conclude, I think that suggests

22  what you're saying, the Democratic primaries are not --

23  because they don't show racially polarized voting, are not --

24  as Dr. Handley concludes, not a barrier to the nomination of

25  Black candidates to these offices.

1  **Q.**    And in a -- in a primary election, the D and the R next

2  to the candidate's name is removed; right?

3  **A.**    It is -- in some states, it is.  It typically is removed

4  because of the fact that it is a Democratic or a Republican

5  primary.  If I'm recalling this correctly, I think there are

6  at least some places in which the party label is kept there

7  just to make it abundantly clear to voters who are sometimes

8  confused.

9      I was a poll assistant for a while in Iowa, and if a

10 person came back out of the polls and said I've always voted a

11 straight Democratic ticket, I'm trying to vote a straight

12 Democratic ticket and I can't find the -- and they've said,

13 well, it's a Democratic primary, they're all Democrats.  So

14 people can be confused about that.  Sometimes it's on the

15 ballot.  It's implied, so...

16 **Q.**    You agree that the cue of a candidate's party is not

17 present in a primary; correct?

18 **A.**    The ballot cue of party of the party -- variation of the

19 ballot cue party is not present in a primary.

20 **Q.**    Okay.  And by removing that cue, we're able to -- we're

21 able to help distinguish between the racial cues and partisan

22 cues that you have said are complicating the analysis of the

23 general elections; right?

24 **A.**    I don't think -- I don't think that the presence of both

25 of those cues in general elections complicates the analysis.

1   I think it's precisely the value of the analysis.  But, yeah,

2   the Democratic primary or the Republican primary provides an

3   opportunity to see how voters are voting when that party cue

4   at the candidate level is removed, and I think it's valuable.

5   **Q.**   Okay.  And I want to take a look at one of the primary

6   elections that Dr. Handley analyzed.  Do you have her report

7   available to you there?

8   **A.**   I do.

9           THE COURT:  Before we go into that, let's take a

10  break right here.

11          MR. MILLER:  Thank you, Your Honor.

12          THE COURT:  We'll start back at five to 11:00.

13          (Break taken from 10:39 a.m. to 10:50 a.m.)

14          THE COURT:  You can resume your cross.

15          MR. MILLER:  Thank you, Your Honor.

16  BY MR. MILLER:

17  **Q.**   Dr. Alford, before we took a break, I was asking if you

18  have Dr. Handley's report in front of you.  Do you?

19  **A.**   Yes.

20  **Q.**   Could you turn to -- this is APA Exhibit 5 for the

21  record.

22          Could you turn to page 64, please, which is Appendix C1

23  in the -- it shows a table of Democratic primaries and runoffs

24  in the Eastern Atlanta Metro region.

25          And I want to just zoom in on the commissioner of

1  insurance race between Cindy Zeldin and Janice Laws.  And you

2  discussed this contest in another area with Mr. Jacoutot

3  earlier; correct?

4  **A.**    Correct.

5  **Q.**    Okay.  And would you agree that in this contest, in this

6  area, Black voters cohesively supported Laws?

7  **A.**    That's fair.  A cohesive vote, yes.

8  **Q.**    And white voters cohesively supported Zeldin; correct?

9  **A.**    That's correct.

10 **Q.**    And the party cue that we were talking about earlier has

11 been removed in this contest; right?

12 **A.**    It's been set as D, as you can see from her column.

13 **Q.**    Okay.  And so partisanship is -- is not explaining the

14 polarization between Zeldin and Laws in this contest; right?

15 **A.**    To say we can diagnose from this table, you can't.

16 Because, again, the party label is the same for both

17 candidates.

18 **Q.**    Right.  So partisanship can't explain the degree of

19 polarization in this contest; right?

20 **A.**    We -- to the extent that this table tells us about it, it

21 cannot.  I can't say more broadly whether it explains it or

22 not, because we don't have evidence broadly about partisan --

23 the partisanship, the party identification, the party label of

24 the candidates does not explain this level of polarization.

25 **Q.**    All right.  And you would agree that this contest was

1  racially polarized; right?

2  **A.**    I would characterize this as racially polarized.

3  **Q.**    Okay.

4          MR. MILLER:  Let's pull this down, please.

5  BY MR. MILLER:

6  **Q.**    And we can turn to Defendants' Exhibit 8 at page 9.  And

7  this is your report, Dr. Alford.  The Republican primary

8  table.

9  **A.**    Yes.

10  **Q.**    So you mentioned earlier, Dr. Alford, the only EI

11  analysis your colleague looked at was of the 2022 Republican

12  primary for U.S. Senate in this region of Georgia; correct?

13  **A.**    Correct.

14  **Q.**    Okay.  And so you have not assessed or offered an opinion

15  or an analysis regarding any other Republican primary for any

16  of the other areas of Georgia that Dr. Handley analyzed;

17  correct?

18  **A.**    I believe I mention in the report that the ecological

19  inference analysis is not really necessary to establish what I

20  take to be the most important result of this table.  And we

21  discussed this a little bit earlier, but Herschel Walker is

22  the -- wins the majority -- outright majority of the vote in

23  every county in Georgia.  And so you don't need an ecological

24  inference analysis to say that Herschel Walker, the Black

25  candidate, was the candidate that won in every county in

1  Georgia.  So there is no county in Georgia in which the voting

2  in this primary was racially polarized.

3  **Q.**  So you testified at your deposition that for those

4  reasons there's no purpose to the inclusion of this EI

5  analysis in your report; right?

6  **A.**  I don't think it adds anything beyond what we can see,

7  again, from just the election results themselves.  They speak

8  for themselves.  Often that's not the case.  Obviously, we

9  don't -- we don't perform the racially polarized analysis for

10 no reason.  But sometimes the election result is so stark in

11 its result and in its distribution, its relatively flat

12 distribution across the state, that you -- you can't produce a

13 result other than the result that you see from simply looking

14 at the election result.

15 **Q.**  So when you're referring to what the election result as

16 compared to the EI analysis tells us, you're speaking about

17 the behavior of white voters; right?

18 **A.**  The election results cannot tell us whether Herschel

19 Walker was the preferred candidate of Black Republicans.  They

20 can tell us that white Republicans did not vote as a bloc to

21 defeat the candidacy of Herschel Walker.

22 **Q.**  Okay.  So the election results establish, in your

23 opinion, that Herschel Walker was the candidate of choice of

24 white voters, and those election results do not establish

25 whether Herschel Walker was the candidate of choice of Black

1  voters or of what is labeled here as other voters; correct?

2  **A.**    That's correct.

3  **Q.**    And with respect to the EI analysis that you have

4  produced here, the table estimates Black support for Walker at

5  62.4 percent; right?

6  **A.**    Correct.

7  **Q.**    Do you know the percentage of the Republican primary

8  electorate in this election in this area that was Black?

9  **A.**    I do not.

10  **Q.**    Okay.  Would you estimate that it was very small, though?

11  **A.**    In general, Black participation involving primary voting

12  in modern times is small.

13  **Q.**    Okay.  And you had testified before that it was very

14  small; right?

15  **A.**    Very small.

16  **Q.**    Okay.  And you testified previously that you think it's

17  less than 5 percent of the participants in this election;

18  right?

19  **A.**    I would think that's probably a reasonable estimate for

20  -- for this part of Georgia.

21  **Q.**    Okay.  And you agree that a minority group making up less

22  than 5 percent of the electorate in a contest would not

23  typically be sufficiently large to produce reliable EI

24  estimates; right?

25  **A.**    It's typically the case.  It's -- not because of the size

1   of the voting group, but because the distribution of the group

2   across precincts would be insufficient to produce reliable

3   estimates.  And the guide here would be the confidence

4   intervals.

5   **Q.**   Right.  And so you didn't look at whether the share of

6   voters that were identifying as Black or other vary between

7   precincts in this region; correct?

8   **A.**   I didn't look at that underlying characteristic.  I

9   simply look at the confidence intervals.  And the confidence

10  intervals tell us that, within the precision we need, which is

11  to establish whether, in fact, Herschel Walker was the

12  preferred candidate or even the majority candidate, the

13  confidence intervals there, again, it is at 10 percent

14  intervals, so it's somewhat wide, but it doesn't include any

15  value below 50 percent.  So EI is capable of making this

16  estimate and making it with that level of precision.

17  **Q.**   So to be clear, you've testified that when a minority

18  group makes up less than 5 percent of an electorate, it's

19  typically too small to produce reliable EI estimates, but you

20  do not agree that the EI estimates for Black voters are

21  unreliable in this table.

22  **A.**   That's correct.  So, again, I would say typically you

23  would not be able to make that estimate with this level of

24  confidence.  But both because that level is sufficiently above

25  50 percent at 62.4 and because the variability here is fairly

1   narrow, it's not at all uncommon to see -- for estimates that

2   are difficult to make, to see confidence intervals that range

3   from 20 percent to 80 percent, where we really can't say much

4   about it.  But we have confidence intervals there, diagnostic,

5   that tells us what EI was able to make -- how confident or how

6   stable the -- the -- basically, the priors for probability

7   were within this particular topography of data.  That's what

8   -- the confidence intervals are actually credible intervals,

9   but that's what they're for.

10  **Q.**   Okay.  So I just want to return to something that you

11  spoke with about -- that you spoke with the judge about

12  earlier, the relationship between race and party.

13       You agree that polarization in an election may reflect

14  race and something else; right?

15  **A.**   Yes.

16  **Q.**   Okay.  And polarization can reflect partisanship and

17  something else; right?

18  **A.**   Yes.

19  **Q.**   Okay.  And you agree that it's possible, as you discussed

20  with the judge, for political affiliation to be motivated by

21  race; right?

22  **A.**   Yes.

23  **Q.**   Okay.  All right.  Just a few more questions.

24       So you've testified in other cases --

25            MR. MILLER:  Oh, and excuse me.  Your Honor, for this

1  portion of my examination, I'll be asking questions for the

2  three cases again.

3          THE COURT:  Okay.

4          MR. MILLER:  Thank you.

5  BY MR. MILLER:

6  **Q.**    So, Dr. Alford, you've testified in other cases that

7  party affiliation rather than race is the -- is driving

8  polarization like that observed here; correct?

9  **A.**    Again, we're not measuring voter partisanship, but to the

10  extent that we can draw a conclusion from the information we

11  have, the information we have would suggest that this

12  polarization, this high level of polarization is associated

13  with probably one of the most observed transit American

14  political behavior in the last 50 years, which is the

15  remarkable level of partisan polarization in the electorate.

16  **Q.**    And for about 20 of those 50 years, courts have rejected

17  your opinion about this matter more often than not; correct?

18  **A.**    I -- I would say most -- not all, but most of the time my

19  view is that the courts accepted the analysis, the data and

20  the facts that I presented, but had a different view of the

21  legal implication of those facts, which is, I think, exactly

22  the right division of labor.  I do the easy stuff.  I just do

23  EI RxC.  And then the Court tries to figure out, you know,

24  this apportionment or something hopelessly complex like that.

25          So I would say I've been in court where the judge has

# Doc. 357-9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY INC., et al.;

     *Plaintiffs*,

     vs.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia.

     *Defendant*.

Case No. 1:21-cv-05337-SCJ

## EXPERT REPORT OF
## DR. ADRIENNE JONES

**December 5, 2022**

1



APA Exhibit
**002**
Case No. 1:21-cv-5337-SCJ

montage of Biden, Harris, Abrams and Warnock with soundbites of their statements about race and racism.  The montage footage appears through a black and white filter.  The montage of Dems gives way to a steady one shot of Walker in unfiltered color.[283]  Walker contrasts himself with Warnock,

> "Senator Warnock thinks that America is a racist country full of racist people. I think America is a great country with generous people… Warnock wants to divide us, I want to bring us together."[284]

The ad simultaneously focuses entirely on Warnock's race and suggests that discussing racism is anti-American.[285]  NBC News reported that "[a] Republican source said the ad isn't designed to appeal to Black voters: It's aimed at white voters — especially those white swing voters who stayed home or voted Democratic in the 2020 presidential race and the 2021 Senate runoff elections, both of which Republicans lost."[286] The Republic source said that the ad "is about a permission structure for white swings. That's where we're going to win or lose."[287]

It also echoes Perdue's campaign rally attack on Abrams – a candidate was attacked as an outsider and divider, and not a good Georgian, because they are Black and condemned racism.

These examples show that racial appeals and commentary—both explicit and subtle—continue to play an important role in political campaigns in Georgia.

### III.  Black Georgians Have Historically Been Underrepresented in Public Office and That Underrepresentation Persists Today, Particularly in Areas that are the Focus of the Lawsuit (Factor 7).

Senate Factor 7 is the "extent to which members of the minority group have been elected to public office in the jurisdiction," the state of Georgia.

Black Georgians have been and continue to be underrepresented in public office. Despite persistently making up a significant portion of the state population, Black Georgians have faced barriers to being elected to public office, both historically and contemporarily. There are, moreover, areas in the state, including areas at issue in this lawsuit, that have not elected any Black officials to the Georgia Assembly in at least the last two decades.

The state has sent very few Black elected officials to the U.S. Congress. During the state's history, spanning over 200 years, there have only been twelve Black members of Congress elected from the state of Georgia (11 to the House of Representatives, 1 to the U.S. Senate). Until 1972, there had only been one Black candidate elected to the U.S. Congress from Georgia,

---

[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] Marc Caputo &Henry J. Gomez, "Walker downplays racism in historic Georgia Senate campaign while casting Warnock as divisive", *NBC News*, September 8, 2022, https://www.nbcnews.com/politics/2022-election/walker-downplays-racism-historic-georgia-senate-campaign-casting-warno-rcna46872.
[287] *Id.*

44

Jefferson Franklin Long. His tenure was short, spanning just three months in 1871. Between 1965 and 2021, out of the 365 total seats in the U.S. Congress allocated to Georgia, only 12, or 3.28%, have been occupied by Black officials. Raphael Warnock was the first Black person to represent Georgia in the U.S. Senate. Warnock was elected in 2020, a year when voting access was substantially expanded to make voting accessible despite the COVID pandemic.

At the state level, only two Black people have been elected to non-judicial statewide office in Georgia's entire 233 years: Labor Commissioner Mike Thurmond in 2002 and 2006 and former Attorney General Thurbert Baker in 1998, 2002, and 2006.[288] Georgia has never had a Black Governor[289]or Lieutenant Governor.[290]

Judge Robert Benham of the Georgia Court of Appeals was the first Black person ever elected to a statewide office in Georgia in 1984, but as is the case with the election of almost all appellate judges in Georgia, he had been first appointed to the position by the Governor, before running for, and winning election, to retain his seat.[291] While statewide judge positions in Georgia are formally selected by non-partisan election,[292] in practice the overwhelming majority of positions are filled by people who were appointed to an interim vacancy on the bench. Between 1964-2004, that was true for 91% of Georgia state supreme court justices.[293]

In the state capitol, as of 2022, there are 16 Black State Senators in Georgia out of 56 State Senate districts, meaning Black Senators make up 28.57% of the State Senate.[294] In the Georgia State House, there are 54 Black State Representatives out of 180 districts, meaning Black

[288] Order, *Fair Fight Action, Inc. v. Raffensperger*, 18-cv-05391-SCJ (N.D. Ga. Nov. 15, 2021), ECF No. at 636. *See also* Euell A. Nielsen, "Thurbert Earl Baker," BlackPast.org, September 26, 2020, https://www.blackpast.org/african-american-history/thurbert-earl-baker-1952/; History, Office of the Att'y Gen., https://law.georgia.gov/about-us/history (last visited Jan. 4, 2022).  History, Office of the Att'y Gen., https://law.georgia.gov/about-us/history (last visited Dec. 4, 2022).
[289] *See* Asma Khalid, "50 States And No Black Governors, But That Could Change In 2018," *NPR*, May 18, 2018, https://www.npr.org/2018/05/18/611783940/50-states-and-no-black-governors-but-that-could-change-in-2018.
[290] *See* Yussuf Simmonds, "African American Lieutenant Governors," *Los Angeles Sentinel*, April 6, 2009, https://lasentinel.net/african-american-lieutenant-governors.html; Scott Buchanan, "Lieutenant Governor," in *New Georgia Encyclopedia*, last modified Aug. 21, 2020. https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system.
[291] "Black Judge Wins Georgia Election," *The New York Times,* August 16, 1984, https://www.nytimes.com/1984/08/16/us/black-judge-wins-georgia-election.html.
[292] Hon. Diane Johnsen, Building a Bench: A Close Look at State Appellate Courts Constructed by the Respective Methods of Judicial Selection, 53 San Diego L. Rev. 829, 850 (2016).
[293]Kate Berry &Cathleen Lisk, *Appointed and Advantaged: How Interim Vacancies Shape State Courts,* 2017, https://www.brennancenter.org/sites/default/files/analysis/Appointed_and_Advantaged_How_Interim_Appointments_Shape_State_Courts.pdf.
[294] Georgia State Senate elections, 2022, Ballotpedia, https://ballotpedia.org/Georgia_State_Senate_elections,_2022; *see also* Carl Smith, "Blacks in State Legislatures: A State-by-State Map", *Governing* (blog), January 13, 2021,  https://www.governing.com/now/blacks-in-state-legislatures-a-state-by-state-map.html (accurate through 2021)

APA EXHIBIT 002, page 45 of 92

Representatives make up 30% of the State House.[295] According to the 2020 census, Georgia is 33% Black.[296]

The 3% gap between the percentage of Black State Representatives and the Black population is significant.  3% of Georgia's population of 10,711,908 is 321,357 people, or the equivalent of more than 5 state house districts.[297] So, too, with the 4.43% gap between the percentage of Black Senators and the Black population. 4.43% of the population is 474,537 people, or the equivalent of several senate districts.[298]

Among Black candidates who were elected to the General Assembly in 2020, all were elected in districts where the percentage of registered voters who are white is under 54.9%, with the vast majority elected from districts where the percentage of registered voters who are white is under 40%.[299]

**House**

| | Race of winning candidate | | | | |
|---|---|---|---|---|---|
| % of Registered voters who are white | White | Black | Asian | Latinx | Total |
| Under 40.0 | 7 | 48 | 3 | 2 | 60 |
| 40.0-46.2 | 3 | 3 | 0 | 0 | 6 |
| 46.3-54.9 | 17 | 1 | 0 | 0 | 18 |
| 55.0-62.4 | 28 | 0 | 0 | 0 | 28 |
| Over 62.4 | 68 | 0 | 0 | 0 | 68 |
| Total | 123 | 52 | 3 | 2 | 180 |
| | | | | | |
| | Race of Winning Candidate | | | | |
| % of Registered voters who are white | White | Black | Asian | Latinx | Total |
| Under 50.0 | 16 | 51 | 3 | 2 | 72 |
| Over 50.0 | 107 | 1 | 0 | 0 | 108 |
| Total | 123 | 52 | 3 | 2 | 180 |

[295] Georgia House of Representatives elections, 2022, Ballotpedia, https://ballotpedia.org/Georgia_House_of_Representatives_elections,_2022. See also, Smith, *supra* note 289.
[296] U.S. Census Bureau, "Georgia Among Top Five Population Gainers Last Decade", Census.gov, last accessed January 1, 2022, https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.
[297] EX B. at 5 (identifying population range for 2021 House districts as 58,678 to 60,308).
[298] Ex. A at 5 (identifying population range for 2021 Senate districts as 189,320 to 193,163
[299], John Greenbaum, Jason Enos, and Divya Korada, "The Central Role of Racial Demographics in Georgia Elections", Lawyers' Committee for Civil Rights Under Law, May 2021, https://lawyerscommittee.org/wp-content/uploads/2021/05/Final_Georgia-Redistricting-Report-1-1.pdf.

46

**Senate**

| % of Registered voters who are white | Race of Winning Candidate | | | | |
|---|---|---|---|---|---|
| | White | Black | Asian | Latinx | Total |
| Under 47.0 | 1 | 16 | 2 | 0 | 19 |
| 47.0-54.9 | 6 | 0 | 0 | 0 | 6 |
| 55.0 and above | 31 | 0 | 0 | 0 | 31 |
| Total | 38 | 16 | 1 | 0 | 56 |

The state parties too, historically and today, are divided by race. Since 1908, when the last Black person to be elected as part of the Reconstruction era left office, the Republican Party has only elected two Black people to the Georgia Assembly.[300] And up until 1963, the Democratic Party had never elected a Black member to the Georgia Assembly.[301] Between 2000-2020, 59% of Democratic Party elected officials were Black. A mere 0.5% of Republican Party elected officials have been Black. The 2020 election shows this racial division in parties continues for state legislative races: Of the 138 seats that the Republicans secured, 0 were won by Black legislators; of the 99 the Democratic party secured, 68 of them went to Black candidates.[302] The exclusion of Black participation in the General Assembly is not unique to one party, but at all times only one party has elected Black officials. Black representation and influence are necessarily stymied because only one party appears to be open.

I specifically analyzed certain areas of focus in this litigation, namely 3 Senate districts (16, 17, 23) and 10 House districts (74, 117, 124, 133, 134, 171, 173, 144, 145, 149), in the enacted plan to determine whether Black candidates have been elected to represent the areas represented in the districts, over the last 20 years. The districts I discuss here were identified for me by counsel. Because district boundaries (and their numbering) have changed over this period, I received from Bill Cooper, another expert, information that allowed me to identify for each enacted district, the numbers of the historic districts that in each previous districting plan covered the same geographic area that falls within the boundaries of a particular enacted district. For the Senate Districts, I identified which historic districts were part of the enacted Senate District in 2002, 2004, 2006, 2012, and 2014. For the House Districts, I identified which historic districts were part of the enacted House District in 2002, 2004, 2012, and 2015. He also produced maps to visually show this information. The information produced by Bill Cooper, and provided to me, is attached as exhibits to his report.[303]

---

[300] KlarnerPolitics, "Dr. Carl E. Klarner - Biography & CV," 2018. https://www.klarnerpolitics.org/bio-1; Robert A. Holmes, "The Georgia Legislative Black Caucus: An Analysis of a Racial Legislative Subgroup", Sage Journal of Black Studies, Vol. 30 No. 6, July 2000 768-790; Fort Valley State University, "Alumni Profile: Willie Lee Talton: GA's first black Republican legislator since Reconstruction", https://www.fvsu.edu/news/alumni-profile-willie-lee-talton (describing Talton as the first Black Republican elected to the Georgia legislature since Reconstruction when he was elected in 2005).
[301] Robert A. Holmes, "The Georgia Legislative Black Caucus: An Analysis of a Racial Legislative Subgroup", Sage Journal of Black Studies, Vol. 30 No. 6, July 2000 768-790.
[302] KlarnerPolitics, "Dr. Carl E. Klarner - Biography & CV," 2018, https://www.klarnerpolitics.org/bio-1.
[303] Georgia General Assembly, "Legislative and Congressional Reapportionment Office", 2022, https://www.legis.ga.gov/joint-office/reapportionment; *see also* Exhibit A.

47

After I identified all of the historic districts I would need to look up, and for which years, I turned to identifying whether Black people had been elected in these districts. Using a database compiled by Carl Klarner, a political scientist who specializes in state legislative elections,[304] I identified the winner of each of the relevant state senate and house elections between 2002-2022 and the race of the winning candidate, in the geographical areas covered in the enacted plan. For the 2002-2020 elections this information was included in the Klarner database. For the 2022 elections I used Georgia's Secretary of State Election results reporting.[305] I created a table of this information, attached here as Exhibit A.

Based on my analysis, I conclude that each of the enacted plan districts evaluated are comprised of large geographical areas that have not elected a Black candidate to the General Assembly for at least the last two decades. I have limited this part of my evaluation to the past 20 years because that is the period for which Bill Cooper was able to create the district equivalency files.

The following summarizes my findings:

**HD 171 & HD 173**

HD 171 includes Decatur County and portions of Mitchell and Grady counties that have not elected any Black representatives to the House in at least 20 years. The same is true of HD 173, which includes portions of Thomas and Grady counties that have not elected any Black representatives to the House in at least two decades.



[304] KlarnerPolitics, "Dr. Carl E. Klarner - Biography & CV," 2018, https://www.klarnerpolitics.org/bio-1
[305] *Nov. 8, 2022*, Georgia Sec. of State, https://results.enr.clarityelections.com/GA/115465/web.307039/#/summary; *see also* Georgia State Senate elections, 2022, Ballotpedia, https://ballotpedia.org/Georgia_State_Senate_elections,_2022; Georgia House of Representatives elections, 2022, Ballotpedia, https://ballotpedia.org/Georgia_House_of_Representatives_elections,_2022

48

## HD 133 & HD 149

HD 133 includes portions of Jones and Baldwin counties that have not elected any Black representatives to the House in at least 20 years. (There is one very small exception: in 2002, less than 1% of people over 18 were in another district that in 2002 elected a Black person.)

The areas encompassed in HD 149, which includes Wilkinson, Twiggs, Bleckley, and Dodge counties, as well as part of Telfair counties, have also not elected a Black representative to the House in at least two decades.



## HD 124

HD 124 includes Oglethorpe, Greene, and Taliaferro counties, and as part of Putnam County, that has not elected any Black representatives in at least 20 years. There is one very small exception to this conclusion: a piece of the north east corner of Clarke County that has been included in enacted HD 124, was included in a different district from 2006-2010 (just 1.6% of people over 18), and that former district did elect a Black representative during those years.



49

| **House 2021** | **Senate 2021** |
|---|---|



HD 134 includes portions of Spalding, Lamar, and Monroe counties that have not elected any Black representatives in at least 20 years.

HD 74 includes portions of Fayette, Spalding, and Henry Counties that have not elected any Black representatives in at least 15 years. HD 74 also includes a portion of Henry County that, as part of a different district that included Clayton County, elected a Black candidate in 2006, thus that portion has not elected any Black representatives in the past 13 years. And HD 74 includes a portion of Fayette County that, as part of a different district, elected a Black candidate in 2002, thus that portion has not elected any Black representatives in the past 18 years.

HD 117 includes a portion of Henry County and Spalding County that has elected few Black representatives to the House in at least 20 years. Portions of enacted HD 117 were part of different districts, and in five elections those districts elected a Black representative. Some of these prior districts had very little overlap with enacted HD 117--two of the districts that elected a Black representative had less than 3% of the over 18 population overlap.

SD 16 includes Spalding, Pike, Lamar, and part of Fayette Counties, the vast majority of which has not elected a Black candidate to the state Senate in at least 20 years. A small portion of Fayette County that is in enacted SD 16 was previously combined with part of Clayton County as part of former SD 34 (less than 10% of people over 18), which has elected a Black candidate. SD 17 includes Morgan County, as well as parts of Henry, Newton, and Walton Counties, the vast majority of which has not elected any Black candidates to the state in at least 20 years. A part of Henry County that is included in SD 17 was from part of former SD 10, which was made up of DeKalb and Henry Counties, and elected a Black state senator. A very small portion of enacted SD 17 that was previously part of SD 43 (less than 5% of people over 18) previously elected a Black representative as part of SD 43.

50

## HD 144

HD 144 includes an area with portions of Monroe, Jones, and Bibb County that has not elected any Black representatives to the House for at least two decades.



## HD 145

HD 145 includes portions of Crawford, Peach, Bibb, Houston, and Monroe Counties. Most of which has not elected Black representatives for 20 years. The finger of what is now HD 145 in Houston County was part of a different districts that from 2004-2012 elected a Black Representatives. In 2002, a small number--7.25% of people over 18--of what is now 145 were in a different district that elected a Black representative. In two other areas that had an overlap of less than 2% (in one case 0.05%) Black candidates were elected.



## SD 23

SD 23 includes Taliaferro, Warren, McDuffie, Glascock, Jefferson, Burke, Emanuel, Jenkins, and Screven Counties, as well as portions of Columbia and Richmond Counties, almost all of which have not elected Black candidates in at least 20 years. The small area of Richmond County between the border of enacted 22 and the border of Richmond County was part of SD 22 in the 2012-2020 map (less then 1% of people over 18), and SD 22 has elected Black state senators.



51

**CONCLUSION**

Historically, and contemporarily, Black Georgians have had poorer treatment, and less access to the franchise and elected office. Blacks Georgians have not been elected to the degree that they would have (based on the population of the state historically and today) if they had equal and fair access to the state's electoral system.

***

I reserve the right to modify and/or supplement my opinions, as well as to offer new opinions.[306]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted and executed on <u>December 5, 2022</u>.

_____
Adrienne Jones, Ph.D., J.D.

---

[306] This includes supplementing to incorporate information from the ongoing 2022 election cycle.

52

# Doc. 357-11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY INC., et al.;

      *Plaintiffs*,

      vs.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia.

      *Defendant*.

Case No. 1:21-cv-05337-SCJ

## EXPERT REPORT OF DR. JASON MORGAN WARD



APA Exhibit

**004**

Case No. 1:21-cv-5337-SCJ

competitive metropolitan counties where conflicts over redistricting and voting laws are increasingly pivotal.

Through this era of demographic and political transformation, the most reliable factor at play in redistricting plans has been race. This conclusion is borne out by the 2020 election results, when Georgia House and Senate districts with solid majorities of white registered voters (55% or greater) elected white Republicans in 122 out of 127 total races. In the same cycle, House districts with a percentage of white registered voters less than 40%, and Senate districts with a white percentage of registered voters lower than 47%, elected only Democrats.[65]

The strong correlation between racial demographics and election results is consistent with Georgia's post-Civil War history. Despite the dynamic reemergence of two-party politics in the late twentieth century, and the uneven yet steady drift of white support from Democratic to Republican candidates, white Georgians have spent relatively little of the state's modern history split evenly between two parties. Henry Grady's 1888 prediction that a voting Black minority would dominate a "divided" white majority never materialized, in part because white Georgians have consistently demonstrated an overwhelmingly preference for the political party that draws little to no support from Black voters.[66] From the Democratic "white man's party" of the Jim Crow era to the overwhelmingly white GOP of recent decades, race has been the most consistent predictor of partisan preference in Georgia. That historical and contemporary reality incentivizes not only policies that dilute voting strength by race, but also appeals and actions informed by racial stereotypes and resentments.


### Racial Appeals, Voter Suppression, and Twenty-First Century Political Violence

Redistricting remained a powerful tool for voter dilution in the twenty-first century, but the Supreme Court's decision in *Shelby v. Holder* (2013) invalidating Section 5's coverage formula also opened the door for increased voter restrictions. By striking down the criterion utilized to identify which jurisdictions must seek preclearance before altering their voting laws, the Court effectively freed those areas from federal review of those changes. In the nine years since *Shelby*, Georgia officials enacted several measures, from changes to election dates and precinct locations to voter identification requirements and voter purges, that would have been more difficult to enact before the *Shelby* decision. Indeed, some of these tactics more closely resemble suppression tactics from the Jim Crow era—voter purges and challenges, in particular—than the disfranchisement practices later targeted by the Voting Rights Act and other civil rights legislation in the 1950s and 1960s.

The rationale for these measures, which focuses on election fraud, traded in rhetoric that resonates with disfranchisement arguments of the past. For example, Richmond County legislator Sue Burmeister, an early and enthusiastic backer of voter identification measures, complained in 2005 that Black voters in her district's Black-majority precincts only showed up when they were "paid to vote."[67] As in previous generations, while these measures remain race neutral on their face, their true impact is revealed, in part, by the racial appeals their supporters use to defend them.

---

[65] Lawyers' Committee for Civil Rights Under Law, *The Central Role of Racial Demographics in Georgia Elections*, May 2021, 10.
[66] *Life and Labors of Henry W. Grady*, 296-7.
[67] Anderson, *One Person, No Vote,* 60

22

Nathan Deal, a former Democratic congressman turned Republican gubernatorial candidate, ridiculed criticism of voter ID measures as "the complaints of the ghetto grandmothers who didn't have birth certificates" during his successful run for governor in 2009.[68]

Backers of voting restrictions also kept alive longstanding arguments about civic fitness and "education." The year after the *Shelby* decision, DeKalb County representative Fran Millar criticized Sunday voting at a mall "dominated by African American shoppers and…near several large African American mega churches." Aiming his comments at the south end of a metropolitan county transformed by Black suburbanization and immigration, Millar announced on social media, "I would prefer more educated voters than a greater increase in the number of voters."[69]

The voter suppression campaign that picked up momentum in the wake of *Shelby* ran headlong into cultural and racial conflicts fueled by other demographic changes. While Georgia's Black population has grown significantly since 1980—after several decades of stagnation due to outmigration—other racial and ethnic minority populations have grown faster. Many have taken advantage of the state's changing demography to promote fears of white decline. Responding to the demographic transformations that have reshaped Georgia into the South's most multicultural and metropolitan state, some gubernatorial candidates melded rhetoric of imperiled heritage, illegal immigration, and voter fraud into a potent blend. Most vocal was Michael Williams, a Forsyth County legislator who toured the state in a "deportation bus" and pledged to fight "liberal cities" on immigration policies. Appealing to broader anxieties about social and cultural change, Williams also made the protection of the 1,700-foot high bas-relief sculpture at Stone Mountain, Georgia—the largest Confederate monument in the world—one of his key issues.[70]

For constituents who feel under siege in an era of tremendous demographic and cultural change, these racial appeals fuel support for a slew of strategies designed to preserve their political power and advantage. As in previous generations, those tactics are racial but also spatial, as former President Trump's attacks on Atlanta officials and voters bear out. From his 2017 attack on voting rights icon John L. Lewis' "crime infested" congressional district to unsubstantiated claims that Fulton County election officials fabricated tens of thousands of ballots, shredded "thousands and thousands" more, and forged "at least a couple hundred thousand" absentee ballot signatures in the 2020 presidential election, Trump revived an age-old tactic of targeting urban Georgia—and urban Georgians—as uniquely unfit for governance.[71]

These claims matter because they demonstrate the historical link between voter suppression and political violence. To an extent not seen since the Reconstruction era, allegations of voter fraud and electoral corruption aimed primarily at Atlanta and metropolitan areas fueled the threat of political bloodshed.[72] Hundreds of armed rioters, including a Georgia-born man who entered the

---

[68] Aaron Gould Sheinin, "Deal Apologizes for 'Ghetto' Remark," *Atlanta Journal-Constitution,* 6 October 2009.

[69] Hunter Schwarz, "Georgia State Senator Upset Over Efforts to Increase Voter Turnout in Black, Democratic Area," *Washington Post,* 10 September 2014.

[70] Molly Olmstead, "Georgia Gubernatorial Candidate Begins 'Deportation Bus' Tour With Promise to 'Fill This Bus With Illegals'," *Slate*, 16 May 2018.

[71] Christina Walker and Amy Laporte, "Reality Check: Trump says Atlanta is 'falling apart' and 'crime infested'," *CNN,* 16 January 2017; Hope Yen, Jeff Amy, and Michael Balsamo, "AP FACT CHECK: Trump's Made-Up Claims of Fake Georgia Votes," *Associated Press,* 3 January 2021.

[72] Quinn Owen, "Oath Keepers Discussed Possibility of 'Blood in the Streets' on Jan. 6, FBI Agent Testifies," *ABC News,* 13 October 2022.

23

Senate Chamber with zip ties, a Henry County man who threatened Capitol police with death, and a Cobb County woman who died in the crowd crush, believed themselves to be part of a patriotic attempt to save their country. "We occupied the Capitol and shut down the Government," bragged an attorney from Sumter County. "We shut down their stolen election shenanigans."[73]

With the violent response to the 2020 election results, and the claims of malfeasance and corruption in Georgia as pretext, diehard supporters of voter restrictions redoubled their efforts. In early 2021, Columbia County state representative Barry Fleming introduced House Bill 531, which ramped up restrictions on absentee ballots, early voting, and ballot drop boxes. These restrictions included restrictions on Sunday voting options that have historically boosted Black voter turnout.[74] Large portions of this bill were later incorporated into Senate Bill 202, a sweeping piece of legislation that was passed by the legislature and signed by the Governor in March of 2021.

That the renewed push for voting restrictions followed the most serious threat to a national election in more than a century demonstrates the ongoing link between racial appeals, voter intimidation, and policies that depress and dilute minority voting strength. The current redistricting effort must be understood not only in the context of Georgia's longstanding history of racial violence, voter intimidation, and racial appeals, but also in the immediate context of an accelerated assault on voting rights.


## V. CONCLUSION

Racial intimidation of and violence against Black voters has a long history in Georgia, and no state has fought harder to limit the franchise since Reconstruction. Political campaigns in the state, as well as advocacy for voter restrictions by elected officials, have consistently relied on overt and subtle racial appeals to mobilize support. Historically, the politics of voting rights in Georgia has pitted state against nation, and rural against urban.

While no state has been more comprehensive and consistent in the use of voter suppression measures, the erosion of Black political power via redistricting and various forms of voter dilution has increased in strategic importance even as other disfranchisement tactics have been eliminated. The strong correlation between race and party preference throughout Georgia's modern history has incentivized voter dilution tactics that disproportionately harm Black voters.

Furthermore, the racial and spatial nature of voter suppression in Georgia has relied consistently on a language and logic that equates Black politics with urban politics, malfeasance, and corruption. Consequently, Georgia politics has been marred by violence, intimidation, and volatile racial appeals from Reconstruction to the present.

---

[73] Associated Press, "Georgia Man Arrested in Connection With Capitol Riot," *US News and World Report*, 18 February 2021
[74] Ben Nadler and Anila Yoganathan, "Georgia House Passes GOP Bill Rolling Back Voting Access," *Associated Press,* 1 March 2021.

24

I reserve the right to modify and/or supplement my opinions, as well as to offer new opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted and executed on December 5, 2022.

_____
Dr. Jason Morgan Ward

25

**Doc. 357-12**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY INC., et al.;

      *Plaintiffs*,

      vs.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia.

      *Defendant*.

Case No. 1:21-cv-05337-SCJ

## <u>EXPERT REPORT OF DR. LISA HANDLEY</u>

**December 23, 2022**



| Area of Interest | Illustrative Districts | Adopted Districts | Counties |
|---|---|---|---|
| East Central Georgia with Augusta (Map 3) | **22** **23** **26** 44 | **22** 23 25 **26** | Baldwin, Bibb, Burke, Butts, Columbia, Emanuel, Glascock, Hancock, Henry, Houston, Jasper, Jefferson, Jenkins, Johnson, Jones, Lamar, McDuffie, Monroe, Morgan, Putnam, Richmond, Screven, Taliaferro, Twiggs, Walton, Warren, Washington, Wilkes, Wilkinson |
| **State House Districts** | | | |
| Southeastern Atlanta Metro Region (Map 4) | **74** **75** **78** **115** **116** **117** 118 134 135 | 74 **75** **78** **115** **116** 117 118 134 135 | Butts, Clayton, Fayette, Henry, Jasper, Lamar, Monroe, Pike, Putnam, Spalding, Upson |
| Central Georgia (Map 5) | **128** **133** 144 155 | **128** 133 149 155 | Baldwin, Bibb, Bleckley, Dodge, Glascock, Hancock, Jefferson, Johnson, Jones, Laurens, McDuffie, Taliaferro, Telfair, Twiggs, Warren, Washington, Wilkes, Wilkinson |
| Southwest Georgia (Map 6) | 152 **153** **171** 172 173 | 152 **153** 171 172 173 | Colquitt, Cook, Decatur, Dougherty, Grady, Lee, Mitchell, Seminole, Stewart, Terrell, Thomas, Tift, Webster, Worth |
| Macon Region (Map 7) | **142** **143** **145** | **142** **143** 145 | Bibb, Crawford, Houston, Peach, Twiggs |

## IV. Voting is Racially Polarized in the Seven Areas of Georgia Analyzed

Voting is racially polarized in all seven areas of Georgia that I examined. In all 16 of the recent general and general runoff elections I analyzed (including the two elections that included Jon Ossoff), Black voters were cohesive in supporting their preferred candidates in these areas. And in all 16 of these elections, White voters bloc voted against the candidates preferred by Black voters. In other words, in every recent general election contest that included a Black candidate, in

8

all seven of the areas studied, voting was racially polarized. The results of my analysis of statewide general and runoff elections by area of interest can be found in Appendices A1-A7, with a separate appendix for each area of interest.

Overall, the average percentage of Black vote for the 16 Black-preferred candidates is 96.1%. The average percentage of White vote for these 16 Black-preferred candidates across the seven areas is 11.2%. (When Ossoff is excluded, and only Black-preferred Black candidates are considered, the average White vote is slightly lower: 11.1%.) The highest average White vote for any of the 16 candidates is 14.4% for Raphael Warnock in his 2022 general election bid for re-election. While the percentage of White support for candidates preferred by Black voters varies across the areas, in five of the seven areas the average did not even reach 10%. White crossover voting was the highest in the Eastern Atlanta Metro Region (Map 1), but only about one third of White voters typically supported the Black-preferred Black candidates in this area.

Nearly every one of the 54 of the state legislative elections analyzed (53 of the 54 contests, or 98.1%) was racially polarized. The estimates of Black and White support for the state legislative candidates in these contests analyzed can be found in Appendices B1 (State Senate) and B2 (State House). Black voters were quite cohesive in supporting Black candidates in these state legislative contests: on average, 97.4% of Black voters supported their preferred Black state senate candidates, and 91.5% supported their preferred Black state house candidate. Very few White voters supported these candidates, however: Black-preferred Black state senate candidates garnered, on average, 10.1% of the White vote; Black-preferred Black state house candidates received, on average, 9.8% of the White vote. All but one of the successful Black state legislative candidates in contests analyzed for this report were elected from majority Black districts; the one exception was elected from a district that was majority minority in composition.[16]

My conclusion that voting is racially polarized in the seven areas of interest in Georgia rests on the results of my analysis of voting patterns in recent general and runoff elections – both

---

[16] Black-preferred Black candidates won state legislative contests in majority Black State Senate Districts 22 (2022), 34 (2022 and 2018), 41 (2022), and 43 (2022 and 2016); and in State House Districts 63 (2020), 75 (2022), 111 (2018), 116 (2022), 126 (2018), 128 (2018) and 153 (2022). The only district that elected a Black-preferred Black candidate that was not majority Black was District 109 in 2020. The district had a 42.18% BVAP but was only 46.9% non-Hispanic White in voting age population.

9

the statewide and the endogenous (state legislative) elections. General elections are clearly the barrier to electing candidates preferred by Black voters to the state legislature – at least outside of districts that provide Black voters with an opportunity to elect their preferred candidates. However, because there is typically a two-stage election process in the United States, I analyzed recent Democratic primary elections in the seven areas of interest as well. My analysis was limited to the 11 statewide Democratic primaries and Democratic runoffs that included Black candidates between 2016 and 2020 as turnout by race for the 2022 Democratic primary was not made available in time for inclusion in this report.[17] I found that the majority (55.8%) of the contests I analyzed were racially polarized. Moreover, in over 67% of the contests that were not polarized, it was because Black voters supported White candidates preferred by White voters (e.g., Jon Ossoff in the 2020 Democratic primary for U.S. Senate; John Barrow and Lindy Miller in their 2018 primary bids for Secretary of State and Public Service Commission District 3, respectively; and Jim Barksdale in the 2016 Democratic primary for U.S. Senate), rather than because White voters supported the Black candidate. Overall, White voters supported Black-preferred Black candidates in only 14.3% of the Democratic primary election contests analyzed. The results of my analysis of statewide Democratic primaries and Democratic runoffs by area of interest can be found in Appendices C1-C7, with a separate appendix for each area of interest.

Although many of the Democratic primary contests analyzed were racially polarized, because the majority of Whites who cast ballots in primaries choose to vote in Republican primaries, candidates supported by Black voters often win the Democratic nomination in districts that do not have significant Black populations. The barrier to elected legislative office for candidates preferred by Black voters is usually not the Democratic primary – it is the general election. Minus a substantial Black population in the district, Black voters are very unlikely to be able to elect their preferred candidates to the Georgia state legislature in the seven areas of interest I studied for this project.

---

[17] While I was able to analyze statewide Democratic primaries in the areas of interest, my attempt at analyzing state legislative Democratic primaries produced confidence intervals that were too wide to ascertain the candidates of choice of White voters. This was in large part due to the limited number of precincts in the legislative districts and the consistently low number of White voters turning out to vote in Democratic primaries in these precincts.

APA EXHIBIT 005, page 11 of 89

**VI. Conclusion**

My analysis of voting patterns by race determined that voting in all seven areas of Georgia that I examined is racially polarized. The Black community is quite cohesive in supporting their preferred candidates in all of these areas, and White voters in these areas consistently bloc vote to defeat the candidates supported by Black voters. These seven areas are all areas where additional Black opportunity districts could have been created but were not, as demonstrated by a comparison of the Adopted Plans to the Illustrative Plans.

Racially polarized voting substantially impedes the ability of Black voters to elect candidates of their choice in the seven areas examined in this report unless districts are drawn to provide Black voters with this opportunity. The 2022 Adopted State Senate and House Plans dilute the voting strength of Black voters in Georgia by failing to create additional districts in these areas that offer Black voters an opportunity to elect their candidates of choice to the state legislature.

***

I reserve the right to modify and/or supplement my opinions, as well as to offer new opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted and executed on December 23, 2022.

_____

Dr. Lisa Handley

# Doc. 360-10

**Exhibit 0002**

EXPERT REPORT OF JOHN R. ALFORD, Ph.D.

**Scope of Inquiry**

I have been retained by the Georgia Secretary of State and State Election Board as an expert to provide analysis related to *Grant v. Raffensperger*, *Alpha Phi Alpha v. Raffensperger*, and *Pendergrass v. Raffensperger*. All three cases allege the current U.S. Congressional, state Senate, and state House districts in Georgia violate Section 2 of the Voting Rights Act. In early 2022, I provided a report and testified in the preliminary injunction hearing in this matter. I have examined the reports and supplemental reports provided by plaintiffs' experts Dr. Maxwell Palmer, and Dr. Lisa Handley in this case. My rate of compensation in this matter is $500 per hour.

**Qualifications**

I am a tenured full professor of political science at Rice University. At Rice, I have taught courses on redistricting, elections, political representation, voting behavior and statistical methods at both the undergraduate and graduate level. Over the last thirty years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues. I have previously provided expert reports and/or testified as an expert witness in voting rights and statistical issues in a variety of court cases, including on behalf of the U.S. Attorney in Houston, the Texas Attorney General, a U.S. Congressman, and various cities and school districts.

In the 2000 round of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of Representatives, and the Texas State Board of Education. In the 2010 round of redistricting in Texas, I was again retained as an expert by the State of Texas to assist in defending various state election maps and systems including the district maps for the U.S. Congress, the Texas Senate, the Texas House of Representatives, and the current at large system for electing Justices to the State Supreme Court



DEFENDANTS' TRIAL EXHIBIT
**8**

and Court of Appeals, as well as the winner-take-all system for allocating Electoral College votes.

I have also worked as an expert on redistricting and voting rights cases at the state and/or local level in Alabama, Arkansas, Florida, Georgia, Kansas, Louisiana, Michigan, Mississippi, New Mexico, New York, Pennsylvania, Washington, and Wisconsin. The details of my academic background, including all publications in the last ten years, and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are covered in the attached CV (Appendix 1).

**Data and Sources**

In preparing this report, I have reviewed the reports filed by the plaintiffs' experts in this case. I have relied on the analysis provided to date by Dr. Palmer and Dr. Handley in their expert reports in this case. I have also relied on various election and demographic data provided by Dr. Palmer and Dr. Handley in their disclosures related to their reports in this case. In addition, I relied on data on turnout by race for the 2022 Republican Primary election provided to counsel by the Georgia Secretary of State, and 2022 precinct-level election results for that election downloaded from the publicly available website of the Georgia Secretary of State.

**Dr. Palmer's Reports**

Dr. Palmer, in his report in *Pendergrass v. Raffensperger* dated 12/12/2022, provides the results of an EI election analysis that he used to assess Racially Polarized Voting (RPV) in each of 40 contests between 2012 and 2022, and reports the results in his Tables 1 through 6 for five U.S. Congressional districts and as a combined focus area. Similarly, in his report in *Grant v. Raffensperger* dated 12/12/2022, Dr. Palmer provides the EI results for the same 40 contests between 2012 and 2022 as reported in his Tables 2 through 6, for three Georgia House and two Georgia Senate focus areas. The race of the candidate preferred by Black voters is indicated in Dr. Palmer's tables with an asterisk by the name of each Black candidate, and the absence of an asterisk indicating a non-Black candidate. Across the 40 reported contests 19 of the preferred candidates are Black and 21 are non-Black, providing an ideal, almost equal distribution, for comparing both Black and white voter support for Black-preferred candidates that happen to be Black, with Black voter support for Black-preferred candidates that happen not to be Black.

However, despite having this data identified in his reports and the associated opportunity analyze it, there is no discussion of the impact, if any, that the race of the candidate might have on the behavior of Black or white voters in these contests. Also, Dr. Palmer provides no party labels in these tables, and does not mention the party of candidates in his discussion of the results of his analysis.

As evident in Dr. Palmer's Tables 1-6 in his *Pendergrass* report, and Tables 2-6 in his *Grant* report, the pattern of polarization is quite striking. Black voter support for their preferred candidate is typically in the 90 percent range and scarcely varies at all across the ten years examined from 2012 to 2022. Nor does it vary in any meaningful degree from the top of the ballot elections for U.S. President to down-ballot contests like Public Service Commissioner. While slightly more varied, estimated white voter opposition to the Black-preferred candidate is typically above 80 percent. In the *Pendergrass* Table 1 for the combined focus area, Dr. Palmer reports estimates of Black voter support that only varies between 96 and 99 percent when results are rounded to the nearest percent. White voter opposition to the Black preferred candidate is slightly more varied, but still remarkably stable, ranging in *Pendergrass* Table 1 only from 84.5% to 91.4 percent.

What accounts for this remarkable stability in the divergent preferences of Black and white voters across years and offices? It is clearly not Black voter's preference for Black candidates, or white voter's disinclination to vote for Black candidates. At 98.5 percent, the average Black support for the 19 Black candidates identified as Black in Palmer's *Pendergrass* Table 1 is indeed nearly universal, but so is the average 98.4 percent support for the 21 candidates identified as non-Black in Table 1. Similarly, the average white vote in opposition to the 19 candidates identified as Black in *Pendergrass* Table 1 is a clearly cohesive 88.1 percent, but so is the average 87.1 percent white voter opposition to the 21 candidates identified as non-Black. The same can said for Dr. Palmer's results in his *Grant* report where, for example, the average Black support for the 19 candidates identified as Black in Table 2 is 98.2 percent, and Black voter support for the 21 candidates identified as non-Black is a nearly identical 98.1 percent. Similarly, the average white vote in opposition to the 19 candidates identified as Black in *Grant* Table 2 is a clearly cohesive 90.1 percent, but so is the average 89.1 percent white voter opposition to the 21 candidates identified as non-Black.

If we do consider the party affiliation of the candidates, the pattern over these election contests is stark in both the *Grant* report and the *Pendergrass* report. In all 40 contests the candidate of choice of Black voters is the Democrat and the candidate of choice of white voters is the Republican.

In contrast, the race of the candidates does not appear to be influential. Black voter support for Black Democratic candidates is certainly high, as Dr. Palmer's Tables 2 through 6 in *Grant* and Tables 1 through 5 in *Pendergrass* clearly show, but those same figures also show Black voter support in the same high range for white Democratic candidates as it is for Black Democratic candidates. Similarly, white voter support for Black Democratic candidates is very low, but white voter support for white Democratic candidates is also very low.[1] In other words, there appears to be just one overarching attribute of candidates that uniformly leads to their relative acceptability or unacceptability among white voters and Black voters alike. And it is not the candidate's race. It is their party affiliation.

For example, in the 2022 contest for Governor in Dr. Palmer's *Pendergrass* Table 1 (his combined focus region) Stacey Abrams, the Black Democratic candidate, gets an estimated 98.5% of the Black vote, but in the same election in the adjacent Lt. Governor contest Charlie Bailey, a white Democrat, gets an almost identical estimated 98.4% of the Black vote. Looking at White voters a similar pattern is clear. Abrams gets an estimated 10.3% of the white vote, but in the same election in the adjacent Lt. Governor contest Baily, the white Democrat, received a similar estimated 12.1% of the white vote.

Similarly, in the 2021 U.S. Senate runoffs in Dr. Palmer's *Pendergrass* Table 1 (his combined focus region) Raphael Warnock, the Black Democratic candidate gets an estimated 98.7% of the Black vote, but in the same election in the other Senate contest Jon Ossoff, a white Democrat gets an identical estimated 98.7% of the Black vote. Looking at white voters a similar pattern is clear. Warnock, the Black Democratic candidate, gets an estimated 15.2% of the white vote, but in the same election in the other Senate contest, Ossoff, the White Democrat, gets an almost identical estimated 14.5% of the white vote.

---

[1] The limited evidence from the 2022 endogenous elections provided in Dr. Palmer's supplemental reports do not contradict this broad pattern.

Moving beyond his EI analysis, Dr. Palmer also provides reconstituted election results to demonstrate the success rate of Black preferred candidates in his focus areas. Given that as mentioned above the Black preferred candidate is always the Democratic candidate and given the dominance of political party in the EI results as discussed above, it is no surprise that these tables show stable performance for Democratic candidates across the 40 contests, regardless of race. For example, in Dr. Palmer's Table 7 in his *Pendergrass* report, the average vote share for the Democratic candidate is 41.7 percent in the 19 contests where the Democratic candidate is Black, and a very similar 42.3 percent in the 21 contests where the Democratic candidate is not Black.

In short, all that Dr. Palmer's analysis demonstrates is that Black voters provide uniformly high levels of support for Democratic candidates and white voters provide uniformly high levels of support for Republican candidates. There is no indication in these EI results that the high levels of Black voter support for Democratic candidates is connected in any meaningful way to the race of the Democratic or Republican candidates. Similarly, there is no indication in these results that the high levels of white voter support for the Republican candidates is connected in any meaningful way to the race of the Democratic or Republican candidates.

**Dr. Handley's Report**

Dr. Handley's December 12, 2022 report in *Alpha Phi Alpha* focuses first on general elections, and reports results similar to those reported by Dr. Palmer. Black voters support Democratic candidates and white voters support Republican candidates. She indicates that she has chosen to focus on racially contested elections, so this limits the ability to see whether this partisan pattern varies at all with the race of the candidates, but in the two contests without a Black Democrat, the Ossoff 2020 Senate contest and 2021 runoff, the results for both Black and White voters are very similar to the results for the racially contested elections, as was the case in Dr. Palmer's larger set of general elections.

Unlike Dr. Palmer, Dr. Handley also analyzes eleven racially contested statewide Democratic primaries. The results in these primaries are very different from the general election patterns. The general election pattern is a very important contrast to keep in mind when evaluating the results for these eleven primary contests. In the general elections, Black support for the Democratic candidate is very high and very stable in the upper 90% range. Similarly,

White voter opposition to the Democratic candidates is also high and stable in the 80 percent and up range.

While there is not currently a bright-line court standard for determining the level of support needed under *Gingles* prongs 2 and 3 to demonstrate cohesion, multiple plaintiffs' experts have recently discussed a minimum of 60 percent threshold for cohesion in a two-person contest. Simply having a preferred candidate (50 percent plus 1 in a two-candidate contest) is not sufficient. This is, of course, true by definition. If simply having a preferred candidate was sufficient to establish cohesion, then the *Gingles* 2 threshold test would always be met in two candidate contests and thus not actually constitute a test at all. As Dr. Palmer notes on page 4 of his *Pendergrass* report, "[i]f the group's support is roughly evenly divided between the two candidates, then the group does not cohesively support a single candidate". Even if a more stringent 75 percent or 80 percent threshold was the cohesion threshold standard, the results for the general elections provided by both Dr. Palmer and Dr. Handley clearly establish partisan polarization, with Blacks always favoring Democratic candidates at stable levels well above 80 percent, and whites favoring Republican candidates at similarly stable levels, typically above 80 percent.

Applying the 60 percent threshold for cohesion to the 40 general election contests in Dr. Palmer's *Grant* report or the 40 general election contests in Dr. Palmer's *Pendergrass* report, produces the same clear result. In 40 out of 40 contests, Black voters provide cohesive support to the Democratic candidate and white voters provide cohesive support to the opposing Republican candidate. This unequivocal result is what Palmer references as supporting his conclusion of polarized voting. As he states on pages 5-6 of his December 12, 2022 *Grant* report:

> *Black voters are extremely cohesive, with a clear candidate of choice in all 40 elections. In contrast to Black voters, Figure 2 shows that White voters are highly cohesive in voting in opposition to the Black-preferred candidate in every election across the five focus areas. Table 1 lists the average level of support for the Black-preferred candidate for Black and White voters in each focus area. Across all five focus areas, Black voters support their preferred candidate with an average of 98.5% and a minimum of 95.2% of the vote, and White voters support Black-preferred candidates with an average of 8.3% and a maximum of 17.7% of the vote. This is strong evidence of racially polarized voting across all five focus areas.*

The same can be said for the 16 general election contests that Dr. Handley includes for each of her seven focus regions as reported in her Appendix C1-C7. In every one of the 16 contests examined in all seven regions, Black voter support for the Democratic candidate clearly exceeds 60 percent and in all the regular elections (excluding the one 20 candidate special Senate election in 2020) exceeded 90 percent. White voters provided cohesive support to the opposing Republican candidates exceeding 60% in every contest with the sole exception of the 2022 Senate contest in Appendix 1, where the white estimated vote fell just short of 60 percent at 59.3 percent.

As Dr. Handley, herself, states on page 9 of her December 23, 2022 Report:

> *Overall, the average percentage of Black vote for the 16 Black-preferred candidates is 96.1%. The average percentage of White vote for these 16 Black-preferred candidates across the seven areas is 11.2%. (When Ossoff is excluded, and only Black-preferred Black candidates are considered, the average White vote is slightly lower: 11.1 %.) The highest average White vote for any of the 16 candidates is 14.4% for Raphael Warnock in his 2022 general election bid for re-election. While the percentage of White support for candidates preferred by Black voters varies across the areas, in five of the seven areas the average did not even reach 10%. White crossover voting was the highest in the Eastern Atlanta Metro Region (Map 1), but only about one third of White voters typically supported the Black-preferred Black candidates in this area.*

She finds similarly clear evidence of polarization when she considers the analysis of state legislative elections included in her Appendix B1 and B2, stating on page 9 of her December 23, 2022:

> *Nearly every one of the 54 of the state legislative elections analyzed (53 of the 54 contests, or 98.1%) was racially polarized. The estimates of Black and White support for the state legislative candidates in these contests analyzed can be found in Appendices B1 (State Senate) and B2 (State House). Black voters were quite cohesive in supporting Black candidates in these state legislative contests: on average, 97.4% of Black voters supported their preferred Black state senate candidates, and 91.5% supported their preferred Black state house candidate. Very few White voters supported these candidates, however: Black-preferred Black state senate candidates garnered, on average, 10.1% of the White vote; Black-preferred Black state house candidates received, on average, 9.8% of the White vote.*

Based on their summary descriptions of their general election analysis, it is clear that both Dr. Palmer and Dr. Handley know what a convincing pattern of polarization looks like. That clear pattern is not present once candidate party labels are removed from the contest. Dr. Palmer

makes no effort to address this issue of conflating polarization in support for Democratic versus Republican candidates with racial polarization. Dr. Handley attempts to address the issue by providing analysis for eleven Democratic primaries in each of her seven focus regions.

But looking at the Democratic primary contests, as reported in Dr. Handley's Appendix C1-C7, the contrast to the pattern in the partisan general elects is stark. As detailed above, the pattern of Black voter support for Democratic candidates and white voter support for their Republican opponents in general elections is near universal, and both Black and white voters show strong and highly stable levels of cohesion. In contrast the pattern Dr. Handley identifies in the Democratic primaries is far from universal or stable. The support of Black voters for Black candidates varies widely, and seldom reaches above 80 percent. Similarly, white voter support for Democratic candidates is typically below 20% in the general elections, but in the primaries white support for Black candidates varies widely and is often fairly evenly divided. In many of the contests within Dr. Handley's six focus regions, for example, the votes of Blacks, whites, or both are divided too evenly to characterize the voting as cohesive. Even ignoring any concern for establishing minority or majority cohesion and applying a very loose standard of Blacks and whites simply preferring different candidates, Dr. Handley is only able to conclude that "the majority (55.8%) of the contests I analyzed were racially polarized" (page 10), a level not much above chance, and far below the 100 percent or 98.1 percent reported for general elections.

If we consider the *Gingles* 2 and 3 cohesion thresholds, even this slight result disappears. Using even a modest 60% standard for voter cohesion, Black voters vote cohesively for Black candidates in only 35 contests out of 77 (46 percent). If we add the instances where Blacks vote cohesively for white candidate that rises to 49 contests (64 percent of the 77 total). In those 49 contests, white voters cohesively opposed the Black preference in only 10 contests (20 percent of the 49 contests).

**Herschel Walker Senate Race**

The recent 2022 Republican U.S. Senate primary provides an additional racially contested primary to consider. Among the six candidates, the majority winner was Herschel Walker, one of the three Black candidates. Given that Black voters were less than 12 percent of the voters in in any county in the state in that primary, and that Walker received a majority of the vote in every county in Georgia, it is clear the Walker was the preferred candidate among White voters

in the Republican primary.  This can be seen as well in an initial look at EI estimates for the area covered in Dr. Handley's Appendix A1, reproduced below in Table 1 (Eastern Atlanta Metro Region – Map Area 1, Dekalb, Henry, Morgan, Newton, Rockdale, and Walton).  With an estimated 62 percent support among Black voters, and 67 percent support among white voters, Walker is the preferred candidate of both Black and white voters in the Republican primary.

Table 1; Ecological Estimates of Voting Patterns by Race in the 2022 Republican U.S. Senate Primary for Dr. Handley's Eastern Atlanta Metro Region

| Last Name | Candidate Race | Black support | 95% Confidence Interval | | White Support | 95% Confidence Interval | | Other Support | 95% Confidence Interval | |
| | | | Low | High | | Low | High | | Low | High |
| Herschel Walker | Black | **62.4%** | 57.8% | 67.4% | **67.0%** | 66.3% | 67.6% | 5.3% | 1.8% | 11.7% |
| Kelvin King | Black | **10.1%** | 7.7% | 12.8% | **2.5%** | 2.0% | 3.0% | 17.5% | 12.5% | 22.5% |
| "Jon" McColumn | Black | **3.0%** | 1.7% | 4.8% | **0.9%** | 0.6% | 1.2% | 22.4% | 18.8% | 25.4% |
| Gary Black | white | **12.8%** | 9.6% | 16.2% | **15.3%** | 14.5% | 16.0% | 9.3% | 3.3% | 17.0% |
| Latham Saddler | white | **7.1%** | 4.1% | 10.7% | **12.7%** | 11.9% | 13.5% | 15.7% | 7.8% | 24.0% |
| Josh Clark | white | **4.5%** | 2.7% | 6.8% | **1.6%** | 1.1% | 2.2% | 29.8% | 23.7% | 35.3% |

**Summary Conclusions**

The partisan general election analysis report by Dr. Palmer and Dr. Handley show that Black voters cohesively support Democratic candidates, regardless of whether those candidates are Black or White.  Similarly, white voters cohesively vote for Republican candidates, and in opposition to Democratic candidates, regardless of whether those Democratic candidates are Black or white.  Thus, it is cohesive Black voter support for *Democratic* candidates, and white voter support for *Republican* candidates that the general election analysis reveals, not cohesive Black voter support for *Black* candidates and white voter support for *white* candidates. Nonetheless, the voting pattern is clearly one of partisan polarized voting, with both highly cohesive Black vote for the Democrat and highly cohesive white vote for the Republican candidate.  The more limited analysis of Democratic primaries reported by Dr. Handley shows a very different picture of voting behavior from the general elections.  Nothing even approaching the levels of Black and white cohesion seen in the general elections appears anywhere in the

primary contests, and the overall patterns are mixed and variable even within the same set of voters on the same day as we see in the multiple contests in the 2018 Democratic primary. Similarly, the 2022 U.S. Senate Republican primary indicates that white Republican primary voters are willing to support a Black Republican candidate over multiple white opponents.

February 6, 2023

John R. Alford, Ph.D.

# Appendix 1

## CV

# John R. Alford
Curriculum Vitae
January 2023

Dept. of Political Science
Rice University - MS-24
P.O. Box 1892
Houston, Texas 77251-1892
713-348-3364
jra@rice.edu

## Employment:
Professor, Rice University, 2015 to present.
Associate Professor, Rice University, 1985-2015.
Assistant Professor, University of Georgia, 1981-1985.
Instructor, Oakland University, 1980-1981.
Teaching-Research Fellow, University of Iowa, 1977-1980.
Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:
Ph.D., University of Iowa, Political Science, 1981.
M.A., University of Iowa, Political Science, 1980.
M.P.A., University of Houston, Public Administration, 1977.
B.S., University of Houston, Political Science, 1975.

## Books:
*Predisposed: Liberals, Conservatives, and the Biology of Political Differences*. New York: Routledge, 2013. Co-authors, John R. Hibbing and Kevin B. Smith.

## Articles:
"Political Orientations Vary with Detection of Androstenone," with Amanda Friesen, Michael Gruszczynski, and Kevin B. Smith. **Politics and the Life Sciences**. (Spring, 2020).

"Intuitive ethics and political orientations: Testing moral foundations as a theory of political ideology." with Kevin Smith, John Hibbing, Nicholas Martin, and Peter Hatemi. **American Journal of Political Science**. (April, 2017).

"The Genetic and Environmental Foundations of Political, Psychological, Social, and Economic Behaviors: A Panel Study of Twins and Families." with Peter Hatemi, Kevin Smith, and John Hibbing. **Twin Research and Human Genetics**. (May, 2015.)

"Liberals and conservatives: Non-convertible currencies." with John R. Hibbing and Kevin B. Smith. **Behavioral and Brain Sciences** (January, 2015).

"Non-Political Images Evoke Neural Predictors Of Political Ideology." with Woo-Young Ahn, Kenneth T. Kishida, Xiaosi Gu, Terry Lohrenz, Ann Harvey, Kevin Smith, Gideon Yaffe, John Hibbing, Peter Dayan, P. Read Montague. **Current Biology**. (November, 2014).

"Cortisol and Politics: Variance in Voting Behavior is Predicted by Baseline Cortisol Levels." with Jeffrey French, Kevin Smith, Adam Guck, Andrew Birnie, and John Hibbing. **Physiology & Behavior**. (June, 2014).

"Differences in Negativity Bias Underlie Variations in Political Ideology." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Negativity bias and political preferences: A response to commentators Response." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Genetic and Environmental Transmission of Political Orientations." with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**, (December, 2013).

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing. **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (October, 2011).

"Linking Genetics and Political Attitudes:  Re-Conceptualizing Political Ideology." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"The Politics of Mate Choice." with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (March, 2011).

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions:  Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008).  This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008).  This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **The Political Economist**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005).  (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics:  An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions:  Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

"We're All in this Together:  The Decline of Trust in Government, 1958-1996." in **What is it About Government that Americans Dislike?**, eds. John Hibbing and Beth Theiss-Morse, Cambridge:  Cambridge University Press, (2001).

"The 2000 Census and the New Redistricting," **Texas State Bar Association School Law Section Newsletter**, (July, 2000).

"Overdraft:  The Political Cost of Congressional Malfeasance" with Holly Teeters, Dan Ward, and Rick Wilson, **Journal of Politics** (August, 1994).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 5th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1993).

"The 1990 Congressional Election Results and the Fallacy that They Embodied an Anti-Incumbent Mood" with John R. Hibbing, **PS** 25 (June, 1992).

"Constituency Population and Representation in the United States Senate" with John R. Hibbing.  **Legislative Studies Quarterly**, (November, 1990).

"Editors' Introduction:  Electing the U.S. Senate" with Bruce I. Oppenheimer.  **Legislative Studies Quarterly**, (November, 1990).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 4th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1988).  Reprinted in The Congress of the United States, 1789-1989, ed. Joel Silby, Carlson Publishing Inc., (1991), and in The Quest for Office, eds. Wayne and Wilcox, St. Martins Press, (1991).

"Can Government Regulate Fertility?  An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge.  **The Western Political Quarterly** (December, 1986).

"Partisanship and Voting" with James Campbell, Mary Munro, and Bruce Campbell, in **Research in Micropolitics. Volume 1 - Voting Behavior**. Samuel Long, ed. JAI Press, (1986).

"Economic Conditions and Individual Vote in the Federal Republic of Germany" with Jerome S. Legge. **Journal of Politics** (November, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry. **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress: A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R. Hibbing, **Journal of Politics** (November, 1981). Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions: Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

"Comment on Increased Incumbency Advantage" with John R. Hibbing, Refereed communication: **American Political Science Review** (March, 1981).

"Can Government Regulate Safety? The Coal Mine Example" with Michael Lewis-Beck, **American Political Science Review** (September, 1980).


# Awards and Honors:

CQ Press Award - 1988, honoring the outstanding paper in legislative politics presented at the 1987 Annual Meeting of the American Political Science Association. Awarded for "The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing.


# Research Grants:

National Science Foundation, 2009-2011, "Identifying the Biological Influences on Political Temperaments", with John Hibbing, Kevin Smith, Kim Espy, Nicolas Martin and Read Montague. This is a collaborative project involving Rice, University of Nebraska, Baylor College of Medicine, and Queensland Institute for Medical Research.

National Science Foundation, 2007-2010, "Genes and Politics: Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2007-2010, "Investigating the Genetic Basis of Economic Behavior", with John Hibbing and Kevin Smith. This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the Queensland Institute of Medical Research.

Rice University Faculty Initiatives Fund, 2007-2009, "The Biological Substrates of Political Behavior". This is in assistance of a collaborative project involving Rice, Baylor College of Medicine, Queensland Institute of Medical Research, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2004-2006, "Decision-Making on Behalf of Others", with John Hibbing. This is a collaborative project involving Rice and the University of Nebraska.

National Science Foundation, 2001-2002, dissertation grant for Kevin Arceneaux, "Doctoral Dissertation Research in Political Science: Voting Behavior in the Context of U.S. Federalism."

National Science Foundation, 2000-2001, dissertation grant for Stacy Ulbig, "Doctoral Dissertation Research in Political Science: Sub-national Contextual Influences on Political Trust."

National Science Foundation, 1999-2000, dissertation grant for Richard Engstrom, "Doctoral Dissertation Research in Political Science: Electoral District Structure and Political Behavior."

Rice University Research Grant, 1985, Recent Trends in British Parliamentary Elections.

Faculty Research Grants Program, University of Georgia, Summer, 1982. Impact of Media Structure on Congressional Elections, with James Campbell.

## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology, Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

"The Heritability of Value Orientations" Annual meeting of the Behavior Genetics Association, Minneapolis, MN (2009), with Kevin Smith, John Hibbing, Carolyn Funk, Robert Krueger, Peter Hatemi, and Lindon Eaves.

"The Ick Factor: Disgust Sensitivity as a Predictor of Political Attitudes" Annual meeting of the Midwest Political Science Association, Chicago, IL (2009), with Kevin Smith, Douglas Oxley Matthew Hibbing, and John Hibbing.

"The Ideological Animal: The Origins and Implications of Ideology" Annual meeting of the American Political Science Association, Boston, MA (2008), with Kevin Smith, Matthew Hibbing, Douglas Oxley, and John Hibbing.

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

"Getting from Genes to Politics: The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy." Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy" Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted? A Research Agenda" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

"The Politics of Mate Choice"   Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice"   Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others"   Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"   Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions:  Humans as Wary Cooperators" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

"The Impact of Organizational Structure on the Production of Social Capital Among Group Members" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Allison Rinden.

"Isolating the Origins of Incumbency Advantage:  An Analysis of House Primaries, 1956-1998" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Kevin Arceneaux.

"The Electorally Indistinct Senate," Norman Thomas Conference on Senate Exceptionalism, Vanderbilt University; Nashville, Tennessee; October (1999), with John R. Hibbing.

"Interest Group Participation and Social Capital" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (1999), with Allison Rinden.

"We're All in this Together:  The Decline of Trust in Government, 1958-1996."  The Hendricks Symposium, University of Nebraska, Lincoln. (1998)

"Constituency Population and Representation in the United States Senate," Electing the Senate; Houston, Texas; December (1989), with John R. Hibbing.

"The Disparate Electoral Security of House and Senate Incumbents," American Political Science Association Annual Meetings; Atlanta, Georgia; September (1989), with John R. Hibbing.

"Partisan and Incumbent Advantage in House Elections," Annual Meeting of the Southern Political Science Association (1987), with David W. Brady.

"Personal and Party Advantage in U.S. House Elections, 1846-1986" with David W. Brady, 1987 Social Science History Association Meetings.

"The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing, 1987 Annual Meeting of the American Political Science Association.

"A Comparative Analysis of Economic Voting" with Jerome Legge, 1985 Annual Meeting of the American Political Science Association.

"An Analysis of Economic Conditions and the Individual Vote in Great Britain, 1964-1979" with Jerome Legge, 1985 Annual Meeting of the Western Political Science Association.

"Can Government Regulate Fertility?  An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge, 1985 Annual Meeting of the Southwestern Social Science Association.

"Economic Conditions and the Individual Vote in the Federal Republic of Germany" with Jerome S. Legge, 1984 Annual Meeting of the Southern Political Science Association.

"The Conditions Required for Economic Issue Voting" with John R. Hibbing, 1984 Annual Meeting of the Midwest Political Science Association.

"Incumbency Advantage in Senate Elections," 1983 Annual Meeting of the Midwest Political Science Association.

"Television Markets and Congressional Elections:  The Impact of Market/District Congruence" with James Campbell and Keith Henry, 1982 Annual Meeting of the Southern Political Science Association.

"Economic Conditions and Senate Elections" with John R. Hibbing, 1982 Annual Meeting of the Midwest Political Science Association. "Pocketbook Voting:  Economic Conditions and Individual Level Voting," 1982 Annual Meeting of the American Political Science Association.

"Increased Incumbency Advantage in the House," with John R. Hibbing, 1981 Annual Meeting of the Midwest Political Science Association.


## Other Conference Participation:

Roundtable Participant – Closing Round-table on Biopolitics; 2016 UC Merced Conference on Bio-Politics and Political Psychology, Merced, CA.

Roundtable Participant "Genes, Brains, and Core Political Orientations" 2008 Annual Meeting of the Southwestern Political Science Association, Las Vegas.

Roundtable Participant "Politics in the Laboratory" 2007 Annual Meeting of the Southern Political Science Association, New Orleans.

Short Course Lecturer, "What Neuroscience has to Offer Political Science" 2006 Annual Meeting of the American Political Science Association.

Panel chair and discussant, "Neuro-scientific Advances in the Study of Political Science" 2006 Annual Meeting of the American Political Science Association.

Presentation, "The Twin Study Approach to Assessing Genetic Influences on Political Behavior" Rice Conference on New Methods for Understanding Political Behavior, 2005.

Panel discussant, "The Political Consequences of Redistricting," 2002 Annual Meeting of the American Political Science Association.

Panel discussant, "Race and Redistricting," 1999 Annual Meeting of the Midwest Political Science Association.

Invited participant, "Roundtable on Public Dissatisfaction with American Political Institutions", 1998 Annual Meeting of the Southwestern Social Science Association.

Presentation, "Redistricting in the '90s," Texas Economic and Demographic Association, 1997.

Panel chair, "Congressional Elections," 1992 Annual Meeting of the Southern Political Science Association.

Panel discussant, "Incumbency and Congressional Elections," 1992 Annual Meeting of the American Political Science Association.

Panel chair, "Issues in Legislative Elections," 1991 Annual Meeting of the Midwest Political Science Association.

Panel chair, "Economic Attitudes and Public Policy in Europe," 1990 Annual Meeting of the Southern Political Science Association

Panel discussant, "Retrospective Voting in U.S. Elections," 1990 Annual Meeting of the Midwest Political Science Association.

Co-convener, with Bruce Oppenheimer, of Electing the Senate, a national conference on the NES 1988 Senate Election Study. Funded by the Rice Institute for Policy Analysis, the University of Houston Center for Public Policy, and the National Science Foundation, Houston, Texas, December, 1989.

Invited participant, Understanding Congress: A Bicentennial Research Conference, Washington, D.C., February, 1989.

Invited participant--Hendricks Symposium on the United States Senate, University of Nebraska, Lincoln, Nebraska, October, 1988

Invited participant--Conference on the History of Congress, Stanford University, Stanford, California, June, 1988.

Invited participant, "Roundtable on Partisan Realignment in the 1980's", 1987 Annual Meeting of the Southern Political Science Association.

## Professional Activities:

### Other Universities:

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2018.

Invited Speaker, Annual Allman Family Lecture, Dedman College Interdisciplinary Institute, Southern Methodist University, 2016.

Invited Speaker, Annual Lecture, Psi Sigma Alpha – Political Science Dept., Oklahoma State University, 2015.

Invited Lecturer, Department of Political Science, Vanderbilt University, 2014.

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2014.

Invited Speaker, Graduate Student Colloquium, Department of Political Science, University of New Mexico, 2013.

Invited Keynote Speaker, Political Science Alumni Evening, University of Houston, 2013.

Invited Lecturer, Biology and Politics Masters Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2010.

Invited Lecturer, Biology and Politics Senior Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2008.

Visiting Fellow, the Hoover Institution, Stanford University, 2007.

Invited Speaker, Joint Political Psychology Graduate Seminar, University of Minnesota, 2007.

Invited Speaker, Department of Political Science, Vanderbilt University, 2006.


**Member:**

Editorial Board, Journal of Politics, 2007-2008.

Planning Committee for the National Election Studies' Senate Election Study, 1990-92.

Nominations Committee, Social Science History Association, 1988


**Reviewer for:**

American Journal of Political Science
American Political Science Review
American Politics Research
American Politics Quarterly
American Psychologist
American Sociological Review
Canadian Journal of Political Science
Comparative Politics
Electoral Studies
Evolution and Human Behavior
International Studies Quarterly

Journal of Politics
Journal of Urban Affairs
Legislative Studies Quarterly
National Science Foundation
PLoS ONE
Policy Studies Review
Political Behavior
Political Communication
Political Psychology
Political Research Quarterly
Public Opinion Quarterly
Science
Security Studies
Social Forces
Social Science Quarterly
Western Political Quarterly

## University Service:

Member, University Senate, 2021-2023.

Member, University Parking Committee, 2016-2022.

Member, University Benefits Committee, 2013-2016.

Internship Director for the Department of Political Science, 2004-2018.

Member, University Council, 2012-2013.

Invited Speaker, Rice Classroom Connect, 2016.

Invited Speaker, Glasscock School, 2016.

Invited Speaker, Rice Alumni Association, Austin, 2016.

Invited Speaker, Rice Alumni Association, New York City, 2016.

Invited Speaker, Rice TEDxRiceU , 2013.

Invited Speaker, Rice Alumni Association, Atlanta, 2011.

Lecturer, Advanced Topics in AP Psychology, Rice University AP Summer Institute, 2009.

Scientia Lecture Series: "Politics in Our Genes: The Biology of Ideology" 2008

Invited Speaker, Rice Alumni Association, Seattle, San Francisco and Los Angeles, 2008.

Invited Speaker, Rice Alumni Association, Austin, Chicago and Washington, DC, 2006.

Invited Speaker, Rice Alumni Association, Dallas and New York, 2005.

Director: Rice University Behavioral Research Lab and Social Science Computing Lab, 2005-2006.

University Official Representative to the Inter-university Consortium for Political and Social Research, 1989-2012.

Director: Rice University Social Science Computing Lab, 1989-2004.

Member, Rice University Information Technology Access and Security Committee, 2001-2002

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop:  Southern Politics, May, 1988.

Guest Lecturer, Mellon Workshop:  The U.S. Congress in Historical Perspective, May, 1987 and 1988.

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.


## External Consulting:

Expert Witness, Soto Palmer v. Hobbs, (Washington State), racially polarized voting analysis, 2022.

Expert Witness, Pendergrass v. Raffensperger, (Georgia State House and Senate), racially polarized voting analysis, 2022.

Expert Witness, LULAC, et al. v. Abbott, et al., Voto Latino, et al. v. Scott, et al., Mexican American Legislative Caucus, et al. v. Texas, et al., Texas NAACP v. Abbott, et al., Fair Maps Texas, et al. v. Abbott, et al., US v. Texas, et al. (consolidated cases) challenges to Texas Congressional, State Senate, State House, and State Board of Education districting, 2022.

Expert Witness, Robinson/Galmon v. Ardoin, (Louisiana), racially polarized voting analysis, 2022.

Expert Witness, Christian Ministerial Alliance et al v. Arkansas, racially polarized voting analysis, 2022.

Expert Witness, Johnson v. Wisconsin Elections Commission, 2022.

Expert Witness, Rivera, et al. v. Schwab, Alonzo, et al. v. Schwab, Frick, et al. v. Schwab, (consolidated cases) challenge to Kansas congressional map, 2022.

Expert Witness, Grant v. Raffensperger, challenge to Georgia congressional map, 2022

Expert Witness, Brooks et al. v. Abbot, challenge to State Senate District 10, 2022.

Expert Witness, Elizondo v. Spring Branch ISD, 2022.

Expert Witness, Portugal v. Franklin County, et al., challenge to Franklin County, Washington at large County Commissioner's election system, 2022.

Consulting Expert, Gressman Math/Science Petitioners, Pennsylvania Congressional redistricting, 2022.

Consultant, Houston Community College – evaluation of election impact for redrawing of college board election districts, 2022.

Consultant, Lone Star College – evaluation of election impact for redrawing of college board election districts, 2022.

Consultant, Killeen ISD – evaluation of election impact for redrawing of school board election districts, 2022.

Consultant, Houston ISD – evaluation of election impact for redrawing of school board election districts, 2022.

Consultant, Brazosport ISD – evaluation of election impact for redrawing of school board election districts, 2022.

Consultant, Dallas ISD – evaluation of election impact for redrawing of school board election districts, 2022.

Consultant, Lancaster ISD – redrawing of all school board member election districts including demographic analysis and redrawing of election districts, 2021.

Consultant, City of Baytown – redrawing of all city council member election districts including demographic analysis and redrawing of election districts, 2021.

Consultant, Goose Creek ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, 2021.

Expert Witness, Bruni et al. v. State of Texas, straight ticket voting analysis, 2020.

Consulting Expert, Sarasota County, VRA challenge to district map, 2020.

Expert Witness, Kumar v. Frisco ISD, TX, racially polarized voting analysis, 2019.

Expert Witness, Vaughan v. Lewisville ISD, TX, racially polarized voting analysis, 2019.

Expert Witness, Johnson v. Ardoin, (Louisiana), racially polarized voting analysis, 2019.

Expert Witness, Flores et al. v. Town of Islip, NY, racially polarized voting analysis, 2018.

Expert Witness, Tyson v. Richardson ISD, racially polarized voting analysis, 2018.

Expert Witness, Dwight v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, NAACP v. East Ramapo Central School District, racially polarized voting analysis, 2018.

Expert Witness, Georgia NAACP v. State of Georgia, racially polarized voting analysis, 2018.

# Doc. 385

1     UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2        ATLANTA DIVISION

3

4 ALPHA PHI ALPHA FRATERNITY,  )DAY 3 - P.M. SESSION
 INC., ET AL.,       )
5      PLAINTIFFS,  )
           )DOCKET NO.1:21-CV-05337-SCJ
6   -VS-       )
           )
7 BRAD RAFFENSPERGER,    )
           )
8      DEFENDANT.  )
 _____
9 COAKLEY PENDERGRASS,    )
 ET AL.,        )
10      PLAINTIFFS,  )
           )DOCKET NO. 1:21-CV-5339-SCJ
11   -VS-       )
           )
12 BRAD RAFFENSPERGER, ET AL.,  )
           )
13      DEFENDANTS.  )
 _____
14 ANNIE LOIS GRANT, ET AL.,   )
           )
15      PLAINTIFFS,  )
           )DOCKET NO. 1:22-CV-00122-SCJ
16   -VS-       )
           )
17 BRAD RAFFENSPERGER, ET AL.,  )
           )
18      DEFENDANTS.  )
 _____
19

      TRANSCRIPT OF BENCH TRIAL
20    BEFORE THE HONORABLE STEVE C. JONES
     UNITED STATES DISTRICT JUDGE
21     THURSDAY, SEPTEMBER 7, 2023

22

23 **STENOGRAPHICALLY RECORDED BY:**

24    PENNY PRITTY COUDRIET, RPR, RMR, CRR
      OFFICIAL COURT REPORTER
25     UNITED STATES DISTRICT COURT
       ATLANTA, GEORGIA

1  election and the election between Raphael Warnock and Herschel

2  Walker; is that correct?

3  **A.**    Not exactly.  I looked at some state legislative contests

4  that had only white candidates as well.

5  **Q.**    Okay.  And how many election -- well, we'll get to that

6  later.

7              MR. JACOUTOT:  That's all I have, Your Honor, so...

8              THE COURT:  Any objection to this witness testifying

9  as an expert as submitted?

10              MR. JACOUTOT:  No objection.

11              THE COURT:  The witness will be allowed to testify as

12  an expert in that area.

13  DIRECT EXAMINATION (CONT'D)

14  BY MS. LAKIN:

15  **Q.**    Dr. Handley, what were you asked to do in this case?

16  **A.**    I was asked to conduct a racial Black voting analysis to

17  determine if voting was polarized in seven specific areas in

18  Georgia.  I was also asked to look at the effectiveness of

19  districts in these seven areas of interest.

20  **Q.**    Why did you focus on these particular seven areas?

21  **A.**    These are seven areas of the state of Georgia where state

22  legislative districts could have -- districts that offered

23  Black voters opportunities to elect their candidates of choice

24  could have been drawn and were not drawn when you compare the

25  illustrative to the adopted plan.

1   **Q.**   At a high level can you summarize your opinions with

2   respect to whether there is racially polarized voting in the

3   areas of Georgia that you examined?

4   **A.**   The general elections, both the statewide and the state

5   legislative elections in the seven areas that I examined was

6   starkly polarized, starkly racially polarized.

7   **Q.**   When you say "starkly polarized," what do you mean by

8   that?

9   **A.**   There are some levels of polarization.  And in this

10  particular instance, you had something like over 90 percent of

11  the Black voters supporting the Black-preferred candidate and

12  nearly or sometimes over 90 percent of the white voters not

13  supporting that candidate, supporting the opponent of that

14  candidate.

15  **Q.**   At a high level, how, if at all, did this starkly

16  racially polarized voting affect the ability of Black voters

17  to elect candidates of their choice in the areas that you

18  analyzed?

19  **A.**   Because voting is polarized, the only way that you could

20  elect Black-preferred candidates is to create districts that

21  provide Black voters with this opportunity.

22  **Q.**   And what conclusions did you draw regarding the ability

23  of Black voters to elect candidates of their choice under the

24  illustrative plan as compared to the plans adopted by the

25  state legislature?

1  **A.**   As I said, I looked at seven areas.  Each of those areas

2  offered at least one additional -- one area offered two

3  additional districts that provided Black voters with the

4  opportunity to elect their candidates of choice compared to

5  the adopted plans.

6  **Q.**   And what conclusions did you reach regarding the success

7  of Black-preferred candidates in general elections in each of

8  the seven areas you analyzed?

9  **A.**   In each of the areas, the districts that provided Black

10  voters with an opportunity to elect were districts that were

11  at least 50 percent Black in voting age population.

12  **Q.**   I'd like to turn first to your opinions on racially

13  polarized voting.

14      Dr. Handley, how do you define racially polarized voting?

15  **A.**   I define -- an election is racially polarized if the

16  election outcome would be different if Black voters and white

17  voters voted separately.

18  **Q.**   And is this a definition that you've used in your

19  previous work as an expert in racially polarized voting?

20  **A.**   Yes.

21  **Q.**   At a high level, how did you go about determining whether

22  voting in the areas of interest was racially polarized?

23  **A.**   Of course we don't have the race of the candidate on --

24  the race of the voter on the ballot they submit, so we use a

25  statistical analysis to estimate the percentage of Black and

1  95 percent confidence that your actual value is within that

2  range.

3  **Q.**   How would you characterize this election?

4  **A.**   This contest is quite polarized.  Well over 90 percent of

5  the Black voters supported Warnock and over 88 percent of the

6  white voters supported Walker.

7  **Q.**   And what does that mean in terms of Black voters

8  cohesiveness in this area?

9  **A.**   Black voters are very cohesive.  I mean, it's over

10  96 percent of Black voters supported Warnock.

11  **Q.**   And what about vis-à-vis white voters?

12  **A.**   I don't know what you mean by vis-à-vis white voters.

13  **Q.**   In terms of -- how would you characterize white support

14  in this area for different candidates?

15  **A.**   The white support for Warnock was very low, close to

16  10 percent, but the support for Warnock was quite high.

17           THE COURT:  For Walker.

18           THE WITNESS:  For Walker.  Sorry.

19           THE COURT:  Could it be argued that -- you're going

20  to be asked this so I'll just kind of -- let's say I was Bryan

21  Tyson.

22           THE WITNESS:  Okay.

23           THE COURT:  Could we say that the Black voters are

24  voting for the Democratic candidate?

25           THE WITNESS:  The Black voters do vote for the

Democratic candidate.

THE COURT:  So it's not necessarily the person, if they're a Democrat, they vote for the Democrat?

THE WITNESS:  Well, I mean, everybody who's voting in the --

THE COURT:  Speak into the mic.

THE WITNESS:  I'm sorry.

First of all, you are not explaining why white voters choose to vote for Republicans and Black voters choose to vote for Democrats.

THE COURT:  You say you're not explaining why.  I'm not quite following you there.

THE WITNESS:  It -- I would say that race impacts the decision on who you're going to vote for, what party you're going to support.  So to say that it is party instead of race is ignoring the fact that actually race explains party in part.

THE COURT:  Okay.  So the two are not one and the same?  In other words, could a non-Democrat -- did you find a situation where a non-Democrat was supported by more than 50 percent in the south of Black voters in an election?

THE WITNESS:  In my lifetime of doing this, certainly.  Here in Georgia in the elections that I looked at --

THE COURT:  With regard to this case.

1  THE WITNESS:  In this case, I cannot think of an

2  instance in which Black voters did not support the Democrat.

3  THE COURT:  Okay.

4  BY MS. LAKIN:

5  **Q.**  And just to clarify, and that is with respect to the

6  general elections?

7  **A.**  I'm sorry?

8  **Q.**  With respect to the Judge's questions, that is -- your

9  answer, that you can't think of a situation in which the Black

10  voters did not support the Democrat, is specific to general

11  elections that you analyzed in this case?

12  **A.**  Well, the other one was the Democratic primaries where

13  they're also Democrats, yes.

14  **Q.**  Turning back to the -- the -- this particular first race

15  here.  Would you -- would you -- is it fair to say that white

16  voters bloc voted against the Black-preferred candidate in

17  this election?

18  **A.**  Yes.

19  **Q.**  How would you characterize the remaining elections that

20  you evaluated in this table?

21  **A.**  All of these contests are quite starkly polarized.

22  **Q.**  Did you analyze voting patterns in the six other areas of

23  interest that you identified earlier?

24  **A.**  That's correct, I did.

25  **Q.**  And all of the analysis is in Appendix A of your

1  report in similar tables?

2  **A.**    That's correct.  All of general -- all the statewide

3  general elections are in Appendix A for the seven areas.

4         THE COURT:  Let me interrupt again.  In your analysis

5  were the white voters mainly supporting Democrats or

6  Republicans?

7         THE WITNESS:  Well, in the Democratic primary they're

8  all supporting Democrats.

9         THE COURT:  In the general election.  The general

10  election.

11         THE WITNESS:  In general elections, the majority of

12  white voters in all of these instances voted for Republican

13  candidates.

14         THE COURT:  Now, here you have 96 percent.  Did you

15  have a percentage of white voters that support Republicans?

16         THE WITNESS:  Well, it -- it varies by area.

17         THE COURT:  Let me change the question.

18         THE WITNESS:  Okay.

19         THE COURT:  If a Black voter was voting for a certain

20  preferred candidate, did you find that white voters usually

21  voted for that candidate or did they vote a higher percent

22  against that candidate?

23         In other words, here you have Warnock was the

24  Black-preferred candidate as you testified, yes?

25         THE WITNESS:  Yes.

1　　　　　THE COURT:  Okay.  And you indicated that 10 percent

2　of the white voters voted for him, so that means 90 percent

3　voted against him; is that correct?

4　　　　　THE WITNESS:  Yes.

5　　　　　THE COURT:  Is that the trend, or was that unusual?

6　　　　　THE WITNESS:  That is not unusual in most of these

7　areas that I looked at.

8　　　　　THE COURT:  What were the exceptions?  Were there any

9　exceptions?

10　　　　　THE WITNESS:  Well, the degree of white crossover

11　vote was slightly variable.  So, for example, I think it's in

12　the first area, you'll see a higher percentage of whites

13　supporting the Democratic candidate in some of the -- as

14　compared to some of these other areas.

15　　　　　So voting was still polarized, but there was

16　variability in the percentage of white voters who voted for

17　the Black-preferred Democratic candidates.  More variability

18　among white voters than there is among Black voters.

19　　　　　THE COURT:  Go ahead.

20　　　　　MS. LAKIN:  And Your Honor's questions anticipates

21　something that we were going to get into a little bit later

22　that I would clarify goes, in our view, to the totality of the

23　circumstances.

24　BY MS. LAKIN:

25　**Q.**　But, Dr. Handley, did you -- when -- you considered

1  Democratic primaries in this case as well; is that correct?

2  **A.**   I analyzed 11 statewide Democratic primaries.

3         MS. LAKIN:  And, again, this particular portion of

4  these particular questions go specifically to the totality of

5  the circumstances.

6  BY MS. LAKIN:

7  **Q.**   When evaluating the Democratic primaries in this case,

8  did you reach any conclusions with respect to their

9  polarization?

10  **A.**   Yes.  More than half of those contests, the Democratic

11  primaries that I analyzed were polarized.

12         MS. LAKIN:  Can we pull up slide 3.2.  Sorry.  20.

13  20.  Slide 20.

14  BY MS. LAKIN:

15  **Q.**   What, if anything, did you conclude with respect to the

16  non-polarized Democratic primaries you examined?

17  **A.**   A strong majority of the Democratic primaries that were

18  not polarized were not polarized because the Black voters

19  supported the white candidate rather than because the white

20  voters supported the Black candidate.

21  **Q.**   And speaking of polarization in Democratic primaries,

22  could party alone explain the racial polarization that you see

23  there?

24         MR. JACOUTOT:  Objection, Your Honor.  Her report

25  doesn't go to explanation of why voting patterns are occurring

1  where they are.  It specifically only deals with the fact that

2  the voting patterns are occurring where they are.  I think

3  this is outside the scope.

4          MS. LAKIN:  Your Honor, all of these opinions were

5  offered during the PI stage of this case.  And I'm happy

6  to put that -- you know, the rebuttal report where she

7  outlines some of these opinions formally into the record, but

8  they were also included in the PI record as well.  And she was

9  asked extensively about this at her deposition.

10         THE COURT:  I'm going to allow the question.

11  Overruled.

12  BY MS. LAKIN:

13  **Q.**   With respect to the Democratic primaries, can party alone

14  explain the racial polarization that you see, that you've

15  identified?

16  **A.**   Party can't explain it at all, because everyone

17  participating in the Democratic primary is a Democrat.  So if

18  you have polarization, it couldn't be explained by party.

19  **Q.**   What if you had found no racial polarization in party

20  primaries in Georgia, what would that mean -- would that mean

21  that race is not a factor?

22         MR. JACOUTOT:  I'm sorry, just another objection that

23  we're now speculating that -- on something that she hasn't

24  found in her report and then trying to explain what it means.

25  I think we're well outside the scope of the report.

1        THE COURT:  Is this not in the report?

2        MS. LAKIN:  Your Honor, this is a -- whether or

3   not -- what reasonable inference could be made in terms of the

4   analysis that she has done?  She's opining with respect to the

5   data she has found and what would be or not be reasonable

6   inferences from that data.

7        THE COURT:  Well, I think she's saying based on the

8   data she's found as an expert she can do it if she's given you

9   all at least something.  You haven't gotten anything on this

10  aspect of it?

11       MR. JACOUTOT:  I'm sorry?

12       THE COURT:  You haven't received any information on

13  the aspect she's testifying about now?

14       MR. JACOUTOT:  Not that I have -- I have not seen

15  anything about inferences that could be made based on voting

16  patterns that have not occurred.

17       MS. LAKIN:  Your Honor, she's an expert.  She

18  is testifying as to the --

19       THE COURT:  Yeah, that's part of my question, because

20  there's got to be something that she's basing it on.  I'm

21  hearing that they have received nothing that she's basing this

22  on.  You're saying something different.

23       MS. LAKIN:  That's correct, Your Honor.  I'm happy to

24  pull up Exhibit -- Alpha Phi Alpha Exhibit 10, which is the

25  rebuttal report that Dr. Handley --

1       THE COURT:  Can I see it?

2       MS. LAKIN:  -- submitted in the -- into the --

3       THE COURT:  Hold on a second.

4       It says it right there.  She gives it right there.

5       Have you seen rebuttal declaration number 10?

6       MS. LAKIN:  It's Alpha Phi Alpha Exhibit 10.

7       THE COURT:  I'm asking, have you seen this prior to

8  today?

9       MR. JACOUTOT:  Yes, Your Honor, prior to the PI

10  hearing -- or it might have been -- yeah, that was prior to

11  the PI hearing.  Obviously the Rule 26 report that she

12  submitted for this case and for the trial does not contain

13  this information.  And as far as I know, that -- these

14  questions can certainly be, you know, explaining or expanding

15  somewhat on what's considered -- what's written in the 26

16  report, Rule 26 report.  But going back to the PI hearing and

17  rebuttal declaration, I'm not familiar with that.

18       MS. LAKIN:  Your Honor, Mr. Tyson just offered into

19  evidence Mr. Cooper's preliminary injunction report, which was

20  submitted into evidence, as well as the fact that there have

21  been no objections lodged to this exhibit on the exhibit list.

22       THE COURT:  I'm going to allow it in over objection.

23  I'll note your objection.

24       MR. JACOUTOT:  Thank you.

25       MS. LAKIN:  So I'm handing up what is marked as

1  Exhibit APA 10.

2       Your Honor, Alpha Phi Alpha plaintiffs move to admit

3  Alpha Phi Alpha Exhibit 10 into the trial record.

4       THE COURT:  I'm allowing it over objection.  And I'll

5  note your objection for the record.

6       MR. JACOUTOT:  Thank you, Your Honor.

7       (APA Exhibit 10 was admitted and marked into

8  evidence.)

9       MS. LAKIN:  Your Honor, I would also note that the

10 primary data that she analyzed that we're discussing is in --

11      THE COURT:  What's your next question?

12      MS. LAKIN:  -- is in the report.  Is in her

13 December 2003 report.

14 BY MS. LAKIN:

15 **Q.**  Dr. Handley, can you -- you were discussing whether party

16 alone could explain racial polarization in the Democratic

17 primaries that you identified.  And the question that I asked

18 was what if you had found no racial polarization in party

19 primaries in Georgia, would that mean that race is not a

20 factor in the racially polarized voting patterns that you've

21 documented in general elections?

22 **A.**  No.  Because it still doesn't explain why white voters

23 are voting for Republicans and why Black voters are voting for

24 Democrats.  Race is still playing a role in that decision.  In

25 fact, social scientists have known this for a long time.

1    We've traced the movement of the -- of white voters from the

2    Democratic party to the Republican party, the realignment of

3    southern whites to civil rights legislation in the 1960s.

4    When national Democrats passed, for example, the Voting Rights

5    Act, that led to the white flight out of the Democratic party.

6         And this idea that the parties are divorced from race is

7    just not true because racial attitudes between the two parties

8    are quite different.  And it's not surprising that Black

9    voters would support the Democratic party.

10        THE COURT:  Didn't they basically just do a switch in

11   the '60s?  Up until about 1960s Blacks voted heavily

12   Republican.

13        THE WITNESS:  They didn't vote very much at all in

14   Georgia.

15        THE COURT:  When they voted, they voted Republican,

16   did they not?

17        THE WITNESS:  When they were allowed to vote, it's

18   true that they --

19        THE COURT:  White supported the Democrat.

20        THE WITNESS:  They supported Lincoln's party

21   originally, that's right.

22        THE COURT:  And then you had the 1964 Civil Rights

23   Act pass and they more of less kind of did a flip.  Blacks

24   started voting, well, Democratic, and whites started voting

25   Republican.

1    THE WITNESS:  That's correct.

2  BY MS. LAKIN:

3  **Q.**  And, Dr. Handley, do those trends continue to this day?

4  **A.**  That's correct.  That's correct.  And I think you can see

5  it reflected in attitudes about things like affirmative action

6  and racial justice.  There is a decided difference between the

7  two parties.

8  **Q.**  So going back to your conclusion that the majority of

9  Democratic primaries that you examined were racially

10  polarized, could that be due to chance?

11  **A.**  Only if you believed that voters voted randomly and all

12  of your contests had only two candidates in it.  I don't

13  believe -- I know that all the contests didn't have two

14  candidates in it.  And I don't believe that voters vote

15  randomly.

16  **Q.**  Did you see any evidence that voters were voting randomly

17  in the Democratic primaries that you looked at here?

18  **A.**  I did not.  You would see much -- much less variation

19  than you do.

20    THE COURT:  Let's take a ten-minute break here.  And

21  we'll go from 4:55 and we'll stop at 5:30.  We probably won't

22  finish direct today.  We definitely won't finish cross today.

23  They've got a lot of questions over there, so let's do that.

24    So giving a little -- some people, the court reporter

25  needs a break.  Thanks.  Let's stop right here for ten

1  minutes.

2        MS. LAKIN:  Thank you, Your Honor.

3        (After a recess, the proceedings continued at

4  4:52 p.m. as follows:)

5        THE COURT:  You-all can be seated.

6        Ms. Lakin, it was pointed out to me that I need to

7  apologize to you that my questioning threw you off your

8  presentation.  So I will sit here and listen.

9        MS. LAKIN:  Not at all, Your Honor.  I want to answer

10 the questions that you're most interested in and so that is

11 what I have been trying to accomplish.  And I hope this has

12 been helpful.

13       THE COURT:  It's been very helpful, but you-all have

14 a presentation you-all have prepared, so I will listen and not

15 talk.

16       Ms. Lewis is going, that's not possible.

17       MS. LAKIN:  We are happy to take the questions that

18 you have any time you have them.

19 BY MS. LAKIN:

20 **Q.**  So, Dr. Handley, I have one last question with respect to

21 these Democratic primary elections that we've been talking

22 about for now.

23       Just to be clear, you have said that the majority of

24 Democratic primary elections that you evaluated were

25 polarized, racially polarized; is that right?

# Doc. 387

```
 1                 UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

 4  ALPHA PHI ALPHA FRATERNITY,      )DAY 5 - P.M. SESSION
    INC., ET AL.,                    )
 5                     PLAINTIFFS,   )
                                     )DOCKET NO.1:21-CV-05337-SCJ
 6         -VS-                       )
                                     )
 7  BRAD RAFFENSPERGER,              )
                                     )
 8                     DEFENDANT.    )
    _____
 9  COAKLEY PENDERGRASS,             )
    ET AL.,                          )
10                     PLAINTIFFS,   )
                                     )DOCKET NO. 1:21-CV-5339-SCJ
11         -VS-                       )
                                     )
12  BRAD RAFFENSPERGER, ET AL.,      )
                                     )
13                     DEFENDANTS.   )
    _____
14  ANNIE LOIS GRANT, ET AL.,        )
                                     )
15                     PLAINTIFFS,   )
                                     )DOCKET NO. 1:22-CV-00122-SCJ
16         -VS-                       )
                                     )
17  BRAD RAFFENSPERGER, ET AL.,      )
                                     )
18                     DEFENDANTS.   )
    _____
19
                    TRANSCRIPT OF BENCH TRIAL
20             BEFORE THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT JUDGE
21               MONDAY, SEPTEMBER 11, 2023

22

23  STENOGRAPHICALLY RECORDED BY:

24            PENNY PRITTY COUDRIET, RPR, RMR, CRR
                    OFFICIAL COURT REPORTER
25             UNITED STATES DISTRICT COURT
                     ATLANTA, GEORGIA
```

1  **Q.**   And on pages 53 or 54, and I pulled up on the screen as

2  well, this is where you discuss the statistics relating to

3  ballot drop boxes; is that right?

4  **A.**   Yes.

5  **Q.**   Section D on page 55 of your report talks about the

6  electoral success of Black candidates.  You provide a table

7  about winning candidates in the 2020 Georgia House and State

8  Senate races.

9       Can you explain for the Court what the table shows?

10 **A.**   It shows that Black people or citizens or candidates are

11 really not elected unless they have Black majority districts

12 or close to it.

13 **Q.**   And at what percentage of white registered voters in a

14 district does the number go from -- go to zero?

15 **A.**   Rephrase the question for me again.

16 **Q.**   Yeah.

17      So fair to say in the Georgia House of Representatives,

18 if the percentage of white registered voters in a district is

19 over 55 percent, no Black candidate would be elected into that

20 district?

21 **A.**   That's right.  And even from 46.2 to 54.9, you had one

22 Black Democrat elected.

23 **Q.**   You talk about what is called the, quote, Great White

24 Switch on page 58.  Can you describe what the Great White

25 Switch was?

1  **A.**    Sure.    That was a term that Earl and Merle Black, two

2  twin political scientists, one taught right here at Emory

3  University, the other taught at Rice University, talked about

4  in the 1960s the huge shift of African-Americans from the

5  party of Lincoln, the Republican party, to the Democratic

6  party and the shift of white conservatives from the Democratic

7  party to the Republican party.

8       A lot of people forget, you know, the 1960 election,

9  Daddy King was a Republican and was probably supporting Nixon

10  until the famous phone call came when Martin Luther King, Jr.

11  was in jail, but there was that -- that was a really pivotal

12  moment.  And Georgia's critical in that about what happens.

13            THE COURT:  Do you think it was '60 rather than '64?

14            THE WITNESS:  It actually begins a little earlier.

15  You probably won't be going into this, but I think '64 is

16  critical.  And I can explain that later, because it really

17  starts in '48 when Strom Thurmond runs on what is commonly

18  called the Dixiecrats.  And he takes -- or the party uses the

19  confederate flag commitment to segregation.  So that changes

20  everything.  And then that plays back into Georgia with the

21  flag wars of 2002, you know.

22            THE COURT:  How did the fact that Truman's decision

23  on integrating the military --

24            THE WITNESS:  Well, that's it.  It was '48.  And

25  that's why Thurmond and the third party runs.  And it's very

interesting because, you know, Thurmond (sic) has it on the left with the Wallace and the progressives, and he has Strom Thurmond on the right, so no one thought he could pull it off.

And it's -- he integrates the military, but he also does that Civil Rights Commission, and that's often overlooked at how critical that was for America to start looking at race and what race was about in American politics. So that really starts it. Then Strom Thurmond is the -- really the first to leave the Democratic party, powerful Democrat, to go into the Republican party.

And then you have the '64 election where you have a major candidate, a non-Southerner, saying, let's go hunting where the ducks are. Let's don't, you know, try to attract Black people, let's don't go for Black voters, we can go for white voters.

And then you have -- after Strom Thurmond had run, it is his campaign manager, Harry Dent, who goes with Richard Nixon. And you have Kevin Phillips with his book on the Southern Strategy, they put it in. And then Nixon says, you know, let's don't go for the Jews or the Blacks. And it's a big shift there. And then Lee Atwater sort of explains the racial appeal and how that all appeals -- appears into it.

For me, it's a sad story for someone who loves Lincoln and that great Republican party that was committed to equal rights. And we forget that the Civil Rights Act, the

term, but it's become overused.  But it's made up.  It's a

genome project.  Everything that -- genetics all say that

there's no such thing but the human race, one race.

And as I said before, my sacred mother taught me from day

one that, from my faith perspective, that all people are

created in the image of God.  So there is no such thing as

race.  But there is a thing called racism.

And I was surprised when I was doing the book that I

co-authored with Armand Derfner, Justice Deferred, how much

the courts created this real-life thing called racism by

singling out a group of people and then making laws early on

that explicitly made them legally different by the law.  And

even making white people behave differently, that they could

not teach Black people to read or write.  They could not marry

someone they loved if they were Black.  It's not a different

race, but that law had the effect of creating racism.

And I would never deny that racism exists and that that

is part of our culture and has been part of sort of the

original sin of a country I love.  That we have come so far

and I had hoped that sort of moved beyond that until the last

few years, it seems like, that we are really, once again,

dealing with these issues that tear at our heart of who we are

as Americans, and particularly democracy itself, I think, is

being challenged.  And race, the word "race" and groups of

people being used to tear up the greatest experiment the

1    world's ever seen.

2         Is that what you were asking?  I don't know what you were

3    asking.

4    Q.    Yes.

5         And as a historian, you agree that race has been used

6    in -- in -- throughout history and particularly with respect

7    to voting laws and discrimination against Black voters?

8    A.    Yes.

9    Q.    You had an exchange about why race -- about race and

10   party being inextricably linked.

11        Do you remember that?

12   A.    Yes.

13   Q.    Can you explain why race and party can't be separated in

14   Georgia?

15   A.    Well, you know, the statistical term, when I talk

16   statistics, was multicollinearity -- I can spell it for you

17   later, okay -- which means that if you look at race and

18   partisanship, that statistically they're going to correlate so

19   much with party that you cannot really separate them.  I mean,

20   they can be separate things, but the way that they are -- have

21   developed.

22        And I think part of that is because one group of a

23   political party decided to use race and to use coded words, in

24   particular, to get the former confederacy, to white people,

25   desert the Democratic party and become part of the Republican

1  party by appealing to the -- not everything was race.  I mean,

2  physical conservatism, a lot of people, you know, look at it

3  that way.

4      So you can't really separate it out.  There are a lot of

5  issues that go into who someone chooses to vote for, what

6  political party they are a part of.  But race was used so that

7  now we find ourselves at a critical moment in politics where

8  it is almost impossible to distinguish race from partisanship,

9  particularly on how people vote.  As the scorecard from the

10  NAACP dramatically shows, I think, from looking at -- as I

11  said, it's not the candidate's race, but the race of the voter

12  and how they vote for political parties.

13      As Charles Bullock said, you know, the percentage of

14  Blacks who vote for the Democratic party identify as

15  Democrat, the percent of whites who identify with the

16  Republican Party and vote for Republican party, all those

17  things have come together.

18  **Q.**   Has the State of Georgia ever asked you to provide a

19  historical analysis of voting discrimination?

20  **A.**   No.  I wish they would.

21  **Q.**   Dr. Burton, you were asked about your use of news

22  articles as sources you considered in writing your report.

23      Do you recall that?

24  **A.**   I do.

25  **Q.**   As a historian are you trained to evaluate reports and

1 news articles to assess their accuracy?

2 **A.**    Historians are trained better than any single discipline

3 to evaluate, to contextualize, to look at newspaper sources to

4 be able to use, whether it's in court or in writing any book,

5 how to evaluate it, evaluate the biases of that article and

6 still try to find out what is best.

7       And what's really good about them is the public opinion,

8 like that Slate article explaining how that meme went -- that

9 trope got distributed on Facebook and got, you know, all over

10 the place right before the election.

11 **Q.**    Did you only cite to sources you found to be reliable in

12 your report?

13 **A.**    I hope that I did, that I evaluated each one.  And,

14 again, it's not just one thing.  It's the totality of all

15 these things.  And as I said, that pattern that begins with

16 reconstruction of advancement in terms of Blacks and then laws

17 coming in to stop it.

18       Advancement by Blacks, laws that -- they never give up.

19 I mean, it amazes me why Black people love democracy in the US

20 so much because of all the times of that discrimination, but

21 they never give up and keep fighting for the equal rights --

22 they're only asking for the equal rights and opportunities

23 that whites have.

24       Even though whites fantasize that other things are

25 happening, like the Black Panther Party and the meanness in

***Grant v. Raffensperger***, No. 1:22-cv-00122 (N.D. Ga.):

# Doc. 313-4

***Grant et al. v. Raffensperger, et al.***, **No. 1:22-cv-00122**

**United States District Court for the Northern District of Georgia**

**Expert Report of Orville Vernon Burton, Ph.D.**

_____

**Dr. Orville Vernon Burton**

December 5, 2022

GRANT
EXHIBIT
4

from the nearest lamppost and set on fire," horribly echoing the calls for lynchings of Black citizens from earlier years who were attempting to participate in the political process [275] As discussed above, the intense focus on Fulton County is not random—reference to this large, urban, majority-minority county in Georgia has been used as a coded racial appeal in the election context.

The drumbeat of allegations against the "integrity" of Georgia's electoral processes, especially as practiced in the interracial county governments in the Atlanta metro area, has continued. In August 2021, Republican Congressman Jody Hice, who challenged Raffensperger in the Republican primary in the race for Secretary of State, stated that "as long as *these people* are allowed to continue cheating, they will continue to do so." Kemp claimed that "Fulton County has a long history of mismanagement, incompetence, and lack of transparency when it comes to running elections, including during the 2020 elections." Butch Miller, a candidate for lieutenant-governor argued that "maintaining integrity of our elections is of the utmost importance to me and my colleagues in the state senate. Unfortunately, Fulton County's apparent disregard for election procedures and state law have called that integrity into doubt."[276]

## C. Divergent Race-Related Views of Members of the Democratic and Republican Parties in Georgia

Aside from the use and effect of racial appeals in Georgia, the significant impact race has on the state's partisan divides is made readily apparent when one considers the opposing positions that members of Georgia's Democratic and Republican parties take on issues inextricably linked to race. For example, the Democratic and Republican members of Georgia's congressional delegation consistently oppose one another on issues relating to civil rights. As indicated in the table below, each Republican member of the delegation during the 2017-2019 congressional session received extremely low scores (no higher than 6-13% on a scale of 0-100%) on the civil rights scorecard produced by the NAACP, an organization dedicated to promoting minority rights. Meanwhile, each Democratic member received extremely high scores (81-100%).

---

[275] *Id.*
[276] Mark Niesse, "Board Launches Fulton County Election Woes Inquiry," *Atlanta Journal Constituion* (Aug. 19, 2021), https://www.ajc.com/politics/panel-appointed-to-investigate-fulton-election-problems/IBRJTWD4ERAP7HRIFZ7D243JAA/.

| Pro-Civil Rights Votes Among Georgia's Congressional Delegation, 2017-2019 Congressional Session[277] | | | |
|---|---|---|---|
| Republican Members | | Democratic Members | |
| Johnny Isakson | 13% | Sanford Bishop Jr. | 81% |
| David Perdue | 9% | Hank Johnson | 100% |
| Earl "Buddy" Carter | 6% | John Lewis | 97% |
| Drew Ferguson | 13% | David Scott | 84% |
| Rob Woodall | 9% | | |
| Austin Scott | 13% | | |
| Doug Collins | 6% | | |
| Jody B. Hice | 6% | | |
| Barry Loudermilk | 6% | | |
| Rick W. Allen | 9% | | |
| Tom Graves | 9% | | |

The Pew Research Center's *Beyond Red and Blue: The Political Typology* (issued in November 2021) confirm these differences between the parties on issues relating to race. This study divided political allegiance into nine distinct typology groups, four leaning Republican, four leaning Democratic, with the "Stressed Sideliners," uncertain and generally not following politics very closely.[278] Among the four Republican groupings [Faith and Flag Conservatives (85% white), Committed Conservatives (82% white), Populist Right (85% white), and Ambivalent Right (65% white], the survey found "no more than about a quarter say a lot more has to be done to ensure equal rights for all Americans regardless of their racial or ethnic backgrounds, by comparison, no fewer than about three-quarters of any Democratic group [Progressive Left (68% white), Establishment Liberals (51% white), Democratic Mainstays 46% white), and Outsider Left (49% white) says a lot more needs to be done to achieve this goal."[279] The four Republican groups agreed between 78 and 94% that "white people do not benefit much or not at all from the advantage that Black people do not have," or in other words, that there is no systematic racism at work in American society or institutions.[280] Among the four Democratic leaning groups, there was

[277] Nat'l Ass'n for the Advancement of Colored People, "NAACP Civil Rights Federal Legislative Report Card, Congressional Votes 2017-2018" (Feb. 1, 2019), https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf.
[278] Pew Research Center, *Beyond Red and Blue: The Political Typology,* (Nov. 9, 2021), https://www.pewresearch.org/politics/2021/11/09/beyond-red-vs-blue-the-political-typology-2/.
[279] *Id.* at 7.
[280] *Id.* at 14.

agreement (between 73 and 96%) that "a lot more needs to be done to ensure equal rights for all Americans regardless of their ethnic or racial backgrounds."[281]

Georgia-specific polls suggest the same. An NORC poll conducted for 3,291 likely Georgia voters just before the 2020 election found that 45% were Democratic or Democratic leaning, 51% Republican or Republican leaning. Among voters who believed that racism was the most important issue facing the country, 78% voted for Joe Biden and 20% voted for Donald Trump. Among voters who believed that racism was "not too or not at all serious," 9% voted for Biden and 90% voted for Trump. And among voters who believe that racism is a serious problem in policing, 65% voted for Biden and 33% voted for Trump.[282]

### C. Conclusion

As this report has shown, Georgia has worked for decades to diminish the voting power of Black Georgians, both at the structural electoral level (in terms of redistricting and electoral arrangements), and at the individual level (in terms of voter requirements). These efforts have often been successful, stymying Georgia's Black voters from exercising their full political power. It is my opinion that Georgia's newest congressional plan is best viewed with this historical context.

Moreover, the correlation between race and party in Georgia is no coincidence. Instead, race and issues inextricably linked to race have long played a role in separating Black voters and white voters along partisan lines, and they continue to contribute to the partisan divisions we see today.

### APPENDIX A: Representative Discriminatory Voting Tactics

| Voting Mechanism Adoption | Name of Georgia Jurisdiction | Details |
|---|---|---|
| Majority voting requirement | Americus (city) | Adopted plurality to majority vote for mayor and city council in 1968 |

---

[281] *Id.* at 29

[282] A.P. VoteCast, "Georgia Voter Surveys: How Different Groups Voted," N.Y. Times, (Nov. 3 2020), https://www.nytimes.com/interactive/2020/11/03/us/elections/ap-polls-georgia.html.

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will automatically send a notice of the electronic filing to all registered CM/ECF users who have entered an appearance in the case.

Dated: April 10, 2024        */s/ Sophia Lin Lakin*
                                     SOPHIA LIN LAKIN