**Nos. 23-13914, -13916, -13921**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

Alpha Phi Alpha Fraternity, Inc., *et al.*,

*Plaintiffs-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

On appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division
No. 1:21-cv-05337 — Steve C. Jones, Judge

**BRIEF OF VOTING RIGHTS HISTORIANS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES**

Eugene R. Fidell
YALE LAW SCHOOL SUPREME COURT
  CLINIC
127 Wall Street
New Haven, CT 06511

Charles A. Rothfeld
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@mayerbrown.com

*Attorneys for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, counsel for *amici curiae* Voting Rights Historians certify that, in addition to those identified in the briefs filed by Plaintiffs-Appellees and other *amici curiae*, the following is a complete list of trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Charles A. Rothfeld, counsel for *amici curiae* Voting Rights Historians.

2. Eugene R. Fidell, counsel for *amici curiae* Voting Rights Historians.

3. Mayer Brown LLP, counsel for *amici curiae* Voting Rights Historians.

4. Yale Law School Supreme Court Clinic, counsel for *amici curiae* Voting Rights Historians.

5. Carol Anderson, *amicus curiae*.

6. Orville Vernon Burton, *amicus curiae*.

7. Alexander Keyssar, *amicus curiae*.

8. J. Morgan Kousser, *amicus curiae*.

No publicly traded company or corporation has an interest in the outcome of this appeal.

Dated: This 15th day of April, 2024.

Respectfully submitted,

*/s/ Charles A. Rothfeld*
Charles A. Rothfeld
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000
Attorney for A*mici Curiae*
 Voting Rights Historians

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST .................................................................. 1

STATEMENT OF ISSUES...................................................................... 3

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

ARGUMENT ......................................................................................... 6

    A.   In determining the meaning of the VRA the Court should look to the history of voting rights enforcement........ 6

    B.   Congress enacted the VRA in 1965 to provide an effective mechanism for enforcement of voting rights. ................. 7

    C.   Practice under Section 2 from 1965 to 1982 confirms the existence of a private cause of action........................... 12

    D.   The history of the 1982 Amendment of Section 2 reveals Congress intended to authorize a private cause of action. .................................................................................. 16

    E.   Litigation following passage of the 1982 Amendments confirms that the Amendments were meant to preserve the private right of action. .................................................. 26

CONCLUSION ................................................................................... 31

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ......................................................... 7, 18

*Am. Broad. Cos. v. Aereo, Inc.,*
573 U.S. 431 (2014) ............................................................. 21

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment,*
86 F.4th 1204 (8th Cir. 2023) ......................................... 28, 30

*Armour v. State of Ohio,*
775 F. Supp. 1044 (N.D. Ohio, 1991)............................... 28, 29

*Baker v. Cuomo,*
58 F.3d 814 (2d Circ. 1995)............................................. 29, 30

*Bond v. White,*
508 F.2d 1397 (5th Cir. 1975)............................................... 13

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ............................................................... 6

*Brnovich v. Democratic National Committee,*
141 S. Ct. 2321 (2021) ......................................................... 28

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979) ............................................................. 19

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ............................................................... 16

*City of Rancho Palos Verdes v. Abrams,*
544 U.S. 113 (2005) ............................................................... 7

*Criterion Club of Albany v. Bd. Of Comm'rs of Dougherty Cnty.,* 594 F.2d 118 (5th Cir. 1979)....................................... 13

ii

# TABLE OF CONTENTS
## (continued)

*Dillard v. Crenshaw Cnty., Ala.,*
   640 F. Supp. 1347 (M.D. Ala. 1986) ...................................... 27

*Hibbs v. Winn,*
   542 U.S. 88 (2004) ............................................................... 31

*James v. Humphreys Cnty. Bd. of Election Comm'rs,*
   384 F. Supp. 114 (N.D. Miss. 1974) .................................... 12

*McQuiggin v. Perkins,*
   569 U.S. 383 (2013) ............................................................. 18

*Moch v. E. Baton Rouge Parish Sch. Bd.,*
   533 F. Supp. 556 (M.D. La. 1980) ....................................... 15

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014) ......................................................... 6, 30

*Smiley v. Holm,*
   285 U.S. 355 (1932) ............................................................... 6

*United States v. Post,*
   297 F. Supp. 46 (W.D. La. 1969) ......................................... 15

*Zimmer v. McKeithan,*
   485 F.2d 1297 (5th Cir. 1973) ............................................ 15

## Statutes

52 U.S.C. § 10301(a) ................................................................. 17

## Other Authorities

Carol Anderson, ONE PERSON, NO VOTE: HOW VOTER
   SUPPRESSION IS DESTROYING OUR DEMOCRACY (2018) ............... 1, 9, 11

Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History*, 40 WASH. & LEE L. REV. 1347 (1983)...................................................17

Tomiko Brown-Nagin, COURAGE TO DISSENT: ATLANTA AND THE LONG HISTORY OF THE CIVIL RIGHTS MOVEMENT (2011)...............11

Orville Vernon Burton & Armand Derfner, JUSTICE DEFERRED: RACE AND THE SUPREME COURT (2021) ............................17

111 CONG. REC. 10037 (1965) ..........................................................9, 10, 11

Chandler Davidson & Bernard Grofman, *The Voting Rights Act and the Second Reconstruction,* in QUIET REVOLUTION: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 (Davidson & Grofman, eds., 1994). ..........................................................27

*Executive Session Considering Voting Rights Act, Hearings Before the S. Comm. On the Judiciary*, 97th Cong. (1982) .........................................20, 21, 22, 23, 25

*Extension of the Voting Rights Act, Hearings before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary*, 97th Cong. (1982) ...................19, 21, 23, 24

H.R. REP. NO. 89-439 (1965)....................................................................10

H.R. REP. NO. 97-205 (1981)....................................................................25

Ellen D. Katz, M. Aisenbrey, *et al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. MICH. J. L. REFORM 643, 655 (2006) ....................................................................14

Alexander Keyssar, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES (2000) ...................8, 9

# TABLE OF CONTENTS
## (continued)

**Page**

J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION (1999) ...................................................... 17

J. Morgan Kousser, *Do The Facts of Voting Rights Support Chief Justice Roberts's Opinion in Shelby County?*, 1 TRANSATLANTICA (2015) ...................................................... 27

J. Morgan Kousser, *How Judicial Action Has Shaped the Record of Discrimination in Voting Rights*, for the H. Comm. On the Judiciary (2021). ....................................... 14

Allan J. Lichtman, THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (2018) ......................................... 10, 11

Gordon A. Martin, Jr., COUNT THEM ONE BY ONE: BLACK MISSISSIPPIANS FIGHTING FOR THE RIGHT TO VOTE (2014) ................... 8

Gary May, BENDING TOWARD JUSTICE: THE VOTING RIGHTS ACT AND THE TRANSFORMATION OF AMERICAN DEMOCRACY (2013) ........................................................................... 8, 9

S. REP. NO. 162 (1965) ........................................................... 11

S. REP. NO. 97-417 (1982) ...................................................... 25

# STATEMENT OF INTEREST[1]

*Amici Curiae* are historians who are authorities in the field of minority voting rights. They have published on the subject extensively. In addition, certain of the *amici* have served as expert witnesses or consultants in voting rights cases and have testified before Congress on the subject, including on the renewal of the Voting Rights Act. In light of their deep experience with the Act and its history, *amici* submit this brief to assist the Court in the resolution of these cases.

*Amici* include:

**Carol Anderson** is the Robert W. Woodruff Professor of African American Studies at Emory University. She is the author of five books, including *One Person, No Vote: How Voter Suppression is Destroying our Democracy*, which was Long-listed for the National Book Award in Non-Fiction and a finalist for the PEN/Galbraith Book Award in Non-Fiction. She has been elected into the Society of American Historians, named a W.E.B. Du Bois Fellow of the American Academy of Political and Social

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity aside from *amici curiae* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

Sciences, inducted into the American Academy of Arts and Sciences, and elected to the American Philosophical Society. Anderson was a member of the U.S. State Department's Historical Advisory Committee; the Pulitzer Prize Committee for History; and the National Book Awards Committee in Non-fiction.

**Orville Vernon Burton** is the inaugural Judge Matthew J. Perry Distinguished Chair of History and Professor of Pan-African Studies, Sociology and Anthropology, and Computer Science at Clemson University. His most recent book, co-authored with Armand Derfner, is *Justice Deferred: Race and the Supreme Court*.

**Alexander Keyssar** is the Matthew W. Stirling, Jr. Professor of History and Social Policy at the Kennedy School of Government, Harvard University. His books include *The Right to Vote* (2000), a Pulitzer Prize finalist in History and recipient of best book in U.S. history from the American Historical Association and the Historical Society, and *Why Do We Still Have the Electoral College?* (2020).

**J. Morgan Kousser** is Professor of History and Social Science, Emeritus, at the California Institute of Technology. The author of two books, 50 scholarly articles, 83 book reviews, and 26 entries in

encyclopedias and dictionaries, most concerning minority voting rights, he has twice testified on the Voting Rights Act before the Judiciary Committee of the House of Representatives, as well as in over 30 federal and state voting rights cases.

## STATEMENT OF ISSUES

*Amici* will address the following issue: Whether there is a private cause of action to enforce § 2 of the Voting Rights Act.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has made clear that the meaning of a provision may be determined by looking to the context in which the provision was written, as well as to how the provision was understood by those who wrote it, those who were subject to it, and those who interpreted it soon after enactment. Here, those considerations include (1) the problem Congress sought to address with the Voting Rights Act (VRA) when it enacted voting rights legislation in 1965 and in 1982, which casts light on how Congress meant the law to be read; (2) the way in which VRA litigants—private plaintiffs, defendants, and the Justice Department—understood that legislation after the enactments in 1965 and 1982; and (3) the meaning ascribed to that legislation by courts. Here, *all* of those considerations

leave no doubt that Congress intended both to permit and to encourage private litigation under the Act's Section 2.

*First*, Congress enacted the VRA in 1965 because prior civil rights legislation had proved ineffective in guaranteeing voting rights. In particular, those earlier laws relied for their enforcement on litigation initiated by the Justice Department. But the Department had proved inconsistent in seeking enforcement and unable to complete litigation expeditiously. The VRA, and with it the prospect of a private right of action, therefore was understood to be essential for the effectuation of voting rights.

*Second*, private litigation was the principal means of VRA enforcement in the years after 1965. During the 1965-1982 period, the overwhelming majority of VRA enforcement actions were brought by private plaintiffs, not the Justice Department. At this time, not only plaintiffs themselves, but also defendants and the Justice Department, recognized the availability of a private VRA right of action; neither defendants nor the Department, either in reported cases or in threatened or settled litigation, suggested that the VRA did not authorize private rights of action. Nor, so far as we are aware, was that suggestion ever made by a court.

That uniform understanding of the VRA is powerful evidence of what Congress intended.

*Third*, the Congress that amended the VRA in 1982 was well aware of this history of private enforcement activity. At that time, Congress heard extensive testimony from attorneys who had litigated voting rights challenges for private plaintiffs under the 1965 Act. Far from disapproving that practice, Congress took steps sought by these private litigants to make private actions more effective and, in authoritative legislative history, endorsed the private right of action. This congressional action plainly embraced the existing practice.

*Finally*, the same practice has prevailed with undiminished force since amendment of the VRA in 1982. Following the amendment, Section 2 enforcement by private plaintiffs has accounted for over 90% of voting rights litigation, dwarfing Justice Department enforcement activity. And during almost all of this period, defendants did not contend and courts did not hold (or even suggest) that such actions had been brought in error. That literally everyone involved in voting rights enforcement on both sides recognized the validity of private actions is exceedingly powerful evidence that this understanding properly reflects Congress's intent.

**ARGUMENT**

**A.**   **In determining the meaning of the VRA the Court should look to the history of voting rights enforcement.**

The Supreme Court has recognized that constitutional interpretation should be informed by "the actual practice of Government." *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (looking to historical practices to interpret the Recess Appointments Clause). Consequently, "long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning." *Smiley v. Holm*, 285 U.S. 355, 369 (1932). The same principle applies to the interpretation of statutes, where the "ordinary public meaning" should be assessed from the perspective of the statute's intended audience. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020).

This statutory meaning may be gleaned by looking to the understanding of a law held by institutional actors both inside and outside the government. Here, those actors include Congress's intended audience of voting rights plaintiffs, the Justice Department, Section 2 defendants, and courts. And there is no doubt about what those actors understood VRA's Section 2 to mean: With striking unanimity, all have agreed since 1965 that Section 2 includes a private cause of action. That answers the

question in this case. When determining whether a private right of action exists, a court must determine "Congress's intent." *Alexander v. Sandoval*, 532 U.S. 275, 287-88 (2001); *see City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005). In this case, the best evidence of that intent is the historical interplay between litigants, courts, and Congress. This history reveals that Congress was well aware that private plaintiffs were leading the enforcement of Section 2 and was affirmatively interested in strengthening private litigants' ability to do so.

### B. Congress enacted the VRA in 1965 to provide an effective mechanism for enforcement of voting rights.

At the outset, Congress enacted the VRA in a setting where the *lack* of a private enforcement mechanism was understood to be a fatal flaw in the existing mechanism for safeguarding voting rights. Congress's clear intent in enacting the VRA was to remedy this deficiency.

Discrimination against Black voters was endemic in the South of the 1950s and early 1960s. At the time, southern states maintained substantial barriers to the full enfranchisement of Black voters, including literacy tests, poll taxes, and the discriminatory administration of elections. *See* Gary May, BENDING TOWARD JUSTICE: THE VOTING RIGHTS ACT AND THE TRANSFORMATION OF AMERICAN DEMOCRACY xi (2013). Until the

federal government provided meaningful enforcement tools, Black residents would continue to be deprived of their fundamental rights. *Id*. at 42.

The first wave of civil rights statutes, however, was ineffective. The Civil Rights Acts of 1957 and 1960 were comparatively modest, allowing the federal government to pursue certain remedies but giving little direct opportunity to Black voters to protect their rights. *See* Alexander Keyssar, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES, 260 (2000). At the time the 1957 Act was passed, many recognized that it was not powerful enough to combat widespread voting discrimination. NAACP executive Roy Wilkins called it "a small crumb from Congress," while U.S. Deputy Attorney General William Rogers, who would formally create the Department's Civil Rights Division, compared it to "giving a policeman a gun without the bullets." Gordon A. Martin, Jr., COUNT THEM ONE BY ONE: BLACK MISSISSIPPIANS FIGHTING FOR THE RIGHT TO VOTE, 30 (2014). Subsequent civil rights statutes enacted prior to the VRA had the same defects. *See* Keyssar, THE RIGHT TO VOTE, 262-263; May, BENDING TOWARD JUSTICE, 36-51; 111 Cong. Rec. 10037-38 (1965).

Of particular relevance here, scholars have observed that Justice Department litigation under these statutes was excruciatingly slow and ineffective. "The Civil Rights Act (1957), while seemingly a landmark piece of legislation, was actually a paper tiger that had no ability to protect the right to vote." Carol Anderson, ONE PERSON, NO VOTE: HOW VOTER SUPPRESSION IS DESTROYING OUR DEMOCRACY, 19 (2018). "[I]t was—by design and implementation—no match for the entrenched resistance to black citizenship." *Id.* The 1957 Act thus gave the Justice Department authority to sue jurisdictions that employed discriminatory voting practices, but that lawsuit mechanism as employed by the Department had "any number of insurmountable problems." *Id.* Perhaps most problematic was the Department's "reluctance … to pursue these cases with any true vigor." *Id.* at 20. As a result, the 1957 statute proved to be a "modest piece of legislation … [with] few teeth and little impact." *Id.*

Discrimination and resistance to civil rights increased despite these initial legislative interventions. Growing political violence in the South demanded further federal intervention. National outrage grew over the highly publicized Bloody Sunday in Selma, and President Johnson called for the adoption of a new voting rights law. *See* Allan J. Lichtman, THE

EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT, 164 (2018). In passing the 1965 Voting Rights Act, many in Congress pointed to the ineffectiveness of previous civil rights enforcement as the central reason for needing a new statute.

In a House Report submitted by Rep. Peter Rodino, for example, the Committee on the Judiciary explained the basis for the 1965 Act by reference to the sluggish activity of the Justice Department in one southern county:

> [L]itigation in Dallas County took more than 4 years to open the door to the exercise of constitutional rights conferred almost a century ago. The problem on a national scale is that the difficulties experienced in suits in Dallas County have been encountered over and over again under existing voting laws. Four years is too long. The burden is too heavy—the wrong to our citizens is too serious—the damage to our national conscience is too great not to adopt more effective measures than exist today. Such is the essential justification for the pending bill.

H.R. REP. NO. 89-439, at 11 (1965). Similarly, Senator Paul Douglas observed that "there is almost unanimous opinion in the country that the right to vote should be guaranteed and enforced … [but] [w]e passed laws in 1957, 1960, and again in 1964 which did not do the job." 111 CONG. REC. 10037 (1965). "After a decade of ineffective legislation aimed at guaranteeing the right of all citizens to vote," he concluded, "we should

finally finish the job and do it right." *Id*. at 10038; *see also* S. REP. NO. 162, pt. B, at 8 (1965) (criticizing ineffectiveness of voting rights litigation in Selma).

Thus, the Johnson Administration and Congress designed the VRA to provide several potent tools to combat discrimination against Black voters, including discrimination in redistricting. It was understood as a "seismic shift in thought, action and execution" when compared to the Civil Rights Act of 1957 and "its equally enfeebled companion legislation of 1960." Anderson, ONE PERSON, NO VOTE 21; *see also* Tomiko Brown-Nagin, COURAGE TO DISSENT: ATLANTA AND THE LONG HISTORY OF THE CIVIL RIGHTS MOVEMENT 253 (2011) (noting that SNCC's John Lewis called the VRA the "crowning achievement" of the civil rights movement). In particular, the VRA carried a stronger set of enforcement mechanisms—it "would be enforced through both direct administrative actions by the U.S. Department of Justice and lawsuits that could be filed by both the Justice Department and private parties." Lichtman, THE EMBATTLED VOTE 166.

## C. Practice under Section 2 from 1965 to 1982 confirms the existence of a private cause of action.

The reaction to enactment of the VRA in 1965 demonstrates a universal understanding that the new statute authorized private rights of action. It is clear that everyone in the voting rights ecosystem—judges from the district court to the Supreme Court, voting rights plaintiffs, governmental defendants, and the Justice Department—recognized that Section 2 included a private cause of action. This understanding must be understood both to reflect, and confirm, the congressional intent.

*First*, the private civil rights bar quickly mobilized to put Section 2 into operation. We identified 85 Section 2 cases brought between 1965 and 1982. Of these, the vast majority—66 cases—were brought by private plaintiffs, not the Justice Department. It is telling that no court held, or even hinted, between 1965 and 1982 that a private right of action was unavailable under Section 2, even as judges certified Section 2 class actions brought by private plaintiffs. *See, e.g.*, *James v. Humphreys Cnty. Bd. of Election Comm'rs*, 384 F. Supp. 114, 117 & n.1 (N.D. Miss. 1974) (finding that a case brought by a class representing "all black qualified and registered voters of the county and all black qualified candidates" was "properly maintainable as a class action under Rule 23").

Notably, amid controversy over whether prevailing voting rights plaintiffs were entitled to attorneys' fees, judges never questioned whether private lawyers representing private plaintiffs could bring voting rights claims in the first place. S*ee, e.g.*, *Criterion Club of Albany v. Bd. Of Comm'rs of Dougherty Cnty.*, 594 F.2d 118, 120 (5th Cir. 1979); *see also Bond v. White*, 508 F.2d 1397, 1401-02 (5th Cir. 1975) (holding that attorneys' fees should be awarded because "awarding attorneys' fees encourages private enforcement actions" and "there is a need for private enforcement of Section 5"). Indeed, the Fifth Circuit held that if private plaintiffs representing "black residents of Dougherty County, Georgia" in a challenge to an at-large election system were the prevailing party, attorneys' fees should be awarded, whether or not the plaintiffs successfully "vindicated rights through a consent judgment or without formally obtaining relief." *Criterion Club of Albany*, 594 F.2d at 120. If private plaintiffs could be awarded attorneys' fees even where they prevailed "without formally obtaining relief," certainly judges did not doubt the existence of a private cause of action. To the contrary, their rulings encouraged private litigation.

*Second*, it is further telling that defendant jurisdictions themselves assumed the existence of a private right of action. A thorough search of published decisions from 1965-1982 reveals that no defendant even *contended* that Section 2 did not include a private cause of action. Instead, far from disputing the existence of a right, state and local government bodies often agreed to change discriminatory policies or enter into settlements based merely on the threat of private litigation advanced by voting rights lawyers. These defendants surely would not have done so had they doubted the existence of a private right of action. *See* Ellen D. Katz, M. Aisenbrey, *et al.*, *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*, 39 U. MICH. J. L. REFORM 643, 655 (2006) (discussing published cases approving settlements). As one of *amici* here has documented, "[i]t was not the U.S. government with 'vast resources,' but private lawyers or civil rights organizations that received the vast majority of settlements." J. Morgan Kousser, *How Judicial Action Has Shaped the Record of Discrimination in Voting Rights*, for the H. Comm. On the Judiciary at 2 n.1 (2021).

Although most such settlements were never the subject of published judicial opinions, courts occasionally had cause to approve consent

decrees. In one such case, the district court praised the defendant school board for deciding, "in the face of litigation ... demanding immediate and total dismantling of the present system," that it would "fence black voters in, rather than out of, the electoral process." *Moch v. E. Baton Rouge Parish Sch. Bd.*, 533 F. Supp. 556, 560 (M.D. La. 1980). The judge remarked: "[C]onsidering the jurisprudence of the last fifteen years, it is certainly prudent for the school board to view these suits as serious claims." *Id.* If defendants or the court had doubted the existence of a private right of action under Section 2, such claims would not have been "serious" and settlement would not have been "prudent."

*Third*, during this period, voting rights plaintiffs—private plaintiffs but also the United States—had no doubt about the existence of a private cause of action. In some cases, private plaintiffs and the Justice Department litigated side by side, with neither party questioning the arrangement. *See, e.g.*, *United States v. Post*, 297 F. Supp. 46, 47 (W.D. La. 1969) (consolidating case brought by private plaintiffs with case brought by the United States under Sections 2, 11(a), and 12(b) of VRA); *Zimmer v. McKeithan*, 485 F.2d 1297 (5th Cir. 1973) (en banc) (allowing named

plaintiff to intervene on behalf of himself and all similarly situated voters in East Carroll).

Thus, the uniform understanding of the VRA's original intended audience was that Section 2 included a private right of action.

**D.    The history of the 1982 Amendment of Section 2 reveals Congress intended to authorize a private cause of action.**

This same understanding is clearly visible in the lead-up to the amendment of the VRA's Section 2 in 1982. In that year, Congress responded to the Supreme Court's decision two years earlier in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), which had held that a facially neutral state law violates Section 2 "only if motivated by a discriminatory purpose." *Id.* at 62. Notably, *City of Mobile* itself was brought by private plaintiffs representing Black citizens of Mobile, Alabama, and the Supreme Court's decision in the case—even while cutting back substantially on the substantive scope of the VRA—did not question the ability of plaintiffs to proceed. See *id.* at 58 (observing that "appellees brought this suit in the Federal District Court for the Southern District of Alabama as a class action on behalf of all Negro citizens of Mobile").

Concern about the impact of *City of Mobile* on the substantive reach of the VRA sparked a campaign to "reinstate the pre-Bolden understanding of the law." J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION 61 (1999); *see* Armand Derfner, *Vote Dilution and the Voting Rights Act Amendments of 1982*, in MINORITY VOTE DILUTION 148 (Chandler Davidson ed., 1984); Orville Vernon Burton & Armand Derfner, JUSTICE DEFERRED: RACE AND THE SUPREME COURT 284 (2021); Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments to the Voting Rights Act: A Legislative History*, 40 WASH. & LEE L. REV. 1347, 1355 (1983). Amending Section 2 in light of *City of Mobile* drew broad support. *See* Burton and Derfner, JUSTICE DEFERRED, at 284.

Congress, which was already set to reauthorize the special provisions of the VRA, including Section 5 preclearance, therefore overturned *City of Mobile*'s intent standard by condemning any voting practice that "*results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). Nothing in the amended text referred to the means of enforcement, and the extensive debates about differing substantive standards

reveal no dispute over whether private litigation should remain the primary means of enforcing Section 2.

Instead, the 1982 debates reveal that Congress was keenly aware of the importance of private Section 2 enforcement and was concerned this enforcement would be weakened by *City of Mobile*'s intent standard, which was already proving challenging for under-resourced private plaintiffs. This evidence conclusively demonstrates, in two ways, Congress's "intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. First, Congress clearly acquiesced in—indeed, sought to empower through a change in the legal standard—existing Section 2 litigation practice which, as the foregoing analysis demonstrates, principally advanced through private litigation. And second, Congress actively intended to strengthen the "private remedy" of Section 2 by creating a "results," rather than intent, substantive standard that private plaintiffs would be more capable of meeting.

1. As to Congress's endorsement of the 1965-1982 practice of private litigation under Section 2, the general understanding is that "Congress legislates against the backdrop of existing law." *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013). "It is always appropriate to assume that our

elected representatives … know the law; in this case, because" the 1982 legislation grew out of the prior version of the VRA, "we are especially justified in presuming both that those representatives were aware of the prior interpretation of [the VRA] and that that interpretation reflects their intent with respect to [the 1982 amendment]." *Cannon* v. *Univ. of Chicago*, 441 U.S. 677, 697-98 (1979).

Here again, there is no need to engage in presumption or speculation about congressional awareness of the prevalence of private VRA litigation prior to 1982. The 1982 congressional debates reveal recognition that *City of Mobile itself* was brought by private plaintiffs. In fact, Congress invited and heard testimony from James Blacksher, the lawyer who represented the class of Black citizens of Mobile in C*ity of Mobile. Extension of the Voting Rights Act, Hearings before the Subcomm. On Civil and Constitutional Rights of the H. Comm. On the Judiciary* [hereinafter *H. Comm. Hearings*], 97th Cong. 2035-36 (1982).

2. Legislative history further reveals that the effects of *City of Mobile* on Section 2 litigation brought by private plaintiffs were at the forefront on both sides of the debate over amending Section 2. Senators were particularly concerned with the proceedings in *City of Mobile* on remand.

Speaking in favor of a results test, Senator Patrick Leahy observed: "The decision in the remand of Bolden by the Federal District Court in Alabama is a painful illustration of how the intent test can turn a search for the truth about the openness of an election system into a battle over ancient municipal records." *Executive Session Considering Voting Rights Act, Hearings Before the S. Comm. On the Judiciary* [hereinafter *S. Comm. Hearings*], 97th Cong. 46 (1982). He clearly demonstrated cognizance of how such a "battle over ancient municipal records" was beyond the capacity of the average private voting rights plaintiff, as opposed to a Justice Department team, explaining: "Though the *Bolden* plaintiffs prevailed in this case, the demands made on them were excessive. Others may not be able to meet them." *Id.*

Even opponents of the VRA amendment acknowledged that private plaintiffs could bring Section 2 claims. Senator Jeremiah Denton, opposing the amendment, sought to "lay to rest the argument for the establishment, under Section 2, of an 'effects' test" by arguing that intent is not "impossible to prove" for private plaintiffs. *S. Comm. Hearings*, 97th Cong. 55 (1982). His view was not that private litigants lacked a cause of action, but that they could prevail under the *City of Mobile* standard. He

thus explained: "Just last week, on remand to the district court, requirements of the 'intent' test were satisfied when the plaintiffs were able to demonstrate to the court's satisfaction the discriminatory intent of Mobile's at-large election method." *Id.* This unanimity on the availability of a private action is particularly telling because it shows that this is not a case that rests on "isolated snippets of legislative history." *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting). Instead, it reflects consensus in the body as a whole.

3. Congress also carefully considered concerns raised by the civil rights community, particularly voting rights experts, who testified regarding the *City of Mobile* intent standard's specific effects on private plaintiffs. Sharing their on-the-ground knowledge of the field, these experts argued that, "[w]ithout this amendment, plaintiffs would face the impossible and ridiculous task of getting defendants to confess to an intent to break the law." *S. Comm. Hearings*, 97th Cong. 196 (1982) (statement of John E. Jacob, President of the National Urban League); *see also H. Comm. Hearings*, 97th Cong. 2072-73 (1982) (testimony of Joseph E. Lowery, President, Southern Christian Leadership Conference) ("[W]e're very much concerned about the *Bolden v. City of Mobile* judicial ruling,

which has now placed the additional burden upon plaintiffs of proving intent on the part of the city fathers and mothers.").

This evidence makes clear that Congress was aware of (1) the existing private Section 2 litigation landscape and (2) *City of Mobile*'s damaging effects on private litigants. Had Congress been surprised by the existence of private VRA litigation or sought to curtail the private right of action, it surely would have done so in the 1982 amendment when the issue of private litigation was squarely before it. Instead, Congress took precisely the private-remedy-enhancing action recommended by the civil rights community when it enacted a results standard under Section 2.

Voting rights advocates also explained to Congress that their ability to bring voting rights cases on behalf of minority plaintiffs would be affected by the intent standard. Laughlin McDonald, the Director of the Southern Regional Office of the American Civil Liberties Union, argued: "Prior to *Mobile*, it was understood by *lawyers trying these cases* and by the judges who were hearing them that a violation of voting rights could be made out upon proof of a bad purpose or effect. ... *Mobile* had a dramatic effect on *our* cases." *S. Comm. Hearings*, 97th Cong. 369 (1982) (emphasis added). Similarly, another attorney representing private

plaintiffs, David F. Walbert, explained that "[i]n one case I have been handling … the several attorneys who have participated in that case have expended several thousand hours already and the case is not yet final" due to the intent standard. *H. Comm. Hearings*, 97th Cong. 2032 (1982).

The testimony of academics studying voting rights similarly relied on the real-world experiences of minority plaintiffs and their lawyers who were struggling to meet the intent standard. Chandler Davidson recounted how "[l]awyers for the plaintiffs" in a vote dilution case concerning Taylor, Texas were stymied by the unavailability of evidence documenting the discriminatory intent behind an election system established generations earlier. *S. Comm. Hearings*, 97th Cong. 300 (1982) (prepared statement of Chandler Davidson, Chairman, Department of Sociology, Rice University). *Amicus* Kousser warned that if Congress failed to act, "organizations [would] respond with a spate of lawsuits, but have difficulty locating the carefully hidden smoking guns." *H. Comm. Hearings*, 97th Cong. 2009 (1982). Congress was therefore on alert that in amending Section 2, it was intervening to make more effective a system where private actors played the key role in enforcing the Act.

Because Congress was reacting to *City of Mobile* and its impact on private litigants, the testimony of James Blacksher, the lawyer who represented Black citizens of Mobile in the case, is particularly significant. Blacksher opened his remarks by stating his support for the amended Section 2, which he expected "would restore to black Southerners the opportunities to challenge racially discriminatory election schemes which were developing before *City of Mobile v. Bolden*." *H. Comm. Hearings*, 97th Cong. 2035-36 (1982). This statement highlighted the importance of Black southerners themselves having agency to challenge discriminatory election schemes under Section 2 as private plaintiffs. Blacksher went on to detail how the pre-*City of Mobile* landscape of private litigation "*presented a real opportunity for black plaintiffs on their own, as I have indicated, without substantial assistance from the Department of Justice*, to seek *self-help relief*." *Id.* at 2049-50 (emphasis added). Thus, Blacksher's testimony revealed that private plaintiffs played the dominant role in Section 2 litigation, explicitly putting Congress on notice that it could not rely on Justice Department enforcement in the absence of a private right of action.

4. Finally, the key committees that approved the 1982 amendments left no doubt that they understood, and approved, the practice of private VRA enforcement.

In the House Report, the House Committee on the Judiciary stated unambiguously: "It is intended that citizens have a private cause of action to enforce their rights under Section 2. ... If they prevail they are entitled to attorneys' fees under 42 U.S.C. §§ 1973l(e) and 1988." H.R. REP. NO. 97-205, at 32 (1981). Similarly, the Senate Committee on the Judiciary explained: "[T]he Committee reiterates the existence of a private right of action under Section 2, as has been clearly intended by Congress since 1965." S. REP. NO. 97-417, at 30 (1982).[2] Congress's intent in 1982 could not have been clearer: it intended both (1) to reaffirm the existence of a private right of action under Section 2, and (2) to strengthen

_____

[2] There are innumerable other references in the legislative history to the importance of preserving a right of action for private voting rights plaintiffs. *See, e.g.*, *S. Comm. Hearings*, 97th Cong. 131 (1982) (statement of Timothy G. O'Rourke, Research Associate and Assistant Professor); *S. Comm. Hearings*, 97th Cong. 191 (1982) (statement of Howard University School of Law Student Bar Association) (discussing how the "intent standard" will "doubtless be difficult for the plaintiffs to prove on remand"); *S. Comm. Hearings*, 97th Cong. 399 (1982) (statement by Raymond Nathan, Director, Washington Ethical Action Office, American Ethical Union) ("If the Attorney General or private plaintiffs wish to challenge a discriminatory practice ...").

the effectiveness of the Section 2 private remedy through the results standard.

**E. Litigation following passage of the 1982 Amendments confirms that the Amendments were meant to preserve the private right of action.**

This understanding is confirmed by the litigation following the 1982 amendments: For 40 years, private litigants continued to bring claims, courts continued to entertain them, and VRA defendants still made no suggestion that a private right of action was unavailable. That literally everyone involved in voting rights enforcement on both sides recognized the validity of private actions is exceedingly powerful evidence that this understanding properly reflects Congress's intent.

The vast majority of cases alleging Section 2 claims since 1982 have been brought by private plaintiffs, mostly alone but occasionally in concert with the Justice Department. A comprehensive analysis of all known cases involving a Section 2 claim filed in 1982 or later found that 1,328 cases, or 92.7% of all cases, were brought by private plaintiffs alone.[3] By

---

[3] This database was assembled by *amicus* Kousser, a voting rights historian and emeritus professor at the California Institute of Technology who has acted as an expert witness in over 35 federal and state voting rights cases. The database identifies 1,709 voting rights cases brought since 1982. This analysis focuses only on those cases that articulated a Section

comparison, only 77, or 5.4% of all cases, were brought by the Justice Department. As scholars have noted: "[S]ection 2 litigation brought solely by the Department of Justice played only a minor role in effecting changes in local election systems. One of the most remarkable results of amended section 2, therefore, is its encouragement of the private bar to take a major role in enforcing public voting rights law." Chandler Davidson & Bernard Grofman, *The Voting Rights Act and the Second Reconstruction,* in QUIET REVOLUTION: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 at 385 (Davidson & Grofman, eds., 1994).

Twenty-seven cases, accounting for 1.9% of all cases, were brought jointly by private litigants and the Justice Department, with 24 of those

---

2 claim, and identifies cases where the Government participated in any capacity. This means that, for example, a case might concern both Section 2 and Section 5 claims, as well as 14th and 15th Amendment claims. If the Government was party to any of those claims as the primary litigator, intervenor, or *amicus*, the case was identified as one brought at least in part by the Government. This list does not consolidate cases brought against individual political subdivisions as part of a broader lawsuit. *See e.g.*, *Dillard v. Crenshaw Cnty., Ala.*, 640 F. Supp. 1347 (M.D. Ala. 1986) (in which after an early victory against an at-large chairperson scheme in Crenshaw County, plaintiffs amended their complaint to name 183 cities, counties, and county school boards using the same scheme). *See* Morgan Kousser, *Do The Facts of Voting Rights Support Chief Justice Roberts's Opinion in Shelby County?*, 1 TRANSATLANTICA 1, 24-25 (Appendix B) (2015).

brought by an organization like the NAACP-LDF, ACLU, or MALDEF representing the private litigants. The Department's joint litigation with private plaintiffs, including as an intervenor or as *amicus curiae* in existing cases brought by private plaintiffs, underscores the extent to which the private cause of action was an accepted, standard practice, questioned neither by the Department nor by the private litigants in these cases. The joint litigation was also not questioned by the courts.

In fact, until very recently, courts have not addressed any arguments against a private right of action, even as they discussed standing in ways relevant to other parts of the analysis.[4] For example, in *Armour v. State of Ohio*, a group of Black voters argued that a line drawn between two legislative districts in Youngstown, Ohio split and diluted the voting strength of a community of Black voters. 775 F. Supp. 1044, 1075 (N.D. Ohio, 1991) (Batchelder, J., dissenting). The dissenting opinion gave lengthy treatment to which factors may establish a cause of action under Section 2, opining that because plaintiffs did not show that they were a

---

[4] So far as we are aware, a court did not suggest that a private VRA right of action is unavailable until the decision in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). *See also Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J, concurring).

population "whose ability to influence elections is impaired by the use of multimember districts," there was no cause of action. *Id.* at 1080. But that opinion does not mention, let alone address in detail, the question whether the private plaintiffs may bring the case, appearing to take that as a given. *Id.* at 1079-83.

Similarly, in *Baker v. Cuomo*, the court considered the question of standing as it pertained to a claim by Black and Hispanic prisoners in New York that the State's laws barring them from voting in federal, state, or local elections while incarcerated or on parole violate Section 2. The plaintiffs argued that racial disparities in sentencing lead Black and Hispanic people to be disproportionately likely to be incarcerated and disenfranchised. The court held that the plaintiffs lacked standing to advance a vote dilution claim because their contention was that they had "no vote at all." 58 F.3d 814, 824 (2d Circ. 1995), *vacated in part sub nom. Baker v. Pataki*, 85 F.3d 919 (1996) (per curiam). But the court added that, if plaintiffs wished to contend that the disproportionate effect of the felon-disenfranchisement law dilutes the voting strength of all minorities in districts where minority voters are more likely to be incarcerated, "[a] black or Hispanic voter from one of these assembly districts might well

have standing to assert a cause of action for vote dilution." *Id.* So even as the court considered issues of standing, it did not suggest that private plaintiffs lack a claim; its point was only that the *proper* private plaintiff had to bring the claim.

Thus, post-enactment litigation confirms what the legislative background and history demonstrate. The 1982 Amendments were intended to, and actually did, preserve a private right of action that supplemented litigation brought by the Department of Justice. Giving appropriate weight to "the actual practice of Government" (*Noel Canning*, 573 U.S. at 557), the VRA private right of action should be maintained.

One final point also is relevant. As the 1982 amendment itself demonstrates, Congress has not hesitated to correct erroneous judicial interpretations of the VRA. *See, e.g.*, *Arkansas State Conference NAACP*, 86 F.4th at 1208 ("*Bolden* did not sit well with Congress, which jumped into action the following year."). But here, despite 42 years of litigation following the passage of the 1982 Amendments—and 59 years of litigation since enactment of the VRA in 1965—Congress has not even entertained a proposal to disapprove the existence of the private right of action. This Court should not act where Congress has declined to step in.

*See Hibbs v. Winn*, 542 U.S. 88, 112 (2004) (Stevens, J., concurring) ("In statutory matters, judicial restraint strongly counsels waiting for Congress to take the initiative in modifying rules on which judges and litigants have relied.").

## CONCLUSION

The Court should affirm the judgments below.

Dated: April 15, 2024

Respectfully submitted,

MAYER BROWN LLP

*/s/ Charles A. Rothfeld*

Eugene R. Fidell
YALE LAW SCHOOL SUPREME COURT
   CLINIC[5]
127 Wall Street
New Haven, CT 06511

Charles A. Rothfeld
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
Telephone: (202) 263-3000
crothfeld@mayerbrown.com

*Attorneys for Amici Curiae*

---

[5] The representation of *amici* by a Clinic affiliated with Yale Law School does not reflect any institutional views of Yale Law School or Yale University.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of the Federal and Local Rules because it contains 6289 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: April 15, 2024                    */s/ Charles A. Rothfeld*
                                          Charles A. Rothfeld

**CERTIFICATE OF SERVICE**

I certify that on this 15th day of April, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld