**No. 23-13914**

(consolidated with Nos. 23-13916 & 23-13921)

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ALPHA PHI ALPHA FRATERNITY, INC., *et al.*,
*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellant.*

On Appeal From The United States District Court
For The Northern District Of Georgia, Atlanta Division
No. 1:21-cv-05337, Hon. Steve C. Jones

(*Captions continue inside front cover.*)

**BRIEF OF THE DISTRICT OF COLUMBIA, NEW YORK, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

LETITIA JAMES
 *Attorney General*
 *State of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
ANDREA W. TRENTO
 *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-8656
andrea.trento@ag.ny.gov

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
CAROLINE S. VAN ZILE
 *Solicitor General*
ASHWIN P. PHATAK
 *Principal Deputy Solicitor General*
SEAN FRAZZETTE
 *Assistant Attorney General*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

**No. 23-13916**
(consolidated with Nos. 23-13914 & 23-13921)

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

COAKLEY PENDERGRASS, *et al.*,
*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellant*.

On Appeal From The United States District Court
For The Northern District Of Georgia, Atlanta Division
No. 1:21-cv-05339, Hon. Steve C. Jones

**No. 23-13921**
(consolidated with Nos. 23-13914 & 23-13916)

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ANNIE LOIS GRANT, *et al.*,
*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE OF GEORGIA,
*Defendant-Appellant*.

On Appeal From The United States District Court
For The Northern District Of Georgia, Atlanta Division
No. 1:22-cv-00122, Hon. Steve C. Jones

*Alpha Phi Alpha Fraternity, Inc. v. Secretary of State of Georgia*, No. 23-13914
*Pendergrass v. Secretary of State of Georgia*, No. 23-13916
*Grant v. Secretary of State of Georgia*, No. 23-13921

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the undersigned counsel certifies that the following listed persons and parties, in addition to those listed in Appellant's opening brief and Appellee's response brief, may have an interest in the outcome of this case:

1. Bonta, Rob – *Counsel for Amicus Curiae*;

2. Brown, Anthony G. – *Counsel for Amicus Curiae*;

3. Campbell, Andrea Joy – *Counsel for Amicus Curiae*;

4. Clark, Charity R. – *Counsel for Amicus Curiae*;

5. Commonwealth of Massachusetts – *Amicus Curiae*;

6. District of Columbia – *Amicus Curiae*;

7. Ellison, Keith – *Counsel for Amicus Curiae*;

8. Ferguson, Robert W. – *Counsel for Amicus Curiae*;

9. Ford, Aaron D. – *Counsel for Amicus Curiae*;

10. Frazzette, Sean – *Counsel for Amicus Curiae*;

11. Frey, Aaron M. – *Counsel for Amicus Curiae*;

12. James, Letitia – *Counsel for Amicus Curiae*;

13. Jennings, Kathleen – *Counsel for Amicus Curiae*;

14. Lopez, Anne E. – *Counsel for Amicus Curiae*;

*Alpha Phi Alpha Fraternity, Inc. v. Secretary of State of Georgia*, No. 23-13914
*Pendergrass v. Secretary of State of Georgia*, No. 23-13916
*Grant v. Secretary of State of Georgia*, No. 23-13921

15. Neronha, Peter F. – *Counsel for Amicus Curiae*;

16. Phatak, Ashwin P. – *Counsel for Amicus Curiae*;

17. Platkin, Matthew J. – *Counsel for Amicus Curiae*;

18. Schwalb, Brian L. – *Counsel for Amicus Curiae*;

19. Raoul, Kwame – *Counsel for Amicus Curiae*;

20. Rosenblum, Ellen F. – *Counsel for Amicus Curiae*;

21. State of California – *Amicus Curiae*;

22. State of Colorado – *Amicus Curiae*;

23. State of Connecticut – *Amicus Curiae*;

24. State of Delaware – *Amicus Curiae*;

25. State of Hawaii – *Amicus Curiae*;

26. State of Illinois – *Amicus Curiae*;

27. State of Maine – *Amicus Curiae*;

28. State of Maryland – *Amicus Curiae*;

29. State of Minnesota – *Amicus Curiae*;

30. State of Nevada – *Amicus Curiae*;

31. State of New Jersey – *Amicus Curiae*;

32. State of New York – *Amicus Curiae*;

33. State of North Carolina – *Amicus Curiae*;

*Alpha Phi Alpha Fraternity, Inc. v. Secretary of State of Georgia*, No. 23-13914
*Pendergrass v. Secretary of State of Georgia*, No. 23-13916
*Grant v. Secretary of State of Georgia*, No. 23-13921

34. State of Oregon – *Amicus Curiae*;

35. State of Rhode Island – *Amicus Curiae*;

36. State of Vermont – *Amicus Curiae*;

37. State of Washington – *Amicus Curiae*;

38. Stein, Joshua H. – *Counsel for Amicus Curiae*;

39. Tong, William – *Counsel for Amicus Curiae*;

40. Trento, Andrea W. – *Counsel for Amicus Curiae*;

41. Underwood, Barbara D. – *Counsel for Amicus Curiae*;

42. Vale, Judith N. – *Counsel for Amicus Curiae*;

43. Van Zile, Caroline S. – *Counsel for Amicus Curiae*;

44. Weiser, Philip J. – *Counsel for Amicus Curiae*.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................1

STATEMENT OF THE ISSUES.......................................................2

SUMMARY OF ARGUMENT ..........................................................3

ARGUMENT .....................................................................................4

    I.    Section 2's Remedial Scheme Is Constitutional ...................4

        A.    Race-conscious redistricting is a constitutional remedy for unlawful vote dilution on account of race ..................5

        B.    *Amici* States' experiences demonstrate that remedial race-conscious redistricting remains necessary ...............10

    II.    Section 2 Is Privately Enforceable ....................................12

        A.    The Supreme Court's binding decision in *Morse* determined that § 2 is privately enforceable............13

        B.    Section 2's text, structure, and history confirm that it creates a private right of action.................................15

            1.    The Voting Rights Act's text and structure establish that § 2 is privately enforceable......................................16

            2.    The VRA's history and context further confirm that § 2 is privately enforceable............................................21

        C.    In *Amici* States' experience, private enforcement of § 2 remains necessary ...................................................23

CONCLUSION ................................................................................28

# TABLE OF AUTHORITIES

## *Cases*

*Abbott v. Perez*, 585 U.S. 579 (2018) ............................................................ 2, 6, 23

*Abrams v. Johnson*, 521 U.S. 74 (1997) ................................................................ 23

*Alabama State Conf. of the NAACP v. Alabama*,
  949 F.3d 647 (11th Cir. 2020) ............................................ 13, 15, 17, 18, 23, 25

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ................................................... 16, 20

*Allen v. Cooper*, 589 U.S. 248 (2020) ..................................................................... 6

*Allen v. Milligan*, 599 U.S. 1 (2023) ............................................ 5, 6, 7, 8, 9, 15, 23

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ....................................... 18, 19

*Arkansas State Conf. of the NAACP v. Arkansas Bd. of Apportionment*
  86 F.4th 1204 (8th Cir. 2023) ................................................................ 14, 22, 23

*Arkansas State Conf. of the NAACP v. Arkansas Bd. of Apportionment*
  91 F.4th 967 (8th Cir. 2024) ............................................................................ 14

*Houston Laws.' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419 (1991) ................... 23

*Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017) .............................. 21, 22

*Bond v. United States*, 572 U.S. 844 (2014) .................................................... 26, 27

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) ................ 18

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ........ 4, 13, 17, 20, 23

*Cannon v. University of Chi.*, 441 U.S. 677 (1979) ............................................... 20

*Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020) .................................................... 24

*Chisom v. Roemer*, 501 U.S. 380 (1991) .......................................................... 4, 23

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................. 6, 7, 8

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) .................................................. 22, 23

*Florida State Conf. of the NAACP v. Lee*,
576 F. Supp. 3d 974 (N.D. Fla. 2021) .............................................. 15

*Growe v. Emison*, 507 U.S. 25 (1993) ................................................. 1, 23

*Holder v. Hall*, 512 U.S. 874 (1994) ....................................................... 23

*In re Wild*, 994 F.3d 1244 (11th Cir. 2021) ........................................... 15

*Johnson v. De Grandy*, 512 U.S. 997 (1994).......................................... 23

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .................... 23

*Lorillard v. Pons*, 434 U.S. 575 (1978) .................................................. 21

*Love v. Delta Air Lines*, 310 F.3d 1347 (11th Cir. 2002)....................................... 16

*Marks v United States*, 430 U.S. 188 (1977) ............................................. 14

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996)....................................... 3, 13, 14, 17, 19, 20, 21

*Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003) .................................... 6

*Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) ......... 21

*Perry v. Perez*, 565 U.S. 388 (2012)....................................................... 23

*Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348 (E.D. Va. 2009)..................... 17

*Reynolds v. Sims*, 377 U.S. 533 (1964)....................................................... 2

*Safe Streets All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ......................... 20

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ..................................... 19

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ............................................ 14

*Shaw v. Reno*, 509 U.S. 630 (1993) .......................................................... 1

*Shelby County v. Holder*, 570 U.S. 529 (2013) ............................................ 7, 8, 25

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022) ................................. 15

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ................................. 4, 5, 6, 27

*Stone v. Allen*, No. 21-cv-1531, 2024 WL 578578
    (N.D. Ala. Feb. 13, 2024) ................................................................ 15

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ...................................................................... 9

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ................................................ 23

*Toney v. White*, 476 F.2d 203 (5th Cir.) .................................................. 18

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ............................................... 23

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ......................................................... 15

### Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 ................................................................18

U.S. Const. amend. XV .......................................................................4

### Statutes and Regulations

42 U.S.C. § 1982 .......................................................................... 10

42 U.S.C. § 1983 .......................................................................... 17

42 U.S.C. § 2000e-2 ................................................................ 10

52 U.S.C. § 10301 ............................................. 1, 4, 9, 16, 21

52 U.S.C. § 10302 ......................................................... 17, 18

52 U.S.C. § 10308 ................................................................ 19

52 U.S.C. § 10310 ................................................................ 19

Pub. L. No. 109-246, 120 Stat. 577 (July 27, 2006) ............... 22

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965) .................. 16

Cal. Elec. Code § 14030 ..................................................... 26

Cal. Elec. Code § 14032 ..................................................... 26

Conn. Gen. Stat. § 9-368j .................................................... 26

N.Y. Elec. Law § 17-206 ..................................................... 26

Or. Rev. Stat. § 255.411 ...................................................... 26

Va. Code § 24.2-128 ........................................................... 26

Va. Code § 24.2-130 ........................................................... 26

Wash. Rev. Code § 29A.92.080 ........................................... 26

Wash. Rev. Code § 29A.92.130 ............................................26

## Legislative History

H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437 ....................26

H.R. Rep. No. 97-227 (1981) ................................................22

H.R. Rep. No. 109-478 (2006), *reprinted in* 2006 U.S.C.C.A.N. 618 ....................22

S. Rep. No. 94-295 (1975), *reprinted in* 1975 U.S.S.C.A.N. 774 ...........................17

S. Rep. No. 97-417 (1981), *reprinted in* 1982 U.S.S.C.A.N. 177 ................7, 17, 22

S. Rep. No. 89-162 (1965), *reprinted in* 1995 U.S.C.C.A.N. 2508 .......................26


### Other

Ellen D. Katz et al., To Participate and Elect: Section 2 of the Voting Rights
    Act at 40 (Univ. Mich. L. Sch. 2022),
    https://voting.law.umich.edu/findings ................................................................24

Kevin Morris & Coryn Grange, Growing Racial Disparities in Voter
    Turnout, 2008-2022 (Brennan Ctr. for Just. Mar. 2024),
    https://www.brennancenter.org/our-work/research-reports/growing-
    racial-disparities-voter-turnout-2008-2022 .................................................11, 12

Pamela S. Karlan, *Two Section Twos and Two Section Fives: Voting Rights
    and Remedies After* Flores, 39 Wm. & Mary L. Rev. 725 (1998) ..................8, 9

*Reported Voting and Registration of the Total Voting-Age Population, by
    Sex, Race and Hispanic Origin, for States: November 2022* (Table 4b),
    Dep't of Commerce, Census Bureau (Apr. 2023),
    https://www.census.gov/data/tables/time-series/demo/voting-and-
    registration/p20-586.html ..................................................................................11

*The Use of Section 2 to Secure Fair Representation*, Brennan Ctr. for Just.
    (Aug. 13, 2021), https://www.brennancenter.org/our-work/research-
    reports/use-section-2-secure-fair-representation .................................................8

## INTEREST OF *AMICI CURIAE*

The District of Columbia, New York, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, North Carolina, Oregon, Rhode Island, Vermont, and Washington (collectively, "*Amici* States") file this brief as *amici curiae* in support of the plaintiffs-appellees and affirmance of the district court's determination that Georgia's congressional and legislative maps violate § 2 of the Voting Rights Act ("VRA"). *Amici* States write to explain that: (i) under the U.S. Constitution, race may be considered to remedy § 2 violations that unlawfully diluted votes on account of race; and (ii) § 2 is enforceable by private litigants.

*Amici* States have strong interests in these issues because § 2 directly implicates States' redistricting processes. Section 2 of the VRA prohibits any State from creating legislative districts that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). *Amici* States have the "primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25, 34 (1993). When fulfilling this responsibility in accordance with § 2, *Amici* States consider a variety of demographic factors to achieve fair representation for their residents. *See Shaw v. Reno*, 509 U.S. 630, 646 (1993). And when they fail to adhere to § 2's requirements, *Amici* States may need to take express account of race to

"draw opportunity districts in which minority groups form effective majorities." *Abbott v. Perez*, 585 U.S. 579, 587 (2018) (cleaned up).

*Amici* States also have important interests in ensuring that their electoral processes do not result in the abridgment or denial of any citizen's right to vote on account of race, color, or membership in a minority-language group. And in *Amici* States' experiences, enforcement by private litigants has been an essential tool in assisting the States to vindicate the Constitution's guarantee that government remains "collectively responsive to the popular will." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). Section 2's remedial scheme remains necessary for our multiracial democratic system, and the residents of every State have an essential role in enforcing its guarantees.

## STATEMENT OF THE ISSUES

Although this case concerns whether Georgia's electoral districts violate § 2, *Amici* States address only:

1. Whether using race-conscious redistricting to remedy § 2 violations falls within the Fifteenth Amendment's guarantee of equal voting rights.

2. Whether § 2 provides a private cause of action, as the Supreme Court, and every other court but one, has understood for over forty years.

## SUMMARY OF ARGUMENT

I. Considering race to remedy § 2 violations that dilute voting power based on race is constitutional. Under the Fifteenth Amendment, no State can abridge a citizen's right to vote because of race. Congress enforced this amendment through § 2 of the VRA, which, in part, prohibits States from creating legislative districts that dilute the voting power of Black residents—as the district court found Georgia did here. To remedy a § 2 violation, States may need to consider race to draw nondilutive districts. This remedy is constitutionally permissible. Ample precedent permits race-conscious redistricting when necessary to satisfy the VRA's mandates, and requiring race-conscious redistricting to cure a VRA violation is congruent and proportional to the Fifteenth Amendment's guarantee. Moreover, § 2's framework ensures that States must use race-conscious redistricting to remedy only severe situations of race-based vote dilution.

II. Section 2 is enforceable by private litigants. The Supreme Court's decision in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996)—in which five Justices reasoned that § 2 is privately enforceable in holding that § 10 of the VRA is also privately enforceable—is binding and dispositive. Even if *Morse* did not control, § 2's text, structure, and history confirm that Congress intended private enforcement of § 2. In the experience of *Amici* States, private enforcement remains

vital to ensuring that § 2's protections are realized, and *Amici* States are well-equipped to manage § 2's obligations in the face of private enforcement actions.

## ARGUMENT

## I.     Section 2's Remedial Scheme Is Constitutional.

The Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Using its power to "enforce this article by appropriate legislation," *id.* § 2, Congress enacted the VRA in 1965 "to banish the blight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).

To broaden the VRA's protections, Congress amended § 2 in 1985 to apply to cases involving "discriminatory results alone," not merely intentional discrimination. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). As amended, § 2 prohibits any election practice or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language-minority group. 52 U.S.C. § 10301(a). To this day, § 2 "provides vital protection against discriminatory voting rules, and no one suggests that discrimination in voting has been extirpated or that the threat has been eliminated." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2343 (2021).

Nevertheless, appellant and his Alabama-led *amici* contend that § 2's remedy for unlawful racial vote dilution—race-conscious redistricting—is unconstitutional. They argue that this remedy (i) is not congruent and proportional to the Fifteenth Amendment violations that § 2 deters, Appellant Br. 44-51, and (ii) is not justified by present conditions of racial discrimination in Georgia or the nation, Appellant Br. 52-57; Br. of Ala. & 13 Other States as *Amici Curiae* Supporting Appellant & Reversal ("Alabama Br.") 22-26. Neither argument is correct.

## A. Race-conscious redistricting is a constitutional remedy for unlawful vote dilution on account of race.

In 1966, the year after the VRA was enacted, the Supreme Court held that the statute "was clearly a legitimate response to the problem" of racial discrimination in voting. *Katzenbach*, 383 U.S. at 328. For decades thereafter, courts applied § 2 in vote dilution cases "and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." *Allen v. Milligan*, 599 U.S. 1, 41 (2023). In 2023, the Supreme Court confirmed that § 2 does not "exceed[] the remedial authority of Congress" and rejected Alabama's argument that § 2 "as applied to redistricting is unconstitutional under the Fifteenth Amendment." *Id.* Ten months later, that remains true.

*Amici* States do not concede that congruence and proportionality is the test for the constitutionality of Fifteenth Amendment legislation because "Congress may use any rational means to effectuate the constitutional prohibition of racial

discrimination in voting." *Katzenbach*, 383 U.S. at 324. But § 2's remedial scheme satisfies the congruence and proportionality test even if it applies.

Although Congress cannot "decree the substance" of the Fifteenth Amendment's "restrictions on the States," *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), it can pass laws "to remedy and to deter violation[s] . . . by prohibiting a somewhat broader swath of conduct" than what the amendment prohibits, *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727 (2003) (citation omitted). By barring discriminatory results, § 2 is "somewhat broader" than the Fifteenth Amendment— a calibrated choice by Congress to deter continued discrimination. *See Milligan*, 599 U.S. at 10-14. And "[h]ard problems," like the dilution of Black voting power, "often require forceful responses," like § 2's race-conscious remedy. *See Allen v. Cooper*, 589 U.S. 248, 261 (2020).

Section 2's remedy remains congruent and proportional because it applies in limited circumstances. *See Perez*, 585 U.S. at 587. Section 2 applies only where racially polarized voting allows the majority to vote as a bloc to defeat the minority's preferred candidate. *Milligan*, 599 U.S. at 18-19. And in assessing whether § 2 is violated, courts "must conduct an intensely local appraisal of the electoral mechanism at issue, as well as a searching practical evaluation of the past and present reality." *Id.* at 19 (cleaned up). In this way, § 2, as amended by Congress and as interpreted by the Supreme Court, is "responsive to, or designed to prevent,

unconstitutional behavior." *See City of Boerne*, 521 U.S. at 532. The statute's "exacting requirements . . . limit judicial intervention to 'those instances of intensive racial politics' where the 'excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate.'" *Milligan*, 599 U.S. at 30 (quoting S. Rep. No. 97-417, at 33-34 (1981), *reprinted in* 1982 U.S.S.C.A.N. 177, 211-12). So, a race-conscious remedy applies only "when there is reason to believe" that the districts "affected by the congressional enactment have a significant likelihood of being unconstitutional" based on their racial effects. *City of Boerne*, 521 U.S. at 532.

Appellant and the Alabama *amici* argue that this race-conscious remedy is not congruent and proportional because it is no longer justified. Appellant's Br. 43-57; Alabama Br. 22-26. Their reading of the law is wrong for several reasons.

*First*, their reliance on *Shelby County v. Holder*, 570 U.S. 529 (2013), is misplaced. There, the Court's principal concern was that § 4(b)'s preclearance formula was applied to only some States, in a way that implicated "the fundamental principle of equal sovereignty" among the States. 570 U.S. at 542 (citation omitted). That formula "applie[d] to only nine States (and several additional counties)" and was "intended to be temporary." *Id.* at 538, 544. The Court thus cautioned that "Congress—*if it is to divide the States*—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." *Id.* at 553 (emphasis added).

Section 2, by contrast, does not divide the States at all, much less divide them based on empirical differences among the various States that may no longer exist. All States are subject to § 2's requirements and remedies. And the Court's holding in *Shelby County* "in no way affect[ed] the permanent, nationwide ban on racial discrimination in voting found in § 2." *Id.* at 557. Indeed, several States with vastly different racial and political demographics have faced scrutiny under § 2 throughout the years. *See Milligan*, 599 U.S. at 19 (collecting Supreme Court § 2 cases from Florida, Georgia, Minnesota, North Carolina, Ohio, Texas, and Wisconsin). And many of those varied States have been required to remedy unlawful vote dilution. *See The Use of Section 2 to Secure Fair Representation*, Brennan Ctr. for Just. (Aug. 13, 2021) (internet) (surveying successful § 2 vote dilution claims in California, Florida, Georgia, Michigan, Mississippi, Missouri, New York, Ohio, South Dakota, Texas, Virginia, Washington, Wisconsin, and Wyoming).[1]

*Second*, congruent and proportional legislation does not "require[] termination dates, geographic restrictions, or egregious predicates." *City of Boerne*, 521 U.S. at 533. Those "limitations" are but a few ways that "tend to ensure Congress' means are proportionate to ends legitimate under" its authority. *Id.* Section 2 instead has a durational limit, as it offers remedies only for ongoing harms. *See* Pamela S. Karlan,

---

[1] For internet authorities, full URLs appear in the Table of Authorities. All URLs were last visited on April 15, 2024.

*Two Section Twos and Two Section Fives: Voting Rights and Remedies After* Flores, 39 Wm. & Mary L. Rev. 725, 741 (1998). The applicable framework is not frozen at the time the VRA was amended. Rather, it requires a dynamic analysis that evaluates both past and present performance of racial equality. *Milligan*, 599 U.S. at 18. In other words, if Georgia were correct that its progress has provided Black voters no "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," 52 U.S.C. § 10301(b), the solution would not be to declare § 2 unconstitutional. The solution would be to declare Georgia in compliance with § 2.

Appellant's and the Alabama *amici*'s reliance on the affirmative action cases to demand an end date for § 2 misreads those cases as well. Appellant Br. 55-56; Alabama Br. 22-23. In *Students for Fair Admissions v. President and Fellows of Harvard College*, the Court found problematic that affirmative action programs not predicated on findings of existing discrimination had "no end . . . in sight." 600 U.S. 181, 213 (2023). It did not find that *all* race-conscious programs, including remedial measures, called for end-dates. In fact, the Court approved of race-conscious remedies for "specific, identified instances of past discrimination that violated . . . a statute"—just as § 2 requires. *Id.* at 207.

*Third*, appellant's argument that § 2's continued constitutionality requires new legislative findings and reauthorization would lead to absurd results. Congress

has long used its enforcement powers under the Reconstruction Amendments to legislate permanent solutions to present discrimination, presumably with the hope that those solutions would one day be unnecessary because the discriminatory conduct would cease. A constitutional rule that required Congress to repromulgate each solution when the underlying circumstances incrementally improve would be impractical and would jeopardize landmark civil rights statutes in the areas of (for example) housing discrimination, *see* 42 U.S.C. § 1982, and workplace discrimination, *see* 42 U.S.C. § 2000e-2. The fact that protected individuals face fewer inequities now than they did when these statutes were passed does not suggest that discrimination has ceased. No one doubts that voting is more open to all races since § 2's enactment, but that does not support striking the statute down when discrimination in voting remains a pressing problem.

### B. *Amici* States' experiences demonstrate that remedial race-conscious redistricting remains necessary.

Race-conscious redistricting not only passes constitutional scrutiny, but also remains necessary in certain circumstances. Contrary to appellant's suggestion, Appellant Br. 52-53, the court below found extensive evidence "of both past and present history in Georgia that the State's voting practices disproportionately affect Black Voters." Doc. No. 333, at 214;[2] *see id.* at 214-33, 430-50.

---

[2] Record citations herein refer to the docket in *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-cv-05337 (N.D. Ga.).

Indeed, the Census Bureau report on which appellant relies confirms that Black and white voters are not registered and do not vote at equal rates. *See Reported Voting and Registration of the Total Voting-Age Population, by Sex, Race and Hispanic Origin, for States: November 2022* (Table 4b), Dep't of Commerce, Census Bureau (Apr. 2023) (internet). This report shows that, nationwide, citizens classified as "Black alone" and "Black alone or in combination" are registered to vote at rates of 60.2% and 59.9%, respectively, which is between 5% to 11% less than the voter registration rates of white (65.6%) and white non-Hispanic (71.9%) citizens. *Id.* Meanwhile, citizens classified as "Black alone" and "Black alone or in combination" vote at rates of 42.3% and 41.8%, respectively, approximately 8% lower than white voters (50.6%) and 14% lower than white non-Hispanic voters (56.6%). *Id.*

Georgia is no different. For instance, voter registration for Georgians classified as "Black alone" and "Black alone or in combination" is approximately 5% percent lower than registration of white non-Hispanic residents. *Id.* And voter turnout by "Black alone" and "Black alone or in combination" voters is approximately 3% lower than white voters and 8% lower than white non-Hispanic voters. *Id.* Indeed, adjusted for population, Georgia's turnout gap between Black and white voters *increased* between 2020 (5.6%) and 2022 (6.5%). Kevin Morris & Coryn Grange, Growing Racial Disparities in Voter Turnout, 2008-2022, at 15,

(Brennan Ctr. for Just. Mar. 2024) (internet). While these registration and turnout gaps are smaller than they were in the 1960s, Appellant Br. 53, "the racial turnout gap is growing around the country," Morris & Grange, *supra*, at 4; *see id.* at 3 (turnout gap in "2022 midterms was larger than in any midterm since at least 2006"). And regardless, a single-digit percentage gap is still meaningful. *Id.* at 3-4 ("In 2020, if the gap had not existed, 9 million more ballots would have been cast—far more than the 7 million by which Joe Biden won the national popular vote.").

States, of course, have a strong interest in regulating their own election practices. *Amici* States do not lightly accept intrusion into their redistricting processes and embrace the idea that States can and should experiment in ways to promote voting rights and to protect election security. But when laws and practices result in unlawful discrimination and unequal access to political representation, § 2 remains an essential form of protection.

## II. Section 2 Is Privately Enforceable.

Appellant and the Alabama *amici* err in arguing that private litigants may not sue to enforce § 2 and that only the Attorney General may do so. Appellant Br. 57-64; Alabama Br. 3-12. This argument is contradicted by binding Supreme Court precedent; the text, structure, and history of § 2; and the hundreds of private lawsuits to enforce § 2. As this Court explained, the VRA's success "is largely due to the work of private litigants," who for more than 50 years have "remain[ed] the primary

enforcers of § 2." *Alabama State Conf. of the NAACP v. Alabama* ("*Alabama NAACP*"), 949 F.3d 647, 649 (11th Cir. 2020), *judgment vacated as moot*, *Alabama v. Alabama State Conf. of NAACP*, 141 S. Ct. 2618 (2021).[3]

### A. The Supreme Court's binding decision in *Morse* determined that § 2 is privately enforceable.

The reasoning of the Supreme Court's binding precedent in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), rested on the Court's determination that § 2 is privately enforceable.

In *Morse*, the Court concluded that a political-party fee for certification as a state convention delegate both required preclearance under § 5 and could be challenged by private plaintiffs under § 10. 517 U.S. at 219, 230-35 (opinion of Stevens, J., announcing the judgment of the Court); *id.* at 237, 240 (Breyer, J., concurring in the judgment). While fractured on the § 5 question, the majority agreed that private plaintiffs must be able to sue under § 10—notably, *because* the Court had determined that both § 2 and § 5 are privately enforceable. *Id.* at 234, 240.

Justice Stevens, joined by Justice Ginsburg, observed that because the Court had already found that § 5 is privately enforceable, and had already heard § 2 cases brought by private litigants, it would be "anomalous . . . to *hold* that both § 2 and § 5

---

[3] Although the Court's decision in *Alabama NAACP* was vacated as moot, it remains highly persuasive.

are enforceable by private action but § 10 is not, when all lack the same express authorizing language." *Id.* at 232 (opinion of Stevens, J.) (emphasis added). Justice Breyer, joined by Justices O'Connor and Souter, agreed that Congress could not "have want[ed] to treat enforcement of § 10 differently from enforcement of §§ 2 and 5," both of which allowed private causes of action. *Id.* at 240 (Breyer, J., concurring in the judgment). This rationale is controlling. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

The Court's reasoning was not mere dicta, as appellant erroneously argues, *see* Appellant Br. 62, and as the Eighth Circuit erroneously concluded, *see Arkansas State Conf. of the NAACP v. Arkansas Bd. of Apportionment* ("*Arkansas NAACP*"), 86 F.4th 1204, 1215-16 (8th Cir. 2023). Lower courts are bound not only by the result of a Supreme Court opinion "but also those portions of the opinion necessary to that result." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). The majority's conclusion that § 2 is privately enforceable was the lynchpin necessary to that opinion's result and thus binds this Court. *See Arkansas State Conf. of the NAACP v. Arkansas Bd. of Apportionment*, 91 F.4th 967, 971 (8th Cir. 2024) (Colloton, J., dissenting from denial of rehearing en banc) ("[T]he Supreme Court majority in Morse said that § 2 is enforceable by a private right of action.").

It is therefore not surprising that "decades of controlling Section Two jurisprudence," emanating from "both the Supreme Court and the Eleventh Circuit,"

show that § 2 is privately enforceable. *Stone v. Allen*, No. 21-cv-1531, 2024 WL 578578, at *6 (N.D. Ala. Feb. 13, 2024); *see, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1287, 1311 (11th Cir. 2020) (affirming finding of § 2 violation in private enforcement action). In this Circuit alone, courts have universally held—as the district court held, Doc. No. 65, at 31-34—that § 2 conferred a private right of action. *See, e.g.*, *Alabama NAACP*, 949 F.3d at 652; *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031-32 (N.D. Ala. 2022) (three-judge panel), *aff'd*, *Milligan*, 599 U.S. at 10. *Morse* controls and this Court should affirm that § 2 confers a private right of action on that basis alone.

## B. Section 2's text, structure, and history confirm that it creates a private right of action.

Even if *Morse* did not control, there is ample evidence that Congress intended private litigants to enforce § 2. Indeed, multiple VRA provisions, when properly read together, establish that Congress has made "what was once implied now explicit: private parties can sue to enforce the VRA." *Florida State Conf. of the NAACP v. Lee*, 576 F. Supp. 3d 974, 989 (N.D. Fla. 2021) (quoting *Alabama NAACP*, 949 F.3d at 651). This makes appellant's and the Alabama *amici*'s arguments about whether Congress *impliedly* authorized private enforcement of § 2 irrelevant. *See In re Wild*, 994 F.3d 1244, 1274 (11th Cir. 2021) (en banc) (Pryor, C.J., concurring) ("If the Act expressly granted a private right of action [to enforce a different statute], then *Sandoval* [concerning implied rights of action] would be

beside the point."). In any event, the VRA's text, structure, and history prove that Congress intended § 2 to be privately enforceable, satisfying the standards for an implied private cause of action. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) (statute's text and structure); *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002) (history, if needed, informs whether Congress intended private enforcement). And "legislative intent to create a private right of action" is "the touchstone of [this Court's] analysis." *Love*, 310 F.3d at 1352 (emphasis omitted).

    1.    The Voting Rights Act's text and structure establish that § 2 is privately enforceable.

Section 2 has always focused on the individual right of a private citizen to vote. As originally enacted, § 2 prohibited States or their subdivisions from imposing voting rules denying or abridging "the *right of any citizen* of the United States to vote on account of race or color." *See* Voting Rights Act of 1965, Pub. L. No. 89-110, § 2, 79 Stat. 437, 437 (1965) (emphasis added). As amended, § 2 prohibits States or their subdivisions from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the *right of any citizen* of the United States to vote on account of race or color," or membership in a language-minority group. 52 U.S.C. § 10301(a) (emphasis added). This focus on private citizens' voting rights reflects that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress

16

since 1965." *Morse*, 517 U.S. at 232 (opinion of Stevens, J.) (quoting S. Rep. No. 97-417, at 30).

Congress amended § 3 of the VRA, titled "Proceeding to enforce the right to vote," in 1975, 52 U.S.C. § 10302, extending to private litigants certain statutory enforcement mechanisms that had previously been available to only the Attorney General. *See Morse*, 517 U.S. at 234 & n.45 (opinion of Stevens, J.) (citing S. Rep. No. 94-295, at 39-40 (1975), *reprinted in* 1975 U.S.S.C.A.N. 774, 807). Under the amended § 3, the mechanisms are available in any "proceeding instituted by the Attorney General *or an aggrieved person* under any statute to enforce the voting guarantees of the [F]ourteenth and [F]ifteenth [A]mendment in any State or political subdivision." 52 U.S.C. § 10302(b)-(c) (emphasis added); *see id.* § 10302(a).

Section 2 is unmistakably a statute designed to enforce the voting guarantees of the Fifteenth Amendment, *e.g.*, *Brnovich*, 141 S. Ct. at 2331, and thus falls squarely within § 3. *See Alabama NAACP*, 949 F.3d at 652; *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009). "The language of § 2 and § 3, read together, imposes direct liability on States [and their subdivisions] for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute." *Alabama NAACP*, 949 F.3d at 652.

Appellant errs in contending that § 3 recognizes only private causes of action that preexisted the 1975 amendments, such as challenges under 42 U.S.C. § 1983 to

enforce the Fourteenth or Fifteenth Amendments. It is implausible that Congress enacted § 2 to enforce the voting guarantees of the Fifteenth Amendment, expressly recognized in § 3 the availability of private lawsuits brought under *any* statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments, and yet did not intend private litigants to enforce § 2. *See Alabama NAACP*, 949 F.3d at 652-53. And regardless, by the time of the 1975 amendments, the Supreme Court had recognized a private right of action under § 5 under a rationale that plainly encompassed § 2, *see Allen v. State Bd. of Elections*, 393 U.S. 544, 554-57 (1969), and lower courts had adjudicated private lawsuits under § 2, *see, e.g.*, *Toney v. White*, 476 F.2d 203, 205, 207 (5th Cir.), *vacated in part on reh'g*, 488 F.2d 310 (5th Cir. 1973); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit all Fifth Circuit decisions issued before October 1, 1981). Congress thus would have understood that private causes of action under the VRA, including under § 2, existed when it amended § 3.[4]

---

[4] Appellant misreads the VRA in contending that interpreting § 2 and § 3 together to allow private lawsuits would mean that § 3 extends to "all voting rights statutes." Appellant Br. 63 (emphasis omitted). Section 3 extends to any statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendments, 52 U.S.C. § 10302(a)-(c). Section 2 is included in this category, but other voting-rights statutes—such as statutes enacted under the Elections Clause, U.S. Const. art. I, § 4, cl. 1—might not be.

Congress's intent to provide a private action is reinforced by the VRA's structure. Appellant and the Alabama *amici* point to § 12, which confers civil enforcement authority on the Attorney General, *see* 52 U.S.C. § 10308(d)-(e), in arguing that the existence of public enforcement mechanisms excludes private enforcement mechanisms. *See* Appellant Br. 60; Alabama Br. 11-12. But § 12 itself refers to *private* enforcement, conferring jurisdiction to federal courts over proceedings "without regard to whether *a person* asserting rights under the provisions of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10308(f) (emphasis added). Excusing private parties from exhaustion requirements makes sense only if they may bring lawsuits in the first place—as § 2 and § 3 provide. *See Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003).

Moreover, § 14(e) expressly refers to private enforcement by allowing attorney's fees to "the prevailing party, *other than the United States*," in any action "to enforce the voting guarantees of the [F]ourteenth or [F]ifteenth [A]mendment." 52 U.S.C. § 10310(e) (emphasis added); *see Morse*, 517 U.S. at 234 n.46 (opinion of Stevens, J.) (discussing importance of fee awards in enabling private litigants to vindicate federal rights). Accordingly, Congress plainly intended public enforcement to supplement private enforcement, not to preclude it. *See Morse*, 517 U.S. at 231-33 (opinion of Stevens, J.); *Allen*, 393 U.S. at 556.

The argument that § 2 cannot be privately enforceable because the VRA did not create new substantive rights is meritless. *See* Alabama Br. 5-10. The Alabama *amici* appear to be taking the phrase "rights-creating language," which courts use in analyzing implied private causes of action, *see Sandoval*, 532 U.S. at 288, and insisting that there can be no private enforcement of § 2 because that provision does not create entirely new substantive "rights." But the phrase "rights-creating language" serves to identify Congress's intent that the statute at issue focuses on the rights of individuals, rather than on the duties of regulated persons or the public. *See Sandoval*, 532 U.S. at 289; *Cannon v. University of Chi.*, 441 U.S. 677, 690-93 (1979). The inquiry called for by *Sandoval* and its progeny is whether § 2 "creates new federal substantive rights *or incorporates by reference a private citizen's existing substantive rights*, elevating them for federal protection." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 903 (10th Cir. 2017) (emphasis added). Section 2 focuses on individual voting rights—those enshrined in the Fifteenth Amendment—and Congress plainly intended individuals to use the VRA's remedial mechanisms to protect those rights. *See Brnovich*, 141 S. Ct. at 2331; *supra at* 16-18.

Even the dissenters in *Morse* agreed that § 5—also part of the VRA's remedial regime—created a "statutory privilege in a[] particular class of persons" to be free of complying with a state enactment covered by, but not approved under, § 5's preclearance regime. 517 U.S. at 287 (Thomas, J., dissenting). Section 2 likewise

creates a statutory privilege in a particular class of persons to be free of state or local voting rules or practices that result in a denial or abridgement of their right to vote on account of race, color, or membership in a language-minority group.[5] *See* 52 U.S.C. § 10301(a); *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 217-18 (2009) (Thomas, J., concurring in the judgment in part and dissenting in part) (VRA § 2 "seek[s] to implement the Fifteenth Amendment's substantive command by creating a private cause of action to enforce § 1 of the Fifteenth Amendment.").

2. The VRA's history and context further confirm that § 2 is privately enforceable.

The VRA's history and context reaffirm Congress's intent to create a private right of action under § 2.

Congress repeatedly ratified the existence of a private right of action by amending the VRA, including § 2 and § 3, against the backdrop of hundreds of cases allowing private enforcement of the VRA. Congress is presumed to be aware of a "judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see Bank of*

---

[5] The Alabama *amici* also miss the mark in arguing that Congress's expansion of § 2 liability to cover discriminatory results did not substantively expand the underlying constitutional rights. Alabama Br. 7-10. Like § 5, this results standard validly prohibits slightly more conduct than does the Fifteenth Amendment. *See supra* at 6. And like § 5, § 2 is privately enforceable.

*Am. Corp. v. City of Miami*, 581 U.S. 189, 198-99 (2017). Here, Congress amended § 3 in 1975 after the Supreme Court had recognized § 5's private enforceability in *Allen*. It expanded § 2 in 1982, in reaction to *City of Mobile v. Bolden*, 446 U.S. 55 (1980)—a case brought by private plaintiffs. *See* S. Rep. No. 97-417, at 2. And it amended the VRA again in 2006, after the Court expressly stated in *Morse* that §§ 2, 5, and 10 are all privately enforceable. *See* Pub. L. No. 109-246, 120 Stat. 577 (July 27, 2006). All the while, private litigants continued to enforce § 2. *See Arkansas NAACP*, 86 F.4th at 1218-19 (Smith, C.J., dissenting) (collecting cases).

In none of these amendments did Congress take any action to stop or limit private enforcement. To the contrary, the 1975 amendments expanded the remedies available to private litigants. *See supra* at 17-19. The 1982 amendments were accompanied by House and Senate reports reaffirming that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30; *see also* H.R. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2."). And the 2006 amendments were preceded by committee findings about the significance of private § 2 actions. H.R. Rep. No. 109-478, at 52-53 (2006), *reprinted in* 2006 U.S.C.C.A.N. 618, 654 ("African American plaintiffs filed and won the largest number of suits under [§] 2, with Latino citizens close behind," and those "results achieved in [§] 2 cases . . . must be protected.").

## C. In *Amici* States' experience, private enforcement of § 2 remains necessary.

Private enforcement of § 2 remains critically important. The VRA's success "is largely due to the work of private litigants." *Alabama NAACP*, 949 F.3d at 649 Indeed, for decades, private § 2 actions have vastly outnumbered those brought by the Attorney General. *See* Br. of Amici Curiae Former Dep't of Justice Attorneys in Support of Plaintiffs-Appellants at 21-23, *Arkansas NAACP*, 86 F.4th 1204 (8th Cir. 2023) (No. 22-1395).

This long-standing fundamental role of private enforcement has shaped current understandings of § 2—on which States have long relied in redistricting. Most, if not all, of the Supreme Court's reported § 2 cases were brought (at least initially) by private parties.[6] And the *Gingles* framework—which States rely on to draw districts without diluting votes and to defend those districts in litigation—resulted from a § 2 case brought by private plaintiffs. *See* 478 U.S. at 35. There is no basis for this Court to abandon the private enforcement mechanism that was

---

[6] *See, e.g.*, *Bolden*, 446 U.S. at 58 (1980); *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *Houston Laws.' Ass'n v. Attorney Gen. of Tex.*, 501 U.S. 419, 421-22 (1991); *Chisom*, 501 U.S. at 384; *Voinovich v. Quilter*, 507 U.S. 146, 149 (1993); *Growe*, 507 U.S. at 27; *Holder v. Hall*, 512 U.S. 874, 877 (1994); *Johnson v. De Grandy*, 512 U.S. 997, 1000-01 (1994); *Abrams v. Johnson*, 521 U.S. 74, 78 (1997); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 411 (2006); *Perry v. Perez*, 565 U.S. 388, 391 (2012) (per curiam); *Perez*, 585 U.S. at 587-88; *Brnovich*, 141 S. Ct. at 2334; *Milligan*, 599 U.S. at 16.

critical to establishing the structured framework that underlies § 2's vote dilution proscription.

Moreover, the *Amici* States have extensive experience with private enforcement of § 2 and have proven adept at defending against unwarranted § 2 claims brought by private plaintiffs. Indeed, private plaintiffs have succeeded in § 2 actions far more often against local governments (50% success rate) than against the States (27% success rate). Ellen D. Katz et al., To Participate and Elect: Section 2 of the Voting Rights Act at 40 (Univ. Mich. L. Sch. 2022) (internet). Private enforcement of § 2 has thus not resulted in undue burdens on States. And in the experience of *Amici* States, such burdens are justified by the expansion of relief for voters harmed by violations of § 2.

Contrary to the contentions of the Alabama *amici*, *see* Alabama Br. 12, private enforcement of § 2 does not disturb the "usual balance of state and federal power" or "intrude on a historic state prerogative." *See Carey v. Throwe*, 957 F.3d 468, 483, 483 (4th Cir. 2020). It was the Reconstruction Amendments that altered the balance of state and federal power, and authorized Congress to protect voting rights from state and local discriminatory laws and practices. Those amendments gave Congress ample authority to remedy voting-related constitutional harms, not only by authorizing the Attorney General to enforce laws protecting voting rights, but also

by authorizing a private right of action to supplement that enforcement. *See Alabama NAACP*, 949 F.3d at 654-55.

Private enforcement of § 2 is particularly important given the demise of preclearance and the limits of government enforcement resources. As discussed, *supra* at 7-8, in invalidating § 4(b)'s coverage formula for preclearance, the Supreme Court in *Shelby County* stressed that its "decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." 570 U.S. at 557. And the Court further emphasized that "[b]oth the Federal government *and individuals* have sued to enforce § 2." *Id.* at 537 (emphasis added). Eliminating the private enforceability of § 2 would undermine these reassurances and remove an important protection against voting discrimination that was critical to the Court's conclusion that § 4(b)'s formula was no longer necessary.

Indeed, without preclearance, the need for robust § 2 protection is now even more important. *See, e.g.*, Christopher S. Elmendorf & Douglas M. Spencer, *Administering Section 2 of the Voting Rights Act After* Shelby County, 115 Colum. L. Rev. 2143, 2145-46 (2015) (noting that after *Shelby County*, "[a] number of states that had been subject to the preclearance process quickly adopted or implemented new, restrictive voting laws"). That robust protection can come only from private enforcement because the Attorney General does not have the resources necessary to pursue most § 2 violations.

Tellingly, § 5's preclearance regime was motivated in part by the inability of the Attorney General to enforce voting rights through case-by-case litigation. *See* S. Rep. No. 89-162 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2508, 2519-20; H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2441 ("[E]xperience amply demonstrates that [DOJ's] case-by-case approach has been unsatisfactory."). To address these concerns, the preclearance process provided a non-litigation means to monitor jurisdictions' VRA compliance. The same resource constraints that prompted § 5's enactment continue to affect the Attorney General's ability to enforce § 2 against prohibited voting discrimination. *See* Former DOJ Attorneys' Br., *Arkansas NAACP*, *supra*, at 18.

*Amici* States understand such resource constraints on government and the vital role that private enforcement thus serves for § 2. States often operate with limited resources in enforcing their own election laws and often rely on private enforcement to fill coverage gaps. For example, several *Amici* States have enacted state-law voting rights acts modeled on the VRA, and each contemplates shared public-private enforcement.[7] While as a general matter, law enforcement benefits from the exercise of prosecutorial discretion by government officials, *see Bond v. United States*, 572

---

[7] *See, e.g.*, N.Y. Elec. Law § 17-206(4); Cal. Elec. Code §§ 14030, 14032; Conn. Gen. Stat. § 9-368j(d); Or. Rev. Stat. § 255.411(2); Va. Code §§ 24.2-128(C), 24.2-130(C); Wash. Rev. Code §§ 29A.92.080(1), 29A.92.130(1).

U.S. 844, 864-65 (2014), voting rights in particular have often been thwarted by the "unremitting and ingenious defiance of the Constitution," sometimes by the very officials charged with protecting those rights, *Katzenbach*, 383 U.S. at 309. Private parties—voters who are aggrieved by discriminatory voting practices or organizations who represent their interests—are uniquely positioned to bring § 2 cases when the government is unable or unwilling to do so.

# CONCLUSION

This Court should affirm the decision below.

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*

BARBARA D. UNDERWOOD
*Solicitor General*

JUDITH N. VALE
*Deputy Solicitor General*

/s/ Andrea W. Trento
ANDREA W. TRENTO
*Assistant Solicitor General*

28 Liberty Street
New York, NY 10005
(212) 416-8656
andrea.trento@ag.ny.gov

April 2024

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

CAROLINE S. VAN ZILE
*Solicitor General*

ASHWIN P. PHATAK
*Principal Deputy Solicitor General*

SEAN FRAZZETTE
*Assistant Attorney General*

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

## CONCLUSION

This Court should affirm the decision below.

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York

BRIAN L. SCHWALB
Attorney General
District of Columbia

BARBARA D. UNDERWOOD
Solicitor General

CAROLINE S. VAN ZILE
Solicitor General

JUDITH N. VALE
Deputy Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Andrea W. Trento
ANDREA W. TRENTO
Assistant Solicitor General

SEAN FRAZZETTE
Assistant Attorney General

28 Liberty Street
New York, NY 10005
(212) 416-8016
barbara.underwood@ag.ny.gov

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

April 2024

On behalf of:

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, Illinois 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

JOSHUA H. STEIN
*Attorney General*
*State of North Carolina*
114 W Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,495 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f). I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ Andrea W. Trento
ANDREA W. TRENTO

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on April 15, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Andrea W. Trento
ANDREA W. TRENTO
