No. 23-13914
(consolidated with Nos. 23-13916 & 23-13921)

# In the
# United States Court of Appeals
## for the Eleventh Circuit

---

Alpha Phi Alpha Fraternity, Inc., et al.,

*Plaintiff-Appellees,*

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05337 — Steve C. Jones, *Judge*

---

## BRIEF OF AMICUS CURIAE
## THE BRENNAN CENTER FOR JUSTICE

---

YURIJ RUDENSKY
LAUREN E. MILLER
BRENNAN CENTER FOR JUSTICE
  *120 Broadway, Suite 1750*
  *New York, NY 10271*
  *(646) 292-8310*

LEAH J. TULIN
BRENNAN CENTER FOR JUSTICE
  *1140 Connecticut Avenue NW*
  *Suite 1150*
  *Washington, DC 20036*
  *(202) 650-6397*

PAUL D. BRACHMAN
AMANDA VALERIO-ESENE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

MICHAEL S. DAUBER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel for amicus curiae certify that the Brennan Center for Justice at the New York University School of Law has no parent corporation and that no publicly-traded companies own 10% or more of its stock.

Pursuant to Eleventh Circuit Rule 26.1-1, in addition to those identified in appellant's brief, the following persons have or may have an interest in the outcome of this case or appeal:

Brachman, Paul D. (counsel for amicus curiae)

The Brennan Center for Justice (amicus curiae)

Dauber, Michael S. (counsel for amicus curiae)

Miller, Lauren E. (counsel for amicus curiae)

Paul, Weiss, Rifkind, Wharton & Garrison LLP (counsel for amici curiae)

Rudensky, Yurij (counsel for amicus curiae)

Tulin, Leah J. (counsel for amicus curiae)

Valerio-Esene, Amanda (counsel for amicus curiae)

/s/ Paul D. Brachman
PAUL D. BRACHMAN

APRIL 15, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT OF THE ISSUES ......................................................1

INTEREST OF AMICUS CURIAE....................................................1

SUMMARY OF THE ARGUMENT..................................................2

ARGUMENT ...................................................................................4

I.    The Text and Structure of Section 2 Foreclose the Secretary's Attempt to Require Plaintiffs to Affirmatively Rebut Every Conceivable Explanation for Racially Polarized Voting..........................4

    A.    The Text and Structure of Section 2 Refute the Secretary's Argument. .......................................................5

    B.    The Legislative History of Section 2 Confirms That Congress Did Not Require Plaintiffs to Rebut Any Showing of "Ordinary Partisanship." ...............................9

II.    Supreme Court Precedent Interpreting Section 2 Forecloses the Secretary's Argument..............................................15

CONCLUSION.............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Legislative Black Caucus* v. *Alabama*,
    575 U.S. 254 (2015)...............................................................2

*Allen* v. *Milligan*,
    599 U.S. 1 (2023)...........................................................*passim*

*Brnovich* v. *Democratic National Committee*,
    141 S. Ct. 2321 (2021) .....................................................2, 5

*City of Mobile* v. *Bolden*,
    446 U.S. 55 (1980)...............................................................5

*Cooper* v. *Harris*,
    581 U.S. 285 (2017)..............................................................2

*Washington* v. *Davis*,
    426 U.S. 229 (1976)..............................................................7

*Grove* v. *Emison*,
    507 U.S. 25 (1993)..........................................................16, 17

*LULAC* v. *Perry*,
    548 U.S. 399 (2006)........................................................2, 16

*Northwest Austin Municipal Utility District No. One* v. *Holder*,
    557 U.S. 193 (2009)..............................................................2

*Petteway* v. *Galveston County*,
    No. 23-40582 (5th Cir.) ......................................................2

*Shelby County* v. *Holder*,
    570 U.S. 529 (2013)..............................................................2

*Thornburg* v. *Gingles*,
    478 U.S. 30 (1986)................................................................4

*Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)..........................................................7, 8

*Whitcomb* v. *Chavis*,
    403 U.S. 124 (1971).......................................................11, 12

*White* v. *Regester*,
    412 U.S. 755 (1973)............................................5, 11, 12, 13

*Zimmer* v. *McKeithen*,
    485 F.2d 1297, 1307 (5th Cir. 1973)...............................11

## Statutes

52 U.S.C. § 10301 ...............................................................8

52 U.S.C. § 10301(a)...........................................................6

52 U.S.C. § 10303(f)(2).......................................................6

## Other Authorities

S. Rep. 97-417 ...........................................................9, 11, 13

## STATEMENT OF THE ISSUES

1.  Whether Georgia's electoral districts violate Section 2 of the Voting Rights Act.

2.  Whether Section 2 of the Voting Rights Act is unconstitutional.

3.  Whether Section 2 of the Voting Rights Act provides a private cause of action.

## INTEREST OF AMICUS CURIAE[1]

*Amicus*, the Brennan Center for Justice at New York University School of Law ("the Brennan Center"),[2] is a nonprofit, non-partisan public interest law institute and think tank that acts to improve systems of democracy and justice in the United States.  Its Democracy Program is dedicated to ensuring that all Americans have an equal voice in our elections and that our government advances the public interest and upholds the rule of law.  As part of those efforts, the Brennan Center has worked to secure fair, non-

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission.  No person, other than the *amicus curiae* or its counsel, contributed money that was intended to fund preparing or submitting the brief.

[2] This brief does not purport to convey the position of New York University School of Law.

discriminatory redistricting practices and to protect the rights of all Americans to vote. The Brennan Center has submitted numerous *amicus curiae* briefs in United States Supreme Court cases involving redistricting and the Voting Rights Act of 1965 ("VRA"), including *Allen* v. *Milligan*, 599 U.S. 1 (2023), *Brnovich* v. *Democratic National Committee*, 141 S. Ct. 2321 (2021), *Cooper* v. *Harris*, 581 U.S. 285 (2017), *Alabama Legislative Black Caucus* v. *Alabama*, 575 U.S. 254 (2015), *Shelby County* v. *Holder*, 570 U.S. 529 (2013), *Northwest Austin Municipal Utility District No. One* v. *Holder*, 557 U.S. 193 (2009), and *LULAC* v. *Perry*, 548 U.S. 399 (2006). It has also filed such briefs before the United States Courts of Appeal for various Circuits around the country, including, most recently, *Petteway* v. *Galveston County*, No. 23-40582 (5th Cir.).

## SUMMARY OF THE ARGUMENT

In a comprehensive and carefully reasoned opinion, the United States District Court for the Northern District of Georgia (Jones, J.) held that Georgia's 2021 redistricting plan violates Section 2 of the VRA because it dilutes the voting strength of Black voters. That ruling is correct under well-settled law and should be affirmed.

The Secretary makes several radical arguments in favor of reversal, each of which would require this Court to depart from the plain text and settled understanding of Section 2 as established by the Supreme Court. This brief focuses narrowly on the Secretary's argument that Section 2 includes a so-called "racial causation" requirement. Under this theory, the district court committed legal error because it did not require plaintiffs to show that profound racial polarization in the electorate was caused by racial, rather than partisan, reasons. Appellant's Br. 18–29.

As briefing from the appellees persuasively points out, this argument constitutes a thinly veiled attempt to supplant the discriminatory results test that Congress codified in 1982 with a new standard—one that would require proof of discriminatory intent or racial animus on the part of white voters who form the majority. *Amicus* writes separately to explain why, if adopted, the Secretary's interpretation of Section 2 would impose a heightened evidentiary burden on plaintiffs that Congress did not intend and that the Supreme Court has never endorsed. Like the Alabama Secretary of State's recent arguments, this unprecedented argument does not ask this Court to apply the "law as it exists," but to remake Section 2 jurisprudence anew. *See Allen* v. *Milligan*, 599 U.S. 1, 23 (2023).

According to the Secretary, a plaintiff alleging vote dilution under Section 2 must affirmatively prove—in order to establish the preconditions set forth in *Thornburg* v. *Gingles*, 478 U.S. 30 (1986)—that race, not politics, has caused polarized voting between racial groups. *See* Appellant's Br. 25. Taken to its logical conclusion, the Secretary's preferred test would render it insufficient for plaintiffs to prove, as they have here, that candidate preferences and actual voting outcomes follow stark racial patterns across elections year after year. Instead, plaintiffs would also be required to (1) pinpoint *why* the racial voting patterns exist, and (2) disprove any partisan explanation, apparently without any evidentiary showing by the Secretary, all before a court could even engage in a totality of the circumstances analysis.

Because this argument conflicts with the text and structure of Section 2, its legislative history, and decades of binding Supreme Court precedent, the Secretary's argument must be squarely rejected.

## ARGUMENT

## I. The Text and Structure of Section 2 Foreclose the Secretary's Attempt to Require Plaintiffs to Affirmatively Rebut Every Conceivable Explanation for Racially Polarized Voting.

The Secretary argues that, to establish racially polarized voting under the third *Gingles* precondition, plaintiffs had to show that voting is racially

polarized *because of* race "as opposed to ordinary partisan polarization." Appellants' Br. 15; *see also* Appellant's Br. 18–19. But placing this burden on plaintiffs—that is, requiring them to disprove that a widespread pattern of racial polarization exists for political reasons, whether as part of the *Gingles* inquiry or the totality of the circumstances analysis—is fundamentally inconsistent with the text, structure, and legislative history of Section 2.

### A. The Text and Structure of Section 2 Refute the Secretary's Argument.

As originally enacted in 1965, Section 2 of the VRA prohibited voting practices or procedures that "den[ied] or abridge[d] the right of any citizen of the United States to vote on account of race or color." Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965). In *City of Mobile* v. *Bolden*, the Supreme Court interpreted that language to mean that Section 2 prohibited only "purposefully discriminatory" government action. 446 U.S. 55, 65 (1980).[3] In 1982, Congress "repudiate[d]" *Bolden* by amending Section 2. *Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021). In doing so, Congress looked to the Supreme Court's decision in *White* v. *Regester*, 412 U.S. 755 (1973), "which many in Congress believed would allow courts to consider effects but avoid

---

[3] All internal citations, quotations, and alterations in the original have been omitted unless otherwise noted.

proportionality." *Allen*, 599 U.S. at 13; *see infra* Part I.B. Thus, Congress specifically amended Section 2 to prohibit qualifications, prerequisites, standards, practices, or procedures "imposed or applied . . . *in a manner which results in* a denial or abridgement" of voting rights "on account of race or color" or language minority status. 52 U.S.C. §§ 10301(a), 10303(f)(2) (emphasis added); *see Allen*, 599 U.S. at 12–13 (explaining that "the phrase 'in a manner which results in a denial or abridgement' . . . was the effects test that *Mobile*'s detractors sought").

In addition to establishing that Section 2 protects voters from discriminatory results, not just intentional discrimination, the 1982 amendment clearly and unambiguously articulated how "a violation of [the statute] is established"—*i.e.*, how a plaintiff can prove—vote denial or abridgement "on account of race." 52 U.S.C. §§ 10301(a), (b). Specifically:

> A violation of subsection (a) **is established if, based on the totality of the circumstances,** it is shown that the political process . . . [is] not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b) (emphasis added). Thus, such a violation "is established"—*i.e.*, is proven—if plaintiffs show that one race of voters (here, Black voters) has

"less opportunity than other members of the electorate" (here, white voters) "to participate in the political process and to elect representatives of their choice." *Id.*

Reading subsections (a) and (b) "together," the Secretary imagines that "Section 2 requires plaintiffs to show that a challenged law caused them, on account of race, to have less opportunities than members of other races." Appellant's Br. at 21 (cleaned up). But by importing a causality formulation into the text, the Secretary gets the relationship between the two subsections of the statute exactly backwards. Subsection (a) establishes the prohibition— *i.e.*, the denial or abridgement of the right to vote "on account of race or color," while subsection (b) sets out how a violation "is established"—*i.e.*, by demonstrating, based on the totality of the circumstances, that the political process is not equally open.[4]

---

[4] Contrary to the Secretary's suggestion, *see* Appellant's Br. 25–26, this understanding of Section 2 does not read a requirement of racial discrimination out of the statute. Indeed, the Supreme Court has long understood standards that evaluate the totality of the circumstances as well-suited to rooting out racial discrimination. *See, e.g.*, *Washington* v. *Davis*, 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."); *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977)

To be sure, a plaintiff pressing a vote dilution claim does bear the burden of meeting that singular causation requirement articulated in Section 2—namely, that the totality of circumstances support a court's finding of a denial or abridgment of voting rights "on account of race or color." 52 U.S.C. § 10301; *see* Br. of United States 9–10.   And to ensure that the dilution claim is plausible, *Allen*, 599 U.S. at 13, courts require plaintiffs to make a threshold showing of racially polarized voting before the totality of circumstances analysis begins.   *See infra* Part II.   But there is simply nothing in the text of Section 2 requiring plaintiffs to prove that racially polarized voting is itself *caused by* race as opposed to considering it as one of many factors that tends to demonstrate that minority voters have less opportunity to elect their candidates of choice.   Congress explicitly instructed courts to weigh the "totality of the circumstances" affecting minority opportunity.   This Court should reject the Secretary's attempt to erase Congress's words and replace them with a myopic "race only" causation standard.

---

(relying on *Davis* and articulating non-exhaustive "subjects of proper inquiry" to root out intentional discrimination).

**B.** **The Legislative History of Section 2 Confirms That Congress Did Not Require Plaintiffs to Rebut Any Showing of "Ordinary Partisanship."**

Congress intended the 1982 amendments to make clear that Section 2 "turns on the presence of discriminatory effects, not discriminatory intent." *Allen*, 599 U.S. at 25. The Secretary's argument improperly attempts to revive the intent requirement that Congress rejected by repackaging it and relabeling it as a "causation" requirement. At bottom, the Secretary wants Black voters to be required to prove that white voters vote to defeat Black-preferred candidates solely "on account of race" and to the exclusion of all other factors—that is to say, because white voters intend to discriminate against Black voters on the basis of race and for no other reason. *See* Appellant's Br. 20–21. But in the 1982 amendments to Section 2, Congress explicitly stated "that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system in order to establish a violation," and that the words "on account of race" do not "connote any required purpose of racial discrimination." S. Rep. 97-417 at 27–28 & n.109 (1982) ("Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination."). Congress also warned that "[a]ny other arguments

based on similar parsing of isolated words in the bill that there is some implied 'purpose' component in Section 2, even when plaintiffs proceed under the results standard, are equally misplaced and incorrect." *Id.* at 27 n.109. In one fell swoop, Congress both anticipated and rejected the Secretary's argument.

The Secretary disclaims that his desired causation requirement centers on intent, *see* Appellant's Br. 25, 28, but there is no other way to understand it. According to the Secretary, Black voters cannot prove that racial bloc voting results in less opportunity to elect their candidates of choice in violation of Section 2 unless they first prove there is a "*racial* explanation" for *why* white voters vote against Black-preferred candidates separate from politics. Appellant's Br. 22. The Secretary attempts to justify his imagined requirement by arguing that Congress chose "an understanding of racial bloc voting that requires *racial causation*" while "reject[ing] the notion that there must be discriminatory legislative *intent*." Appellant's Br. 25 (emphasis in original). But requiring plaintiffs to extract proof and discern whether majority voters systemically oppose minority-preferred candidates for "racial" reasons, to the exclusion of all other factors, is precisely what Congress sought to avoid. In other words, it would simply replace one intent

requirement for another, contradicting the entire point of the 1982 amendments to the VRA.

The Secretary argues that his imagined causation standard is embedded in the results test that Congress codified in 1982. Appellant's Br. 25. But that too is incorrect. The results test that Congress adopted arose from three cases: *Zimmer* v. *McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973) (en banc), *aff'd sub nom. East Carroll Parish School Board* v. *Marshall*, 424 U.S. 636 (1976) (per curiam); *White* v. *Regester*, 412 U.S. 755 (1973); and *Whitcomb* v. *Chavis*, 403 U.S. 124 (1971). *See* S. Rep. 97-417 at 19–24. None of those cases required anything approximating the Secretary's standard. Instead, the operative inquiries, as well as the outcomes, hinged on the plaintiffs' ability to show that under the totality of the circumstances, minority voters had less opportunity to participate in the electoral process and elect candidates of choice than other voters in the electorate. Not one of the courts in those cases required plaintiffs to discern the reasons why majority voters voted against minority-preferred candidates.

In *Whitcomb*, for example, plaintiffs made no attempt to prove intent and, indeed, conceded that "there was no basis for asserting that legislative districts in Indiana were designed to dilute the vote of minorities." *Whitcomb*,

403 U.S. at 149.  But that concession did not end the inquiry.  Instead, the Court held that no violation of the Fifteenth Amendment occurred because the record showed merely the absence of proportional representation for residents of a particular "ghetto" in Indiana.  *See id.* at 154–63. Disproportionate outcomes alone, the Court held, could not justify striking down Indiana's multimember district scheme "absent evidence and findings [that the relevant class] had less opportunity than did other Marion County residents to participate in the political process and to elect candidates of their choice." *Id.* at 149.  The Court went on to explain that there was an insufficient showing that Republican legislators who resided in the "ghetto" did not represent the area's interests, nor that the residents had been "denied access to the political system." *Id.* at 155 & n.2.  On balance, then, the plaintiffs' challenge failed because the totality of the circumstances did not indicate that residents of color were denied access to the political system or had their voting power unconstitutionally diminished—not because they failed to show that white voters voted against their preferred candidates for purely racial reasons.

Using the same analysis just two years later, in *White*, the Court affirmed a holding that several legislative districts in Texas were

unconstitutional, again without reference to anything resembling what the Secretary asks plaintiffs to prove here. There, the Court reiterated the factors relevant to the totality of the circumstances analysis, *White*, 412 U.S. at 763–64, and found a constitutional violation on the facts presented, *id.* at 764. The Court agreed that Black voters had suffered discrimination given the "history of official racial discrimination in Texas," a rule that required a majority vote to obtain a primary nomination, and the use of "racial campaign tactics," among other factors. *Id.* at 766–67. The Court similarly found a constitutional violation against Mexican Americans in Bexar County, who "had long suffered from . . . the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics, and others." *Id.* at 768. The majority endorsed the district court's "assessment of the multimember district, overlaid, as it was, on the cultural and economic realities of the Mexican-American community in Bexar County and its relationship with the rest of the county." *Id.* at 769. Once again, discussion of the concept that plaintiffs must prove majority voters vote against minority-preferred candidates for solely racial reasons is absent.

To the contrary, when Congress crafted the results test that it enacted in the 1982 amendments to the VRA, it was keenly aware that courts consider

the connections between race and politics. S. Rep. No. 97-417 at 34. Nevertheless, Congress made clear that Section 2's results-based inquiry "makes no assumptions one way or the other about the role of racial political considerations in a particular community." *Id.* So long as plaintiffs can show that a policy "denied [them] fair access to the political process, ***in part***, because of the racial bloc voting ***context***," they can state a claim under Section 2. *Id.* (emphasis added). And, in codifying the results tests employed in *White* and *Whitcomb*, Congress made clear that it was *not* adopting a view of those cases that would require a "plaintiff to meet some 'objective design' test that is, in effect, a version of the 'foreseeable consequences' test of tort law." *Id.* at 28 n.111; *see id.* ("Although *White* refers to the 'design' of the multimember districts, the context makes clear that this refers to their particular format, and has no connotation of purpose."). In other words, the congressional record demonstrates that Section 2 liability does not hinge on plaintiffs proving any particular number of the Senate factors, or even that a majority of the factors point one way or another. *Id.* at 28 n.118 ("[T]he Committee [does not] intend them to be used, as a mechanical 'point counting' device. The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution."). Similarly, in describing how courts should assess the extent to which minority

groups bear the effects of discrimination in other areas, Congress explained: "Where these conditions are shown, and where the level, of [B]lack participation in politics is depressed, ***plaintiffs need not prove any further causal nexus*** between their disparate socio-economic status and the depressed level of political participation." *Id.* at 99 n.253 (emphasis added).

Rather, as the text of Section 2 reflects, courts must look to the totality of the circumstances and make an "overall judgment" as to "whether the voting strength of minority voters is . . . 'minimized or canceled out.'" *Id.* at 28 n.118. The Secretary's standard, in contrast, would permit courts to deny Section 2 claims because plaintiffs have not proved that majority voters vote against minority-preferred candidates solely for racial reasons, to the exclusion of all other factors. That construction of the statute should be rejected because it flatly contradicts Congress's intent for courts to make an "overall judgment" based on the totality of the circumstances.

## II. Supreme Court Precedent Interpreting Section 2 Forecloses the Secretary's Argument.

Consistent with Section 2's text, structure, and legislative history, the Supreme Court has never required plaintiffs to prove why racially polarized voting exists, much less reduce its existence to a single causal explanation. Contrary to the Secretary's assertions, precedent makes clear that plaintiffs

bear no such burden when establishing the *Gingles* preconditions nor at the totality of circumstances phase. Just as the Supreme Court recently declined attempts by the Alabama Secretary of State to recast Section 2 caselaw in *Allen*, 599 U.S. at 24, so too should the Court rebuff the Secretary's attempt here.

Since the Supreme Court's decision in *Gingles*, plaintiffs bringing a Section 2 vote dilution claim must, as a threshold matter, satisfy three preconditions. *Allen*, 599 U.S. at 17–19. "First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* at 18. "Second, the minority group must be able to show that it is politically cohesive." *Id.* "And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* These preconditions serve a gatekeeping function—plaintiffs who can prove the *Gingles* threshold inquiry advance to the totality of circumstances test. *See League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 425–36 (2006). Of course, the failure to satisfy any *Gingles* precondition is fatal to a Section 2 claim. *See, e.g.*, *Growe* v. *Emison*, 507 U.S. 25, 39 (1993) (dismissing a Section 2 claim when the record contained no statistical evidence of minority political

cohesion or majority bloc voting).  This holds true irrespective of what other indicia of discrimination plaintiffs may otherwise be able to establish as part of the totality of circumstances.

The Supreme Court explained that "[e]ach *Gingles* precondition serves a different purpose."  *Allen*, 599 U.S. at 18.  "The third precondition, focused on racially polarized voting, establishes that the challenged districting thwarts a distinctive minority vote at least ***plausibly on account of race***."  *Id.* at 19 (emphasis added).  If this Court were to adopt the Secretary's argument, plaintiffs would be required to establish something far beyond plausibility.

Requiring the totality of circumstances inquiry to turn on whether plaintiffs distill a singular causal explanation for racially polarized voting is equally unsupported by precedent.  The *Allen* Court rejected Alabama's proposed standard that would have required Section 2 plaintiffs to demonstrate that the deviation between the state's plan and a race neutral benchmark "is explainable only by race."  *Id.* at 24.  Such a test, the Court explained, would impermissibly reduce the totality analysis to just one relevant circumstance.  *Id.* at 26.  Moreover, it would "inject[] into the effects test of [Section] 2 an evidentiary standard that even [the Supreme Court's] purposeful discrimination cases eschew."  *Id.* at 37–38.  And doing so would

contrave Congress's clear intent to "reject[] treating discriminatory intent as a requirement for liability under [Section] 2." *Id.* at 37. The Court's reasoning applies with equal force here. Requiring plaintiffs to explain why white bloc voting exists threatens to make the "totality of the circumstances" test a singular-focused inquiry into the motivations of the electorate akin to the intent-based standard Congress long ago rejected.

## CONCLUSION

The evidentiary burden that the Secretary seeks to impose on plaintiffs has no mooring in the text of Section 2 when read as a whole, nor can it be grounded in the forty years of jurisprudence since the statute was amended in 1982. Recognizing such a requirement would contravene Congress's expressed goals in amending Section 2: to provide a remedy for policies and procedures that result in unequal access to the political process and prevent minority voters from electing the candidates of their choosing. Because the district court properly applied Section 2 and found that the 2021 redistricting plan violated Section 2, its judgment should be affirmed.

Respectfully submitted,

/s/ Paul D. Brachman

YURIJ RUDENSKY
LAUREN E. MILLER
BRENNAN CENTER FOR JUSTICE
  120 Broadway, Suite 1750
  New York, NY 10271
  (646) 292-8310

LEAH J. TULIN
BRENNAN CENTER FOR JUSTICE
  1140 Connecticut Avenue NW
  Suite 1150
  Washington DC 20036
  (202) 650-6397

PAUL D. BRACHMAN
AMANDA VALERIO-ESENE
  PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
  2001 K Street NW
  Washington, DC 20006
  (202) 223-7300

MICHAEL S. DAUBER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, NY 10019
  (212) 373-3000

APRIL 15, 2024

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND WORD-COUNT LIMITATIONS

I, Paul D. Brachman, counsel for the Brennan Center for Justice, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7) and 32(g)(1), that the attached brief is proportionately spaced, has a typeface of 14 points or more, was prepared using Microsoft Word 365, and contains 3,859 words.

/s/ Paul D. Brachman
PAUL D. BRACHMAN

APRIL 15, 2024

## CERTIFICATE OF SERVICE

I, Paul D. Brachman, counsel for the Brennan Center for Justice, and a member of the Bar of this Court, certify that, on April 15, 2024, a copy of the attached brief was filed with the Clerk and served on the parties through the Court's electronic filing system.

/s/ Paul D. Brachman\
PAUL D. BRACHMAN

APRIL 15, 2024