No. 23-13914
(*consolidated with Nos.23-13916 & 13921*)

IN THE

# United States Court of Appeals

For the Eleventh Circuit

ALPHA PHI ALPHA FRATERNITY, INC., ET AL.,
*Plaintiffs-Appellees,*
v.
SECRETARY OF STATE OF GEORGIA,
*Defendant- Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
NO. 121-CV-05337— Steve C. Jones, Judge

**BRIEF FOR THE GEORGIA STATE CONFERENCE OF THE NAACP, THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., GALEO LATINO COMMUNITY DEVELOPMENT FUND INC., COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF GEORGIA, DR. CHERYL GRAVES, DR. URSULA THOMAS, DR. H. BENJAMIN WILLIAMS, JASMINE BOWLES, AND BRIANNE PERKINS AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE OF DISTRICT COURT DECISION**

KURT KASTORF
KASTORF LAW LLP
1387 IVERSON ST.,
SUITE 100
ATLANTA, GA 30307

EZRA D. ROSENBERG
JULIE M. HOUK
DAVID ROLLINS-BOYD*
ALEXANDER S. DAVIS*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW,

BRADLEY E. HEARD
JACK GENBERG
COURTNEY O'DONNELL
SOUTHERN POVERTY
LAW CENTER
150 E PONCE DE LEON
AVE, SUITE 340
DECATUR, GA 30030

NEIL STEINER*
DECHERT LLP
THREE BRYANT PARK,
1095 AVENUE OF THE
AMERICAS

Suite 900
Washington, D.C. 20005

KEITH HARRISON*
CROWELL & MORING LLP
1001 PENNSYLVANIA AVENUE
NW
WASHINGTON, D.C. 20004
TELEPHONE: (202) 624-
2500

* *PRO HAC VICE FORTHCOMING*

*Counsel for Amicus Curiae*

No. 23-13916
*(consolidated with Nos.23-13914 & 13921)*

IN THE

# United States Court of Appeals

For the Eleventh Circuit

COAKLEY PENDERGRASS, ET AL.,
*Plaintiffs-Appellees,*
v.
SECRETARY OF STATE OF GEORGIA,
*Defendant- Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
NO. 121-CV-05337— Steve C. Jones, Judge

**BRIEF FOR THE GEORGIA STATE CONFERENCE OF THE NAACP, THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., GALEO LATINO COMMUNITY DEVELOPMENT FUND INC., COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF GEORGIA, DR. CHERYL GRAVES, DR. URSULA THOMAS, DR. H. BENJAMIN WILLIAMS, JASMINE BOWLES, AND BRIANNE PERKINS AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE OF DISTRICT COURT DECISION**

KURT KASTORF
KASTORF LAW LLP
1387 IVERSON ST., SUITE 100
ATLANTA, GA 30307

EZRA D. ROSENBERG
JULIE HOUK
DAVID ROLLINS-BOYD
ALEXANDER DAVIS
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005

BRADLEY E. HEARD
JACK GENBERG
COURTNEY O'DONNELL
SOUTHERN POVERTY LAW
CENTER
150 E PONCE DE LEON AVE, SUITE
340
DECATUR, GA 30030

NEIL STEINER
DECHERT LLP
THREE BRYANT PARK,
1095 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
TELEPHONE: (212) 698-3500

KEITH HARRISON
TONI MICHELLE JACKSON
ASTOR H.L. HEAVEN
CROWELL & MORING LLP
1001 PENNSYLVANIA AVENUE NW
WASHINGTON, DC  20004
TELEPHONE: (202) 624-2500

FACSIMILE: (212) 698-3599
NEIL.STEINER@DECHERT.COM
ANDREW.STAHL@DECHERT.COM

*Counsel for Amicus Curiae*

No. 23-13921
(*consolidated with Nos.23-13914 & 13916*)

IN THE

# United States Court of Appeals

For the Eleventh Circuit

ANNIE LOIS GRANT, ET AL.,

*Plaintiffs-Appellees,*

v.

SECRETARY OF STATE OF GEORGIA,

*Defendant- Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

NO. 121-CV-05337— Steve C. Jones, Judge

**BRIEF FOR THE GEORGIA STATE CONFERENCE OF THE NAACP, THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., GALEO LATINO COMMUNITY DEVELOPMENT FUND INC., COMMON CAUSE, LEAGUE OF WOMEN VOTERS OF GEORGIA, DR. CHERYL GRAVES, DR. URSULA THOMAS, DR. H. BENJAMIN WILLIAMS, JASMINE BOWLES, AND BRIANNE PERKINS AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE OF DISTRICT COURT DECISION**

KURT KASTORF
KASTORF LAW LLP
1387 IVERSON ST., SUITE 100
ATLANTA, GA 30307

EZRA D. ROSENBERG
JULIE HOUK
DAVID ROLLINS-BOYD
ALEXANDER DAVIS
LAWYERS' COMMITTEE for CIVIL
RIGHTS UNDER LAW

BRADLEY E. HEARD
JACK GENBERG
COURTNEY O'DONNELL
SOUTHERN POVERTY LAW
CENTER
150 E PONCE DE LEON AVE, SUITE
340
DECATUR, GA 30030

NEIL STEINER
DECHERT LLP

1500 K Street NW, Suite 900
Washington, DC  20005

KEITH HARRISON
TONI MICHELLE JACKSON
ASTOR H.L. HEAVEN
CROWELL & MORING LLP
1001 PENNSYLVANIA AVENUE NW
WASHINGTON, DC  20004
TELEPHONE: (202) 624-2500

THREE BRYANT PARK,
1095 AVENUE OF THE AMERICAS
NEW YORK, NY  10036
TELEPHONE: (212) 698-3500
FACSIMILE: (212) 698-3599
NEIL.STEINER@DECHERT.COM
ANDREW.STAHL@DECHERT.COM

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page(s)**

INTERESTS OF AMICUS CURIAE...................................................................1

STATEMENT OF THE ISSUES .........................................................................5

INTRODUCTION AND SUMMARY OF ARGUMENT......................................5

ARGUMENT.......................................................................................................9

I.  The Section 2 Results Standard Has Been and Continues
    to be an Appropriate Exercise of Congress's Fifteenth
    Amendment Authority to Remedy Racial Discrimination
    in Voting.............................................................................................9

    A.  The Supreme Court in *Milligan* Reaffirmed the
        Constitutionality of the Section 2 Results Standard as
        Applied to Redistricting, Including its Use of a Race-
        Conscious Remedy ..................................................................9

    B.  The Supreme Court's Decision in *Shelby v. Holder* Does
        Not Raise Any Question or Doubt Regarding the Present-
        Day Constitutionality of the Section 2 Results Standard .........13

        1.  The Shelby County decision ..........................................13

        2.  *Shelby* did not hold that the passage of time may
            trigger a reexamination of the constitutionality of
            the Fifteenth Amendment legislation found to be
            constitutional at the time of enactment..........................16

        3.  The constitutional concerns that animated the
            *Shelby County* decision have no relevance to the
            Section 2 results standard..............................................17

     C.     The Supreme Court's Decision in the *Boerne* Line of Cases Do Not Raise Any Question or Doubt Regarding the Present-Day Constitutionality of the Section 2 Results Standard..................................................................19

II.     The Amici States' Effort to Remake the Section 2 Results Test, and Ignore Nearly 40 Years of Supreme Court Section 2 Precedent, Should Be Rejected ........................................................22

CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Cooper*,
589 U.S. 248 (2020) (Copyright Remedy Clarification Act of
1990) ......................................................................................22

*Allen v. Milligan*,
599 U.S. 1 (2023)................................................................*passim*

*Alpha Phi Alpha v. Raffensperger*,
No. 21-05337 .................................................................... 1, 2

*Bd. of Trs. of the Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) (Title I of the Americans With Disabilities
Act of 1990)............................................................................22

*Chisom v. Roemer*,
501 U.S. 380 (1991)................................................................24

*City of Boerne v. Flores*,
521 U.S. 507 (1997)...........................................................*passim*

*City of Rome v. United States*,
446 U.S. 156 (1980)..................................................... 11, 20, 21

*Coleman v. Court of Appeals of Maryland*,
566 U.S. 30 (2012) (plurality opinion) (self-care provision of the
Family and Medical Leave Act of 1993)............................................22

*College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense
Bd*,
527 U.S. 627 (1999) (Patent Remedy Act of 1992).........................................22

*Dupree v. Owens*,
92 F.4th 999 (2024) (Title V claims asserting a Title I right under
the Americans With Disabilities Act of 1990)................................................22

iii

*In re: Employment Discrimination Litigation Against the State of Alabama*,
198 F.3d 1305 (1999) (Title VII of the Civil Rights Act of 1964) ................... 22

*Grant v. Raffensperger*,
No. 22-00122 (N.D. Ga.) ............................................................. 1, 2

*Kimel* v. *Florida Bd. of Regents*,
528 U.S. 62 (2000) (Age Discrimination in Employment Act, as
amended in 1974) ..................................................................... 22

*Mobile v. Bolden*,
446 U.S. 55 (1980) ...................................................................... 23

*Nev. Dep't of Human Res. v. Hibbs*,
538 U.S. 721 (2003) (family care provision of the Family and
Medical Leave Act of 1993) ......................................................... 22

*Pendergrass v. Raffensperger*,
No. 21-05339 ......................................................................... 1, 2

*Shelby County v. Holder*,
570 U.S. 529 (2013) ............................................................. *passim*

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ............................................... 11, 14, 20, 21

*Students for Fair Admissions v. President and Fellows of Harvard College*,
600 U.S. 181 (2023) .................................................................. 11

*Tennessee v. Lane*,
541 U.S. 509 (2004) (Title II of the Americans With Disabilities
Act of 1990 as to disabled persons' access to the courts) ................ 22

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ............................................................. *passim*

*United States v. Marengo Cnty. Comm'n*,
731 F.2d 1546 (1984) ................................................................. 9

*United States* v. *Morrison,*
   *529 U.S. 598* (2000) (Violence Against Women Act of 1994) ........................22

*Whitcomb v. Chavis,*
   403 U.S. 124 (1971)......................................................................... 9, 22, 23, 24

*White v. Register,*
   412 U.S. 755 (1973)......................................................................... 8, 22, 23, 24

**Statutes**

52 U.S.C. §10303....................................................................................13

52 U.S.C. §10701....................................................................................17

1993 of the Religious Freedom Restoration Act of 1993......................................21

Civil Rights Act of 1964 and the Fair Housing Act of 1968...............................17

Voting Rights Act ............................................................................... 9, 14, 16, 20

Voting Rights Act Section 2, 52 U.S.C. §10301............................................*passim*

Voting Rights Act Section 5, 52 U.S.C. §10304............................................ 13, 14

**Other Authorities**

Fourteenth Amendment.................................................................................*passim*

Fifteenth Amendment ..................................................................................*passim*

Fourteenth and Fifteenth Amendments .............................................................12

U.S. Const. Amend. XIV, sec. 1........................................................................20

Amici Curiae are plaintiffs in two consolidated lawsuits challenging the legality and constitutionality of Georgia's Congressional, Senate, and House redistricting plans under Section 2 of the Voting Rights Act, 52 U.S.C. §10301, and the Fourteenth Amendment. *Georgia State Conference of the NAACP, et al. v. State of Georgia*, 1:21-CV-5338-ELB-SCJ-SDG); *Common Cause, et al. v. Raffensperger*, (1:21-CV-00090-SCJ-SDG-ELB) (the "GA NAACP plaintiffs" and the "Common Cause plaintiffs," respectively). Amici GA NAACP plaintiffs include the Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, Inc., and GALEO Latino Community Development Fund, Inc. Amici Common Cause plaintiffs include Common Cause, the League of Women Voters of Georgia, Dr. Cheryl Graves, Dr. Ursula Thomas, Dr. H. Benjamin Williams, Jasmine Bowles, and Brianne Perkins. Trial in these cases was stayed pending resolution of the instant appeal, taken from the district court's October 26, 2023 Order in *Alpha Phi Alpha v. Raffensperger*, No. 21-05337, *Pendergrass v. Raffensperger*, No. 21-05339, and *Grant v. Raffensperger*, No. 22-00122 (N.D. Ga.), enjoining use of Georgia's 2021 Congressional, State Senate, and State House of Representatives redistricting plans as violative of Section 2.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus or their counsel made a monetary contribution to this brief's preparation and submission.

The Section 2 claims asserted by the GA NAACP plaintiffs in part overlap with the Section 2 claims made by the *Alpha Phi Alpha*, *Pendergrass*, and *Grant* plaintiffs, and the constitutional claims made by both the GA NAACP plaintiffs and the Common Cause plaintiffs overlap with some areas impacted by plaintiffs' claims in the instant litigation. Accordingly, amici have a direct and strong interest in the resolution of this appeal.

Additionally, the organizational plaintiffs are civil rights organizations committed to protecting the right to vote and eliminating discrimination and inequality in any form in the State of Georgia and, for this reason as well, have a strong and concrete interest in this appeal.

The Georgia State Conference of the NAACP ("GA NAACP") is a unit of the National NAACP, and is the oldest and one of the largest, most significant organizations promoting and protecting the civil rights of African Americans and other racial and ethnic minorities in Georgia. The GA NAACP is a nonpartisan, interracial, nonprofit membership organization with a mission to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans. Protecting and promoting the voting rights of Black voters, other voters of color, and underserved communities is essential to this mission. The GA NAACP has approximately 10,000 members across approximately 180 local units, residing

in at least 120 counties in Georgia, including in areas affected by the redistricting plans at issue in this appeal.

GALEO Latino Community Development Fund, Inc. ("GALEO") was founded in 2004 and works to increase civic engagement and leadership development of the Latinx community across Georgia. Protecting and promoting the voting rights of Georgia's Latinx U.S. citizens is essential to this mission. GALEO has over 230 members in Georgia, in over 35 counties and 70 cities, including in areas affected by the redistricting plans at issue in this appeal.

The Georgia Coalition for the People's Agenda ("GCPA") was founded in 1998 by Reverend Joseph Lowery, and is an umbrella organization of human rights, civil rights, labor, women's, youth, and peace and justice groups which advocate for, among other things, voting rights protection and elimination of barriers to the ballot box for all Georgians. GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members across the state of Georgia in various cities and counties, including in areas affected by the redistricting plans at issue in this appeal.

Common Cause is a non-profit corporation and nonpartisan democracy group dedicated to fair elections and making government at all levels more representative, open, and responsive to the interests of all people. Founded in 1970 with offices in Atlanta, Georgia, Common Cause has more than 26,000 members and supporters

across Georgia, including in areas affected by the redistricting plans at issue in this appeal. Unfair and discriminatory redistricting directly frustrates and impedes Common Cause's core mission of making government more responsive to the interests of communities by diminishing the voices of the voters Common Cause works to engage. As a result, Common Cause has an interest in ensuring that Black Georgians do not have their voting strength diluted by the redistricting plans at issue in this appeal.

The League of Women Voters of Georgia (the "League") is a non-profit, nonpartisan membership-based organization dedicated to protecting the rights of eligible voters and expanding access for those who have been left out of the democratic process. With 11 local Leagues around the State, the League has approximately 550 members in Georgia, including in the areas affected by the redistricting plans at issue in this appeal. As part of its mission, the League – including local Leagues – advocates for fair and nondiscriminatory maps, which necessarily include effective representation of racial and linguistic minorities. Unfair and discriminatory redistricting directly frustrates and impedes the League's core mission of protecting the rights of voters the League works to engage, including Black voters and residents. As a result, the League has an interest in ensuring that Black Georgians do not have their voting strength diluted by the redistricting plans at issue in this appeal.

Dr. Cheryl Graves, Dr. Ursula Thomas, Jasmine Bowles, Dr. H. Benjamin Williams, and Brianne Perkins are Black registered voters who reside in the Metro Atlanta, Georgia area. They have an interest in ensuring that their voting strength and the voting strength of other Black voters in the Metro Atlanta area is not diluted by the redistricting plans at issue in this appeal.

## STATEMENT OF THE ISSUES

1)      Whether the results standard of Section 2 of the Voting Rights Act, as applied to redistricting plans, remains a constitutional exercise of Congress's Fifteenth Amendment authority?

2)      Whether the analytic framework for deciding whether a redistricting plan violates the Section 2 results standard is specified by *Thornburg v. Gingles*, 478 U.S. 30 (1986), and subsequent cases that apply *Gingles*, or by Supreme Court Fourteenth Amendment decisions that preceded Congress's enactment of the results standard?

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amici submit this brief principally to address the Georgia Secretary of State's (the "Secretary") argument that the results standard of Section 2 of the Voting Rights Act, 52 U.S.C. §10301, when applied to redistricting plans such as the plans at issue here, falls outside the bounds of Congress's authority to enforce the Fifteenth Amendment's prohibition on racial discrimination in voting.  Amici also address an

argument advanced by amici Alabama and 13 other States ("Amici States") that attempts to drastically rewrite nearly 40 years of Supreme Court precedent defining how the results standard applies to redistricting plans.[2]

1.      The Section 2 results standard, as applied to redistricting plans, is a fully constitutional exercise of Congress's Fifteenth Amendment enforcement authority. The Secretary argues that when a redistricting plan is found to violate the results standard (such as the plans at issue here), the remedy requires that election districts be redrawn using race in a constitutionally suspect manner, that this reliance on race is unjustified, and that Section 2 (as applied) is therefore unconstitutional. In this regard, the Secretary does not assert that Congress acted unconstitutionally when it adopted the results standard in 1982. Instead, the Secretary claims that, with the passage of time since 1982, there is a constitutional imperative to now reexamine the standard's underpinnings, and that, when that is done, the results standard's purported constitutionally-suspect reliance on race is no longer justified, and so the standard has thereby become unconstitutional as applied. The Secretary pins his argument on the Supreme Court's decisions in *Shelby County v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997).

---

[2] Amici agree with the appellees that Georgia's Congressional, State House, and State Senate redistricting plans violate Section 2, however, we do not address the district court's Section 2 determinations in this brief.

The Secretary's argument is fatally flawed. As a threshold matter, just last year the Supreme Court specifically and unambiguously reaffirmed the constitutionality of the Section 2 results standard, and its accompanying remedy. *Allen v. Milligan*, 599 U.S. 1 (2023). There, the Court upheld a district court preliminary injunction that determined that Alabama's 2021 congressional redistricting plan had a prohibited discriminatory result. The Court reiterated its prior holdings that Section 2 does *not* require that a redistricting violation be remedied by using race in a constitutionally-suspect manner. That the results standard was a valid congressional exercise of authority in 2023 as applied to Alabama's 2021 redistricting plan necessarily rebuts the Secretary's assertion that, a year later, it somehow is constitutionally impermissible to apply Section 2 to redistricting plans adopted by Georgia also in 2021.

The Secretary's contention that the passage of time may trigger a reexamination of a statute that was constitutional when enacted is wrong. Neither *Shelby* nor *Boerne* stand for that proposition, and the Secretary has not identified any case (Supreme Court or otherwise) that does.

*Shelby County* dealt with the Voting Rights Act's entirely different preclearance provisions. The Court examined the validity of a 2006 congressional enactment that amended the preclearance requirement and extended its 2007 sunset date, and found it to be unconstitutional. The Court did not revisit the validity of

earlier preclearance statutes it previously had held were constitutional, *i.e.*, the preclearance statutes of 1965, 1970, 1975, and 1982. In addition, even if the validity of the results standard may be reexamined today, the standard (used by the district court below) easily passes muster when measured against the test *Shelby County* relied upon to invalidate the 2006 preclearance statute.

Likewise, *Boerne* and the *Boerne* line of cases concern the constitutionality *ab initio* of congressional enactments, nothing more, and thus do not support a reassessment of the results standard. Furthermore, *the Boerne* cases uniformly address the limits on Congress's enforcement authority under the Fourteenth Amendment, and do not pertain to Congress's Fifteenth Amendment authority; thus, they are inapposite for this reason as well.

2. The construction of the Section 2 results standard put forward by the Amici States also runs headlong into and is foreclosed by the Supreme Court's decision in *Milligan*. In *Milligan*, the Supreme Court reaffirmed the framework utilized for nearly 40 years for applying the results standard to redistricting plans, which had its origin in *Thornburg v. Gingles*, 478 U.S. 30 (1986), decided four years after the results standard was adopted. Amici States would have this Court ignore *Milligan* and *Gingles* (and the Supreme Court's decisions in between), and, instead, apply a framework based on two Supreme Court decisions that preceded Congress's adoption of the results standard in 1982, *White v. Register*, 412 U.S. 755 (1973), and

*Whitcomb v. Chavis*, 403 U.S. 124 (1971).  No such reworking of Section 2 is supportable.[3]

## ARGUMENT

**I.     The Section 2 Results Standard Has Been and Continues to be an Appropriate Exercise of Congress's Fifteenth Amendment Authority to Remedy Racial Discrimination in Voting**

 **A.     The Supreme Court in *Milligan* Reaffirmed the Constitutionality of the Section 2 Results Standard as Applied to Redistricting, Including its Use of a Race-Conscious Remedy**

In *Milligan*, the Supreme Court directly and plainly addressed Section 2's constitutionality: "[w]e . . . reject . . . Alabama's argument that §2 as applied to redistricting is unconstitutional."  599 U.S. at 41.[4]

In so holding, the Court confirmed the long line of authority establishing that the results standard does not require racial proportionality or racial gerrymanders, and thus does not wrongly elevate race as a districting criterion.  The Court grounded

---

[3] Amici curiae NAACP plaintiffs and Common Cause plaintiffs also strongly dispute the assertion by the Secretary, and by amici who have filed in support of the Secretary, that private plaintiffs lack a private right of action under Section 2, and that Section 2 plaintiffs must prove that racially polarized voting is caused by racial animus.  These issues are addressed in the briefs submitted by the plaintiff-appellees and appellee U.S. Department of Justice, and we do not separately address them here.

[4] Previously, this Circuit held that Congress acted within its Fourteenth and Fifteenth Amendment authority when it adopted the Section 2 results standard. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1556-1563 (1984).

this conclusion on the Section 2 analytic framework it first established in *Thornburg v. Gingles*, *supra*, a framework that "has governed [the Court's] Voting Rights Act jurisprudence since it was decided 37 years ago," and which the Court has applied in "one §2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country." *Id.* at 19. The Court considered "Alabama's attempt to remake our §2 jurisprudence anew," *id.* at 23, and rejected it entirely. *Id.* at 24 ("we find Alabama's new approach to §2 compelling neither in theory nor in practice. We accordingly decline to recast our §2 case law as Alabama requests."). The Court thereafter upheld the district court's liability finding by applying *Gingles* to the lower court's findings of fact. *Id*. at 23.

The Court emphasized that the "*Gingles* framework . . . imposes meaningful constraints on proportionality," *id.* at 26, and that "[f]orcing proportional representation is unlawful and inconsistent with this Court's approach to implementing §2." *Id.* at 28. Similarly, a "faithful application" of the Court's precedents does not support a concern that Section 2 requires racial gerrymandering by impermissibly placing race at the center of district line drawing. *Id.* at 42. Districting with an awareness or consciousness of racial demographics is permissible and, as *Milligan* approvingly observed, "for the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of §2 as interpreted in

*Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state redistricting maps that violate §2." *Id*. at 41.[5]

The Court also rejected the assertion, noted here by the Secretary, that Section 2's use of an effect standard is invalid under the Fifteenth Amendment since the Fifteenth Amendment itself prohibits only purposeful discrimination. The Court pointed to its prior rulings in *City of Rome v. United* States, 446 U.S. 156 (1980), and *South Carolina v. Katzenbach,* 383 U.S. 301 (1966), that the Fifteenth Amendment authorizes Congress to legislate against voting practices that have a discriminatory effect, and therefore, Congress acted within its authority by adopting the Section 2 results standard. 599 U.S. at 41.

As the Secretary notes, Justice Kavanaugh, who was the essential fifth vote in the *Milligan* five-Justice majority, wrote a concurring opinion. Importantly, except for one subsection, he joined all of Chief Justice Roberts's opinion including the

---

[5] The Secretary cites *Students for Fair Admissions v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), where the Supreme Court held that the admissions systems used by Harvard College and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment. That decision, however, adds nothing to the discussion of the Section 2 results standard. It was handed down three weeks after *Milligan*, and the opinions in both cases were authored by Chief Justice Roberts, and so the two decisions very much reflect the same constitutional perspectives on the use of race in government decision making. Yet the Chief Justice in *Milligan* found no reason to cite to the Court's decisions on the use of race in school admissions and assignments in reaffirming the limited role that race may appropriately play in applying Section 2. Likewise, this Court should reject the Secretary's effort to import the school decisions here.

portion that reaffirmed Section 2's constitutionality. *Id.* at 42. Underscoring his agreement in that regard, Justice Kavanaugh rejected Alabama's argument that *Gingles* requires racial proportionality. *Id.* at 43 ("As the Court's precedents make clear, *Gingles* does not mandate a proportional number of majority-minority districts."). He similarly rejected the State's assertion "that §2, as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's remedial or preventive authority under the Fourteenth and Fifteenth Amendments." *Id.* at 45.

Justice Kavanaugh did briefly suggest that in the future a question might arise as to whether Congress's constitutional authority to allow race-conscious redistricting under Section 2 could continue indefinitely, but did not comment further since Alabama had not raised this temporal issue. *Id.* Nonetheless, as noted, Justice Kavanaugh fully endorsed Section 2's constitutionality as applied to Alabama's post-2020 Census redistricting plan. His concurrence, therefore, provides no basis for questioning the constitutionality of applying Section 2 to Georgia's post-2020 Census redistricting plans.

For these reasons, *Milligan* forecloses the Secretary's argument that the Section 2 results standard is unconstitutional.[6]

---

[6] The Amici States nominally join the Secretary in making a constitutional argument. They contend that the district court's purported "flawed approach" to applying the results standard was unconstitutional. Br. at 26. The simple response

### B. The Supreme Court's Decision in *Shelby v. Holder* Does Not Raise Any Question or Doubt Regarding the Present-Day Constitutionality of the Section 2 Results Standard

Contrary to what the Secretary argues, there is nothing in the Supreme Court's decision in *Shelby* County *v. Holder*, *supra*, which casts any doubt on the constitutionality of Section 2.

- *Shelby County* was not a case in which the Court revisited the constitutionality of an older statute that was constitutional at the time of enactment, and so does not support the Secretary's assertion that there is a time limit on the number of years a Fifteenth Amendment statute remains valid without a reexamination of its constitutionality.

- In any event, the constitutional concerns that produced the Court's ruling in *Shelby* have no application to the Section 2 results standard, and that standard used here easily passes muster if the *Shelby* test of constitutionality were to be applied to it.

### 1. The Shelby County decision.

In *Shelby County v. Holder*, the Supreme Court held that Congress's 2006 reauthorization of the preclearance requirement of Section 5 of the Voting Rights

---

to this is that if a court misapplies Section 2, the remedy is to reverse that court's Section 2 holding. There is no reason to bootstrap a misapplication of Section 2 into a constitutional issue, and the Amici States do not argue that the results standard itself has any constitutional defect.

Act, 52 U.S.C. §10304, was beyond Congress's Fifteenth Amendment enforcement authority. Specifically, the Court invalidated Congress's extension of the sunset date for Section 5's geographic coverage formula, contained in Section 4 of the Act, 52 U.S.C. §10303. 570 U.S. at 557. The Section 4 coverage formula was enacted in 1965 and subsequently was reauthorized and amended in 1970, 1975, and 1982.

Section 5 required a subset of states to obtain preclearance from the Attorney General or the United States District Court for the District of Columbia before implementing any change in a voting standard, practice, or procedure. The Section 4 geographic coverage formula, as amended, relied on registration and voting statistics extant as of 1964, 1968, and 1972, and on certain state and local voting practices in use in those years whose future use was prohibited by the Voting Rights Act. Under the 1982 reauthorization, the coverage formula was due to lapse in 2007. In 2006, Congress extended the formula for an additional 25 years with no amendment, based on extensive evidence that voting discrimination was continuing in the covered areas. Prior to its decision in *Shelby County*, the Supreme Court had upheld the constitutionality of the 1965 adoption of the preclearance requirement and coverage formula, *South Carolina v. Katzenbach*, *supra*, and the 1970, 1975, and 1982 reauthorizations and amendments. *See generally Shelby County*, 570 U.S. at 537-40.

To assess whether Congress acted within its Fifteenth Amendment authority when it enacted the 2006 reauthorization, the Court applied the following test: the "statute's current burdens must be justified by current needs, and any disparate geographic coverage must be sufficiently related to the problem that it targets." *Id.* at 550-51 (internal quotation marks omitted).

The Court concluded that there were "current burdens" since the preclearance requirement and its coverage formula involved "departures from the basic features of our system of government." *Id.* at 545. Preclearance significantly infringed on federalism principles by reversing the standard rule that state enactments may be challenged by the federal government only after they go into effect, *id.* at 542, 544; and the application of preclearance to some states and not others was inconsistent with "the tradition of equal sovereignty" among the States. *Id.* at 544.

The Court further concluded that Congress failed in 2006 to justify these burdens by "current needs," and did not properly tailor the disparate geographic coverage. "[T]he coverage formula that Congress reauthorized in 2006 ignores . . . developments [in the covered areas since 1965], keeping the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs", *id.* at 553, and "Congress did not use the record it compiled [prior to the 2006 reauthorization] to shape a coverage formula grounded in current conditions." *Id.* at 554.

**2. *Shelby* did not hold that the passage of time may trigger a reexamination of the constitutionality of Fifteenth Amendment legislation found to be constitutional at the time of enactment.**

As is made clear by the foregoing summary of the *Shelby County* decision, it was Congress's 2006 reauthorization that led to the Supreme Court's constitutional review, and it was that reauthorization that the Court found wanting. The Court did not reexamine the constitutionality of the 1965 law, or the subsequent 1970, 1975, and 1982 reauthorizations and amendments, and it was not the passage of time since those enactments that prompted the Court's constitutional review. *Shelby County*, therefore, did not hold that the Fifteenth Amendment imposes a time limit on laws enacted to enforce the Amendment's prohibition on racial discrimination in voting, such that their constitutional validity expires after some number of years and becomes subject to reexamination.

The Secretary cites no court decision that supports his new radical new concept of a constitutional sunset proviso (as discussed *infra*, the Secretary's reliance on *Boerne* in this regard also is misplaced). It is decidedly Congress's job to consider if and when a statute has outlived its usefulness. To hold otherwise would require Congress to periodically revisit its prior enactments (the Secretary offers no guidance on how frequently this would need to occur) and, if Congress did not re-justify them, they would be deemed invalid. Among other things, this potentially would threaten other vital provisions of the Voting Rights Act (such as

16

the ban on the use of tests or devices as a prerequisite to voting or registering to vote, 52 U.S.C. §10701), as well as laws of great consequence adopted under the Fourteenth Amendment (such as the Civil Rights Act of 1964 and the Fair Housing Act of 1968). No such constitutional sunset proviso exists.

> **3.     The constitutional concerns that animated the *Shelby County* decision have no relevance to the Section 2 results standard.**

*Shelby County* also is inapposite because the Section 2 results standard operates in a completely different manner than the former preclearance system and, for this reason, the constitutional concerns underlying that decision do not apply to Section 2. As the Supreme Court noted in *Shelby County*, that "decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in §2." *Id.* at 557.

The Section 2 results standard does not involve any "departures from the basic features of our system of government." Unlike Section 5, Section 2 enables challenges to state and local enactments only after they go into effect, the same as innumerable other federal statutes that provide a cause of action in federal court. And exactly like innumerable other federal statutes, Section 2 applies equally to all states, in accord with "the tradition of equal [state] sovereignty."

With regard to "current needs," that is precisely what the results standard focuses on. Under the well-established *Gingles* framework, reaffirmed by the Court

in *Milligan*, Section 2 liability in redistricting litigation depends on minority voters proving three preconditions: (1) their "geographical compactness and numerosity"; (2) their "political cohesiveness"; and (3) the existence of "racially polarized voting." *Milligan*, 599 U.S. at 18-19. Each of these preconditions requires proof of the current electoral circumstances in the challenged jurisdiction. Thus, Section 2 is violated only when there is a current need to impose liability – as the district court below found in this case.

The Secretary would have this Court conjure up a different understanding of the results standard, one that purportedly involves "current burdens" and fails to address "current needs." This effort is refuted again by *Milligan* and by the nature of the Section 2 results framework.

The Secretary asserts that Section 2 has current burdens "to the extent it requires sorting voters into electoral districts based solely on their race," Br. at 46, or, as the Secretary then asserts with more confidence, because Section 2 "require[s] racial gerrymandering as a remedy." *Id.* at 49. But, as discussed above, *Milligan* makes clear that Section 2 does not require racial gerrymandering, and that a race-conscious application of Section 2 is fully appropriate.

The Secretary claims there is no current need for the results standard because, according to the Secretary, "minority communities [nationwide] today enjoy considerable electoral success," *id.* at 52, and the same is true in Georgia. *Id.* But

whatever the nationwide or Georgia-wide pattern of minority electoral opportunity may be – something that Georgia offers minimal evidence of – there plainly continues to be a "current need" for the results standard in those jurisdictions where, relying on the well-established *Gingles* framework, it is shown that a redistricting plan has a discriminatory result.[7]

For these reasons, even if the constitutionality of the Section 2 results standard were to be revisited, the concerns that animated the *Shelby County* decision are not relevant to Section 2, and the test utilized by the Supreme Court in *Shelby County* demonstrates that the results standard remains well within Congress's Fifteenth Amendment enforcement authority.

>  **C.  The Supreme Court's Decisions in the *Boerne* Line of Cases Do Not Raise Any Question or Doubt Regarding the Present-Day Constitutionality of the Section 2 Results Standard**

The Secretary mixes into his arguments based on *Shelby County* the Supreme Court's earlier decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), where the Court held that Congress properly legislates within its Fourteenth Amendment

---

[7] In *Milligan*, the Court noted that the number of Section 2 decisions invalidating redistricting plans has declined, and observed that this shows how the results standard is appropriately tailored. 599 U.S. at 29. It follows that, even if the Secretary is correct about minority electoral success today, that simply indicates that Section 2 is properly targeted to those instances where a discriminatory result has occurred.

enforcement authority only when there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. But *Boerne* and its subsequent line of Supreme Court decisions have no relevance to this case.

As a threshold matter, Section 2 is a Fifteenth Amendment enactment and the *Boerne* test only addresses Congress's Fourteenth Amendment authority.

When the Supreme Court first undertook a review of the constitutionality of the Voting Rights Act and measured it against the Fifteenth Amendment, the Court held in *South Carolina v.* Katzenbach that "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." 383 U.S. at 324. This approach was reaffirmed by the Court in *City of Rome v. United States*, 446 U.S. 156, 175 (1980), where the Court held that "Congress's authority under §2 of the Fifteenth Amendment" is "no less broad than its authority under the Necessary and Proper Clause" (*citing McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)).

Thereafter, in *Boerne*, the Court determined that a further limitation was needed on Congress's Fourteenth Amendment enforcement authority and applied a test of "congruence and proportionality" instead of the rational basis standard. The Court was concerned that, without appropriate constraints, the Amendment's wide-ranging guarantees to "life, liberty, or property," U.S. Const. Amend. XIV, sec. 1,

could enable Congress to "displace[] laws and prohibit[] official actions of almost every description and regardless of subject matter." 521 U.S. at 532.

In contrast, the Fifteenth Amendment focuses narrowly and exclusively on racial discrimination in voting, and so the Court has not found it necessary to apply *Boerne* to Congress' Fifteenth Amendment enforcement authority. Thus, when the Court in *Shelby* County struck down Congress's 2006 extension of the Section 4 geographic coverage formula, it did so because it found that the reauthorization was "irrational." 570 U.S. at 556. Notably, *Shelby* did not even mention *Boerne*. And when the Court in *Milligan* reaffirmed the constitutionality of the results standard, it cited to *Katzenbach* and *Rome*, cases which, as noted, applied the rational basis test. *Milligan*, 599 U.S. at 41.

Moreover, even if the *Boerne* test applies to Fifteenth Amendment legislation, which it does not, *Boerne* and its progeny offer no support for the proposition that a statute that was constitutional when enacted may have its constitutionality reexamined thereafter due to the passage of time. *Boerne* addressed the original enactment in 1993 of the Religious Freedom Restoration Act of 1993. 521 U.S. at 511. Likewise, each of the subsequent Supreme Court cases that applied the *Boerne* test addressed the constitutionality of congressional statutes *ab initio*, *i.e.*, at the time

of their enactment.[8]   None of these cases involved a reexamination of the constitutionality of enactments previously determined to be constitutional.[9]

For both of these reasons, *Boerne* has no application here.

## II.    The Amici States' Effort to Remake the Section 2 Results Test, and Ignore Nearly 40 Years of Supreme Court Section 2 Precedent, Should Be Rejected

Amici States would have this Court reinvent the Section 2 results standard by exclusively relying on Supreme Court decisions that preceded its enactment in 1982, and ignoring the many post-enactment Supreme Court decisions specifying how the standard applies to redistricting plans.   Specifically, they claim that the results

---

[8] *Allen v. Cooper*, 589 U.S. 248 (2020) (Copyright Remedy Clarification Act of 1990); *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012) (plurality opinion) (self-care provision of the Family and Medical Leave Act of 1993); *Tennessee v. Lane*, 541 U.S. 509 (2004) (Title II of the Americans With Disabilities Act of 1990 as to disabled persons' access to the courts); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) (family care provision of the Family and Medical Leave Act of 1993); *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (Title I of the Americans With Disabilities Act of 1990); *United States* v. *Morrison, 529 U.S. 598* (2000) (Violence Against Women Act of 1994); *Kimel* v. *Florida Bd. of Regents,* 528 U.S. 62 (2000) (Age Discrimination in Employment Act, as amended in 1974); *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd,* 527 U.S. 627 (1999) (Patent Remedy Act of 1992). Several of these cases were initiated and decided many years after the challenged statute's enactment, however, the issue in each instance was still the statute's constitutionality at the time of enactment.

[9] This Circuit likewise has consistently applied *Boerne* to examine the constitutionality of Fourteenth Amendment statutes *ab initio*. *E.g.*, *Dupree v. Owens*, 92 F.4th 999 (2024) (Title V claims asserting a Title I right under the Americans With Disabilities Act of 1990); *In re: Employment Discrimination Litigation Against the State of Alabama*, 198 F.3d 1305 (1999) (Title VII of the Civil Rights Act of 1964).

standard is governed by *White v. Register*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and not by the Section 2 Supreme Court caselaw that began with *Thornburg v. Gingles* and has continued through to *Allen v. Milligan*.[10]

*White* and *Whitcomb* addressed whether the use of multimember districts violated the Fourteenth Amendment's Equal Protection Clause by minimizing or cancelling out minority electoral opportunity. *White* concerned elections for the Texas House of Representatives, and the earlier *Whitcomb* decision concerned Indiana legislative elections. Neither case addressed the Section 2 results standard since that standard did not exist in 1973 or 1971.

Amici States correctly note that the two decisions had a historical role in Congress's decision in 1982 to adopt the results standard, along with a third Supreme Court decision, *Mobile v. Bolden*, 446 U.S. 55 (1980). *Bolden* involved an Equal Protection challenge to at-large elections in Mobile, Alabama, and altered the standard for proving minority vote dilution, requiring proof of discriminatory purpose. *Gingles*, 478 U.S. at 35. Congress disagreed that vote dilution should require proof of intentional discrimination, *Gingles*, 478 U.S. at 43-44, and amended Section 2 to institute the results standard. In so doing, Congress looked back to

---

[10] The Secretary relies on *White* and *Whitcomb* for a different argument, that the results standard requires courts to decide whether racially polarized voting patterns are caused by racial animus or by political party preferences. Amici disagree but do not address this issue here.

*White* and other lower-court pre-*Bolden* caselaw to help fashion the basic parameters of the new standard. *Milligan*, 599 U.S. at 13; *Gingles*, 478 U.S. at 35.

This historical fact aside, the Supreme Court has for nearly 40 years fashioned a substantial body of caselaw that defines the metes and bounds of the results standard. As discussed above, *Gingles*, established the analytic framework for applying the results standard to redistricting, and the Supreme Court reaffirmed this framework in *Milligan* last year. *Gingles* did not base the Section 2 analytic framework on *White* and *Whitcomb*, and did not undertake to construe the results standard by parsing the manner in which *White* and *Whitcomb* had examined the electoral circumstances in Texas and Indiana in the early 1970s. Neither did the *Milligan* Court rely on *White* or *Whitcomb* to decide that Alabama's post-2020 congressional plan violated the results standard. 599 U.S. at 19-23.

Amici States cite no authority for the proposition that this Court may reach back to the 1970s to replace the *Gingles* framework with a *White*/*Whitcomb* construction. They point to a brief discussion of *White* in *Milligan*, but that merely consisted of the Court noting *White's* historical role. *Id.* at 13. They cite *Chisom v. Roemer*, 501 U.S. 380 (1991), but that case did not address what constitutes proof of a results violation (the issue was whether Section 2 applies to judicial elections). Lastly, they cite Justice O'Connor's opinion in *Gingles* concurring in the judgment, but that opinion is not controlling. Indeed, the Amici States inexplicably do not even

attempt to explain why this Court could or should ignore and replace the *Gingles* framework.

The magnitude of the Amici States' abandonment of Supreme Court precedent is underscored by the extremity of the analytic framework they claim *White* and *Whitcomb* established. They assert that Section 2 is not violated where minority voters are "allowed to register and vote, choose the party one desires to support, participate in its affairs, and have an equal vote when the party's candidates are chosen." Amici States Br. at 16. But this would entirely negate the question that Section 2, by its terms, poses: whether minority voters have an equal opportunity "to *elect* representatives of their choice" (not simply register to vote, cast ballots, and nominate preferred candidates in party primaries).

In sum, just as the Supreme Court in *Milligan* rejected "Alabama's attempt to remake [the Court's] §2 jurisprudence anew," *id.* at 23, this Court should reject the attempt in this litigation by Amici States (including Alabama) to invent a new and radically different Section 2 results standard.

## CONCLUSION

For these reasons, this Court should reject the Secretary's contention that the results standard of Section 2 of the Voting Rights Act, as applied to redistricting, is unconstitutional, and the Amici States' effort to rewrite the analytic framework for applying the results standard to redistricting.

Dated:  April 15, 2024

Respectfully submitted,

By:  /s/ Kurt Kastorf
**Georgia Bar No. 315315**
**KASTORF LAW LLP**
1387 Iverson St., Suite 100
Atlanta, GA  30307
(404) 900-0030
kurt@kastorflaw.com

Ezra D. Rosenberg
Julie M. Houk
M. David Rollins-Boyd*
Alexander S. Davis*
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
**LAWYERS' COMMITTEE FOR**
**CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, DC  20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Keith Harrison*
kharrison@crowell.com
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC  20004
Telephone: (202) 624-2500

/s/ Jack Genberg
Bradley E. Heard (Ga. Bar 342209)
Jack Genberg (Ga. Bar 144076)
Courtney O'Donnell (Ga. Bar 164720)
**SOUTHERN POVERTY LAW CENTER**
150 E Ponce de Leon Ave, Suite 340
Decatur, GA  30030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
bradley.heard@splcenter.org
jack.genberg@splcenter.org
courtney.odonnell@splcenter.org

Neil Steiner*
Andrew R. Stahl*
**DECHERT LLP**
Three Bryant Park,
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
neil.steiner@dechert.com
andrew.stahl@dechert.com

Vincent Montoya-Armanios*
**DECHERT LLP**
2929 Arch St.,
Philadelphia, PA 19104
Telephone: (215) 994-2307
vince.montoya-armanios@dechert.com

*Pro Hac Vice Pending*

# CERTIFICATE OF COMPLIANCE

1.  I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,011 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.  In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Kurt Kastorf*
Kurt Kastorf (Georgia Bar No. 315315)
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on April 15, 2024, I electronically filed this document using the

Court's CM/ECF system, which will serve all counsel of record.

*/s/ Kurt Kastorf*
Kurt Kastorf (Georgia Bar No. 315315)
Attorney for Plaintiffs